# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth (BAGLY); Callen-Lorde Community Health Center; Campaign for Southern Equality; Darren Lazor; Equality California; Fenway Health; Indigenous Women Rising; NO/AIDS Task Force (d/b/a CrescentCare); and Transgender Emergency Fund of Massachusetts,<br><br>          Plaintiffs,<br><br>     v.<br><br>United States Department of Health and Human Services; Alex M. Azar II, *in his official capacity as secretary of the U.S. Department of Health and Human Services*; Roger Severino, *in his official capacity as Director, Office for Civil Rights, U.S. Department of Health and Human Services*; and Seema Verma, *in her official capacity as Administrator for the Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services*,<br><br>          Defendants. | Civil Action No. 1:20-cv-11297 |

## AMENDED COMPLAINT

1.     The Department of Health and Human Services ("the Department" or "HHS") has promulgated a regulation that seeks to eliminate and undermine many protections against discrimination in healthcare, including on the basis of sex.  *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) (to be codified at 42 C.F.R. pts 438, 440, 460) ("the Rollback Rule").

2.      Although HHS cannot actually eliminate the statutory protections in Section 1557 of the Affordable Care Act ("ACA")—the nondiscrimination provision the Department purports to interpret—the Rollback Rule sows confusion and harms patients seeking care.

3.      The Department issued the Rollback Rule at a time when access to healthcare is vital—during a global COVID-19 pandemic that has already claimed nearly 200,000 lives in the United States.  The disease preys most on people with preexisting conditions and other risk factors, who tend to be members of marginalized groups that already face significant inequities and disparities in healthcare.  *See, e.g.*, APM Research Lab Staff, *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM Research Lab (June 24, 2020) (finding Black, Indigenous, Pacific Islander, and Latinx people disproportionately represented among COVID-19 deaths), https://bit.ly/38LrmTG; Jody L. Herman & Kathryn O'Neill, Williams Inst., UCLA Sch. Law, *Vulnerabilities to COVID-19 Among Transgender Adults in the U.S.* 1–2 (Apr. 2020) (finding transgender adults especially vulnerable), https://bit.ly/3eZqixD.

4.      The Department issued this rule at a time when, due to the pandemic, individuals in America are facing historic levels of unemployment and economic uncertainty, and the loss of access to healthcare that comes with it.  *See, e.g.*, Rakesh Kochhar, *Hispanic Women, Immigrants, Young Adults, Those with Less Education Hit Hardest by COVID-19 Job Losses*, Pew Research Ctr. (June 9, 2020), https://pewrsr.ch/3dRQ8lS.

5.      The Department issued this rule at a time when America is reckoning with its history of systemic racism and bias, an ongoing legacy that continues to play out in access to healthcare and other facets of American society.  *See, e.g.*, Austin Frakt, *Bad Medicine: The Harm That Comes From Racism*, N.Y. Times (Jan. 13, 2020), https://nyti.ms/3iFLZoS.

6.     This timing does not merely reflect an inexplicable policy choice; it manifests a disregard for the intent of the law and the weight of contrary legal authority.  The Department attempts to justify the rule based on its agreement with a single district court's interpretation that one ground of discrimination Section 1557 prohibits—"discrimination on the basis of sex"—does not include all forms of discrimination on the basis of sex, such as discrimination on the basis of transgender status.  Yet the Supreme Court confirmed in *Bostock v. Clayton County*—*before* the rule was promulgated—that this interpretation is wrong.  It held that "to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate . . . in part because of sex" in violation of Title VII.  140 S. Ct. 1731, 1743 (2020).  The Department does not acknowledge *Bostock*'s holding, much less provide justification for adopting a rule that flouts the Court's decision.

7.     The Rollback Rule repeals an implementing regulation issued only four years ago that clarified the non-discrimination protections in healthcare and the uniform standard for enforcement of those protections.  *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) (codified at 45 C.F.R. § 92 (2019)) (the "2016 Rule").  The Department acknowledges that health insurers and healthcare providers conformed their operations and policies to that rule.  *See* 85 Fed. Reg. at 37,225.  In rolling back nearly all of the 2016 Rule, the Department emboldens those who would discriminate and undermines Section 1557.  *See Grimm v. Gloucester Cty. Sch. Bd.,* No. 19-1952, 2020 WL 5034430, at *17 (4th Cir. Aug. 26, 2020), as amended (Aug. 28, 2020) (citing the rule as one of the "current measures and policies" that "continue to target transgender persons for differential treatment").

8.     The Rollback Rule starkly retreats from HHS's mission "to enhance and protect the health and well-being of all Americans" and its long history of combating discrimination,

protecting patient access to care, and eliminating health disparities. *See* U.S. Dep't of Health & Human Servs., *About HHS*, https://bit.ly/3eSoC9b (last visited September 12, 2020).

9.      The Rollback Rule will cause harms that undermine the purpose of Section 1557 of the ACA.  Section 1557, which the rule purports to implement, prohibits discrimination on several grounds: race, color, national origin, sex, age, and disability.  Its stated purpose is to reduce discrimination that leads to decreased access to healthcare and worsened health outcomes. Yet the rule permits and emboldens exactly that discrimination, which will undeniably cause harm.

10.      The Rollback Rule removes protections against discrimination based on gender identity and sex stereotyping, harming LGBTQ+ (lesbian, gay, bisexual, transgender, queer, intersex, or gender-non-binary) people.  Transgender patients in particular have reported being verbally and physically harassed, denied coverage of transgender-related care, and denied care for sex-specific services such as mammograms or screenings for urinary tract infections.  The rule not only eliminates explicit regulatory protections against such discrimination, it limits patients' ability to seek relief where discrimination occurs.

11.      The Rollback Rule emboldens discrimination based on pregnancy, false pregnancy, termination of pregnancy or recovery therefrom, and childbirth or related medical conditions.  It also specifically targets abortion by imposing religious and abortion exemptions. This will harm individuals who have had or are seeking abortion care, miscarriage management, or treatment for ectopic pregnancies.  Pregnant individuals already struggle to access reproductive healthcare needed to terminate a pregnancy or manage pregnancy complications because of refusals to provide care and stigma against abortion.  The rule will exacerbate these harms by sowing confusion about the protections against and remedies for discrimination.

12.     The Rollback Rule weakens language-access standards and removes requirements critical to providing healthcare for persons with limited English proficiency ("LEP").  These include requirements to provide key notices and short statements informing individuals of their right to language assistance and how to seek it in multiple languages—referred to as the notice and taglines requirement.  Absent these protections, LEP patients will struggle to navigate the complicated healthcare system, particularly when confronting medical or insurance terms.  The rule will harm people with LEP by worsening the barriers they face when seeking needed care.

13.     The Rollback Rule weakens enforcement of Section 1557.  Section 1557 borrows the prohibited grounds of discrimination from four cross-referenced civil rights statutes, and the 2016 Rule established a uniform enforcement system for discrimination on any of those grounds. In rescinding this system, the Rollback Rule requires protected and regulated entities alike to navigate a confusing multi-statute mix of legal standards and available remedies.

14.     The Rollback Rule's harms are magnified for those at the intersection of impacted communities, such as Black transgender women; disabled Latinx immigrants; or Indigenous pregnant people.  For example, the rescission of the enforcement system makes raising claims of intersectional discrimination more burdensome.

15.     Commenters put the Department on notice of these harms after it proposed the Rollback Rule.  *See* Nondiscrimination in Health and Health Education Programs or Activities, 84 Fed. Reg. 27,846 (proposed June 14, 2019) ("2019 Proposed Rule").  The vast majority, over 134,000, urged the Department not to adopt the rule.  These included many of the nation's most trusted medical associations, including the American Medical Association, the American Nurses Association, the American College of Obstetricians and Gynecologists, the American Academy of Pediatrics, the American Psychiatric Association, the American College of Emergency

Physicians, the Children's Hospital Association, and the Association of American Medical Colleges. They explained that the rule would encourage "implicit and explicit biases" that "negatively impact the quality of health care equity and patient safety." Am. Medical Ass'n, Comment Letter on 2019 Proposed Rule at 2, https://bit.ly/3ec6s0P.

16.     The Department promulgated the Rollback Rule anyway, leaving it almost wholly unchanged from the 2019 Proposed Rule.

17.     The Rollback Rule bears all the hallmarks of an unlawful agency action. It rests on erroneous interpretations of Section 1557's clear commands. It rescinds protections that just four years earlier the Department found necessary to address pervasive discrimination in the healthcare system without offering any reasoned basis for doing so or responding to comments explaining why it should not. The Department relies on an inaccurate measure of cost savings from eliminating just one narrow provision, the notice and taglines requirement, to justify the sweeping revisions. And it demonstrates animus towards transgender persons, continuing a pervasive pattern by the Trump Administration.

18.     Plaintiffs therefore bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, to set aside the rule as arbitrary and capricious, contrary to law, and in violation of the Constitution.

## PARTIES

### *Plaintiffs*

19.     Plaintiffs are a transgender man who regularly needs to access medical treatment, and uses health insurance coverage (Darren Lazor); three private healthcare facilities that serve LGBTQ+ people, including individuals and families with LEP (Fenway Health, Callen-Lorde Community Health Center, and NO/AIDS Task Force, d/b/a CrescentCare); four organizations that provide a wide range of services, such as facilitating access to healthcare and pregnancy-

related care to LGBTQ+ people, including individuals and families with LEP (The Boston
Alliance of Gay, Lesbian, Bisexual and Transgender Youth, Campaign for Southern Equality,
Indigenous Women Rising, and The Transgender Emergency Fund); and a membership
organization that advances the health and equality of LGBTQ+ people (Equality California).

20.     **Darren Lazor** is a transgender man who lives in Ohio who has experienced sex
discrimination—specifically discrimination based on his transgender status—in healthcare.

21.     For example, in 2012, Mr. Lazor sought treatment for symptoms that later turned
out to be caused by a large ovarian cyst.  Mr. Lazor was denied treatment on three successive
occasions when he tried to obtain care for his symptoms.  One physician had a receptionist call
Mr. Lazor prior to the appointment to say that the physician did not want to see him and thought
he should find another physician.  A second physician called Mr. Lazor prior to the appointment
and said that she had heard that Mr. Lazor had also been diagnosed with gender dysphoria, and
though she was willing to treat Mr. Lazor for his reproductive health issues, she would not be
willing to perform a hysterectomy to resolve his symptoms.  A third physician examined Mr.
Lazor and then said that, although a hysterectomy can be a treatment option for a person with
Mr. Lazor's symptoms, "I will never perform a hysterectomy on a young woman."  Only on his
fourth attempt at seeking care, at a facility outside his hometown, did Mr. Lazor finally find a
physician who was willing to treat him without limiting his treatment options on the basis of sex.

22.     In 2017, Mr. Lazor began experiencing shortness of breath as the symptom of a
recurring health condition and went to the emergency room closest to his home.  While there, the
hospital staff discriminated against him in several ways.  First, the staff misgendered Mr. Lazor
on the hospital bracelet as a female.  Second, the physician's assistant expressed disgust at the
surgery scars from Mr. Lazor's mastectomy when the physician's assistant was preparing Mr.

Lazor for an EKG.  The physician's assistant also refused to remove the EKG stickers from Mr. Lazor's chest, apparently because the physician's assistant did not want to touch Mr. Lazor. Finally, the physician told Mr. Lazor "we don't know how to treat you," then sent him away without any diagnosis or treatment plan.  Mr. Lazor was forced to deal with his symptoms on his own.  This experience caused Mr. Lazor to suffer physical and mental distress.

23.     Shortly thereafter Mr. Lazor filed a complaint with the hospital.  The hospital administration responded with a letter that merely acknowledged the existence of the complaint and did not indicate that the hospital would take any remedial action.

24.     Mr. Lazor has forgone further emergency care for fear of further discrimination. For example, in 2019, when he experienced another episode of acute shortness of breath, he refused to call (or permit others to call) an ambulance because he knew that the closest emergency room was in the hospital where he experienced discrimination in 2017.  He had no family members or friends who could drive him to another hospital.  Though he knew forgoing treatment could be risky, he also knew that he would not receive adequate medical treatment if he returned to the hospital where he had faced discrimination and been denied treatment.

25.     **Fenway Health** is a federally qualified health center whose mission is to provide healthcare to the LGBTQ+ community and to all people through access to highest quality health services, education, research, and advocacy.  Fenway Health aims to increase access to care for existing and new patients and to achieve greater racial and ethnic health equity in its community. Fenway Health serves more than 33,000 patients at its three Boston locations, including many who travel significant distances for care.  Through its telehealth program, it also serves patients who live outside of New England.  Fenway Health has already served more than 12,000 patients in 2020 through its telehealth program.  Fenway Health serves patients in more than twenty

states, including Maine, New Hampshire, Vermont, Florida, Kansas, South Carolina, Colorado, Illinois, Kansas, Michigan, Missouri, Ohio, Oregon, Texas, and Wisconsin.

26.     Fenway Health provides healthcare services to LGBTQ+ people.  Its *Transgender Health Program* provides hormone therapy; mental health services; drop-in social group activities for transgender and gender-non-binary people; and transgender suicide prevention programs, including a help line, a peer listening line, and anonymous referrals to therapy.  It also operates a *Transgender Youth Clinic* that provides gender-affirming treatment for transgender and gender diverse youth under age 18; a *Transgender Health Research Program* that conducts ground-breaking research to improve the health and well-being of all transgender people; a support group for transgender and gender-non-binary people; and drop-in consultations for parents and guardians of transgender and non-binary young people.

27.     Fenway Health also operates research, training, education, and policy programs. These develop clinical techniques, training materials, and model policies, and also provide training and technical assistance to health centers and HIV care providers across the nation to optimize access to quality healthcare for LGBTQ+ populations and people living with HIV.  For example, its *Evidence-Informed Interventions Coordinating Center for Technical Assistance* operates a federal grant that implements multi-site, evidence-informed interventions to improve health outcomes among people living with HIV, including LGBTQ+ people living with HIV.

28.     A significant part of Fenway Health's patient population is LGBTQ+:  About 42% have a sexual orientation other than heterosexual, and about 12% are transgender.

29.     Fenway Health's patients face steep barriers to advocating for themselves.  Even alleging discrimination on the basis of gender identity or sexual orientation is a barrier because it requires disclosing one's LGBTQ+ identity.  *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of*

*Health & Human Servs.*, No. CV 20-1630 (JEB), 2020 WL 5232076, at *22 (D.D.C. Sept. 2, 2020) ("[D]isclosure of transgender status" qualifies as a "hindrance to third-party patients' ability to protect [their] own interests" because of the substantial risk of stigma, discrimination and violence. (internal quotation marks omitted)).  Fenway Health's patients also face financial and language barriers.  About 36% of its patient population lives at or below the federal poverty line.  In 2019, it served 348 patients who were homeless.  In 2019, it served 1,212 patients who communicated best in a non-English language, 718 of whom used a translation service.

30.      Fenway Health asserts claims on behalf of itself, its patients, and other recipients of its services.

31.      **Callen-Lorde Community Health Center ("Callen-Lorde")** is a federally-qualified community health center whose mission is to provide sensitive, quality healthcare and related services targeted to LGBTQ+ people in the New York City area, regardless of their ability to pay.  It cares for nearly 18,000 patients each year at four New York City locations.  Through its telehealth program, it also provides direct health services to patients outside New York City, including patients who live in New Jersey and Connecticut.

32.      Callen-Lorde also provides an eConsult service to assist other clinicians with providing competent healthcare to transgender and gender-non-binary people around the nation.  The clinicians it serves through this eConsult service are almost entirely in community health centers, correctional facilities, or rural areas.  This program improves patient care quality and avoids unnecessary procedures and referrals as well as referrals to the wrong specialty.

33.      In addition to Callen-Lorde's primary care programs, Callen-Lorde also has direct services programs that are tailored to the needs of LGBTQ+ people.  For example, Callen-Lorde's *Health Outreach to Teens* is a welcoming, nonjudgmental, confidential program

designed specifically to meet the medical and mental health needs of LGBTQ+ adolescents and young adults ages 13–24, as well as other young people in need.

34.    Callen-Lorde's patient population is almost entirely LGBTQ+.  About 80% are lesbian, gay, bisexual, or identify as having a sexual orientation other than heterosexual, and about 24% are transgender.

35.    Callen-Lorde's patient population faces numerous barriers to advocating for themselves.  Its patient population has limited financial resources:  About 23% live at or below 150% of the federal poverty line, and about 14% are homeless or unstably housed.  About 26% are uninsured, and about 29% receive Medicaid or other income-based public insurance.  About 2.4% of its patients report that English is their second language.

36.    Callen-Lorde asserts claims on behalf of itself, its patients, and other recipients of its services.

37.    **NO/AIDS Task Force, d/b/a CrescentCare ("CrescentCare"),** is a federally qualified health center whose mission is to offer comprehensive health and wellness services to the community, to advocate empowerment, to safeguard the rights and dignity of individuals, and to provide for an enlightened public.  CrescentCare aims to increase access to care for existing and new patients and to work towards greater racial and ethnic health equity within its community.  In 2019, CrescentCare cared for almost 14,000 individuals at two New Orleans clinics.  It also served over 20,000 individuals through its testing and prevention programs and more than 3,500 individuals through its supportive services programs.  Many of CrescentCare's patients travel significant distances because of its reputation as a safe place for LGBTQ+ people to receive care.  In 2019, CrescentCare served patients from states including Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, and Texas.

38.     CrescentCare provides a number of health and wellness services.  In addition to providing comprehensive adult primary care, CrescentCare provides dentistry, obstetrics and gynecology, pediatrics, psychiatry, specialty care (including HIV, diabetes, and hepatitis C), preventive health, and sexual health services.

39.     CrescentCare provides a number of reproductive health and wellness services.  It offers mammograms, contraception, and obstetric and gynecological care, including Pap smears and pre- and post-natal care.  It provides sexual health services, such as testing and treatment for sexually transmitted infections, including HIV and hepatitis C.  It also provides medical case management for patients living with HIV who may have more complex medical issues, such as pregnancy, medication and treatment-adherence problems, or comorbidities.

40.     CrescentCare has a reputation across the southeast United States for being a welcoming healthcare provider for the LGBTQ+ community, people seeking reproductive care, and people with limited English proficiency.  It designs its services to be inclusive to LGBTQ+ people and families and has programs that specifically address the needs of LGBTQ+ patients. For example, its *Gender Clinic* provides gender-affirming primary care, hormone therapy, mental health services, and peer and group activities for over 1,000 transgender and gender-nonconforming people.  CrescentCare also operates the *Community Awareness Network Project*, a prevention program that provides HIV testing, sexually transmitted disease screenings, rapid hepatitis C testing and care coordination, and other services to the LGBTQ+ community.

41.     CrescentCare also provides support services.  These programs include insurance enrollment, case management, legal services, health education, outreach and education regarding discrimination and public benefits, food & nutrition services, housing assistance, and peer counseling.  CrescentCare runs a number of support groups for people living with HIV.

42.     CrescentCare also operates research, training, education, and policy programs. CrescentCare collaborates with other community health centers and providers to advance clinical service strategies that result in higher engagement with medical care and better health outcomes for its patient population.   For example, CrescentCare serves as a site for the *Transgender Women Engagement and Entry to Care Project*, an evidence-informed intervention that links transgender women to HIV care that is part of a multi-site intervention led by Fenway Health. CrescentCare also works closely with community advocates to ensure that its patients' interests are represented across relevant policy areas, including housing, nutritional support, and nondiscrimination protections.

43.     CrescentCare's patients face significant barriers to advocating for themselves. Many come from marginalized communities.   About 40% have a sexual orientation other than heterosexual, and over 7% are transgender.   Its patients also live with chronic illnesses and disabilities; for example, approximately 21% of its patients live with HIV and require regular access to care.   In 2019, about 48% of its patients lived below the poverty line, and 244 patients experienced homelessness.   About 35% of its patient population is uninsured, and about 36% receive Medicaid.   Many require language assistance:  In 2019, 1,086 CrescentCare patients were best served in a language other than English.

44.     CrescentCare asserts claims on behalf of itself, its patients, and other recipients of its services.

45.     The **Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth (BAGLY)** is a youth-led, adult-supported, social support organization committed to social justice and creating, sustaining, and advocating for programs, policies, and services for the LGBTQ+ youth community, serving over 2,500 youth annually.

46.     BAGLY serves the healthcare needs of LGBTQ+ youth in several ways.  Through The Clinic @ BAGLY, operated in partnership with Fenway Health, BAGLY provides screening for sexually transmitted infections; sexual healthcare through peer health education and a nurse; and referrals for primary healthcare, mental healthcare, and health insurance enrollment.  The Clinic @ BAGLY provides this important array of clinical services free of cost for LGBTQ+ people ages 29 and younger and does not require proof of insurance or identification.  Due to the accessibility of its services and its 40 years of work with LGBTQ+ communities in Boston, BAGLY has become known as a "safety-net" provider of services.

47.     BAGLY also provides direct healthcare services to LGBTQ+ youth under 25 through four free mental and behavioral health therapy programs, including a drop-in therapy program; group therapy; peer-led, adult-supported discussion groups focused on the unique challenges LGBTQ+ youth face when navigating the mental health system; and art therapy.

48.     BAGLY also sponsors monthly workshops on a variety of health education topics such as HIV prevention, transgender healthcare, and healthy relationships.  BAGLY additionally holds workshops teaching young LGBTQ+ people about their rights.

49.     BAGLY's service population faces significant barriers to advocating for themselves.  About 98.7% are lesbian, gay, bisexual, transgender, non-binary, or have a sexual orientation other than heterosexual, and about 60% are transgender and/or non-binary.  Over 35% are homeless, unstably housed, or financially struggling.  About 3% report that they have LEP.

50.     BAGLY's Sexual Health Clinic and Behavioral Health Services serve over 350 youth annually.  Of those, over 45% are transgender and/or non binary, meaning it services over

158 transgender and/or non binary youth annually.  Over 23% of these youth are homeless, unstably housed, or financially struggling.

51.     BAGLY asserts claims on behalf of itself, its patients, and other recipients of its services.

52.     The **Campaign for Southern Equality** is a nonprofit organization dedicated to advancing LGBTQ+ civil rights.  It is based in Asheville, North Carolina, and advocates on behalf of LGBTQ+ people and other marginalized groups throughout the South, focusing on North Carolina, South Carolina, Tennessee, Alabama, and Mississippi.  Its mission is to promote full LGBTQ+ equality—both legal and lived.

53.     The Campaign for Southern Equality has about 8,000 members throughout the nation.  Many members contribute financially to the Campaign for Southern Equality's work, but members who have limited financial resources may contribute by participating in the organization's programs.  The members help shape the organization's long-range goals and priorities, and direct the organization's mission and direction.

54.     About 40% of the Campaign for Southern Equality's work focuses on LGBTQ+ persons' access to healthcare.  It increased its healthcare-related work, which previously made up approximately 30% of its work, in response to its membership's clear need for safe and affirming healthcare and for combatting pervasive barriers to such care.  The most common barriers members report include absence of transgender-friendly primary care, specialty care, and mental health services in their local communities.  This includes families with transgender youth who need trans-affirming pediatric care.  Members also report barriers to navigating insurance denials and coverage.

55. When members contact the Campaign for Southern Equality about health insurance denials for gender-affirming care, its staff frequently provides advocacy and healthcare navigation and/or referrals to attorneys who specialize in health insurance appeals.

56. The Campaign for Southern Equality facilitates access to healthcare for LGBTQ+ people through cultural competency trainings for healthcare service providers. In a number of these trainings, the Campaign for Southern Equality has used materials prepared by HHS about the providers' obligations to provide safe and affirming care to LGBT Southerners. The Campaign for Southern Equality also provides *Pop-Up Resource Clinics* that educate LGBTQ+ people about their rights, including in the healthcare context, instructing them, for example, how to address discrimination in healthcare settings and how to write a healthcare power of attorney.

57. The Campaign for Southern Equality produces *Trans in the South: A Guide to Resources and Services*, a regularly updated, bilingual (Spanish and English) directory of more than 400 Southern health service providers—including mental health providers, primary care physicians, HIV care specialists, and endocrinologists—whom Campaign for Southern Equality staff has confirmed are willing and competent to provide gender-affirming care. *Trans in the South* collects information regarding, among other things, what type of gender-affirming services the provider offers, what pre-requisites a patient must meet in order to receive gender-affirming services, whether the provider serves Spanish-speaking populations, where the provider is located, how the provider can be contacted, and whether the provider is likely to take on new patients within the next six months.

58. Producing *Trans in the South: A Guide to Resources and Services* is a resource-intensive task because the Campaign for Southern Equality must vet each provider. That task is made particularly time-consuming because the guide focuses on rural areas and states that lack

16

protections for LGBTQ+ people in the healthcare context, meaning that providers who offer gender-affirming care are few and far between and staff members must devote a significant amount of time attempting to locate and vet those providers. Community members may request to have a provider vetted and healthcare providers may also request to be vetted.

59.     The Campaign for Southern Equality uses *Trans in the South*, and the research behind it, to provide information about healthcare providers and healthcare resources to the Campaign for Southern Equality's members.

60.     The Campaign for Southern Equality asserts claims on behalf of itself and its members.

61.     **Indigenous Women Rising** is a Native-led and Native-centered reproductive justice collective that uplifts Indigenous-led community organizing and ensures reproductive justice movements are inclusive of Indigenous people and families. Its mission is to honor Native and Indigenous people's inherent right to equitable and culturally safe health options through accessible health education, resources, and advocacy. Indigenous Women Rising provides support for Indigenous people who can become pregnant in accessing healthcare, focusing primarily but not exclusively on three main projects: an Abortion Fund, a Midwifery Fund, and a sex education program.

62.     The Abortion Fund is open to all Indigenous people in the United States and Canada who have the capacity to become pregnant and are seeking an abortion in the United States. The fund helps Indigenous people pay for abortion care by paying clinics for the procedure and by providing clients the necessary funds to cover lodging, gas, food, childcare, and related travel expenses. The fund also provides critical information about pregnancy options and abortion care that is often not otherwise available.

63.     The Abortion Fund serves clients who face financial, linguistic, and geographic barriers to care and who face stigma in accessing abortion care.  Many of the Abortion Fund's clients come from traditional Native communities and live in rural areas, usually on reservations.  About half of the fund's clients must drive distances from over 2 hours to about 10 hours to access abortion care.  And most of the fund's clients have limited financial resources and are either uninsured or lack insurance coverage of abortion.  Some will be alone when obtaining abortion care, or do not have a support system at home or in their communities.  Many others are represented by elders, for whom English is not their first language—it is common for grandparents to raise grandchildren in Native communities because federal policy towards Native communities has led to high rates of unemployment, substance abuse, and serious illnesses.

64.     Indigenous Women Rising launched a Midwifery Fund in May 2020 to help Indigenous people access nondiscriminatory and culturally competent pregnancy-related care.  This fund responds to longstanding and pervasive discrimination against Indigenous people who can become pregnant when they seek care for pregnancy and reproductive health.  The fund provides families in New Mexico with up to $10,000 to help pay for midwifery care, doula care, and supplies.  Birth attendants such as midwives and doulas can safeguard against discrimination by other providers based on both sex and race.  The fund also provides information on midwives in their community who will suit patients' needs, such as insurance coverage, fee structure, experience with Indigenous patients, lincensure, and professional insurance.  The fund is currently compiling a referral network for that purpose.

65.     Indigenous Women Rising runs *NDN Sex Ed*, a program that engages with Native caretakers and families, schools, agencies, and other entities to provide culturally competent sexual education.

66.     Indigenous Women Rising's clients face steep barriers to advocating for themselves.  Legal claims related to abortion bring stigma, invasion of privacy, and risk of retaliation.  *See Singleton v. Wulff*, 428 U.S. 106, 117 (1976) ("obstacles" to asserting abortion rights include "a desire to protect the very privacy of her decision from the publicity of a court suit"); *accord June Med. Servs. L.L.C. v. Russo*, 140 S.Ct. 2103, 2118 (2020) (plurality op.) (reaffirming third-party provider standing on this basis).  Those barriers are compounded for Indigenous women by centuries of colonization trauma and financial, geographic, and linguistic difficulties.

67.     Indigenous Women Rising asserts claims on behalf of itself and the recipients of its services.

68.     The **Transgender Emergency Fund** is a nonprofit organization that seeks to promote the health and equality of transgender people and provides critical financial support and other assistance to low-income and homeless transgender people in Massachusetts.

69.     The Transgender Emergency Fund serves the healthcare needs of transgender people in multiple ways.  It provides financial assistance to transgender people for co-payments for hormone replacement therapy, provides referrals for medical care and transportation and escort to medical appointments, and assists clients who have been denied insurance coverage for needed care in navigating those denials with their health plans.  It also promotes the health and equality of transgender people in other ways, including by providing financial assistance for basic necessities, home rental startup costs, and assistance with relocating due to harassment.

70.     The Transgender Emergency Fund serves people who face significant barriers to advocating on their own behalf.  The recipients of its services are all transgender or gender-nonconforming:  About 85% are transgender, and about 15% are non-binary.  The recipients of its services have limited financial resources.  About 60% of the recipients of the Transgender Emergency Fund's services are homeless, about 20% are at or near the federal poverty line, and about 20% are low income.  About 15% of the recipients of the Transgender Emergency Fund's services are uninsured.  Among those with insurance, 83% have Medicaid, MassHealth, or other public insurance.  About 6% have LEP.

71.     The Transgender Emergency Fund asserts claims on behalf of itself and the recipients of its services.

72.     **Equality California** is a non-profit civil rights and social justice membership organization advocating locally, statewide, and nationally on behalf of LGBTQ+ people and marginalized groups to which LGBTQ+ people belong.  Equality California's mission is to bring the voices of LGBTQ+ people and allies to institutions of power in California and across the United States, striving to create a world that is healthy, just, and fully equal for all LGBTQ+ people.  Equality California is dedicated to combatting discrimination and injustice on the basis of sexual orientation and gender identity, and to protecting the fundamental rights of those within the LGBTQ+ community and the vulnerable communities of which they are a part.

73.     Equality California has more than 500,000 members.  The majority of Equality California's members reside in California, but it has members throughout the nation.

74.     Equality California's members include people who contribute financially to the organization and who support and participate in its education, mobilization, and advocacy work.

75.     Equality California regularly conducts surveys, holds town hall meetings, and hosts conferences to understand the needs of the broader LGBTQ+ community, including its members.  Its members' participation in these surveys, town hall meetings, and conferences, informs and shapes the mission and direction of Equality California and its programs.

76.     Equality California works to increase access to quality, affordable healthcare for LGBTQ+ people—and the diverse communities to which LGBTQ+ people belong—through education, mobilization and advocacy.  Equality California has several programs to advance the healthcare of LGBTQ+ people in California and nationwide.  For example, through the *Health Happens with Equality* program, Equality California has trained over 2,800 healthcare providers and health clinic staff across California, Nevada, and Arizona, empowering them to provide culturally competent quality care to LGBTQ+ patients.  The curriculum includes educational context about basic LGBTQ+ terminology, data on health disparities that affect the LGBTQ+ community, what it means to be LGBTQ+, HIV/AIDS, Pre-Exposure Prophylaxis (PrEP), transgender health issues, and creating a welcoming environment as a healthcare provider.  Through the *Take It: I'm PrEP'd* campaign, Equality California works to educate the LGBTQ+ community and healthcare providers on the availability and benefits of PrEP and other forms of HIV treatment and prevention.  Equality California also has recently launched a COVID-19 Online Help Center and Help Line to connect LGBTQ+ Californians impacted by the crisis with LGBTQ+ friendly resources and support services.

77.     Equality California asserts claims on behalf of its members, including Darren Lazor.

Case 1:20-cv-11297-PBS   Document 18   Filed 09/18/20   Page 22 of 107

*Defendants*

78.     Defendant United States Department of Health and Human Services is a cabinet-level department of the federal government headquartered in the District of Columbia.  HHS issued the Rollback Rule.  HHS is an "agency" under 5 U.S.C. § 551(1).

79.     Defendant Alex Azar is sued in his official capacity as Secretary of HHS. Secretary Azar is responsible for implementing and fulfilling HHS's duties under the United States Constitution and the APA.

80.     Defendant Roger Severino is sued in his official capacity as the Director of the Office for Civil Rights ("OCR") at HHS.  He is responsible for the operation and management of OCR, including the adoption, administration, and enforcement of the Rollback Rule.  OCR is responsible for enforcing civil rights laws such as Section 1557.

81.     Defendant Seema Verma is sued in her official capacity as the Administrator for the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.  She is responsible for the operation and management of CMS, including the adoption, administration, and enforcement of the Rollback Rule as it pertains to regulations relating to the establishment and operation of the ACA marketplace; the marketing and design practices of health insurance issuers under the ACA; the administration, marketing, and enrollment practices of Qualified Health Plans ("QHPs") under the ACA; beneficiary enrollment and the promotion and delivery of services under Medicaid; and the delivery of services under the Programs for All-Inclusive Care for the Elderly ("PACE").

## JURISDICTION AND VENUE

82.     This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331, because this case arises under the United States Constitution

and the APA, 5 U.S.C. § 701 *et seq.*, and challenges final agency action for which there is no

other adequate remedy, 5 U.S.C. § 704.

83.     The Court has the authority to issue declaratory and injunctive relief under the

Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the APA, 5 U.S.C. § 701 *et seq.*

84.     Defendants are subject to suit in any federal jurisdiction in challenges to federal

regulations, and no real property is involved in this action.  28 U.S.C. § 1391(e)(1).

85.     Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(b) and

(e)(1) because at least one Plaintiff is based in this District, Defendant HHS is an agency of the

United States, and Defendants Azar, Severino, and Verma are officers of the United States sued

in their official capacities.

## FACTUAL ALLEGATIONS

### A.  Legal And Factual Background

#### 1.  Congress enacts Section 1557 of the ACA.

86.     In 2010, Congress adopted the ACA.  Pub. L. No. 111-148, 124 Stat. 119.  The

law's purpose is "to increase the number of Americans covered by health insurance and decrease

the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538–539 (2012).

One of the ACA's primary objectives is to improve health outcomes by ensuring that health

services are available on a nondiscriminatory basis to all individuals throughout the country.

87.     At the time of the ACA's enactment, there was clear evidence that discrimination

on the basis of sex was impeding access to insurance and care, leading directly to decreased rates

of health insurance coverage and increased healthcare costs.

88.     Before the ACA, health insurers regularly targeted women, pregnancy-related

care, and transgender-related care for denials of coverage.  For example, insurers rejected health

coverage for a variety of "preexisting conditions" tied to pregnancy, such as a prior pregnancy or

Cesarean delivery. *See* National Women's Law Center, Comment Letter on 2019 Proposed Rule at 2 (Aug. 13, 2019) ("NWLC Comments"), https://bit.ly/2Zsrl2s. Insurers also deemed aspects of a person's history that disproportionately affect women, such as prior medical treatment for domestic or sexual violence, to be preexisting conditions. *See id.* And insurers charged women more for the same coverage, even when a plan excluded maternity coverage. *See id.* Insurers also deemed gender dysphoria to be a preexisting condition. *See* Transgender Law Center, Transgender Health Benefits Negotiating for Inclusive Coverage 5 (last visited July 7, 2020), https://bit.ly/3gKG8gh. Plans regularly denied coverage for and contained discriminatory benefit designs that targeted transgender people, including categorical exclusions of transgender-related care. *See* Jacobs Inst. of Women's Health, Comment Letter on 2019 Proposed Rule at 2–3, (Aug. 13, 2019) ("Jacobs Inst. Comments"), https://bit.ly/2ZyhubI; *cf.* Transgender Law Center, Comment Letter on 2019 Proposed Rule at 3 (Aug. 13, 2019) ("TLC Comments"), https://bit.ly/1557TLCtr; Transgender Legal Defense & Education Fund, Comment Letter on 2019 Proposed Rule at 19 (Aug. 13, 2019) ("TLDEF Comments"), https://bit.ly/3irQvqF.

89.     Similarly, healthcare providers regularly discriminated against women, including in reproductive and pregnancy-related healthcare. For example, healthcare providers have long dismissed women's pain, refused to prescribe needed pain medication, or insisted women's symptoms are influenced by emotional distress. *See* Diane E. Hoffman & Anita J. Tarzian, *The Girl Who Cried Pain: A Bias Against Women in the Treatment of Pain*, 29 J. L, Med. & Ethics 13, 17–18 (2001). Healthcare providers commonly discriminated against people seeking reproductive healthcare and pregnancy-related care. For example, providers have invoked personal beliefs to deny access to services including contraception, sterilization, fertility treatments, and abortion. *See* NWLC Comments at 8. Patients have also been denied care or

received substandard care for pregnancy complications, even in emergencies where their life or health is at risk, because of providers' personal beliefs. *See, e.g.*, *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 222–223 (3d Cir. 2000). And providers do not fully inform patients about pregnancy options. *See* Kelsey Holt et al., *Pregnancy Options Counseling and Abortion Referrals Among US Primary Care Physicians: Results From a National Survey*, 49 Fam. Med. 27, 530–531 (2017), https://bit.ly/3kn1l1F.

90.     Healthcare providers regularly discriminated against LGBTQ+ people. A 2010 survey reported that 70% of transgender and gender-non-binary people, and 56% of lesbian, gay, and bisexual people, reported discrimination such as being refused needed care, being blamed for their health status, or providers being physically rough or abusive. *See* Planned Parenthood Fed'n of Am., Comment Letter on 2019 Proposed Rule at 7 (Aug. 13, 2019) ("Planned Parenthood Comments"), https://bit.ly/3eSHncy.

91.     Discrimination was—and still is—compounded for Black, Indigenous, and other women of color, who face a legacy of forced sterilization, coerced contraception, non-consensual experimentation, and continued lack of access to coverage and care. *See* Cynthia Prather et al., *Racism, African American Women, and Their Sexual and Reproductive Health: A Review of Historical and Contemporary Evidence and Implications for Health Equity*, 2 Health Equity 249, 251–252 (2018); U.S. Nat'l Library of Medicine, *1976: Government Admits Unauthorized Sterilization of Indian Women*, https://bit.ly/3bzD9pz; Rachel Benson Gold, *Guarding Against Coercion While Ensuring Access: A Delicate Balance*, 17 Guttmacher Inst. 8, 10–11 (2014), https://bit.ly/3jVUXy6; Kari Paul, *ICE Detainees Faced Medical Neglect and Hysterectomies, Whistleblower Alleges*, The Guardian (Sept. 14, 2020), https://bit.ly/2ZE1Psf. Women of color––particularly Black women—have also faced arrest, civil commitment, forced medical

interventions, and other deprivations of their liberty and bodily autonomy while pregnant, as well as punishment for abortion, miscarriage, and stillbirths.  *See* Lynn M. Paltrow & Jeanne Flavin, *Arrests of and Forced Interventions on Pregnant Women in the United States, 1973–2005: Implications for Women's Legal Status and Public Health*, 38 J. Health Politics, Policy & L. 299, 300–301, 311–312 (2013).

92.     Recognizing that discrimination posed a significant barrier to the ACA's goals, Congress enacted provisions in the ACA that sought to address the widespread discrimination— particularly sex discrimination—in healthcare and health insurance that prevented many from accessing healthcare and insurance coverage.  *See, e.g.*, 156 Cong. Rec. H1582 (daily ed. Mar. 17, 2010) (statement of Rep. Schakowsky) ("This bill ends gender discrimination.").

93.     One is Section 1557, which provides protections against discrimination in healthcare and health insurance.  *See* 156 Cong. Rec. S1842 (daily ed. Mar. 23, 2010).[1]

94.     Specifically, Section 1557 states that, "except as otherwise provided" in Title I of the ACA, "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance," based "on the ground prohibited under" four cross-referenced statutes.  42 U.S.C. § 18116(a).

95.     The grounds prohibited under those four statutes are "race, color, or national origin," *id.* § 2000d (Title VI of the Civil Rights Act of 1964); "sex" 20 U.S.C. §§ 1681(a), 1684

---

[1] The ACA included other important provisions enacted specifically to correct insurance practices that discriminated on the basis of sex either on their face or in effect. *See, e.g.*, 42 U.S.C. § 300gg(a) (allowing health insurance issuers to charge premium rates based on family size, tobacco use, geographical area, and age, but not based on gender); *id.* § 300gg-3 (prohibiting preexisting condition exclusions); *id.* § 300gg-13(a)(4) (requiring coverage of preventive care and screenings for women); *see also* 45 C.F.R. § 147.104(e) (prohibiting discrimination in marketing and benefit design, including on the basis of sex).

(Title IX of the Education Amendments of 1972); "age," 42 U.S.C. § 6101 (Age Discrimination Act of 1975); and "disability," 29 U.S.C. § 794 (Section 504 of the Rehabilitation Act).

96.     Section 1557's discrimination prohibitions apply to "any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under" the ACA.  42 U.S.C. § 18116(a).

97.     Section 1557 states that the "enforcement mechanisms provided for and available under" the cross-referenced statutes "shall apply for purposes of violations of" Section 1557.  *Id.*

98.     The day the ACA passed, Senator Patrick Leahy stated that its "explicit[] prohibit[ion]" of "discrimination on the basis of race, color, national origin, sex, disability or age in any health program or activity receiving Federal funds" was "necessary to remedy the shameful history of invidious discrimination and the stark disparities in outcomes in our health care system" and "ensure that all Americans are able to reap the benefits of health insurance reform equally without discrimination."  156 Cong. Rec. S1842 (daily ed. Mar. 23, 2010).

99.     Section 1557 was the first federal law to broadly prohibit sex discrimination in healthcare, and its inclusion in the ACA was a watershed moment.  *See Fact Sheet: Nondiscrimination in Health Programs and Activities Proposed Rule*, U.S. Dep't Health & Human Servs., (last updated Nov. 12, 2015), https://bit.ly/3ioTeBk.

### 2.  Section 1557 is used to combat sex discrimination in healthcare.

100.    Following passage of the ACA, Section 1557 led to some progress in combatting the widespread discrimination in healthcare.

101.    Under Section 1557, OCR remedied discrimination against transgender persons. *See OCR Enforcement Under Section 1557 of the Affordable Care Act Sex Discrimination Cases*, U.S. Dep't Health & Human Servs. (last updated May 16, 2016), https://bit.ly/2NVdmgj.

a)     OCR entered into an agreement with a hospital in Brooklyn to resolve a discrimination complaint that the hospital housed a transgender woman in a double-occupancy patient room with a male occupant.  *See id.*

b)     OCR investigated the discriminatory exclusion of transgender women from a CDC-funded mammogram program, resulting in the CDC issuing new guidance clarifying that transgender women can participate in the program.  *See id.*

c)     After an OCR complaint, a transgender person who was initially denied coverage by his insurer for transgender-related surgery was able to obtain coverage.  *See id.*

d)     After OCR investigated a complaint from a man repeatedly harassed regarding his feminine gender expression by a private medical transportation provider, staff was trained on appropriate terminology and avoiding sex stereotyping.  *See id.*

102.    OCR also enforced Section 1557 to address discrimination against people seeking pregnancy-related care.  For example, it investigated and addressed discriminatory policies that barred insurance coverage for maternity care for employees' dependents.  *See* Press Release, Nat'l Women's Law Ctr., *Victory in Sex Discrimination Complaints Brought by NWLC: After Investigation by HHS, Employers Change Policies* (Jan. 26, 2017) (discussing complaints filed with OCR in 2013), https://bit.ly/2YVlIuI.

103.    Under Section 1557, OCR also remedied language-access discrimination.  *See Enforcement Success Stories Involving Persons With Limited English Proficiency*, U.S. Dep't Health & Human Servs. (last updated Jul. 26, 2013), https://bit.ly/2O5LJ4a.

a)     OCR entered into agreements with multiple state and local departments of health after allegations that the departments had failed to ensure that those with LEP had access to the departments' programs and services.  *See id.*

b)     OCR also investigated and resolved complaints that health providers across the country were not providing LEP services.  *See id.*

c)     OCR secured corrective action from Medco Health Solutions, Inc., the nation's largest mail-order pharmacy, related to allegations that the company failed to provide LEP members with meaningful access to pharmacy services.  *See id.*

104.    States adjusted their policies to align with Section 1557.  Connecticut, for instance, referenced Section 1557 when it issued a bulletin requiring issuers to remove age limits

from infertility benefits.  *See* NWLC, *Connecticut Ends Discriminatory Limit on Infertility Coverage* (Aug. 14, 2015), https://bit.ly/3gIen83.

105.    Direct suits under Section 1557 challenged discriminatory insurance benefit plan designs that excluded coverage for transition-related care, including in Medicaid and state employee health benefit plans.  *See e.g.*, *Kadel v. Folwell*, No. 1:19-cv-272-LCB-LPA, 2020 WL 1169271, at *7, *9 (M.D.N.C. Mar. 11, 2020); *Flack v. Wis. Dep't of Health Servs.,* 395 F. Supp. 3d 1001, 1015–19 (W.D. Wis. 2019); *Boyden v. Conlin,* 341 F. Supp. 3d 979, 997 (W.D. Wisc. 2018); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018); *Cruz v. Zucker*, 195 F. Supp. 3d 554, 581 (S.D.N.Y.), *on reconsideration*, 218 F. Supp. 3d 246 (S.D.N.Y. 2016).

106.    Nonetheless, discriminatory practices and bias in healthcare and health insurance have persisted against LGBTQ+ people, women, and people who can become pregnant.

107.    A national survey conducted in the summer of 2015 found that 25% of transgender people surveyed reported insurance-related discrimination over the past year, such as being denied coverage for transgender-related care or for routine care because they were transgender; 33% reported having a negative experience related to being transgender, such as being refused treatment, verbally harassed, or physically or sexually assaulted, or having to teach the provider about transgender people to get appropriate care.  *See* Sandy E. James, et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 10 (Dec. 2016), ("Transgender Survey"), https://bit.ly/3ir2gha; *accord* Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People From Accessing Healthcare*, Ctr. for Am. Progress (Jan. 18, 2018), https://ampr.gs/38pGwNZ.  Because of this discrimination, 23% reported that they did not see a doctor when they needed care for fear of future discrimination.  *See* Transgender Survey at 10.

108.    Some health plans, notably in the public sector, continued to exclude transgender-related healthcare altogether.  *See, e.g.*, *Kadel*, 2020 WL 1169271 at *7, *9.

109.    This discrimination has led to the death of transgender people.  *See, e.g.*, Bensonhurst Bean, *EMS Denied Transgender Patient Care Causing Her Death, Alleges Sheepshead Bay Lawyer*, Blkyner (Apr. 2, 2013), https://bit.ly/3e4arfY.

110.    Lesbian, gay, and bisexual patients also reported high levels of discrimination. Fifty-six percent reported being refused needed care.  These reports included providers who refused to touch these patients, and those who used excessive precautions, harsh or abusive language, were physically rough or abusive, or blamed these patients for their health status.  *See* Lambda Legal, *When Health Care Isn't Caring* 10 (July 31, 2014), https://bit.ly/2D297xf.

111.    Women, likewise, have experienced persistent discrimination in healthcare settings.  In a 2017 study, roughly 18% of women reported experiencing discrimination when seeking care from a doctor or health clinic.  *See* NPR, Robert Wood Johnson Found. & Harv. T.H. Chan. Sch. Pub. Health, *Discrimination in America: Experiences and Views of American Women* 7 (Dec. 2017), https://bit.ly/3ivlFxm.  Women of color were especially likely to confront discrimination: 22% of Black women, 20% of Latina women, and 29% of Native women reported that they experienced discrimination when seeking care from a doctor or clinic.  *See id.* at 15, 17, 21.

112.    This discrimination has resulted in delays of care.  Nine percent of women reported avoiding visiting a doctor or seeking healthcare for themselves or other family members for fear of discrimination or poor treatment because they are women. *See id.* at 10.  Women of color were especially likely to experience delayed care: 12% of Black women, 19% of Latina women, and 27% of Native women have reported avoiding visiting a doctor or seeking

healthcare for themselves or other family members for fear of discrimination or poor treatment. *See id.* at 15, 17, 21.   The numbers are similar for LGBTQ+ women, 20% of whom report avoiding the doctor for fear of discrimination.  *See id.* at 13.

113.    Patients have also faced national origin discrimination.   Communication barriers between LEP patients and their providers created a heightened risk of poor health outcomes. National Health Law Program, Comment Letter on 2019 Proposed Rule at 27 (Aug. 13, 2019) ("NHeLP Comments"), https://bit.ly/3gm1VdF.   As the National Health Law Program pointed out in its comments on the 2019 Proposed Rule, "patients lost their lives and suffered irreparable harm due to language barriers and the failure to provide appropriate language services."  *Id.* at 28.

114.    Race intensifies the effects of discrimination on the basis of sex.  For example, a survey found that in 2015, 34% of white transgender people had negative experiences with a healthcare provider, ranging from unnecessary and invasive questions to physical attacks. Transgender Survey at 97.  That figure jumped to 50% for those who are American Indian, 40% for those who are Middle Eastern, and 38% for multiracial transgender respondents.  *See id.*

115.    Racial and national origin discrimination also compounds the harm of pregnancy discrimination.  For example, a hospital in Albuquerque, New Mexico recently racially profiled pregnant people who appeared to be Native, subjecting them to testing for COVID-19 regardless of whether they were symptomatic and separating Native newborns from their parents until the results came back, up to three days.  *See* Bryant Furlow, *A Hospital's Secret Coronavirus Policy Separated Native American Mothers From Their Newborns*, ProPublica (June 13, 2020), https://bit.ly/332rTxY.   And a recent whistleblower complaint alleges a pattern of coercive sterilizations of immigrant women without informed consent at an immigration detention facility

in Georgia. *See* Compl. to OIG, Dep't of Homeland Sec'y at 18–20 (Sept. 14, 2020), https://bit.ly/3hytwZE.

116. National origin also compounds the intersectional discrimination on the basis of sex. In 2009, 18% of LGB immigrants reported denials of fertility services, compared to 14% of non-immigrant LGB respondents. Lambda Legal, *When Health Care Isn't Caring: LGBT Immigrants and Immigrants Living With HIV* at 1, https://bit.ly/2VZb4Br (last visited July 7, 2020) ("Lambda Immigration Survey"). Over 14% of LGB immigrants disclosed that healthcare professionals refused to touch them or used excessive precautions when treating them, compared to 10% of non-immigrant LGB survey respondents. *See id.* And as to nearly every type of discrimination, LGB immigrants of color were more likely to experience discrimination than either white LGB immigrants or LGB people of color who were not immigrants. *See id.*

### 3. HHS promulgates rules implementing Section 1557 in 2016.

117. Against this backdrop, in 2016 HHS exercised its authority under Section 1557 to "promulgate regulations to implement this section." 42 U.S.C. § 18116(c).

118. Recognizing that many "continue to experience discrimination in the health care context," in May 2016, after extensive public comment and consideration, including numerous stakeholder meetings and two comment periods that generated over 25,000 comments, HHS published a final rule implementing Section 1557. OCR's "intent" was "to provide consumers and covered entities with a set of standards that will help them understand and comply with the requirements of Section 1557," bearing in mind the "purposes of the ACA and Section 1557—to expand access to care and coverage and eliminate barriers to access." 2016 Rule, 81 Fed. Reg. at 31,377. OCR noted the government's "compelling interest in ensuring that individuals have nondiscriminatory access to healthcare and health coverage." *Id.* at 31,380.

119.    The 2016 Rule clarified the scope of Section 1557 and committed HHS to enforcing its prohibitions.

120.    The 2016 Rule included several specific definitions of the grounds of discrimination prohibited under Section 1557 to provide clarity for subject entities and the public, including age, disability, and national origin.  *Id.* at 31,466–467.

121.    It also included specific prohibitions against discrimination in health insurance or other health coverage based on sex, race, color, national origin, age, and disability.  *Id.* at 31,471 (codified at 45 C.F.R. § 92.207(a) (2019)).  Specifically, it prohibited discriminatory denials or restrictions of health coverage, denial of claims, and imposition of cost-sharing.  *Id.* (codified at 45 C.F.R. § 92.207(b)(1) (2019)).  It also prohibited discriminatory marketing practices and benefit design in health plans. *Id.* (codified at 45 C.F.R. § 92.207(b)(2) (2019)).

122.    The 2016 Rule standardized enforcement mechanisms for discrimination in federally funded healthcare programs and activities.  This was particularly important to provide effective redress for claims of intersectional discrimination.  *See* Lambda Immigration Survey at 2 ("[I]t is impossible to separate different types of discrimination and oppression because they intersect and interact to create, sustain or deepen negative outcomes.").

123.    <u>Definitions of, and prohibitions on, discrimination on the basis of sex</u>:  The 2016 Rule defined Section 1557's prohibition on discrimination "[o]n the basis of sex" to include, but not be limited to, "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."  81 Fed. Reg. at 31,467 (codified at 45 C.F.R. § 92.4 (2019)).  The 2016 Rule thus clarified the scope of sex discrimination in Section 1557, consistent with the Supreme Court's holding in *Bostock*.  *See* 140 S. Ct. at 1739.

33

124.     This was consistent with an earlier HHS interpretation of Section 1557 stating that its sex discrimination prohibition applies "to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and will accept such complaints for investigation."  Letter from Leon Rodriguez, Dir., U.S. Dep't of Health & Human Servs., Office for Civil Rights to Maya Rupert, Fed. Policy Dir., Nat'l Ctr. for Lesbian Rights 1 (July 12, 2012), https://bit.ly/3iv7bxt; *see also* Rollback Rule, 85 Fed. Reg. at 37,191.

125.     The 2016 Rule recognized that Section 1557 not only prohibits intentional discrimination on the basis of sex, but also conduct, policies, and practices "that have the effect of subjecting individuals to discrimination on the basis of sex," that is, disparate impact sex discrimination.  81 Fed. Reg. at 31,470 (codified at 45 C.F.R. § 92.101(b)(3)(ii) (2019)).

126.     HHS defined discrimination on the basis of sex to include pregnancy-based discrimination because Section 1557 incorporates the "ground" of discrimination in Title IX— "sex"—and HHS's "Title IX regulation explicitly includes discrimination on the basis of pregnancy as a form of discrimination on the basis of sex."  *Id.* at 31,387 (citing 45 C.F.R. § 86.40(b)).  HHS included discrimination on the basis of "termination of pregnancy" because the "definition of 'on the basis of sex' " in the rule was "based upon existing regulation and previous Federal agencies' and courts' interpretations that discrimination on the basis of sex includes," among other things, "discrimination on the basis of pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom."  *Id.* at 31,388.

127.     The 2016 Rule defined "sex stereotypes" as:

> stereotypical notions of masculinity or femininity, including expectations of how individuals represent or communicate their gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics.  These stereotypes can include the expectation that individuals will consistently identify with only one gender and that they will act in conformity with the gender-related

> expressions stereotypically associated with that gender.   Sex stereotypes also
> include gendered expectations related to the appropriate roles of a certain sex.

*Id.* at 31,468 (codified at 45 C.F.R. § 92.4 (2019)).

128.    HHS defined discrimination on the basis of sex to include sex stereotyping

because the Supreme Court had "made clear in *Price Waterhouse v. Hopkins*," that in enacting

Title VII's prohibition against "sex discrimination, Congress intended to strike at the entire

spectrum of discrimination against men and women resulting from sex stereotypes."   *Id.* at

31,388 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)).   That is, the Supreme

Court had already rejected "the reasoning . . . that limited Title VII's coverage of 'sex' to the

anatomical and biological characteristics of sex," and courts and agencies had followed that

holding to interpret the related prohibition in Title IX in line with that decision.   *Id.*

129.    The 2016 Rule defined "gender identity" as:

> an individual's internal sense of gender, which may be male, female, neither, or a
> combination of male and female, and which may be different from an individual's
> sex assigned at birth.   The way an individual expresses gender identity is
> frequently called ''gender expression,'' and may or may not conform to social
> stereotypes associated with a particular gender.   A transgender individual is an
> individual whose gender identity is different from the sex assigned to that person
> at birth.

*Id.* at 31,467 (codified at 45 C.F.R. § 92.4 (2019)).

130.    HHS defined discrimination on the basis of sex to include discrimination on the

basis of gender identity because, "like other Federal agencies," HHS had "previously" reached

that interpretation, and "courts, including in the context of Section 1557, have recognized that

sex discrimination includes discrimination based on gender identity."   *Id.* at 31,387.   HHS also

noted that the term "gender identity" encompasses "gender expression" and "transgender status,"

which is "consistent with the position taken by courts and Federal agencies."   *Id.* at 31,385.

131.   The 2016 Rule also clarified that Section 1557 reaches specific prohibitions of

discrimination on the basis of sex with respect to gender identity:

a)   The 2016 Rule required covered entities to "treat individuals consistent with their gender identity."  *Id.* at 31,471 (codified at 45 C.F.R. § 92.206 (2019)).

b)   The 2016 Rule required covered entities not to "[h]ave or implement a categorical coverage exclusion or limitation for all health services related to gender transition."  *Id.* at 31,472 (codified at 45 C.F.R. § 92.207 (2019)).  These services were "not limited to surgical treatments and may include, but [were] not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual."  *Id.* at 31,435–436.  A categorical exclusion would have been "discriminatory on its face," *id.* at 31,456, and an "across-the-board categorization"   of   "transition-related   treatment   as   cosmetic   or experimental . . . [was] recognized as outdated and not based on current standards of care."  *Id.* at 31,429.

c)   The 2016 Rule required covered entities not to "deny or limit coverage of a claim, or impose additional cost sharing or other limitations or restrictions on coverage, for specific health services related to gender transition if such denial, limitation, or restriction results in discrimination against a transgender individual."  *Id.* at 31,472 (codified at 45 C.F.R. § 92.207(b)(5) (2019)).

132.   <u>Discrimination based on association</u>:  The 2016 Rule prohibited discrimination

based on association, that is, against someone "on the basis of the race, color, national origin,

age, disability, or sex of an individual with whom the individual or entity is known or is believed

to have a relationship or association."  *Id.* at 31,472 (codified at 92 C.F.R. § 209 (2019)).

133.   In the 2016 Rule, HHS explained that a "prohibition on associational

discrimination is consistent with longstanding interpretations of existing antidiscrimination laws,

whether the basis of discrimination is a characteristic of the harmed individual or an individual

who is associated with the harmed individual."  81 Fed. Reg. at 31,439.  This "prohibition on

associational discrimination," the Department explained, "is consistent with longstanding

interpretations of existing anti-discrimination laws," including the ADA.  *Id.*; *see also* 42 U.S.C.

§ 12182(b)(1)(E); 28 C.F.R. § 35.130(g).

134.   <u>National origin discrimination</u>:   The 2016 Rule defined the "[n]ational origin" ground of discrimination to include, but not be limited to, "[a]n individual's manifestation of the physical, cultural, or linguistic characteristics of a national origin group."  81 Fed. Reg. at 31,467 (codified at 45 C.F.R. § 92.4 (2019)).

135.   The 2016 Rule included provisions requiring covered entities to accommodate LEP persons.

136.   The 2016 Rule required covered entities to "take reasonable steps to provide meaningful access to *each individual* with limited-English proficiency," in order to implement Section 1557's "prohibition of national origin discrimination."   *Id.* at 31,470 (codified at 45 C.F.R. § 92.201(a)) (emphasis added).

137.   HHS explained that it would assess compliance with this requirement "on a case-by-case basis," *id.* at 31,416, by reference to two factors: (1) "the nature and importance of the health program or activity and the particular communication at issue, to the individual" and (2) whether the entity "has developed and implemented an effective written language access plan." *Id.* at 31,377 (codified at 45 C.F.R. § 92.201(b)(1) (2019)).

138.   The 2016 Rule interpreted Section 1557 to require that language interpreters be qualified and that when covered entities provide video interpretation services to LEP individuals, the interpretation be in real-time.  *See id.* at 31,470–471 (codified at 45 C.F.R. § 92.201 (2019)).

139.   The 2016 Rule included requirements that covered entities post notices and taglines in a non-English language informing a LEP individual how she may access language services, and that "qualified" translators be available.  *Id.* at 31,415 (codified at 45 C.F.R. § 92.8 (2019)).   The rule allowed covered entities to "combine the content of the notice

required . . . with the content of other notices if the combined notice clearly informs individuals of their civil rights under Section 1557." *Id.* at 31,469 (codified at 45 C.F.R. § 92.8(h) (2019)).

140.   <u>Exemptions</u>:  The 2016 Rule declined to import categorical exemptions from Title IX to Section 1557's prohibitions against discrimination.

141.   The 2016 Rule declined to interpret Section 1557 to include "Title IX's blanket religious exemption." *Id.* at 31,380.

142.   HHS explained that "Section 1557 itself contains no religious exemption," and "Title IX and its exemption are limited in scope to educational institutions, and there are significant differences between the educational and healthcare contexts that warrant different approaches." *Id.*  These differences made "a more nuanced approach in the health care context" appropriate. *Id.*

143.   HHS further explained that "a blanket religious exemption could result in a denial or delay in the provision of healthcare to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results." *Id.*

144.   HHS also declined to import an abortion exemption into Section 1557.  Though commenters "urged OCR to state explicitly that neither Section 1557 nor [the rule]" requires "the provision or coverage of, or referral for, pregnancy termination," HHS declined to do so. *Id.* at 31,388.  HHS explained that inclusion of "termination of pregnancy" in the rule's definition of "on the basis of sex" was consistent with existing regulations and agency and court interpretations. *Id.*

145.   <u>Definition of entities covered by regulations</u>:  The 2016 Rule included a provision defining the entities—so called covered entities—that were subject to its regulations.

146.   The 2016 Rule applied to "to every health program or activity, any part of which receives Federal financial assistance provided or made available by the Department; every health program or activity administered by the Department; and every health program or activity administered by a Title I entity." 81 Fed. Reg. at 31,466 (codified at 45 C.F.R. § 92.2(a) (2019)).

147.   <u>Uniform standard for enforcement actions</u>:  The 2016 Rule interpreted Section 1557 as containing a uniform standard for enforcement of its protections.  *See id.* at 31,440.

148.   Under this standard, "[t]he enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, or the Age Discrimination Act of 1975 shall apply for purposes of Section 1557 as implemented by th[e regulations]."  *Id.* at 31,472 (codified at 45 C.F.R. § 92.301(a) (2019)).   That is, enforcement mechanisms under *any* of the referenced statutes can be used to remedy discrimination on *any* of the grounds in Section 1557.  *See id.*

149.   The 2016 Rule provided that Section 1557 contains a private right of action and that Section 1557 plaintiffs may recover compensatory damages in judicial and administrative proceedings.  *See id.* at 31,472 (codified at 45 C.F.R. §§ 92.301(b), 92.302(d) (2019)).

150.   In the 2016 Rule, HHS explained that Section 1557 provides for a claim based on disparate impact discrimination, regardless of the ground of discrimination.  *See id.* at 31,440.

151.   The 2016 Rule required covered entities with at least 15 employees to designate an individual to oversee compliance with Section 1557 and investigate complaints and establish and use a grievance procedure.  *Id.* at 31,469 (codified at 45 C.F.R. § 92.7 (2019)).

152.   The uniform standard is crucial for bringing intersectional claims.  *See Rumble v. Fairview Health Service*, No. 14–cv–2037, 2015 WL 1197415, at *12 (D. Minn. Mar. 16, 2015) (If Section 1557 embodied different standards and mechanisms for different types of

discrimination, "courts would have no guidance about what standard to apply [to a] plaintiff bringing an intersectional discrimination claim.").

### 4.  HHS proposes rolling back the 2016 Rule.

153.    In March 2017, President Trump appointed Roger Severino as the head of HHS's Office for Civil Rights.  Director Severino has a significant history of making public, biased statements against transgender people.

154.    In June 2019, HHS issued a Notice of Proposed Rulemaking, proposing to "make substantial revisions" to the 2016 Rule, including "eliminat[ing] provisions."  84 Fed. Reg. at 27,848.

155.    HHS claimed that the regulatory changes were necessary to "address legal concerns."  *Id.* at 27,846.

156.    These concerns stemmed from a single district court decision.  *See id.* at 27,848 (citing *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016) (enjoining the 2016 Rule's prohibition of discrimination on the basis of "gender identity" and "termination of pregnancy")).  This decision contradicted a uniform, nationwide body of cases interpreting sex discrimination under federal civil rights statutes to include discrimination based on gender identity.[2]  HHS chose not to appeal that decision.  *See* Defs.' Mot. for Voluntary Remand and Stay at 1, *Franciscan All., Inc. v. Burwell*, No. 7:16-cv-108-O (N.D. Tex. May 2, 2017), ECF No. 92 (asking the court to remand the matter to HHS).

---

[2] *See Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034 (7th Cir. 2017); *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011); *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005); *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004); *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000); *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008); *Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*, 542 F. Supp. 2d 653 (S.D. Tex. 2008); *Mitchell v. Axcan Scandipharm, Inc.*, No. Civ. A. 05-243, 2006 WL 456173 (W.D. Pa. Feb. 17, 2006); *Tronetti v. Healthnet Lakeshore Hosp.*, No. 03–CV–0375E(SC), 2003 WL 22757935 (W.D.N.Y. 2003).

157.     In HHS's view, this decision indicated that "the Department had . . . exceeded its statutory authority."  84 Fed. Reg. at 27,849 (citing *Franciscan All.*, 227 F. Supp. 3d at 696).

158.     The 2019 Proposed Rule sought to eliminate the 2016 Rule's definition of "on the basis of sex," including the express prohibitions against discrimination on the basis of gender identity, sex stereotyping, pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom.  *Id.* at 27,856.

159.     Although HHS relied on *Franciscan Alliance*'s interpretation of sex discrimination as the reason for its reconsideration of the 2016 Rule, the 2019 Proposed Rule sought to roll back nearly all of the earlier rule.

160.     The 2019 Proposed Rule sought to eliminate the 2016 Rule's uniform standard for enforcing violations of Section 1557 and to replace it with a patchwork approach.  *Id.* at 27,872.

161.     The 2019 Proposed Rule sought to incorporate the religious exemptions that HHS had declined to incorporate in the 2016 Rule.  *Id.* at 27,864.

162.     The 2019 Proposed Rule sought to incorporate the abortion exemption from Title IX.  *Id.*

163.     The 2019 Proposed Rule further stated HHS's intent to eliminate the notice and taglines requirements that the 2016 Rule had included to ensure that LEP individuals can access necessary healthcare.  *Id.* at 27,859.

164.     The 2019 Proposed Rule also sought to limit the reach of Section 1557's protections by interpreting OCR's enforcement authority under Section 1557 not to reach health insurance plans outside of Title I of the ACA that do not receive federal financial assistance, as well as health programs and activities that HHS administers but that are not established under Title I of the ACA, such as Indian Health Services ("IHS").  *Id.* at 27,860.

165.    The 2019 Proposed Rule also proposed to amend HHS's separate Title IX regulations to include the abortion exemption, and to amend other regulations identifying sexual orientation and gender identity as prohibited bases of discrimination for HHS programs and activities by eliminating them.  *See id.* at 27,870.

166.    In response to the 2019 Proposed Rule, HHS received more than 150,000 comments, many of which expressed concern about these proposed revisions.  *See* 85 Fed. Reg. at 37,160, 37,164.  More than 134,000  (over 85%) were from organizations and individuals who voiced and explained their opposition to the 2019 Proposed Rule.  Among the commenters were:

- People who have faced or are at risk of facing discrimination by health programs or activities, *see, e.g.*, Rayna Momen, Jude Patton, Genevieve Ard, Comment Letters on 2019 Proposed Rule (Sept. 7, 2019), https://bit.ly/2C1AZkH; Maddison Wagner, Comment Letter on 2019 Proposed Rule (Sept. 5, 2019), https://bit.ly/2C1Amrl;

- People whose family members have faced or are at risk of facing discrimination by health programs or activities, *see, e.g*., Jennifer Chau, Comment Letter on 2019 Proposed Rule (Sept. 7, 2019), https://bit.ly/3f0ZP2E; Ngoc Dinh, Comment Letter on 2019 Proposed Rule (Sept. 6, 2019), https://bit.ly/2Brom2E; Alondra Cruz-Hernadez, Comment Letter on 2019 Proposed Rule (Sept. 6, 2019), https://bit.ly/2C3xDO6;

- Medical professional associations, *see, e.g.*, The American College of Obstetricians and Gynecologists, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019) ("ACOG Comments"), https://bit.ly/2BYreDT; American Medical Association, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019) ("AMA Comments"), https://bit.ly/3eZKijH; American College of Emergency Physicians, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019) ("College of Emergency Physicians Comments"), https://bit.ly/3gjO1sw; Association of American Medical Colleges, Comment Letter on 2019 Proposed Rule (Aug. 12, 2019) ("AAMC Comments"), https://bit.ly/3dWBcD7; Massachusetts Medical Society, Comment Letter on 2019 Proposed Rule (August 13, 2019), https://bit.ly/2VMAKku;

- Healthcare providers, *see, e.g.*, Planned Parenthood Comments; Callen-Lorde Community Health Center, Comment Letter on 2019 Proposed Rule (Aug. 7, 2019) ("Callen-Lorde Comments"), https://bit.ly/38s6rVf; The Fenway Institute, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019),

https://bit.ly/3dWDa6t; Massachusetts League of Community Health Centers, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019), https://bit.ly/3f4bP3p; Boston Children's Hospital, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019), https://bit.ly/2Z0V0kn;

- Local, state, and federal officials, *see, e.g.*, Senator Murray and 35 Senate Democrats, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019), https://bit.ly/2D8KTSb; State Representative Jeff Currey of Connecticut, Comment Letter on 2019 Proposed Rule (Sept. 6, 2019), https://bit.ly/31GcCnl; Xavier Becerra, Att'y Gen. of the State of California and Maura Healey, Att'y Gen. of the Commonwealth of Massachusetts, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019) (comments on behalf of a group of 22 state attorneys general), https://bit.ly/3gsn7iv; Commonwealth of Massachusetts Connector Health Authority, Comment Letter on 2019 Proposed Rule (Aug. 12, 2019), https://bit.ly/2ZHgQsi; Commonwealth of Massachusetts Office of Medicaid, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019), https://bit.ly/3f8LyBm;

- Associations of health officials and health departments, *see, e.g.*, National Association of County and City Health Officials, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019), https://bit.ly/2VKOQCV; New York State Department of Health, Comment Letter on 2019 Proposed Rule (Aug. 6, 2019), https://bit.ly/31EhKsl; Massachusetts Dept. of Mental Health, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019), https://bit.ly/2Z3Y2EJ; and

- Advocates representing people most likely to be harmed by the rule, *see, e.g.*, NWLC Comments; TLC Comments; TLDEF Comments; Federal AIDS Policy Partnership: HIV Health Care Access Work Group, Comment Letter on 2019 Proposed Rule (Aug. 13, 2019) ("FAPP Comments"), https://bit.ly/1557FAPP; Health Law Advocates, Comment Letter on 2019 Proposed Rule (Aug. 12, 2019), https://bit.ly/31L5MNp; Patrice Leslie Berman, Comment Letter on 2019 Proposed Rule (June 22, 2019), https://bit.ly/2ZDF2fk.

167.    Commenters expressed concern that the proposed rule would cause immediate and irreparable harm to many individuals and healthcare providers. They were concerned, for instance, that it would "lead to increased discrimination in healthcare," which, in turn, "would lead people to delay or forego healthcare and would result in adverse health outcomes and

greater overall healthcare costs to individuals." 85 Fed. Reg. at 37,165. In doing so, the proposed rule would be "effectively encouraging discrimination." *Id.*; *see also id.* at 37,233.

168.    Commenters offered HHS evidence that, since the 2016 Rule, the number of health plans that discriminate on the basis of transgender status had decreased. *See* Lambda Legal, Comment Letter on 2019 Proposed Rule 7 & n.39 (Aug. 13, 2019), https://bit.ly/3dWWOiA ("Lambda Comments").

169.    Others noted that since its passage, Section 1557 was used to ensure that pregnant people would not be denied coverage while on their parents' insurance plans; that people would not be denied fertility services because of their age; that insurance plans could not exclude coverage for transgender-related care; and that insurance companies would provide information about their services, not just in English, but in a language the patient speaks. *See* NWLC Comments at 3.

170.    Numerous commenters urged HHS to postpone finalizing the rule until it could incorporate the ruling of the U.S. Supreme Court in *Bostock*. *See* 85 Fed. Reg. at 37,168. As HHS recognized, the Court had "granted three petitions for writs of certiorari, raising the question whether Title VII's prohibition on discrimination on the basis of sex also bars discrimination on the basis of gender identity or sexual orientation." 84 Fed. Reg. at 27,855. HHS also recognized that the Court`s decision "will likely have ramifications for" the Rollback Rule "[b]ecause Title IX adopts the substantive and legal standards of Title VII." *Id.* Indeed, HHS refused "to propose its own definition of 'sex'" precisely "[b]ecause of the likelihood that the Supreme Court will be addressing the issue." *Id.* at 27,857.

171.    In early 2020, HHS received feedback from Congress and a broad coalition of state Attorneys General that finalizing the rule during the COVID-19 pandemic would harm

public health.  *See* Letter from States' Attorneys General to Alex Azar, Sec'y, U.S. Dep't of

Health and Human Servs. (Apr. 30, 2020), https://bit.ly/31IFpYo; Letter from Robert Mendez

and 30 Other U.S. Senators to Alex Azar, Sec'y, U.S. Dep't of Health and Human Servs. (May

22, 2020), https://bit.ly/3iqDHkt.

172.    Many advocacy groups met with representatives of HHS and the Office of

Management and Budget to relay similar concerns about the consequences to public health,

specifically noting that finalizing the proposed rule would harm individuals and health systems

during a global pandemic.  Director Severino was present at several of these meetings.

### 5.    HHS issues the Rollback Rule.

173.    HHS issued the Rollback Rule for publication on June 12, 2020.

174.    In the version for publication, HHS acknowledged that the *Bostock* decision "will

likely have ramifications for the definition of 'on the basis of sex' under Title IX."

Nondiscrimination in Health and Health Education Programs or Activities, Delegation of

Authority at 34 (Jun. 12, 2029), https://bit.ly/31XYUN4.

175.    Yet HHS explained that it was finalizing the rule before the *Bostock* decision

because it had staked its elimination of the definition of "on the basis of sex" on the

government's litigation position in that case—"that discrimination 'on the basis of sex' . . . does

not encompass discrimination on the basis of sexual orientation or gender identity."  *Id.*

176.    Three days later, the Supreme Court decided *Bostock* and held that "[a]n

employer who fires an individual merely for being gay or transgender defies the law," settling

the question whether the prohibition of discrimination "on the basis of sex" in Title VII prohibits

discrimination because of a person's sexual orientation or transgender status.  140 S. Ct. at 1754.

177.    *Bostock* rejected the government's litigation position that HHS relied on in

issuing the Rollback Rule for publication.  The Court instead held that discrimination based on a

person's sexual orientation or transgender status is discrimination on the basis of sex because "the first cannot happen without the second." *Id.* at 1747; *contra* Rollback Rule, 85 Fed. Reg. at 37,168 (resting on the opposite interpretation). And the Court emphasized that the text of Title VII's nondiscrimination provision sets out a "broad rule." *Bostock*, 140 S. Ct. at 1747.

178.    Because the Rollback Rule had not yet been published in the Federal Register, the public urged HHS to withdraw the rule and reconsider it in light of *Bostock*. *See, e.g.*, Compl. Ex. 1, *Asapansa-Johnson Walker, et al v. Azar, et al.*, No. 1:20-cv-02834-FB-SMG (E.D.N.Y. June 26, 2020) (Letter from Alphonso B. David, President, Human Rights Campaign Found. to Alex Azar, Sec'y, U.S. Dep't of Health and Human Servs. (June 18, 2020)).

179.    Instead, HHS published the Rollback Rule in the Federal Register on June 19, 2020 "as proposed, with minor and primarily technical corrections." 85 Fed. Reg. at 37,161.

180.    The Rollback Rule contains no reference to the Supreme Court's decision in *Bostock*, nor any explanation of why HHS ignores it.

181.    HHS states that "[t]he Department shares th[e Administration's litigation] position and is permitted to issue regulations on the basis of the statutory text and its best understanding of the law." *Id.* at 37,168.

182.    HHS does not explain how a losing litigation position rejected by the Supreme Court can support its understanding of the law.

183.    HHS expressly disavowed a prior HHS interpretation that Section 1557's sex discrimination prohibition applies "to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and will accept such complaints for investigation." Letter from Leon Rodriguez, Director, U.S. Dep't of Health & Human Servs.,

Office for Civil Rights, to Maya Rupert, Federal Policy Director, National Center for Lesbian Rights (July 12, 2012),  https://bit.ly/3iv7bxt; *see* 85 Fed. Reg. at 37,191.

184.    HHS's only other stated basis for promulgating the Rollback Rule is that it will "relieve billions of dollars in undue regulatory burdens."  *Id.* at 37,160.  HHS projects that the Final Rule will result in a purported $2.9 billion in cost savings.  *Id.* at 37,162.

185.    As HHS admits, that figure comes only from "repealing . . . provisions related to mandatory notices."  *Id.*  HHS does not contend it has any connection to removing the definition of discrimination "on the basis of sex," incorporating religious and abortion exemptions, or the swath of other regulatory changes.

186.    That figure is speculative because HHS relied exclusively on providers' self-reported estimates, with no outreach to affected healthcare consumers to determine the impact of notices and taglines.  *See id.* at 37,229.

187.    HHS ignored numerous significant comments when promulgating the Rollback Rule.  For example, HHS did not respond to concerns that eliminating the definition of "on the basis of sex," will invite discrimination against LGBTQ+ people and women, transgender men, and gender-nonbinary people who have obtained or are seeking reproductive healthcare.  85 Fed. Reg. at 37,165, 37,180, 37,192–193.  Nor did it respond to comments stressing that disparate enforcement mechanisms cannot adequately redress discrimination for those living at the intersection of multiple identities, *id.* at 37,199–200; or that the Regulatory Impact Analysis did not reflect—or quantify—the costs and benefits of the changes, *id*. at 37,225.

188.    Two preliminary injunctions have been issued in separate challenges to the Rollback Rule.  *See Whitman-Walker Clinic Inc. v. U.S. Dep't of Health & Human Servs.*, 1:20-

cv-01630-JEB, Dkt. No. 56 at 101 (Sept. 2, 2020); *Asapansa-Johnson Walker v. Azar,* 1:20-cv-02834-FB-SMG, Dkt. No. 23 at 25–26 (Aug. 17, 2020).

## B.  The Rollback Rule Will Cause Substantial Harms, Including To Plaintiffs.

189.     The Rollback Rule will cause substantial and irreparable harm to patients, organizations, and healthcare providers, including plaintiffs.

### 1.  The Rollback Rule will harm patients.

190.     The Rollback Rule will embolden discrimination and harm LGBTQ+ patients, people seeking reproductive healthcare, LEP patients, and people with chronic illnesses.  It will further stigmatize abortion.  And it will create confusion about the scope of protections against discrimination under federal law.  *See* Planned Parenthood Comments at 2; Am. College of Obstetricians and Gynecologists, Comment Letter on 2019 Proposed Rule at 2–6 (Aug. 13, 2019), https://bit.ly/2YNwseC; American Medical Association, Comment Letter on 2019 Proposed Rule at 4–6 (Aug. 13, 2019), https://bit.ly/38hHVGE.

191.     The Rollback Rule's incorporation of the Title IX religious and abortion exemptions will embolden and, in some cases allow, hospitals, insurers, and others to discriminate against patients based on sex by using religious or anti-abortion beliefs as justifications to refuse care or coverage.  *See* FAPP Comments at 10; NWLC Comments at 10–11.  This will disproportionately harm LGBTQ+ people and people who have obtained or are seeking reproductive health services, including abortion and other pregnancy-related care.  *See* FAPP Comments at 10; NWLC Comments at 10–11.

192.     The Rollback Rule's incorporation of the religious exemptions will encourage healthcare providers to deviate from the medical standard of care by citing religion.  This will harm patients seeking transgender-related care; reproductive healthcare, including contraception,

miscarriage management, treatment for ectopic pregnancy, fertility treatment, sterilization and abortion care; and end-of-life care, among others. *See* NWLC Comments at 8, 10–11.

193.    The Rollback Rule will embolden healthcare providers to turn away people seeking abortions and to deny pregnant patients complete and accurate information about their pregnancy options.  If pregnant people are denied that care, they face serious and long-lasting consequences to many aspects of their lives.  People who seek abortion and are turned away end up worse off than those who receive abortions.  *See* Sarah Miller et al., *The Economic Consequences of Being Denied an Abortion* 9 (Nat'l Bureau Econ. Res., Working Paper No. 26662, 2020), https://bit.ly/3ebPwHR.  For example, those denied abortion care experience worse mental health and poorer physical health among those who gave birth.  *Id.*  Those denied abortions experience higher rates of poverty, lower employment, and greater use of public assistance compared to those who received abortions.  *Id.*; *accord* Comments of California and Massachusetts at 9 & n.9.  Those who are denied abortion care are also more likely to remain in contact with violent partners, putting them and their children at risk.  *See* Sarah C.M. Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion,* 12 BMC Med. 5 (2014).  Refusals of abortion care can also mean that a person who became pregnant as a result of sexual assault "is unable to avoid the psychological and physical trauma of a rape-related pregnancy."  *See* National Alliance to End Sexual Violence, Comments on 2019 Proposed Rule 10 & n.201 (August 9, 2019), https://bit.ly/3ednU53.

194.    Emboldening discrimination against pregnant people will aggravate existing discrimination and disparities in healthcare.  *See, e.g.*, Planned Parenthood Comments at 12 (discussing high mortality rates in the United States); National Asian Pacific American Women's Forum, Comments on 2019 Proposed Rule 8 (August 13, 2019) (discussing high incidence of

embolisms and pregnancy-related hypertension among Asian-American and Pacific Islander-American people who give birth), https://bit.ly/2O9cvbW.  It will also exacerbate people's fear of pregnancy-related discrimination, substandard care, denials of care, and coercion, causing patients to mistrust providers and potentially to delay or forgo needed care.

195.    The Rollback Rule will embolden providers to deny healthcare to women, transgender men, and gender-nonbinary people who have previously had an abortion, which will encourage patients to either withhold information about their health or to forgo care altogether, with potentially harmful consequences.  *See* ACOG Comments at 3–4.

196.    The consequences of these denials will fall especially hard on people of color and those in rural areas, where the choice of healthcare is scant and hospitals often merge with or are run by religious institutions.  *See* AAMC Comments at 13–14; FAPP Comments at 10; Kira Shepherd et al., *Bearing Faith: The Limits of Catholic Health Care for Women of Color* 5 (2018), https://bit.ly/31U8Hnf.

197.    Religious exemptions can  impede patients' access to healthcare in emergency situations where they have no ability to choose a provider and a provider's denial of services can have dire consequences.  *See* AAMC Comments at 4.

198.    The Rollback Rule also perpetuates stigma around abortion, which can have adverse mental health consequences.  *See* M. Antonia Biggs et al., *Perceived Abortion Stigma and Psychological Well-Being Over Five Years After Receiving or Being Denied an Abortion*, 15 PLoS ONE 1, (2020), https://bit.ly/2DqXS1T.

199.    The Rollback Rule's removal of prohibitions on excluding or denying health services related to gender transition in insurance will harm transgender and gender-non-binary people.  TLDEF Comments at 5–6.  Access to transgender-related healthcare is often a matter of

life and death.   Denials of care based on a patient's transgender status are associated with increased rates of suicidal ideation.  TLC Comments at 6.  And transgender people who cannot access treatments for gender dysphoria disproportionately attempt to self-medicate through substance use, a particularly harsh outcome because many substance abuse programs are sex-specific and have historically excluded transgender patients.  TLDEF Comments at 6–8.

200.    The Rollback Rule will embolden heathcare providers and insurers to revert to discriminatory practices and policies related to gender identity and sex-stereotyping.  Planned Parenthood Comments at 5 & n.11 (citing 84 Fed. Reg. at 27,876).   In the past, such discrimination has taken the form of intentional misgendering of transgender patients, including those at high risk of suicide; refusing necessary care based on sexual orientation, including denying treatment for HIV; and denial of preventive services, including mammograms and urinary tract infection screenings based on gender identity or transgender status.  *Id.* at 7.

201.    Such discrimination leads transgender and gender-non-binary patients to delay necessary care and worsens their health.  TLC Comments at 8–9.

202.    The repeal of the 2016 Rule's clarification that the ban on sex discrimination includes pregnancy-related care will likewise embolden discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy or recovery therefrom, childbirth, or related conditions.  AMA Comments at 5.

203.    The Rollback Rule will result in patients being denied critical care, including miscarriage management and treatment for ectopic pregnancy.  Pregnant patients report that doctors perform medically unnecessary tests and transfer patients with pregnancy complications because of their hospital's religious affiliation, resulting in delays in care and added complications for patients.  NWLC Comment at 8; *see also* NWLC, *Below the Radar: Health*

*Care Providers' Religious Refusals Can Endanger Pregnant Women's Lives and Health* 2 (Jan. 2011), https://bit.ly/2ZaP6gI.   The problems are even more acute for people of color—Black people in particular—who are more likely to experience pregnancy complications and thus more likely to require services or procedures that some religiously affiliated medical institutions prohibit.   NWLC Comments at 8.   Worse still, people of color are more likely to rely on such institutions for care.   *Id.*

204.   This refusal of care is particularly troubling given the high mortality rate among people who give birth in the United States.   *See* Planned Parenthood Comments at 12.   And the concerns are all the more heightened for Black women, who are more than three times as likely to die from pregnancy-related causes as white women, and for American Indian/Alaskan Native women, who are two times as likely.   Ctrs. for Disease Control & Prevention, Vital Signs: Pregnancy-Related Deaths, United States, 2011–2015, and Strategies for Prevention, 13 States, 2013–2017 (May 7, 2019), https://bit.ly/32cR3uN.

205.   The Rollback Rule's elimination of the 2016 Rule's explicit prohibition on discriminatory insurance plan benefit design, codified at 45 C.F.R. § 92.207 (2019), also will hurt patients.   *See* 85 Fed. Reg. at 37,176–177.   It will allow insurers to discriminate in benefit design by, for example, meeting the minimum requirements necessary to be certified, but shaping the plan so that all of the benefits necessary to treat a certain chronic condition, such as HIV/AIDS, are placed in the highest cost-sharing tier.   *See, e.g.*, OCR, HHS, Admin. Complaint of the AIDS Inst. & Nat'l Health Law Program (May 29, 2014), https://bit.ly/3ePFqgY; OCR, HHS, Admin. Complaint of CrescentCare & Ctr. for Health Law & Policy Innovation of Harvard Law School (Sept. 6, 2016), https://bit.ly/2YSYlCd.   Such regulatory permissiveness will make it so that patients that need certain coverage—especially coverage related to chronic illnesses and

disabilities, including HIV/AIDS—will be effectively priced out of purchasing affordable plans. *See* FAPP Comments at 4–6; Jacobs Inst. Comments at 2–3.

206.    The Rollback Rule's repeal of the notice and taglines requirement will eliminate and weaken protections for individuals, especially LEP individuals.  *See* FAPP Comments at 11.

207.    The Rollback Rule's repeal of these protections will deny LEP individuals access to materials that help them better understand basic health information, access preventative services and avoid adverse events—all of which will complicate the management of chronic illnesses and disabilities and lead to poorer health outcomes for communities that are already disadvantaged.  *Id.*  The Rollback Rule's repeal of the notice and taglines requirement will also mean that individuals will be less informed about applicable civil rights protections.

208.    Although the Rollback Rule cannot eliminate Section 1557's protections, it creates confusion by destroying the clarity provided by the 2016 Rule.  *See* TLC Comments at 3; NHeLP Comments at 4.  The confusion that results from the Rollback Rule will cause some healthcare providers and insurers to withhold or deny care that would otherwise be available to these patients.  This chilling effect is anything but academic.  For transgender and gender-non-binary patients, overcoming barriers to healthcare is a matter of life or death, especially for those who have faced discrimination in the past.

209.    HHS was on notice of the confusion that will result from the Rollback Rule.  For example, GLBTQ Legal Advocates & Defenders (GLAD) is a New England-wide public interest legal organization that operates the "GLAD Answers legal information hotline."  *See* GLAD Comment Letter on 2019 Proposed Rule 2 (Aug. 9, 2019) ("GLAD Comments"), https://bit.ly/2DhVJVW.  Based on hotline inquiries, GLAD informed HHS of widespread, ongoing healthcare discrimination, notwithstanding significant improvements since the 2016

Rule.  *Id.* at 5–6.  GLAD further informed HHS that the Rollback Rule "will create confusion and misinformation about the rights of transgender people to nondiscrimination in healthcare at both the federal and state levels."  *Id.* at 2.  The National Center for Transgender Equality similarly informed HHS that "proceeding with rulemaking at this time could lead to overwhelming confusion and legal uncertainty for health care industry stakeholders, health care professionals, and patients."  Nat'l Ctr. for Transgender Equality, Comment Letter on 2019 Proposed Rule 38 (Aug. 13, 2019) ("NCTE Comments"), https://bit.ly/3dSRDjR.

210.    The Rollback Rule's skeptical position regarding Section 1557's private right of action and enforcement mechanisms has caused confusion about how victims of discrimination can seek relief.  Healthcare consumers with legitimate claims of discrimination will reasonably conclude that the published position of HHS means that OCR will not consider their administrative complaints.  This will limit or eliminate the ability of healthcare consumers with no state or local legal protections, or those without access to legal services, to seek relief.  HHS was on notice of this result.  *See* NHeLP Comments at 20–21.

211.    The Rollback Rule's narrowed definition of covered entities will cause a significant number of insurance plans to conclude that they are not covered by Section 1557.

212.    These various effects of the Rollback Rule will discourage patients from seeking healthcare, potentially leading to devastating consequences.

213.    For example, Darren Lazor fears that he may experience a medical emergency and be unable to receive medical treatment.  Unfortunately, the emergency room closest to his home is at the hospital that previously denied him treatment and discriminated against him.  As part of routine practice, an ambulance would take Mr. Lazor to the closest emergency room.  Yet because the Rollback Rule creates confusion, it could lead medical providers to believe that Mr.

Lazor is not protected from discrimination on the basis of gender identity, emboldening their discriminatory conduct. The Rollback Rule thus reasonably heightens Mr. Lazor's fears of discrimination and substandard treatment were he to return to that hospital. As a result, Mr. Lazor would ask a friend or family member to drive him to an emergency room half an hour away at a hospital where he has not experienced discrimination. This could lead to life-threatening complications.

214. Mr. Lazor also has health insurance needs related to his transgender status, and he fears that the Rollback Rule puts his insurance at risk. In the past, Mr. Lazor has enrolled in different types of insurance plans, including employer-sponsored plans and plans offered on the Affordable Care Act Marketplace. Mr. Lazor intends to stay enrolled in a health insurance plan that meets the minimum coverage requirements of the Affordable Care Act, although the specific source of that plan will depend on his future circumstances. He needs bi-annual doctor's visits and yearly bloodwork to keep receiving the hormone treatments that are part of his medically necessary gender-affirming care. He has always used insurance to pay for those doctor's visits and that bloodwork. Because the Rollback Rule promotes confusion around discrimination protections, Mr. Lazor also fears that his health insurer will deny him the coverage he needs.

215. The Rollback Rule has amplified Mr. Lazor's fear and anxiety about contracting COVID-19. He has a chronic health condition causing shortness of breath, which may put him at further risk for becoming severely ill if he contracts COVID-19. Because of the Rollback Rule, he is afraid that healthcare providers may refuse to treat him or may provide him with poor care on account of his transgender status, which could lead to severe health consequences or death.

216. The Rollback Rule further harms Mr. Lazor by eliminating his ability to seek relief from discrimination or mistreatment by healthcare providers or insurers on account of his

gender identity.  He has filed an administrative complaint about past mistreatment, and he would do so again if he thought that it would help him or others receive better care.

217.    Patients of Fenway Health, Callen-Lorde, CrescentCare, and BAGLY, and clients of Indigenous Women Rising, report similar experiences of discrimination by other providers.

218.    Many LGBTQ+ patients at Fenway Health have previously been refused medical care by other providers, including routine care unrelated to gender dysphoria, simply because they are LGBTQ+.  In 2013, the Fenway Institute at Fenway Health and the Massachusetts Transgender Political Coalition published a survey, Project VOICE, exploring the health and well-being of transgender people in Massachusetts.  *See* Reiner, S.J., *et al., Discrimination and Health in Massachusetts: A Statewide Survey of Transgender and Gender Nonconforming Adults* (July 2014), https://bit.ly/2O5Bb55. The Project VOICE study found that 24% of 452 transgender Massachusetts residents surveyed reported discrimination in healthcare settings.  Of those reporting discrimination in healthcare, 19% did not seek care when they were sick or injured subsequent to that experience of discrimination, and 24% did not seek subsequent preventive or routine care.   Those who reported experiencing public-accommodations discrimination in the past year were nearly twice as likely as those who did not report experiencing such discrimination to report negative emotional and physical symptoms, such as headache, pounding heart, feeling sad and feeling frustrated.

219.    Callen-Lorde Community Health Center conducted similar research among LGBTQ+ Brooklyn residents and found that nearly one-third of Brooklyn LGBTQ+ residents reported not having a regular source of care, and the number one reason given by those surveyed was a lack of LGBTQ+-friendly providers in the area.

220.     Patients of CrescentCare report similar experiences of discrimination.  In 2019, CrescentCare held several meetings with transgender people who had been refused medical care by other providers, including routine care unrelated to gender dysphoria, simply because they are LGBTQ+.  Transgender people in CrescentCare's service population also reported additional discriminatory experiences, including being ridiculed by healthcare providers regarding their gender identity, pharmacy refusal to dispense prescribed gender-affirming medications and associated medical equipment, refusal for medical transportation, and direct refusals of primary, specialty, and emergency healthcare as a result of real or perceived gender identity.

221.     BAGLY service recipients also report discrimination by outside providers to BAGLY staff.  BAGLY's Health Program Manager estimates that in group therapy programs, discrimination from healthcare providers is discussed by participants 20-30% of the time.  Youth have reported that they have avoided receiving medical care because of this, including being reluctant to call ambulances for emergency medical care.

222.     Indigenous Women Rising's clients also experience and fear discrimination by medical providers on the basis of both sex and race.  The legacy of forced sterilizations, historically underfunded services, and cultural ignorance contributes to Indigenous people's fear of discrimination when seeking reproductive and pregnancy-related healthcare, particularly at facilities operated by IHS, the primary source of healthcare for most of Indigenous Women Rising's clients.  Clients have expressed fear that they will be discriminated against for having had an abortion by a hospital or IHS facility.  Due in part to inadequate resources, and in part to anti-abortion bias, Indigenous people who can become pregnant are also denied access to abortion care and information about abortion at IHS facilities even where the Hyde Amendment––which restricts federal funding of abortion—does not apply, including cases of life

endangerment, rape, and incest.  Indigenous people also continue to report physicians' use of coercive tactics to pressure them to use long-acting contraceptives and/or delay their removal.

223.    The Rollback Rule will also negatively affect the ability of patients of Fenway Health, Callen-Lorde, CrescentCare, and BAGLY and clients of Indigenous Women Rising to pay for healthcare services.  The rule's provisions regarding health insurance plans will cause patients to experience significantly less advantageous third-party reimbursement for the healthcare services that they need.  For example, some of Fenway Health, Callen-Lorde, CrescentCare, and BAGLY patients' third-party payors will understand the Rollback Rule to mean that they may now offer plans that categorically exclude gender-affirming care or other sex-based treatments because HHS asserts they are not prohibited by Section 1557.  Other health insurance issuers, plan sponsors, or third-party administrators will understand the Rollback Rule to provide a green light to exclude or deny coverage for pregnancy-related care.  Likewise, some third-party payors with whom Fenway Health, Callen-Lorde, CrescentCare, and BAGLY interact will understand the Rollback Rule to allow them to offer plans that discriminate in their benefit design because HHS asserts they are not prohibited by Section 1557.  The Rollback Rule directly harms Fenway Health's, Callen-Lorde's, CrescentCare's, BAGLY's, and Indigenous Women Rising's patients and clients, and the pool of potential patients and clients that Fenway Health, Callen-Lorde, CrescentCare, BAGLY, and Indigenous Women Rising draws from, by decreasing third-party reimbursement available for necessary healthcare.

224.    Members of Equality California will be negatively affected by the Rollback Rule.  For example, Hillary and Jeffrey Whittington are Equality California members, with Mrs. Whittington serving on the board of directors.  They have experienced discrimination in healthcare in the past and believe that the Rollback Rule will increase the likelihood that they

will experience such discrimination in in the future.  Mr. and Mrs. Whittington have a minor son and a minor daughter.  Their minor son is transgender.  The Whittingtons live in California but travel outside of California frequently, including an annual trip to Utah.   Mr. and Mrs. Whittington's children have primary care providers in California that do not discriminate against their transgender son on the basis of his transgender status.  But they are concerned that, as a result of the Rollback Rule, their transgender son may experience discrimination if he needs healthcare while they are in Utah or traveling to other states that do not have state laws that prohibit healthcare discrimination on the basis of gender identity.

225.    Similarly, Priya Shah and Jaspret Brar are Equality California members.  Ms. Shah and Mr. Brar have two minor daughters, one of whom is transgender.  Ms. Shah and Mr. Brar and their daughters live in California but travel outside of California frequently.  Their transgender daughter has experienced healthcare discrimination and discrimination at school in the past based on her gender identity.  At one clinic, when Ms. Shah and Mr. Brar asked a pediatric endocrinologist about seeing their transgender daughter, the doctor replied:  "I don't do that."  Ms. Shah and Mr. Brar have also had trouble with their insurance company, which rejected a doctor's authorization for hormone therapy.  Now, their daughter receives healthcare at a clinic that does not discriminate.  But Ms. Shah and Mr. Brar are concerned that, as a result of HHS's decision to remove discrimination on the basis of gender identity from the definition of sex discrimination in healthcare, their transgender daughter may experience discrimination if she needs healthcare while the family is traveling outside of California, as they often do.

226.    Ebony Ava Harper is a member of Equality California who has experienced discrimination in healthcare in the past and who believes that the Rollback Rule will increase the likelihood that she will experience discrimination in healthcare in the future.  Ms. Harper is a

transgender woman who lives in California and is receiving gender-affirming care. Ms. Harper's insurance company has denied coverage for gender-affirming surgery for years, and recently denied her coverage for a transition-related medical procedure that was recommended by her doctor as part of her gender-affirming care. Ms. Harper is still in the process of challenging that denial and is now afraid that, as a result of the Rollback Rule, she will be prevented from pursuing her appeal. She also is afraid that it would be futile to file a complaint about the denial with OCR because of the enforcement policy announced in the rule. Ms. Harper also fears that her insurance company will decide to stop covering hormone care or laser treatments.

227. Dr. Andrea Cubitt is a member of Equality California and serves on the board of directors of Equality California. She has also experienced discrimination in healthcare in the past and believes that the Rollback Rule will increase the likelihood that she will experience discrimination in healthcare in the future. Dr. Cubitt is a transgender woman. Dr. Cubitt is responsible for her company's scientific alliances across the United States and globally. Dr. Cubitt regularly travels for work and attends scientific conferences in states outside of California that have limited protections for transgender people, including North Carolina, South Carolina, Texas, and Nebraska. As a 57-year-old transgender woman, there is a real possibility that she will require medical assistance while traveling outside of California for work. As a result of the Rollback Rule, Dr. Cubitt is afraid that she may be denied critical care by healthcare providers because of her transgender status while she is traveling outside of California.

228. Lisa Middleton is a member of Equality California. Ms. Middleton is a 68-year-old transgender woman. Ms. Middleton transitioned in the early 1990s. Ms. Middleton is a lesbian and is married to a woman. As a senior citizen, Ms. Middleton is cognizant of the importance of prompt and reliable healthcare. Ms. Middleton has experienced healthcare

discrimination as a result of her transgender status.  Ms. Middleton was elected to the Palm Springs City Council in November 2017 and was appointed by California Governor Gavin Newsom to the California Public Employees' Retirement System (CalPERS) Board of Administration in April 2019.  Because of Ms. Middleton's duties as an elected official and as a member of the CalPERS Board, she often travels out of California.  Ms. Middleton and her wife travel in their spare time with their two rescue dogs throughout the Western United States.  Ms. Middleton is concerned that, as a result of the Rollback Rule, she may experience discrimination on the basis of her gender identity or her sexual orientation when traveling outside of California.

### 2.  The Rollback Rule will harm healthcare providers.

229.    The Rollback Rule will create significant confusion about the existence of legal protections against discrimination for transgender and gender-non-binary people, which will in turn embolden those seeking to discriminate.

230.    This will lead patients to shy away from preventive care, reproductive healthcare, and pregnancy-related care out of fear of discrimination.  Without important primary and reproductive healthcare, such patients will require more serious and more expensive care, including emergency care, which will increase the burden on healthcare providers.  *See* TLC Comments at 14; NWLC Comments at 9.

231.    That is particularly true if the patients are uninsured or if their insurer has refused to cover the care that they seek.  *See id.*

232.    Healthcare providers will also be confused about the scope of protections.  *See* Equality California, Comment Letter on 2019 Proposed Rule 1 (Aug. 12, 2019) ("Equality California Comments"), https://bit.ly/3dZppUD; *see also* Callen-Lorde Comments at 4; NCTE Comments at 38.

233.    The Rollback Rule's emboldening of discrimination against LGBTQ+ patients will mean that providers with reputations for providing inclusive and transgender-related care will have their capacity to serve their communities stretched and strained as more LGBTQ+ people seek them out to avoid discrimination by other providers.  *See* Callen-Lorde Comments at 3.  For example, Fenway Health, Callen-Lorde, CrescentCare, and BAGLY reasonably believe that the Rollback Rule will directly cause increasing rates of discrimination in the pool from which they draw their patients.  As a result, and because of their reputations as leading providers of healthcare services to the LGBTQ+ community, Fenway Health, Callen-Lorde, CrescentCare, and BAGLY will experience increased strain on their resources and capacity, caused by affected individuals seeking a healthcare setting that is self-determined to be free from discrimination. BAGLY, for example, has already experienced increased demand for its programming since the announcement of the Rollback Rule and anticipates further increases.

234.    The Rollback Rule will also likely cause Fenway Health to lose revenue.  Fenway Health provides healthcare, including gender-affirming care, regardless of insurance status and regardless of ability to pay.  However, Fenway Health currently generates about 73% of its operating revenue from insurer reimbursement for patient services.  And 78% of that insurer reimbursement comes from commercial insurers.  Some of those insurers are subject to limited or no state regulation.  Because some of the patients seeking out Fenway Health to avoid emboldened discrimination from other providers will be uninsured or underinsured, Fenway Health will likely be obligated to provide an increased rate of uncompensated care.

235.    The Rollback Rule's provisions regarding health insurance plans will mean that Fenway Health will be faced with significantly less advantageous third-party reimbursement for the medically necessary healthcare services that it provides.  For example, some third-party

payors for Fenway Health patients will understand the Rollback Rule to mean that they are no longer constrained from offering plans that categorically exclude gender-affirming care or other sex-based treatment that HHS incorrectly asserts to be exempt from Section 1557's scope. Such diminished coverage will generate harm to Fenway Health in the form of decreased reimbursement, as well as significant administrative time associated with understanding, applying, and appealing associated coverage decisions.

236. Callen-Lorde projects that it will lose revenue because of the Rollback Rule. Callen-Lorde serves patients regardless of their ability to pay. But roughly 38% of Callen-Lorde's patient population has private insurance, and roughly 35% have public insurance. Some patients are insured under plans subject to limited or no state regulation. Where patients are insured, Callen-Lorde attempts to recoup the costs that it incurs in providing care. And Callen-Lorde relies on insurance reimbursement to fund a significant portion of its services. But the Rollback Rule will reduce the total amount of insurance reimbursement that Callen-Lorde might otherwise receive. Callen-Lorde will also allocate more resources to assisting patients in appealing denials of claims, and to connecting patients with legal advocates so that they can file complaints or legal actions against health plans refusing to cover gender-affirming services.

237. The Rollback Rule will cause CrescentCare to lose revenue. CrescentCare currently generates about 13% of its operating revenue from insurer reimbursement for patient services. Approximately 25% of this reimbursement comes from commercial insurers, some of which is subject to limited or no state regulation. CrescentCare will be faced with significantly less advantageous third-party reimbursement for services it provides. For example, some third-party payors for CrescentCare patients will understand the Rollback Rule to mean that they are no longer constrained from offering plans that categorically exclude gender-affirming care, or

other sex-based treatment that HHS incorrectly asserts to be exempt from Section 1557's scope. CrescentCare will allocate more resources and administrative time to case management and legal services that help patients understand, apply, and appeal associated coverage decisions. Additionally, some patients will seek out CrescentCare to avoid newly emboldened discrimination from other providers. Because CrescentCare serves all patients regardless of insurance coverage and many of its patients will be uninsured or underinsured, CrescentCare will have to provide more uncompensated care.

238.    The Rollback Rule will also put a strain on Fenway Health, Callen-Lorde, and CrescentCare's training and education programs. Fenway Health, Callen-Lorde, and CrescentCare will need to revise training curricula to address the confusion that the Rollback Rule has caused about the requirements of federal law.

239.    The Rollback Rule will also harm BAGLY's healthcare services and its ability to meet the needs of young LGBTQ+ people in the Boston area. For example, the Rollback Rule will lead to increased demand at the Clinic @ BAGLY as the patients BAGLY serves look to access healthcare that is non-discriminatory and that does not require proof of insurance. The 12% of BAGLY's clients who are on insurance plans of parents who do not live in Massachusetts will further add to BAGLY's administrative and financial burden. BAGLY will need to expend additional administrative resources to sort out which out of state patients have coverage for gender-affirming care, now that there is no standard federal mandate of coverage. Additionally, young people who are on insurance plans from states without state protections against discrimination on the basis of sex will be more likely to go to BAGLY if they are confused about the state of the law and unsure that their insurance will cover services. These young people will be more likely to go to BAGLY because it does not require proof of insurance

for services, and so the young people know they will be able to access care there no matter the state of their coverage.

240.   The Rollback Rule will lead to increased demand for BAGLY's mental and behavioral health services because it will limit the number of non-discriminatory providers, limit the insurance reimbursement options available to BAGLY's service population, and lead to fear and confusion among BAGLY's service population.   BAGLY has seen an increase of young people accessing its counseling since the Rollback Rule was announced.   To expand its mental health services, BAGLY would need to hire an additional therapist and rent a larger space to accommodate more sessions, both of which would be major, unanticipated expenses for BAGLY.   BAGLY has limited financial resources to dedicate to its healthcare services, and it does not anticipate a major an increase in funding during this time of economic recession.

241.   Likewise, the Rollback Rule will lead to increased demand at CrescentCare's clinics as its patients look for healthcare that is non-discriminatory and is accessible for people regardless of insurance.   And it will result in increased demand for mental and behavioral health services at CrescentCare's facilities because the Rollback Rule will reduce the number of non-discriminatory providers, decrease nondiscriminatory insurance reimbursement options available to CrescentCare's service population, and lead to fear and confusion among CrescentCare's service population.   CrescentCare has limited financial resources to dedicate to its healthcare services, and it does not anticipate an increase in funding that will match the increase in need for services.

### 3.   The Rollback Rule will harm healthcare advocacy organizations.

242.   The Rollback Rule will burden the resources of the organizations that provide healthcare to LGBTQ+ people, people seeking pregnancy-related services, and LEP people, and to organizations that assist such people to obtain healthcare.   *See* Callen-Lorde Comments at 3

(discussing the strain discrimination puts on resources of LGBTQ+ organizations).  *See* TLDEF Comments at 4–6, 9 (discussing numerous requests for assistance TLDEF receives regarding transgender healthcare discrimination).

243.    The Rollback Rule will harm the Transgender Emergency Fund's work supporting the healthcare needs of transgender people in Massachusetts.  The Transgender Emergency Fund has limited financial resources and operates entirely from grants, donations, and fundraising.  After 2016, there was an increase in its clients' ability to access medical services, and a corresponding decrease in the number of clients coming to it for assistance obtaining medical care.  This is reflected in a decrease in the Transgender Emergency Fund's total outlays for healthcare-related services over the past few years.

244.    Specifically, from 2008 to 2016, the Transgender Emergency Fund spent between $100 to $500 per year on copayments for hormone replacement therapy for their clients, but this amount decreased to approximately $25 in 2018, and $0 in 2019.  From 2008 to 2016, the Transgender Emergency Fund spent approximately $2,000-$5,000 (depending on budget size) per year for personal supplies and other basic necessities to support the health and welfare of their clients, but this amount decreased to approximately $1,000 in 2017, $1,000 in 2018, and $500 in 2019.  Similarly, since 2016 the Transgender Emergency Fund has received fewer requests for assistance in obtaining medical care or coverage, fewer requests for transportation services to medical facilities, and has had fewer clients requiring long-distance travel to obtain needed medical care, resulting in a decrease in the Transgender Emergency Fund's expenditures on healthcare access, including on providing referrals to medical providers, challenging insurance denials, and transporting and escorting patients to medical facilities.  The Transgender Emergency Fund attributes this decrease in expenditures to improved insurance coverage of and

access to gender-affirming care following the issuance of the 2016 Rule, and the resulting overall improvement in the health of the transgender community in Massachusetts.

245.    Since the Rollback Rule was issued, the Transgender Emergency Fund has observed an increase in patients contacting them, the majority of whom have mentioned the rule or expressed concern and anxiety that the rule will lead to increased discrimination and denials of healthcare and coverage.  Where appropriate, the Transgender Emergency Fund has referred clients to healthcare facilities, including Fenway Health.  Based on this influx of intakes, and based on past trends regarding the Transgender Emergency Fund's healthcare expenditures following the 2016 Rule, the Transgender Emergency Fund anticipates that it will need to reallocate funds and devote more resources to financing clients' copayments for hormone replacement therapy, providing referrals for medical care and transportation to medical appointments, navigating insurance denials on behalf of their clients, and providing other financial assistance necessary for their clients' health and well-being as a result of the Rollback Rule, at a time when their funds are already strained due to the COVID-19 pandemic.

246.    The Transgender Emergency Fund also will need to divert resources to vet additional healthcare providers to whom it can refer clients, as  already-known gender-affirming providers such as Fenway Health will be strained in their ability to meet the increased demand for services.  As it is forced to divert more and more resources to counteract the harms the Rollback Rule will cause to their clients' health and economic security, the Transgender Emergency Fund will risk depleting its already limited funding and may be forced to forgo providing other services critical to accomplishing its mission of supporting low-income and homeless transgender people in Massachusetts.

247.    The Rollback Rule will harm BAGLY's work supporting the healthcare needs of the LGBTQ+ community.  BAGLY has already received questions about the Rollback Rule from young LGBTQ+ people, and staff is spending time to address the young people's concerns.  To respond, BAGLY is investigating whether to establish a new healthcare-focused Know-Your-Rights training for young LGBTQ+ people to combat the confusion and fear.  Creating and implementing this training would put further strain on BAGLY's staff and resources.

248.    The Rollback Rule will also harm the Campaign for Southern Equality's work supporting the healthcare needs of the LGBTQ+ community in the South.  It will cause the Campaign for Southern Equality to expend additional resources producing *Trans in the South* and providing information about providers who serve transgender patients.  In recent years, the number of providers willing to provide transgender-inclusive healthcare in the South has grown, due in part to Section 1557's prohibition of discrimination on the basis of sex as they have been incentivized by successful litigation.  *See supra* ¶ 105.  The staff of the Campaign for Southern Equality therefore anticipates that this increase in supportive providers will wane because healthcare providers and healthcare systems are, by design, responsive to regulatory changes and changes in standards of care.

249.    Because of the Rollback Rule, the Campaign for Southern Equality will need to expend additional staff and financial resources producing a new update to *Trans in the South* and helping its members locate providers who are willing to care for transgender people.  Indeed, it has already received over 500 requests for additional provider screenings for the next update of *Trans in the South*, which currently includes over 400 providers.  And it has recently heard from transgender members who are very concerned about how the Rollback Rule will negatively impact their access to basic health services.

250.    The Campaign for Southern Equality has expedited its timeline for the next update to the guide to respond to community fear and concerns.  The Campaign for Southern Equality hires seasonal staff to identify and to collect information about providers who should be included in the guide.  It planned to hire three staff and one intern to complete the next update; however, because of the increase in requests and the urgency of publishing the guide in light of the Rollback Rule, it will hire six to eight staff and dedicate five permanent staff to the update.

251.    The Rollback Rule will also harm the Campaign for Southern Equality's grassroots grant program (the Southern Equality Fund), which annually distributes grants ranging in size from $500 to $10,000 to grassroots groups and direct service providers across the South, with an emphasis on frontline groups that promote health equity for LGBTQ+ Southerners.  The Rollback Rule will decrease access to LGBTQ+-friendly primary care, without enforcement of sex discrimination claims by transgender patients by the Department of Health and Human Services, creating increased demand for this type of funding, and increased demand on the programs and services of the grassroots groups that the Campaign for Souther Equality supports..

252.    The Rollback Rule will also harm the Campaign for Southern Equality's capacity to train healthcare providers.  The Rollback Rule has induced panic and fear among community members.  The Campaign for Southern Equality's staff expects that requests for training by community members will increase as a result.  The Rollback Rule will also increase confusion among healthcare providers regarding their obligations under anti-discrimination law, resulting in an increased need for training.  The Campaign for Southern Equality currently devotes 60% of one staff member's time and 25% of another's to trainings.  It anticipates diverting additional staffing and funding resources towards their training programs and hiring a consultant for about ten additional hours each month due to the Rollback Rule.

253.    The Rollback Rule will be detrimental for the Campaign for Southern Equality's legal and healthcare navigation services.   Campaign for Southern Equality receives approximately three to five requests for navigation support and crisis support monthly and is at capacity to field those requests; any increase in these requests would require assigning additional staff to respond to these requests.  The Rollback Rule's exemption of many insurers from Section 1557 will likely increase the number of health insurance denials of transgender-affirming care, overwhelming the organization's ability to provide referrals.

254.    The Rollback Rule has already caused panic and confusion among the Campaign for Southern Equality's members.  It has received many inquiries from members about what the Rollback Rule will mean for LGBTQ+ people living in the South—its inconsistency with Section 1557, unlawful definition of "covered entities," and enforcement mechanisms.  One such member is a transgender man living in South Carolina who has sought a double mastectomy for the past three years but has not found a surgeon willing to challenge his self-funded group health insurance policy's exclusion of gender-affirming care.  He now fears that the Rollback Rule has foreclosed any possibility of legal recourse.  That fear has exacerbated his depression. anxiety, and need for psychotropic medications.

255.    Because healthcare discrimination is so rampant for the Campaign for Southern Equality's transgender and gender-non-binary members, many reasonably fear it will recur after the Rollback Rule.  Numerous members of Campaign for Southern Equality have health insurance and seek gender-affirming care and live in states that have no state anti-discrimination laws that would prohibit gender identity discrimination.

256.    The Campaign for Southern Equality's members will effectively have no meaningful legal remedies for this discrimination.  HHS made clear its interpretation that

discrimination claims on the basis of transgender status are not available under Section 1557, making an administrative complaint futile.  A federal suit is not an option for the majority of the Campaign for Southern Equality's members because they lack financial resources and access to attorneys.

257.   The Rollback Rule will harm Indigenous Women Rising's Midwifery and Abortion Funds and the clients they serve.  The Rollback Rule will cause more people to apply for assistance from the Midwifery Fund in order to avoid experiencing discrimination when accessing pregnancy-related care, such as the discrimination recently experienced by Native pregnant people in New Mexico who were racially profiled in the delivery room and had their newborns separated from them.

258.   By deleting the 2016 Rule's protections against discrimination on the basis of "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, [or] childbirth or related medical conditions" and incorporating an unlawful religious exemption into Section 1557, the Rollback Rule will allow and embolden discrimination in reproductive healthcare, including obstetrics and gynecological care.  The rule's consequences will be especially devastating to Indigenous people who already receive inconsistent, discriminatory, and substandard reproductive and pregnancy-related healthcare at IHS facilities—the primary source of healthcare for most IWR's clients.

259.   By removing the unitary standard, the Rollback Rule will also make it more difficult for Native people who can become pregnant to bring claims of intersectional discrimination.

260.   The Rollback Rule removes IHS entirely from the regulatory prohibitions.  By removing the threat of HHS enforcement and making it more difficult to obtain a judicial

remedy, the rule signals that the law does not protect against pregnancy discrimination in IHS and opens the door to further discrimination against Native people.

261.    These layers upon layers of discrimination will further burden the ability of Indigenous people who can become pregnant to access reproductive healthcare, exacerbate their existing fears of discrimination, and cause Native people who need pregnancy-related care to mistrust providers and turn to the Midwifery Fund for midwife or doula care.   Indigenous Women Rising will have to dedicate more funding to its Midwifery Fund to support their needs.

262.    The Rollback Rule targets and stigmatizes abortion in particular by deleting the 2016 Rule's explicit protections for "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom" from the definition of "on the basis of sex" and unlawfully adding an abortion exemption and a religious exemption into Section 1557's nondiscrimination protections. This will embolden and encourage refusals of abortion care and coverage and information about abortion, even in emergency situations.

263.    In particular, although IHS is subject to the Hyde Amendment, which prohibits certain federal funds, including funding for IHS, from being used to pay for an abortion, the Hyde Amendment does not extend to cases of life endangerment, incest, or rape, nor does it extend to the provision of information about abortion.   By removing protections for abortion care, singling out abortion in the preamble, and attempting to carve IHS out of the scope of the Rollback Rule's protections, the rule signals to IHS facilities that they can refuse non-Hyde abortion care and information about abortion care without consequence, thus threatening to exacerbate refusals of care and information.   It also gives the green light to healthcare providers, plans, and third-party administrators outside of IHS to refuse abortion care, coverage, and

information and aggravates our clients' fears that they will be denied the care, coverage, or information they need—even in emergency situations.

264.    This, in turn, will increase costs for Indigenous Women Rising's Abortion Fund. People who are denied abortion care or fear that they will be denied such care will turn to the Indigenous Women Rising Abortion Fund for financial and logistical assistance accessing that care.  People who are denied information or fear that they will be denied information about their pregnancy options will turn to Indigenous Women Rising as a trusted resource to supply the information they need, straining Indigenous Women Rising's already limited staff resources. Finally, people who lose abortion coverage or fear that they will be denied such coverage will turn to the Fund for assistance.  Denying care, coverage, and information about abortion care will inhibit or delay access to abortion care, which will put a greater financial burden on the Fund because the cost of abortion care increases when abortion care is delayed, and fewer clinics are able to provide abortion care later in pregnancy.  Thus, not only will the Rollback Rule threaten the life and health of Indigenous Women Rising's clients who are denied this care, coverage, and information, it also will cause the Abortion Fund to expend greater resources on increased demand for funding, on more expensive abortion care later in pregnancy, on clients' travel and related expenses to the few clinics that provide abortion care later in pregnancy, and on staff labor to provide information and resources to clients about abortion care.   By straining Indigenous Women Rising's finances and operations, the Rollback Rule undermines Indigenous Women Rising's ability to achieve its broader mission of supporting culturally safe health options through its various other programs.

### C.  The Rollback Rule Is Unlawful.

#### 1.  The Rollback Rule's repeal of the 2016 Rule's definition of "on the basis of sex" and other specific protections against sex discrimination is contrary to law and arbitrary and capricious.

265.    HHS's interpretation of discrimination on the ground of sex is contrary to law because it is incompatible with the weight of controlling precedent, including the Supreme Court's decision in *Bostock*; and is arbitrary and capricious because it "rests upon factual findings that contradict those which underlay [the] prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–516 (2009).

> a.  *The Rollback Rule relies on an inaccurate definition of "on the basis of sex."*

266.    The Rollback Rule repeals the 2016 Rule's definition of "on the basis of sex" in its entirety, without offering another definition in its place.

267.    The Rollback Rule also deletes specific requirements for equal access to healthcare programs and specific prohibitions against discrimination on the basis of sex in health insurance coverage and benefit design.  *See* 85 Fed. Reg. at 37,183–201 (discussing 2016 Rule provisions codified at 45 C.F.R. §§ 92.206, 92.207 (2019)).

268.    HHS states its "understanding" that the meaning of "sex" precludes application of Title IX's prohibition on discrimination "on the basis of sex" to discrimination on the basis of sexual orientation or transgender status.  *Id.* at 37,180.   HHS similarly contends that discrimination "on the basis of sex" does not encompass discrimination on the basis of sex stereotyping.  *Id.* at 37,183–186.

269.    This is an incorrect interpretation of Title IX, flatly contradicted by precedent, notably including *Bostock*.

270.    The omission of critical sex discrimination protections previously adopted in the 2016 Rule from the Rollback Rule despite this precedent confirms that HHS no longer intends to respect the rights of LGBTQ+ patients to be free of discrimination.

271.    The Rollback Rule disavows a prior HHS interpretation explaining that Section 1557's sex discrimination prohibition applies "to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and will accept such complaints for investigation." Letter from Leon Rodriguez, Director, U.S. Dep't of Health & Human Servs., Office for Civil Rights, to Maya Rupert, Federal Policy Director, National Center for Lesbian Rights (July 12, 2012),  https://bit.ly/3iv7bxt; *see* 85 Fed. Reg. at 37,191.

272.    The Rollback Rule also refuses to confirm that discrimination on the basis of sex necessarily prohibits discrimination on the basis of termination of pregnancy, instead stating that it "declines to speculate" about when it would consider such discrimination unlawful under Section 1557.  85 Fed. Reg. at 37,193; *see also* 84 Fed. Reg. at 27,870 ("[T]his proposed rule does not adopt a position on whether discrimination on the basis of termination of pregnancy can constitute discrimination on the basis of sex . . . .").  Yet HHS has taken just that position when interpreting Title IX—one of the grounds of Section 1557.  *See* 45 C.F.R. § 86.40(b)(1) (prohibiting discrimination in education "on the basis of such student's pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom").  This interpretation is consistent with the longstanding interpretation of discrimination on the basis of sex under Title VII.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008) ("[A]n employer may not discriminate against a woman employee because she has exercised her right to have an abortion."), *order clarified*, 543 F.3d 178; *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (same); *Ducharme v. Crescent City Deja Vu, L.L.C.*, 406 F. Supp. 3d 548, 556 (E.D. La. 2019) (same); *see also* 29 C.F.R. Pt. 1604, App. ("A woman is therefore protected against such practices as being fired, or refused a job or promotion, merely because she is pregnant or

has had an abortion.").  Rather than providing guidance about HHS' own interpretation of the ACA—the purpose of agency rulemaking—the Rollback Rule does precisely the opposite.

> b.   *The Rollback Rule relies on an unlawful interpretation of Title IX.*

273.   The Rollback Rule's explanation for repealing the definition of "on the basis of sex" is "the plain meaning of the term in the statute," namely that "'[s]ex' according to its original and ordinary public meaning refers to the biological binary of male and female that human beings share with other mammals."  85 Fed Reg. at 37,178.

274.   This explanation disregards *Bostock's* central holding that discrimination on the basis of transgender status and sexual orientation "necessarily entails discrimination based on sex."  *Bostock*, 140 S. Ct. at 1747.  The Supreme Court reached this holding even proceeding under the assumption, for argument's sake, that the definition of "sex" is the "biological distinction[] between male and female," which is the same as the definition on which HHS purports to rely.  *Id.* at 1739.  As *Bostock* makes clear, Title VII prohibits all forms of discrimination "because of sex, however they may manifest themselves or whatever other labels might attach to them."  *Id.* at 1747.  The Rollback Rule is thus contrary to law because it relies on an interpretation expressly rejected by the Supreme Court in an opinion issued days prior to its publication.

> c.   *The Rollback Rule ignores the harms that LGBTQ+ people and people who have obtained or are seeking reproductive healthcare will face, in direct contravention of Section 1557.*

275.   HHS ignored substantial evidence submitted by tens of thousands of commenters that transgender people and women continue to experience discrimination in healthcare and denials of care, leading to disparate health outcomes.  *See* 2016 Rule, 81 Fed. Reg. at 31,460; *see also* Planned Parenthood Comments at 7 (reporting high rates of discrimination against

LGBTQ+ persons in the healthcare system); Lambda Comments at 7 & n.39 (discussing transgender-specific exclusions); TLC Comments at 6 (explaining that denials of care have more severe consequences for transgender people, such as suicidal ideation); TLDEF Comments at 3, 5–6, 9–10; NHeLP Comments at 51–57; Gender Justice, Comment Letter on 2019 Proposed Rule 6–8 (Aug. 13, 2019) ("Gender Justice Comments"), https://bit.ly/3eWmwoM; Nat'l Ctr. for Transgender Equality, Comment Letter on 2019 Proposed Rule 17–19 (Aug. 13, 2019) ("NCTE Comments"), https://bit.ly/3dSRDjR.

276.    Contrary to these undisputed comments, HHS callously concluded that "[c]ommenters' concern about denial of basic healthcare to transgender individuals appears to be largely based on unsubstantiated hypothetical scenarios" and that "denial of basic healthcare on the basis of gender identity is not a widespread problem in the U.S." 85 Fed. Reg. at 37,191–192.   HHS likewise dismissed without basis commenters' fears that the Rollback Rule "will allow discrimination against women based upon their abortion history" and will hinder access to a host of "women's healthcare services related to pregnancy," such as "prenatal and postpartum services, tubal ligations, and birth control (both as a contraceptive and when used to treat other medical conditions), "in vitro fertilization," and "treatments prior to, during, or after a miscarriage." *Id.* at 37,192.

277.    HHS did not offer any facts, studies, or data to refute the findings of the 2016 Rule—or the tens of thousands of comments responding to the 2019 Proposed Rule—with respect to the harms of healthcare discrimination to transgender people and women.

278.    By deleting "gender identity" and "sex stereotyping" from the definition of sex discrimination for purposes of Section 1557 and the 2016 Rule's specific prohibitions against discrimination based on sex, HHS will cause confusion among healthcare providers and insurers

regarding their legal obligations under Section 1557 and embolden discrimination against LGBTQ+ persons on the basis of gender identity and sexual orientation.

279.    Likewise, although HHS claims that it will "fully enforce its statutory authorities concerning any discriminatory denial of access to women's health services, including those related to pregnancy," *id.* at 37,193, the Rollback Rule's deletion of the terms "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions" from the regulatory definition of sex discrimination for purposes of Section 1557 will cause confusion and embolden refusals of reproductive healthcare.  HHS's refusal to clarify that Section 1557 prohibits discrimination based on "termination of pregnancy" will also embolden discrimination against individuals who have obtained or are seeking abortion care. HHS makes no effort to address commenters' concerns that the Rollback Rule will encourage such discrimination and denials of care.  *See id.* at 37,192.

280.    HHS likewise offered no reasoned basis for rescinding the 2016 Rule's prohibitions on discrimination on the basis of association.  Indeed, it expressly declined to base this recission on a view that Section 1557 does not cover such discrimination, and ignored commenters' observations regarding the harms that approach will cause.

> ## 2.  The Rollback Rule's incorporation of Title IX's religious and abortion exemptions is contrary to law and arbitrary and capricious.

281.    Section 1557 includes only one exemption from its prohibition on discrimination —"[e]xcept as otherwise provided" in Title I of the ACA.  42 U.S.C. § 18116(a).  Section 1557 does not contain any exemption regarding religion or abortion.  *Id.*

282.    Section 1557 refers to the cross-referenced non-discrimination statutes only for the grounds on which they prohibit discrimination.  The "ground prohibited" under Title IX is

"sex."  42 U.S.C. § 18116(a).  Section 1557 does not refer to any *exemption* in Title IX.  *See* 42 U.S.C. § 18116(a).

283.    The 2016 Rule correctly interpreted Section 1557 not to incorporate Title IX's religious exemption, both because "Section 1557 itself contains no religious exemption" and because "Title IX and its exemption are limited in scope to educational institutions."  81 Fed. Reg. at 31,380.

284.    Title IX's religious exemption states that Title IX "shall not apply to an *educational institution which is controlled by a religious organization* if the application of this subsection would not be consistent with the religious tenets of such organization."  20 U.S.C. § 1681(a)(3) (emphasis added).

285.    HHS explained in the 2016 Rule that the Title IX religious exemption—which applies by its terms only to certain "educational institutions"—would be inappropriate in the healthcare context.  To the contrary, it would likely *create* harm because patients often face limited choices for healthcare providers and insurers, meaning that denial or delay in the provision of healthcare could discourage individuals from seeking necessary care, leading, in turn, to serious, and even life-threatening, results.  *See* 81 Fed. Reg. at 31,380.

286.    Instead, HHS indicated that the 2016 Rule would not apply where it "would violate applicable Federal statutory protections."  *Id.* at 31,466 (codified at 45 C.F.R. § 92.2(b)(2) (2019)).

287.    The 2016 Rule likewise correctly declined to import Title IX's abortion exemption into Section 1557.  That exemption states that Title IX shall not "be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

288.    The Rollback Rule's incorporation of the religion and abortion exemptions from Title IX is contrary to law and arbitrary and capricious.

289.    The Rollback Rule reverses the agency's position by incorporating the Title IX religious exemption into Section 1557 without any basis.

290.    The Rollback Rule reverses the agency's position by incorporating the Title IX abortion exemption into Section 1557 without any basis.

291.    The Rollback Rule also arbitrarily makes HHS's Section 1557 regulations effective only to the extent they do not conflict with "definitions, exemptions, affirmative rights, or protections" from nine unrelated statutes, and additional, yet-to-be enacted, statutes.  85 Fed. Reg. at 37,245 (to be codified at 45 C.F.R. § 92.6(b)).

292.    HHS did not provide a reasoned basis for discounting the 2016 Rule's findings regarding the risks of importing these exemptions into the healthcare context.

293.    The risks, however, are severe.  Many patients—especially those in rural areas and those who lack financial means to seek other providers—have no alternative to a healthcare provider who wants to use personal beliefs about religion or abortion to dictate patient care, especially when faced with a medical emergency.  *See* AAMC Comments at 4; Katie Hafner, *As Catholic Hospitals Expand, So Do Limits on Some Procedures*, N.Y. Times (Aug. 10, 2018), https://nyti.ms/2C87Wfa.

294.    Discrimination in the healthcare context has devastating consequences—it "could result in a denial or delay in the provision of healthcare to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results."    81 Fed. Reg. 31,379–380; *see also* FAPP Comments at 10).    This will

disproportionately harm LGBTQ+ people and people who have obtained or are seeking reproductive health services, including abortion care.

295.    In justifying its decision to import a new abortion exemption into Section 1557, the Rollback Rule relays scientifically debunked assertions from commenters that "many abortions are dangerous and lead to life-threatening complications for women," while dismissing without basis commenters' fears that the Rollback Rule would cause "serious and/or life-threatening results because hospitals would not provide abortion care on the basis of religious beliefs." 85 Fed. Reg. at 37,193; *but see June Med. Servs. LLC v. Russo*, No. 18-1323, 2020 WL 3492640, at *12 (U.S. June 29, 2020) (plurality op.) (highlighting " 'the fact that abortions are so safe' " (quoting *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2312 (2016))).

296.    By incorporating these exemptions despite the plain text of Section 1557, HHS will cause confusion among healthcare providers and insurers as to their legal obligations under Section 1557.

297.    By incorporating these exemptions despite the plain text of Section 1557, HHS will cause confusion among patients about their rights under Section 1557.

298.    By incorporating these exemptions, the Rollback Rule will embolden healthcare providers and insurers to make patient care decisions based on religious beliefs, rather than medical judgment.

299.    By incorporating these exemptions, the Rollback Rule increases the risk that women and LGBTQ+ people will face barriers to accessing healthcare, including emergency healthcare. *See* College of Emergency Physicians Comments at 2; NWLC Comments at 11; Planned Parenthood Comments at 14; NCTE Comments at 67–69; NHeLP Comments at 22–27.

300.    Religiously affiliated hospitals, for example, routinely deny appropriate miscarriage management or treatments for ectopic pregnancies.  *See, e.g.*, *Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 646–647 (6th Cir. 2016); Julia Kaye et al., *Health Care Denied Patients and Physicians Speak Out About Catholic Hospitals and the Threat to Women's Health and Lives* 8–17 (2016), https://bit.ly/38Epiwt.

301.    The same is true for transgender people.  *See* Planned Parenthood Comments at 7 (explaining that transgender persons are often denied treatment for HIV, mammograms, and urinary tract infection screenings based on their gender identity or transgender status); *Conforti v. St. Joseph's Healthcare Sys., Inc.*, No. 2:17-CV-00050, 2019 WL 3847994 (D.N.J. Aug. 15, 2019) (describing claims of a transgender man who was refused a medically necessary hysterectomy by a Catholic hospital).

302.    By encouraging healthcare institutions and health workers to deny care based on religious beliefs or personal objections even in emergency situations, the Rollback Rule arbitrarily and capriciously encourages those institutions and providers to violate the Emergency Medical Treatment and Labor Act, "EMTALA."  42 U.S.C. § 1395dd.  EMTALA requires any hospital that receives Medicare funds and operates an emergency department to examine all individuals that come into the emergency room and, if an emergency medical condition exists, to either stabilize the condition or, in certain circumstances, arrange for the transfer of the individual.  *Id.*  "[N]othing in [the ACA]," including Section 1557, "shall be construed to relieve any health care provider from providing emergency services as required by . . . EMTALA."  42 U.S.C. § 18023(d).  Nonetheless, the Rollback Rule's incorporation of the religious and abortion exemptions invites entities to deny such emergency care, ignoring the substantial evidence of harm that would result from such denials of emergency care that was before the agency.  *See*

College of Emergency Physicians Comments at 2 ("Patients with life-threatening injuries or illnesses may not have time to wait to be referred to another physician or other healthcare professional to treat them if the present provider has a moral or religious objection."); NWLC Comments at 11; Planned Parenthood Comments at 14.

303.    These harms will increase over time because the healthcare market includes a large, and increasingly growing, number of religiously affiliated hospitals and healthcare systems.  *See, e.g.,* FAPP Comments at 10 & n.34; Planned Parenthood Comments at 13–16.

### 3. The Rollback Rule's elimination of the uniform enforcement scheme is contrary to law and arbitrary and capricious.

304.    Section 1557 created a new, uniform scheme for enforcing protections against discrimination in healthcare.  Section 1557 states: "The enforcement mechanisms provided for and available under such title VI, title IX, section 504, *or* such Age Discrimination Act shall apply for purposes of violations of this subsection." *See* 42 U.S.C. § 18116(a) (emphasis added). By using the disjunctive "or," Congress provided that the enforcement mechanisms available in any of the cross-referenced statutes are available to a Section 1557 plaintiff, regardless of her protected class status.  Thus, under this new uniform standard, any Section 1557 plaintiff may bring a private right of action for disparate treatment *or* disparate impact discrimination.

305.    The uniform standard is necessary to avoid absurd and illogical results, as any other interpretation of the statute would mean that Section 1557 plaintiffs who have experienced the same discriminatory conduct would have different enforcement mechanisms and remedies depending on whether the discrimination was based on their sex, race, color, national origin, sex, age, disability, or a combination of one or more of these bases.

306.    The uniform standard is the only reading of Section 1557 that would permit courts to evaluate the claims of a plaintiff alleging multiple and intersecting forms of discrimination.

307.     The 2016 Rule properly implemented Section 1557's uniform enforcement standard by providing that the enforcement mechanisms available under the cross-referenced statutes are available to remedy discrimination on any of the grounds of discrimination covered by Section 1557.  *See* 81 Fed. Reg. at 31,472 (codified at 45 C.F.R. § 92.301(a) (2019)).

308.     In response to comments requesting confirmation that under the plain language of the statute, "all enforcement mechanisms available under the statutes listed in Section 1557 are available to each Section 1557 plaintiff, regardless of the plaintiff's protected class," *id.* at 31,439, HHS stated that it "interprets Section 1557 as authorizing a private right of action for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the legislation." *Id.* at 31,440.

309.     Consistent with this interpretation, the 2016 Rule explicitly prohibited certain discriminatory acts "that *have the effect* of subjecting individuals to discrimination on the basis of sex"—that is, disparate impact sex discrimination.  *Id.* at 31,470 (codified at 45 C.F.R. § 92.101(b)(3)(ii) (2019)) (emphasis added).

310.     The 2016 Rule also properly acknowledged that Section 1557 contains a private right of action and that compensatory damages are available to Section 1557 plaintiffs in both judicial and administrative proceedings.  *See id.* at 31,472 (codified at 45 C.F.R. §§ 92.301(b), 92.302(d) (2019)).  Such interpretation is supported by the plain language of Section 1557 and the purpose of the ACA.

311.     Yet the Rollback Rule reversed course without reasoned explanation, contravening the plain language of Section 1557 by deleting these provisions and retracting the 2016 Rule's statement that Section 1557 created a new, singular standard that permits disparate impact claims on the basis of sex.  85 Fed. Reg. at 37,195.

312.    Instead, the Rollback Rule adopted an interpretation of Section 1557 that conflicts with the text of the statute, under which each ground of discrimination is governed by a separate standard for liability, causation, proof, and enforcement.  *See id.* at 37,201–202.

313.    The Rollback Rule's position that people have different levels of protection based upon the protected class to which they belong effectively embeds discriminatory practices into Section 1557 and contravenes the statute's express purpose of ensuring equal treatment within the healthcare system.  *See, e.g.*, 156 Cong. Rec. S1842 (daily ed. Mar. 23, 2010).  The Rollback Rule's revised interpretation of Section 1557 is thus not only contrary to the plain language of Section 1557, it is contrary to the overall goal of Section 1557, as well as the broader purpose of the ACA—to improve access to healthcare and reduce health disparities.

314.    The Rollback Rule's deletion of the 2016 Rule's provision confirming that Section 1557 contains a private right of action likewise contradicts the plain language of the statute—which incorporates the "enforcement mechanisms" of four civil rights laws that contain a private right of action.   The deletion of this provision also defies every court that has considered the question of whether Section 1557 confers a private right of action.  *See, e.g.*, *Rumble v. Fairview Health Servs.,* 2015 WL 1197415 at *11 (D. Minn. 2015); *Callum v. CVS Health Corp.*, 137 F.Supp.3d 817, 845 (D.S.C. 2015).   Yet, HHS decided that it "no longer intends to take a position" as to whether Section 1557 provides a private right of action, without providing any basis for that decision. 85 Fed. Reg. at 37,203.

315.    The Rollback Rule indicates that it abandoned the 2016 Rule's uniform enforcement scheme because it viewed that scheme as "a new patchwork regulatory framework unique to Section 1557 covered entities" that was "confusing."  *Id.* at 37,162.  But it is the Rollback Rule's elimination of the uniform enforcement scheme that will create a patchwork of

legal standards and cause confusion by requiring healthcare providers, insurers, and patients to work through a maze of statutory cross-references to determine their obligations and rights under Section 1557.

316.    HHS failed to respond meaningfully to commenters who expressed concern that the Rollback Rule would compound discrimination faced by individuals based on multiple and intersecting characteristics and make it more difficult for individuals experiencing intersectional discrimination to seek a remedy.    HHS responded only that it would continue to accept complaints alleging discrimination based on one or more protected statuses without elaborating what standards HHS would apply, or any explanation of why the Rollback Rule will not hinder individuals' ability to obtain a judicial remedy through private action.  *Id.* at 37,200.

317.    Although the statute itself will continue to protect Section 1557 plaintiffs who seek to vindicate their rights in court, the Rollback Rule injects ambiguity as to the appropriate legal standard for resolving Section 1557 claims.  This ambiguity, as well as HHS's refusal to recognize claims for disparate impact sex discrimination, will make it more difficult for patients to assert their rights under Section 1557 and obtain redress administratively or judicially.

### 4.    The Rollback Rule's narrowing of the definition of covered entities is contrary to law and arbitrary and capricious.

318.    The Rollback Rule's narrowing of the scope of covered entities is contrary to the plain text of Section 1557.  It is also arbitrary and capricious because doing so belies the purpose of the ACA, which is to *increase* health access and coverage.  *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538–539 (2012).

319.    The Rollback Rule narrowed the category of covered entities to a "health program or activity" that receives federal financial assistance from HHS or a "program or activity

administered by" HHS under Title I of the ACA or by an entity established under that Title.  85 Fed. Reg. at 37,167–170 (to be codified at 45 C.F.R. § 92.3(a)).

320.    For entities "principally engaged in the business of providing health care," the Rollback Rule defines "health program or activity" to include all the activities of that entity.  *Id.* at 37,171–172 (to be codified at 45 C.F.R. § 92.3(b)).

321.    For entities *not* principally engaged in the business of providing healthcare, the Rollback Rule defines "health program or activity" to include "such entity's operations only to the extent any such operation receives Federal financial assistance."  *Id.*

322.    The Rollback Rule defines health insurance issuers as not "principally engaged in the business of providing health care."  *Id.* at 37,172–174 (to be codified at 45 C.F.R. § 92.3(c)).

323.    These definitions significantly narrow the scope of entities subject to HHS's enforcement of Section 1557.

324.    In support of these new definitions, HHS cites the Civil Rights Restoration Act (CRRA), Public Law 100-259, 102 Stat. 28 (Mar. 22, 1988), *see* 85 Fed. Reg. at 37,171.  The CRRA was passed by Congress to restore an expansive interpretive scope to Title IX in response to *Grove City College v. Bell*, 465 U.S. 555 (1984).  *See Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir. 1993) ("In response to *Grove City*, Congress scrapped the program-specific approach and reinstated an institution-wide application of Title IX by passing the Civil Rights Restoration Act of 1987 [] . . . requir[ing] that if any arm of an educational institution received federal funds, the institution as a whole must comply with Title IX's provisions." (citing S. Rep. No. 64, 100th Cong., 2d Sess. 4 (1988), reprinted in 1988 U.S.C.C.A.N. 3, 6)).

325.     These definitions conflict with Section 1557, which covers a substantially broader scope of entities.   *See* 42 U.S.C. § 18116(a); *see also* 81 Fed. Reg. 31,466 (the 2016 Rule, interpreting covered entities broadly in line with Section 1557).

326.     Section 1557 applies to "*any* health program or activity, *any part of which* is receiving Federal financial assistance."  42 U.S.C. § 18116(a) (emphasis added).

327.     Section 1557's reference to "health program or activity" includes the issuance of insurance because the ACA was designed to increase access to both care *and* insurance; indeed, the signature components of the ACA—the individual responsibility provision, the guaranteed issue provision, and the community rating provision—each seek to increase access to health insurance.

328.     By narrowing these definitions, the Rollback Rule contradicts the purpose of the ACA and will embolden healthcare providers and insurers to discriminate against persons on the basis of sexual orientation, gender identity, pregnancy, false pregnancy, termination of pregnancy or recovery therefrom, and childbirth or related medical conditions.

329.     By narrowing these definitions, HHS will cause confusion among healthcare providers and insurers about their obligations under Section 1557.

330.     By narrowing these definitions, HHS will cause confusion among patients about their rights under Section 1557.

### 5.  The Rollback Rule's elimination of the notice and taglines requirement is arbitrary and capricious.

331.     The 2016 Rule recognized that "national origin" discrimination under Title VI entails discrimination based on the "linguistic characteristics of a national origin group."  81 Fed Reg. at 31,470–471.

88

332.    The 2016 Rule required covered entities to "take reasonable steps to provide meaningful access to each individual with limited English proficiency eligible to be served or likely to be encountered in its health programs and activities."  *Id.* at 31,470 (codified at 45 C.F.R. § 92.201(a) (2019)).

333.    The 2016 Rule required covered entities to provide notice of nondiscrimination policies, including notice of availability of language assistance services and an explanation of how to access those services.  *Id.* at 31,469 (codified at 45 C.F.R. § 92.8(a) (2019)).

334.    The 2016 Rule required covered entities to include notices and taglines on all significant documents in the top fifteen languages spoken by LEP individuals in the entity's state.  *Id.* at 31,469 (codified at 45 C.F.R. § 92.8(d)(1)).

335.    The Rollback Rule revised the meaningful access standard to require covered entities to "take reasonable steps to ensure meaningful access to such programs or activities by limited English proficient individuals."  85 Fed. Reg. at 37,245.  This revised standard does not require covered entities to ensure that "each individual" with LEP has meaningful access; instead, it requires that covered entities take steps only with respect to LEP persons as an undifferentiated group, without requiring entities to consider, for example, which specific languages the people they are likely to interact with speak.  This removes the requirement for providers to have a meaningful language access plan.

336.    The Rollback Rule removes the notice and taglines requirement because HHS considers them too expensive.  *See id.* at 37,162–163.  HHS offers no explanation, rationale, or calculation beyond summary conclusions and figures for that assertion.  HHS also neglects to account for the cost of confusion that will be occasioned by the Rollback Rule.

337.    HHS did not explain why potential cost savings justify revising the "meaningful access" test to refer to groups rather than individuals.

338.    HHS did not offer a reasoned explanation for prioritizing costs over patients' needs to communicate with their doctors and healthcare providers.

### 6. The Rollback Rule's elimination of non-discrimination provisions not promulgated under Section 1557 is contrary to law and arbitrary and capricious.

339.    The Rollback Rule eliminates protections against gender identity and sexual orientation discrimination in regulations that implement statutes other than Section 1557, such as Medicaid State Plans, Programs for All-Inclusive Care for the Elderly (PACE), and the ACA state health insurance marketplaces and plans. *See id.* at 37,218–222, 37,243.

340.    These provisions were promulgated to further the ACA's aim of expanding insurance coverage and access to healthcare by eliminating discrimination-based barriers to coverage and care. *See* 45 C.F.R. §§ 147.104(e), 155.120(c)(1)(ii), 155.220(j)(2)(i), 156.200(e), & 156.1230(b)(2); *see also* PPACA; Establishment of Exchanges and Qualified Health Plans, 77 Fed. Reg. 18,310, 18,319, 18,415 (Mar. 27, 2012); PPACA; Health Insurance Market Rules, 78 Fed. Reg. 13,406, 13,417 (Feb. 27, 2013); PPACA; Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240, 30,261 (May 27, 2014); PPACA; HHS Notice of Benefit and Payment Parameters for 2018, 81 Fed. Reg. 94,058, 94,064, 94,152 (Dec. 22, 2016).

341.    The deletion of these protections is both contrary to law and arbitrary and capricious.  It is contrary to the Supreme Court's clear holding in *Bostock* that statutory prohibitions of discrimination "on the basis of sex" necessarily encompass discrimination based on sexual orientation and gender identity.  And HHS arbitrarily and capriciously failed to update its explanation of that deletion in light of *Bostock*.

342.     The deletion will also cause confusion among healthcare providers and insurers as to their legal obligations, cause confusion among patients as to their legal rights, and embolden discrimination against persons on the basis of gender identity, sexual orientation, pregnancy, false pregnancy, termination of pregnancy or recovery therefrom, and childbirth or related medical conditions.

343.     The Rollback Rule did not identify a reasoned basis for eliminating these protections.

344.     The Rollback Rule did not estimate the benefits of eliminating these protections.

345.     The Rollback Rule did not estimate the costs of eliminating these protections.

346.     The Rollback Rule did not sufficiently respond to numerous public comments that raised concerns with this proposed deletion.  *See, e.g.*, TLC Comments at 4–5; TLDEF Comments at 2–3.

### 7.   The Rollback Rule's regulatory impact analysis is arbitrary and capricious.

347.     Agencies must make a reasoned determination that a regulation's benefits justify its costs.  *See* Exec. Order No. 13563 § 1(b), 76 Fed. Reg. 3,821 (Jan. 18, 2011).

348.     The cost-benefit analysis is "a centrally relevant factor when deciding whether to regulate."  *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015).

349.     HHS identifies only one quantifiable benefit—"approximately $2.9 billion in cost savings"—from repealing the notice and taglines requirement.  85 Fed. Reg. at 37,162.

350.     HHS relied exclusively on self-reported providers' estimates, with no public outreach, to determine the impact of the notice and taglines requirement.  *See id.* at 37,229.

351.     HHS's own calculations show that figure must be adjusted down to $2.65 billion after accounting for costs.  *Id.* at 37,224.

352.     HHS did not explain why the benefits as calculated in the Rollback Rule dropped from the $3.6 billion figure in the 2019 Proposed Rule.  *See* 84 Fed. Reg. at 27,880.  HHS does not explain whether or how the regulatory impact analysis changes in light of the almost one billion (or more than 25%) difference.

353.     HHS did not account for costs of additional litigation that will inevitably arise because of the Rollback Rule's dismantling of the uniform enforcement mechanism and grievance procedure requirement available under the 2016 Rule.

354.     HHS did not explain why its calculation of the benefits from eliminating the notice and taglines requirement justified the full scope of the Rollback Rule, which eliminated numerous other provisions that provided demonstrable benefits, including making healthcare more accessible for those who do not speak English.  *See* Am. Lung Ass'n, Comment Letter on 2019 Proposed Rule 5 (Aug. 13, 2019), https://bit.ly/2Dbecnj.

355.     HHS did not establish that the savings outweigh the costs of the Rollback Rule.

356.     Language barriers can impede access to quality care, and the costs of these barriers can be deadly.  According to a 2010 study, patients lost their lives and suffered irreparable harm due to language barriers and the failure to provide appropriate language services.  *See* NHeLP Comments at 27–29.

357.     HHS acknowledged that some covered entities will revert back to the discriminatory policies and practices related to gender identity and sex-stereotyping.  85 Fed. Reg. at 37,225.

358.     Denying transgender-related care can result in increased costs because it increases the risk of negative "end points," such as depression, suicidality, substance abuse, drug abuse,

and HIV.  *See* Cities of Chicago, et al., Comment Letter on 2019 Proposed Rule 29 (Aug. 13, 2019), https://bit.ly/2ZEslRe.

359.    Delaying or forgoing basic preventive care due to fear of discrimination causes higher costs down the road because conditions are left untreated.  *See, e.g.*, TLC Comments at 8–9; 85 Fed. Reg. at 37,165; *see also id.* at 37,233.

360.    Discrimination based on pregnancy history can mean a patient is unable to get the care they need when they need it.  For example, patients who are pregnant and face discrimination because they previously had had an abortion may delay or forgo prenatal care. Research shows that prenatal care is associated with lower hospital costs.  James W. Henderson, *The Cost Effectiveness of Prenatal Care*, 15 Health Care Financing Rev. 21, 22, 27 (1994), https://bit.ly/3fcs4f3.

361.    Any delay in care could lead to later costs in the long run, both in caring for the patient and the infant.  For Black and Indigenous women, such denials of care can be life-threatening.  *See* NHeLP Comments at 61–62.  For Asian American and Pacific Islander and Latina women, existing barriers to comprehensive reproductive healthcare could also worsen if they are discriminated against based on their pregnancy history.  *Id.*

362.    HHS declined to address the costs of the Rollback Rule because it "lacks the data necessary to estimate the number of individuals who currently benefit from covered entities' policies governing discrimination on the basis of gender identity who would no longer receive those benefits," and, consequently, it cannot compute "related cost and benefits from such change."  *Id.; see also id.* at 37,163 ("Costs are not calculable based on available data.").

363.    In doing so, HHS ignored the substantial data, reports, and studies submitted by commenters who supplied this data as part of the request for data in the 2019 Proposed Rule.

**8.**             **The Rollback Rule evinces animus toward transgender people.**

364.    Director Severino was closely involved in the drafting and decisionmaking reflected in the Rollback Rule.  Director Severino personally attended several of the meetings between the Office of Management and Budget and advocates urging changes to the Notice of Proposed Rulemaking before the Rollback Rule was published.  *See, e.g.*, Minutes, Office of Mgmt. and Budget, EO 12866 Meeting 0945-AA11 (May 4, 2018), https://bit.ly/2ZQiuYL.

365.    The Rollback Rule was promulgated as part of a campaign of consistent, repeated anti-transgender sentiments, advocacy, and comments by the Administration as a whole, including HHS officials responsible for enforcing Section 1557 and promulgating its regulations. The Rollback Rule aims to denigrate LGBTQ+ people, particularly transgender people: falsely characterizing them as a threat, spreading misinformation and lies about them, and turning the federal government's efforts to combat discrimination into efforts to promote discrimination.

366.    Thus, on January 24, 2017, the Administration's fifth day in office, it scrubbed all mentions of LGBTQ+ people from the websites of the White House, Department of State, and Department of Labor.  Emily O'Hara, *Trump Administration Removes LGBTQ Content From Federal Websites*, NBC News (Jan. 24, 2017, 11:01 AM), https://nbcnews.to/31SgD8g.

367.    On February 22, 2017, the Departments of Justice and Education withdrew landmark 2016 guidance explaining how schools must protect transgender students under the federal Title IX law.  Cory Turner & Anya Kamenetz, *The Education Departments Says It Won't Act on Transgender Student Bathroom Access,* NPR (Feb. 12, 2018, 5:39 PM), https://n.pr/38xO6Gx.  The Department of Education has since consistently taken the position that discrimination "on the basis of sex" under Title IX does not protect transgender students

against discrimination due to their transgender status.   This is contrary to numerous court decisions that have expressly held otherwise.

368.   On March 28, 2017, the Census Bureau retracted a proposal to collect demographic information on LGBTQ+ people in the 2020 Census.   Laurie Kellman, *Census Suggests Counting LGBTQ, Then "Corrects" and Deletes*, AP News (Mar. 29, 2017), https://bit.ly/3iBItvB.

369.   In early 2017, the Department of Housing and Urban Development (HUD) removed "for review six resource documents aimed at helping emergency homeless shelters and other housing providers comply with HUD nondiscrimination policies regarding LGBT service recipients."  Letter from Members of Congress to Ben Carson, Sec'y, U.S. Dep't of Housing and Urban Dev. 1 (Jan. 31, 2019), https://bit.ly/3fljVFj.  The "review" was never completed, despite its completion being directed by Congress.  *See id.*

370.   On July 26, 2017, President Trump announced that transgender service members would no longer be allowed to continue to serve in the military because they are a "distraction" from the military's mission.

371.   On October 4, 2017, then-Attorney General Jeff Sessions issued a memorandum stating that "as a conclusion of law," Title VII does not prohibit discrimination on the basis of transgender status.  Mem. From Jefferson Beauregard Sessions III, Att'y Gen., Dep't of Justice, Re: Revised Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Oct. 4, 2017), https://bit.ly/2ZLqD0t.

372.   On May 11, 2018, the Department of Justice announced a policy change to the Federal Bureau of Prison's Transgender Offender Manual to eliminate recommending housing

consistent with gender identity.  *See* Katie Benner, *Federal Prisons Roll Back Rules Protecting Transgender People*, N.Y. Times (May 11, 2018), https://nyti.ms/2Z8vbza.

373.    On August 15, 2019, the Department of Labor proposed a rule intended to allow federal contractors to discriminate against their LGBTQ+ employees on the basis of sexual orientation and gender identity.  *See* Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption, 84 Fed. Reg. 41,677 (proposed Aug. 15, 2019) (codified at 41 C.F.R. pt 60), https://bit.ly/2Chy2Ne.

374.    On September 19, 2019, Housing and Urban Development (HUD) Secretary Ben Carson shocked his staff by referring to homeless transgender women seeking shelter as "big, hairy men" trying to infiltrate women's homeless shelters.  Tracy Jan et al., *HUD Secretary Ben Carson Makes Dismissive Comments About Transgender People, Angering Agency Staff*, Wash. Post (Sept. 19, 2019), https://wapo.st/2VUhLVk.

375.    On June 18, 2020, the Justice Department issued a proposed rule that would make it more difficult for LGBTQ+ refugees to claim asylum as members of a "particular social group."  Nicole Narea, *Trump Is Quietly Gutting the Asylum System Amid the Pandemic*, Vox (June 12, 2020), https://bit.ly/2VSug3K.

376.    On July 24, 2020, HUD published a proposed rule seeking to rescind protections for homeless transgender people in shelters.  This proposed rule, which calls transgender women "men," rests on the trope of transgender women presenting a threat of sexual and psychological violence to cisgender women.  85 Fed. Reg. 44,811 ("HUD does not believe it is beneficial to institute a national policy that may force homeless women to sleep alongside and interact with men [*sic*] in intimate settings—even though those women may have just been beaten, raped, and sexually assaulted by a man the day before.").  HUD admitted it "is not aware of data suggesting

that transgender individuals pose an inherent risk to biological women." *Id.* To the contrary, it is transgender women who are at an elevated risk of sexual and other forms of violence.

377.   Director Severino has consistently exhibited such animus. He has denounced the Department of Justice's enforcement of Title IX's sex discrimination protections as they applied to transgender people, referencing the trope of transgender people being a threat to children. Roger Severino, *DOJ's Lawsuit Against North Carolina Is Abuse of Power*, The Daily Signal (May 9, 2016) (claiming transgender people "us[e] government power to coerce everyone, including children, into pledging allegiance to a radical new gender ideology"), https://perma.cc/3FFM-KFMB.

378.   Director Severino has also referred to a transgender male student involved in a Title IX lawsuit as a "teen biological girl;" Roger Severino & Jim DeMint, *Court Should Reject Obama's Radical Social Experiment,* The Heritage Foundation (Dec. 14, 2016), https://perma.cc/N6K8-HQY5; and he derided the plaintiff and his suit, which he won, as "a gender-dysphoric teen girl in Virginia [who] sued her school district to get full access to the boys' bathrooms." Jim DeMint & Roger Severino, *Commentary: Court Should Reject Obama's Radical Social Experiment* (Nov. 7, 2016), https://bit.ly/2ZN5Zgv.

379.   Director Severino has opined that transgender military personnel serving openly "dishonors the[] sacrifice" of veterans. Roger Severino, *Pentagon's Radical New Transgender Policy Defies Common Sense*, CNSNews (July 1, 2016), https://perma.cc/VK37-5FP7.

380.   Since 2017, HHS leadership has not only ceased to combat anti-LGBTQ+ discrimination but has scrubbed the mention of transgender people from its activities. Early that year, HHS decided not to publish a finished and signed regulation allowing transgender HHS staff more protections when using bathrooms and other facilities. HHS has ceased to update its

webpage on health and well-being for LGBTQ+ people, U.S. Dep't of Health & Human Servs., *Health & Well-Being for Lesbian, Gay, Bisexual and Transgender Americans* (last updated June 7, 2017), https://bit.ly/2BrMfaj, and it has archived its website on LGBTQ+ families and children, U.S. Dep't of Health & Human Servs., Admin. For Children & Families, *LGBT ACF Programs and Services for LGBT* (last visited July 7, 2020), https://bit.ly/3efEZvz.

381.    HHS has ceased to gather information on transgender people in its surveys; for example, on March 20, 2017, HHS removed demographic questions about LGBTQ+ people that Centers for Independent Living must fill out each year in their Annual Program Performance Report.  Sejal Singh et al., *The Trump Administration Is Rolling Back Data Collection on LGBT Older Adults*, Ctr. for Am. Progress (Mar. 20, 2017), https://ampr.gs/3iA7reN.

382.    HHS reassigned its senior adviser dedicated to LGBTQ+ health, Elliot Kennedy, to work on disease prevention instead.  Dan Diamond, *Trump Administration Dismantle LGBT-Friendly Policies*, Politico (Feb. 19, 2018), https://politi.co/2ZHNeLn.

383.    HHS's four-year strategic plan, released in October 2017, did not make a single reference to LGBTQ+ health issues, though the plan originally contained references that were removed.  Dan Diamond, *Trump Policy Shop Filters Facts to Fit His Message*, Politico (July 28, 2018), https://politi.co/3fcJokc.

384.    HHS instructed staff at the Centers for Disease Control and Prevention, an HHS agency, not to use the word "transgender" in the agency's 2019 budget request.

385.    On November 19, 2019, it issued a proposed rule that would rescind rules prohibiting discrimination based on, among other things, sexual orientation and gender identity in all HHS-funded health, child welfare, and family programs.  *See* Health and Human Services Grants Regulation, 84 Fed. Reg. 63,831 (Nov. 19, 2019).

386.    Since a single "listening session" in April 2017, Director Severino has had no ongoing communication with LGBTQ+ health advocates about LGBTQ+ health.

387.    Despite this "listening session" and more than 134,000 comments opposing the Rollback Rule, when asked in 2019, "What if someone who's transgender is refused care at the emergency room?," Director Severino answered that he had "not heard of such a hypothetical actually happening in real life," Selena Simmons-Duffin, *Trump Administration's Proposed HHS Rule Would Redefine What 'Sex' Means*, NPR (May 24, 2019), https://n.pr/2VPWTyf.

388.    In an interview that year, Director Severino said that he was not aware of any claims filed with OCR regarding LGBTQ+ discrimination, calling such claims "hypothetical" and "not yet seen out in the world."   Sandhya Raman, *Trump Administration Swayed by Conservative Think Tank on Abortion, LGBT Decisions, Group Says*, Roll Call (Apr. 25, 2019), https://bit.ly/31R9YLJ.  In reality, OCR regularly received and addressed numerous such claims until Director Severino's tenure, when it ceased to address them.

389.    The consistent message of the Administration, including HHS, is unmistakable: LGBTQ+ people, and transgender people in particular, have no right to be free of the discrimination they experience on the basis of sexual orientation or transgender status. Indeed, they have no claim even to the basic dignity of being properly referred to by accurate pronouns, titles of respect, or gender identification. Rather, in the Administration's telling, transgender people are a threat to children, to cisgender women, and to national security.

390.    Even transgender peoples' claim to existence is called into doubt; because they are either "biological men" or "biological women," no acknowledgement need be made of their transgender status.  This "entrenches the belief that transgender individuals must preserve the . . . attributes of their natal sex."  *Boyden*, 341 F.3d at 988.

391.    Consistent with its anti-transgender animus, HHS has repeatedly, purposefully, and disrespectfully refused to refer to transgender people by their correct gender and corresponding pronoun in the Rollback Rule.  When discussing Aimee Stephens, a transgender woman and one of the plaintiffs who won *Bostock* (in which the Court referred to her correctly), HHS remarked that "Stephens quite obviously is not a woman because Stephens's sex is male." 85 Fed. Reg. at 37,180 & n.90–91 (internal quotation marks omitted).  There are more examples. *See id.* at 37,189 (referring to a hypothetical "transgender patient [who] self-identifies as male" as "her"); *id.* (referring to a pregnant transgender man as "her" and "in fact a . . . woman"); *id.* at 37,191 (referring to the decedent in *Prescott v. Rady Children's Hospital*, who died of suicide following severe mistreatment and harassment because of his transgender status, as "her"— despite quoting, in a footnote, the court opinion correctly referring to him as a boy).

392.    The government itself has previously recognized that the intentional misgendering of a person amounts to discrimination.  *Cf. Lusardi v. McHugh*, No. 0120133395, 2015 WL 1607756 (EEOC Apr. 1, 2015) ("Persistent failure to use the employee's correct name and pronoun may constitute unlawful, sex-based harassment if such conduct is either severe or pervasive enough to create a hostile work environment.").  Courts agree.  *See, e.g.,* S*tate v. Cantrill*, No. L-18-1047, 2020 WL 1528013 (Ohio Ct. App., Mar. 31, 2020) ("There is no place in our judicial system for malice, disparagement, or intentional disrespect toward any party, witness, or victim, and this includes improper treatment arising from a bias toward a transgender person."); *see also Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 943, 946–51 & n.28 (W.D. Wis. 2018); *Prescott v. Rady Children's Hosp.*, 265 F. Supp. 3d 1090, 1096, 1098– 1100 (S.D. Cal. 2017).

393.     The Rollback Rule also returns to the trope that transgender persons are a threat to children.  *See* 85 Fed. Reg. at 37,222 (observing that adding gender identity to a definition of sex discrimination risks ignoring "competing privacy interests, especially when young children . . . are involved").   This baseless statement invokes a dangerous trope that has historically been used to justify violence and discrimination against transgender people.

394.     This animus toward transgender people, coupled with the agency's failure to meaningfully respond to commenters' concerns, shows that the agency's proffered reasons are nothing more than pretext.

## CAUSES OF ACTION

### Count I: Violation Of The Administrative Procedure Act
### (Agency Action Not In Accordance With Law)

395.     Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

396.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

397.     The Rollback Rule adopts an interpretation of discrimination on the basis of sex that is contrary to Section 1557.

398.     The Rollback Rule adopts an interpretation of "health program or entity" that conflicts with Section 1557.

399.     The Rollback Rule adopts an interpretation of discrimination on the basis of sex, incorporating Title IX's exemptions, that conflicts with Section 1557 and Title IX.

400.     The Rollback Rule adopts an interpretation of the enforcement procedures that are available under Section 1557 that conflicts with statute itself.

401.     The Rollback Rule's elimination of protections against discrimination on the basis of association is contrary to case law and the underlying statutes, and therefore is not in accordance with law.

402.     The Rollback Rule will sow confusion and increase harm among patients seeking access to care, will decrease patients' access to care, and will embolden denials of access to care, in violation of the prohibition in Section 1554 of the ACA that bars the promulgation of "any regulation" that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," "interferes with communications regarding a full range of treatment options between the patient and the provider," "violates the informed consent and the ethical standards of health care professionals," or "limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114.

403.     The Revised Rule is "not in accordance with law" as required by the APA. 5 U.S.C. § 706(2)(A).

404.     Under the APA, a court must also "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(c).

405.     An agency has no statutory authority to act contrary to law.

406.     The Rollback Rule therefore is also "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of the APA. 5 U.S.C. § 706(2)(C).

### Count II: Violation Of The Administrative Procedure Act
### (Agency Action That Is Arbitrary, Capricious, And An Abuse Of Discretion)

407.     Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

408.     Section 706(2)(A) of the APA requires that a reviewing court "hold unlawful and set aside agency action" if that action is "found to be" "arbitrary, capricious, [or] an abuse of discretion."

409.     The Rollback Rule is arbitrary, capricious, and an abuse of discretion because HHS failed to

     a)      explain why it relied on an unsuccessful litigation position that *Bostock* rejected;

     b)      articulate a reasoned basis for removing the 2016 Rule's definition of discrimination "on the basis of sex";

     c)      articulate a reasoned basis for importing a series of blanket exemptions into Section 1557;

     d)      articulate a reasoned basis for replacing the 2016 Rule's unified enforcement scheme with a patchwork enforcement scheme;

     e)      articulate a reasoned basis for eliminating the notice and taglines requirement and revising the standard of access for LEP individuals; or

     f)      articulate a reasoned basis for eliminating non-discrimination protections in regulations issued under statutes other than Section 1557.

410.     The Rollback Rule is arbitrary, capricious, and an abuse of discretion because HHS failed to identify the costs associated with the changes to the 2016 Rule.

411.     The Rollback Rule is arbitrary, capricious, and an abuse of discretion because HHS relied on a speculative estimate of the benefits of the changes to the 2016 Rule.

412.     The Rollback Rule is arbitrary, capricious, and an abuse of discretion because HHS failed to address the disconnect between its estimated cost savings relating to the elimination of one set of requirements and the scope of the revisions to numerous additional requirements in the 2016 Rule.

413.     By publishing a rule that is both contrary to law and unconstitutional, HHS acted arbitrarily and capriciously and abused its discretion in violation of 5 U.S.C. § 706(2)(A).

414.   By failing to adequately address and incorporate significant public comments, HHS acted arbitrarily and capriciously and abused its discretion in violation of 5 U.S.C. § 706(2)(A).

**Count III: Violation Of The Administrative Procedure Act**
**(Agency Action That Is Contrary To Constitutional Right—**
**Fifth Amendment Due Process Clause, Equal Protection)**

415.   Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

416.   Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

417.   The Fifth Amendment's Due Process Clause includes an equal protection component.

418.   The equal protection component of the Fifth Amendment's Due Process Clause makes government action that discriminates on the basis of sex, including on the basis of gender identity, transgender status, sexual orientation, and failure to conform to sex stereotypes, subject to heightened scrutiny.

419.   The equal protection component of the Fifth Amendment's Due Process Clause prohibits government action based on animus towards persons on the basis of gender identity, transgender status, sexual orientation, and failure to conform to sex stereotypes.

420.   The Rollback Rule discriminates on the basis of sex without a close relationship to an important government interest and demonstrates animus toward transgender people.

421.   The statements and actions of Director Severino and other HHS staff and Administration officials, and HHS's attempt to define away transgender people's existence, demonstrate animus toward transgender people.

422.   The Rollback Rule will have a disproportionate impact on LGBTQ+ people.

423.    The Rollback Rule violates the equal protection guarantee of the Fifth Amendment of the U.S. Constitution and must be set aside under the APA and the Fifth Amendment.

**Count IV: Violation Of The Administrative Procedure Act**
**(Agency Action Not In Accordance With Law—Enforcement Policy)**

424.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

425.    The Rollback Rule adopts a general enforcement policy that is contrary to Section 1557 in several ways, including:

a)    Although Section 1557 prohibits discrimination in health programs or activities based on transgender status or sexual orientation, HHS adopted a general enforcement policy based on its reading of Section 1557 in the Rollback Rule and will "return[] to" enforcing Section 1557 using "the biological binary meaning of sex," without regard for discrimination on the basis of, *inter alia*, sexual orientation or transgender status.  85 Fed. Reg. at 37,180.

b)    Although Section 1557 applies to "any health program or activity, any part of which is receiving Federal financial assistance" and "any program or activity . . . administered by an Executive Agency or any entity established under [Title I of ACA]," 42 U.S.C. § 18116(a), HHS adopted a general enforcement policy that it will "enforce Section 1557's discrimination requirements against" a different, narrower, set of entities. 85 Fed. Reg. at 37,169.

426.    The Rollback Rule's statement of enforcement policy is reviewable under the APA.

427.    The Rollback Rule's enforcement policy is arbitrary and capricious and contrary to law.

## REQUEST FOR RELIEF

THEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that the Rollback Rule is unauthorized by, and contrary to, the Constitution and laws of the United States in a declaratory judgment under 28 U.S.C. § 2201(a) and 5 U.S.C. § 706(a);

B.     Set aside and vacate the Rollback Rule;

C.     Permanently enjoin the implementation of the Rollback Rule;

D.     Award reasonable attorneys' fees, costs, and expenses; and

E.     Award any other further and additional relief the Court deems just and proper.

Dated: September 18, 2020

Kevin Costello (BBO No. 669100)
Maryanne Tomazic (admitted pro hac vice)
CENTER FOR HEALTH LAW & POLICY
INNOVATION
Harvard Law School
1585 Massachusetts Avenue
Cambridge, MA 02138
Phone: 617.496.0901
kcostello@law.harvard.edu

Sunu Chandy (admitted pro hac vice)
Michelle Banker (admitted pro hac vice)
Lauren Gorodetsky (admitted pro hac vice)
Dorianne Mason (admitted pro hac vice)
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle NW Suite 800
Washington, DC 20036
Phone: 202.588.5180
schandy@nwlc.org
mbanker@nwlc.org
lgorodetsky@nwlc.org
dmason@nwlc.org

David Brown (admitted pro hac vice)
Noah E. Lewis (admitted pro hac vice)
Alejandra Caraballo (admitted pro hac vice)
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND, INC.
520 8th Ave. Ste. 2204
New York, NY 10018
Phone: 646.862.9396
dbrown@transgenderlegal.org
nlewis@transgenderlegal.org
acaraballo@transgenderlegal.org

Respectfully submitted,

/s/ William H. Kettlewell
William H. Kettlewell (BBO No. 270320)
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110
Phone: 617.371.1000
bill.kettlewell@hoganlovells.com

Jessica L. Ellsworth (admitted pro hac vice)
Kirti Datla (admitted pro hac vice)
Jo-Ann Tamila Sagar (admitted pro hac vice)
Erin R. Chapman (admitted pro hac vice)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Phone: 202.637.5600
jessica.ellsworth@hoganlovells.com
kirti.datla @hoganlovells.com
jo-ann.sagar@hoganlovells.com
erin.chapman@hoganlovells.com

Kristina Alekseyeva (admitted pro hac vice)
Peter W. Bautz (admitted pro hac vice)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Phone: 212.918.3000
kristina.alekseyeva@hoganlovells.com
peter.bautz@hoganlovells.com

Lynly Egyes (admitted pro hac vice)
Dale Melchert (admitted pro hac vice)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: 510.587.9696
lynly@transgenderlawcenter.org
dale@transgenderlawcenter.org

*Counsel for Plaintiffs*