# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth (BAGLY); *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:20-cv-11297 |
| United States Department of Health and Human Services, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

LEGAL STANDARD...................................................................................................... 7

ARGUMENT .................................................................................................................. 8

I.    Plaintiffs Have Sufficiently Alleged Standing To Challenge The Rollback
Rule. ..................................................................................................................... 8

    A.    Defendants' motion mischaracterizes Article III's requirements. ............. 8

        1.    *Plaintiffs need only allege a substantial risk of harm to
establish injury-in-fact.* ................................................................ 8

        2.    *The presence of a third party in a causal chain does not
defeat standing.* .......................................................................... 12

        3.    *A decision that will reduce Plaintiffs' injuries meets the
redressability requirement.* ......................................................... 15

    B.    Plaintiffs have sufficiently alleged standing as to each challenged
provision. ................................................................................................ 16

        1.    *The repeal of the definition of "on the basis of sex" and
unlawful interpretation of that term in Title IX.* ......................... 17

        2.    *The narrowing of the definition of "covered entities."* ............... 26

        3.    *The elimination of the uniform enforcement scheme.* ................... 30

        4.    *The incorporation of Title IX's religious and abortion
exemptions.* ................................................................................ 32

        5.    *The removal of protections for association discrimination.* ......... 35

        6.    *The elimination of the notice and taglines requirement.* .............. 35

        7.    *The elimination of other non-discrimination regulations.*............ 37

II.    Plaintiffs' Claims Are Ripe....................................................................................38

**TABLE OF CONTENTS—Continued**

**Page**

III.   Plaintiffs Have Stated A Claim As To Counts III And IV. ...................................40

    A.   The Amended Complaint States An Equal Protection Violation.............. 40

    B.   The Amended Complaint States A Final, Reviewable Agency Action.................................................................................................... 42

CONCLUSION...................................................................................................................44

EXHIBITS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Watson*,
  10 F.3d 915 (1st Cir. 1993) ............................................................................... 18

*Animal Welfare Inst. v. Martin*,
  623 F.3d 19 (1st Cir. 2010) ............................................................................... 22

*Arroyo Gonzalez v. Rossello Nevares*,
  305 F. Supp. 3d 327 (D.P.R. 2018) ............................................................. 20, 21

*Attias v. Carefirst, Inc.*,
  865 F.3d 620 (D.C. Cir. 2017) .......................................................................... 30

*Aulenback, Inc. v. Fed. Highway Admin.*,
  103 F.3d 156 (D.C. Cir. 1997) .......................................................................... 39

*Bennett v. Spear*,
  520 U.S. 154 (1997) ....................................................................... 13, 16, 42, 43

*Block v. Meese*,
  793 F.2d 1303 (D.C. Cir. 1986) (Scalia, J.) ...................................................... 12

*Bostock v. Clayton County, Georgia*,
  140 S. Ct. 1731 (2020) ............................................................................ *passim*

*Boyden v. Conlin*,
  341 F. Supp. 3d 979 (W.D. Wis. 2018) ....................................................... 14, 15

*Carey v. Population Services Int'l*,
  431 U.S. 678 (1977) ......................................................................................... 33

*City & Cnty. of San Francisco v. Azar*,
  411 F. Supp. 3d 1001 (N.D. Cal. 2019) ............................................................ 20

*Crowley Caribbean Transp., Inc. v. Pena*,
  37 F.3d 6717 (D.C. Cir. 1994) .......................................................................... 44

*D.H. v. Snyder*,
  No. 4:20-cv-335-SHR (D. Ariz. Sept. 28, 2020), ECF No. 18 ............................ 11

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ............................................................................. 13, 28, 29

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) .......................................................................13, 28, 29, 30

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020) ........................................................................................40, 42

*District Hosp. Partners, L.P. v. Sebelius*,
    794 F. Supp. 2d 162 (D.D.C. 2011) ....................................................................42

*Edison Elec. Inst. v. EPA*,
    996 F.2d 326 (D.C. Cir. 1993) ............................................................................44

*Equal Means Equal v. Dep't of Educ.*,
    450 F. Supp. 3d 1 (D. Mass. 2020) .....................................................................21

*Equal Means Equal v. Ferriero*,
    No. 20-CV-10015-DJC, 2020 WL 4548248 (D. Mass. Aug. 6, 2020) ....................................8

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ..............................................................................................7

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
    45 F.3d 530 (1st Cir. 1995) .................................................................................38

*Franciscan All., Inc. v. Burwell*,
    227 F. Supp. 3d 660 (N.D. Tex. 2016) ......................................................4, 11, 24

*Franciscan All. v. Azar*,
    No. 20-10093 (5th Cir., June 2, 2020) ................................................................4

*Franciscan All. v. Azar*,
    No. 7:16-cv-00108-O, Dkt. No. 182 (N.D. Tex. Nov. 21, 2019) .......................4, 11

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ............................................................................................26

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................................... *passim*

*June Med. Servs. LLC v. Russo*,
    140 S. Ct. 2103 (2020) ...........................................................................12, 20, 33

*Kadel v. North Carolina*,
    2020 WL 6101994 (4th Cir. 2020) ................................................................11, 15

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012) ..................................................................19, 26, 37

*Lambert v. Hartman*,
    517 F.3d 433 (6th Cir. 2008) ................................................................30

*Larson v. Valente*,
    456 U.S. 228 (1982) ...............................................................................16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..............................................................7, 9, 12, 18, 36

*Maine People's All. and Nat. Res. Def. Council v. Mallinckrodt, Inc.*,
    471 F.3d 277 (1st Cir. 2006) ................................................................17

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
    923 F.3d 209 (1st Cir. 2019) ........................................................ *passim*

*McInnis-Misenor v. Maine Med. Ctr.*,
    319 F.3d 63 (1st Cir. 2003) ...................................................................38

*Merlonghi v. United States*,
    620 F.3d 50 (1st Cir. 2010) ...................................................................7

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ..........................................................................12, 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................40

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018) ....................................................................13

*National Park Hospitality Association v. Department of Interior*,
    538 U.S. 803 (2003) ...............................................................................40

*Nevada Dep't of Human Res. v. Hibbs*,
    538 U.S. 721 (2003) ...............................................................................41

*New York v. Dep't of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019) ..................................................12

*New York v. United States Dep't of Health & Human Servs.*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ..................................................17

**TABLE OF AUTHORITIES—Continued**

Page(s)

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ..................................................................10, 34, 35

*Ohio Forestry Association, Inc. v. Sierra Club,*
  523 U.S. 726 (1998) .................................................................................39

*OSG Bulk Ships, Inc. v. United States,*
  132 F.3d 808 (D.C. Cir. 1998) ................................................................44

*Powers v. Ohio,*
  499 U.S. 400 (1991) ........................................................................20, 34

*Price Waterhouse v. Hopkins,*
  490 U.S. 228 (1989) .................................................................................25

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
  374 F.3d 1209 (D.C. Cir. 2004) ..............................................................17

*Reddy v. Foster,*
  845 F.3d 493 (1st Cir. 2017) .........................................................9, 10, 23

*Romer v. Evans,*
  517 U.S. 620 (1996) ........................................................................40, 41

*Rothstein v. UBS AG,*
  708 F.3d 82 (2d Cir. 2013) ......................................................................30

*Sierra Club v. Dep't of the Interior,*
  899 F.3d 260 (4th Cir. 2018) ..................................................................16

*Simon v. Eastern Kentucky Welfare Rights Organization,*
  426 U.S. 26 (1976) .........................................................................13, 14

*Singleton v. Wulff,*
  428 U.S. 106 (1976) ........................................................................21, 33

*Staub v. Proctor Hospital,*
  562 U.S. 411 (2011) .................................................................................16

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .......................................................................9, 10, 38

*Sutliffe v. Epping School Dist.,*
  584 F.3d 314 (1st Cir. 2009) .....................................................................7

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct.
   2271 (2016) ...................................................................................................................13

*Torres-Negron v. J & N Records, LLC*,
   504 F.3d 151 (1st Cir. 2007) ..........................................................................................7

*United States v. Virginia*,
   518 U.S. 515 (1996) .......................................................................................................41

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) .......................................................................................................42

*Walker v. Azar*,
   No. 20CV2834FBSMG, 2020 WL 4749859 (E.D.N.Y. Aug. 17, 2020)....................17, 24, 25

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
   No. CV 20-1630 (JEB), 2020 WL 5232076 (D.D.C. Sept. 2, 2020) .............................. *passim*

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990).....................................................................................................25, 26

*Whole Woman's Health v. Hellerstedt*,
   136 S. Ct. 2292 (2016)....................................................................................................44

**Statutes**

20 U.S.C. § 1681(a) ..............................................................................................................3

29 U.S.C. § 794(a) ................................................................................................................3

42 U.S.C. § 6101 ...................................................................................................................3

42 U.S.C. § 18116(a) ............................................................................................................3

42 U.S.C. § 2000d .................................................................................................................3

**Regulations**

45 C.F.R. § 92.1 *et seq.* (2020) ...........................................................................................17

45 C.F.R. § 92.2 (2017) ........................................................................................................32

45 C.F.R. § 92.4 (2017) ..............................................................................................3, 5, 17, 25, 26

45 C.F.R. § 92.8 (2017) ........................................................................................................35

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

45 C.F.R. § 92.8(b) (2017)...................................................................................................4

45 C.F.R. § 92.201(a) (2017).............................................................................................4

45 C.F.R. § 92.206 (2017) ..............................................................................................5, 17

45 C.F.R. § 92.207 (2017) ..............................................................................................5, 17

45 C.F.R. § 92.209 (2017) ..............................................................................................3, 35

45 C.F.R. § 92.301 (2017) ..................................................................................................30

45 C.F.R. § 92.301(a) (2017)...........................................................................................4

45 C.F.R. § 92.301(b) (2017)...........................................................................................4

Nondiscrimination in Health Programs and Activities,
    81 Fed. Reg. 31,376  (May 18, 2016) ................................................................1, 25

Nondiscrimination in Health and Health Education Programs or Activities,
    84 Fed. Reg. 27,846 (June 14, 2019) ......................................................................14

Nondiscrimination in Health and Health Education Programs or Activities,
    Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020).................................... *passim*

**Rules**

Rule 12(b)(1).....................................................................................................................7

Rule 12(b)(6).....................................................................................................................7

**Other Authorities**

5B C. Wright & A. Miller, Federal Practice and Procedure § 1350 (3d ed. 2004)..........................7

**INTRODUCTION**

Defendants—the Department of Health and Human Services ("Department" or "HHS") and three of its officers—worked deliberately to undermine non-discrimination protections in healthcare through the regulatory action at issue here. In 2016, the Department adopted a rule that fleshed out the non-discrimination provision in the Affordable Care Act ("ACA"). It did so because its experience had made clear "the importance of a regulation that is prescriptive in the sense that it provides concrete guidance." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,444 (May 18, 2016) ("2016 Rule"). HHS believed its rule did just that and would increase "compliance with Section 1557 by covered entities and the ability of individuals to assert and protect their rights under the law." *Id.* Four years later, the Department has now eschewed this "concrete guidance" in favor of a regulation that injects ambiguity into the law, adopts an unlawful interpretation of Section 1557's protections, and adds sweeping new exemptions that further erode the law's nondiscrimination protections. *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) (to be codified at 42 C.F.R. pts 438, 440, 460) ("the Rollback Rule").

Defendants' principal defense now is to claim that all this effort really amounted to nothing at all. In its telling, all it did was eliminate protections and allow the statute to fill in the gaps. That is simply not true.

For one thing, the Department justified the Rollback Rule by adopting an interpretation of sex discrimination which Section 1557 prohibits—under which sex discrimination does not encompass discrimination on the basis of sexual orientation and gender identity. *Id.* at 37,180, 37,191. But the Supreme Court rejected that narrow interpretation *before* the Rollback Rule was published, in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020). The Department

1

made no effort to justify its refusal to follow a Supreme Court precedent laid down literally days before it published its rule.

For another, the Department's logic is backwards:  The 2016 Rule filled in the gaps in Section 1557 and offered clarity both for those it protects—about their rights and how to enforce them—and for those it regulates—about their obligations.  The Rollback Rule eliminated this clarity, both by removing much of the 2016 Rule and by justifying its action and setting out and enforcement policy for Section 1557 based on a definition of sex discrimination that conflicts with the Supreme Court's ruling in *Bostock*.

It should be no surprise then, that the Department's bulldozing of the protections it had previously endorsed has caused harm.  The Rollback Rule will lead to an increase in discrimination in healthcare and make it harder for people to access much needed care, will decrease people's ability to get relief when they experience that discrimination, and increase the demand for provision of healthcare by trusted sources like many of the Plaintiffs, thereby forcing them to divert their resources to mitigate the harms of the rule and frustrating their ability to care for their patients' health.

All of this is plain from the allegations in the Amended Complaint.  Plaintiffs' standing to challenge the Rollback Rule is clear.  And Defendants' arguments for dismissal of a narrow set of Plaintiffs' claims do not hold up.  This Court should deny Defendants' motion to dismiss.

## BACKGROUND

In 2010, Congress adopted the ACA, which contains a non-discrimination provision known as Section 1557.  Am. Compl. ¶¶ 86, 92–93.  Under it, "an individual shall not, on the ground prohibited under" four cross-referenced statutes "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity,

any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under [Title I of the ACA or amendments made by Title I]."  42 U.S.C. § 18116(a).  Those prohibited grounds are "race, color, or national origin," *id.* § 2000d (Title VI of the Civil Rights Act of 1964), "sex," 20 U.S.C. §§ 1681(a), 1684 (Title IX of the Education Amendments of 1972), "age," 42 U.S.C. § 6101 (Age Discrimination Act of 1975), and "disability," 29 U.S.C. § 794(a) (Rehabilitation Act).   "The enforcement mechanisms provided for and available under" those statutes "apply for purposes of violations of" Section 1557.  42 U.S.C. § 18116(a).

Before the ACA, healthcare providers and insurers routinely discriminated against LGBTQ+ (lesbian, gay, bisexual, transgender, queer, intersex, or gender-non-binary) people, women, people seeking pregnancy-related and reproductive care, and people seeking gender affirming care.  Am. Compl. ¶¶ 88–91.  Private plaintiffs and HHS's Office for Civil Rights (OCR) used Section 1557 to address this discrimination.  *Id.* ¶¶ 100–105.  Their efforts stemmed it, but did not end it.  *Id.* ¶¶ 106–116.

To carry out Section 1557, HHS issued the 2016 Rule.  As relevant, the rule covered *who* was subject to its requirements, *what* it prohibited, and *how* its prohibitions could be enforced.  First, it defined the term "covered entity" to set out the entities that were subject to the rule.  *See* 45 C.F.R. § 92.4 (2017).  Second, it defined Section 1557's protections.  Among other things, it defined discrimination on the basis of sex to include "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."  *Id.*  And it covered discrimination on the basis of association with someone with a protected characteristic.  *See id.* § 92.209.  It also required covered entities to "take

reasonable steps to provide meaningful access to each individual with limited English proficiency" (LEP) who was eligible or likely to be served by the entity. *See id.* § 92.201(a). Third, it required covered entities to post a notice of prohibited discrimination and OCR complaint procedures, created an administrative enforcement scheme, and specified remedies. *See id.* §§ 92.8(b), 92.301(a), 92.301(b).

In 2019, HHS proposed rolling back the 2016 Rule. To explain this reversal, it pointed to a district court decision that had preliminarily enjoined five words in the Rule's definition of discrimination "on the basis of sex"—that is, as including "gender identity" and "termination of pregnancy." 2019 Proposed Rule at 27,848 (citing *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016)). That decision, HHS said, had compelled it to question whether it had "exceeded its statutory authority." *Id.* at 27,849; *see also id.* at 27,854, 27,856–57, 27,871 (citing a Memorandum of the Attorney General (Oct. 4, 2017)).[1]

HHS, however, reached far beyond any question raised by *Franciscan Alliance* and proposed to "eliminate most of" the 2016 Rule. *Id.* at 27,872. It received over 150,000 comments on its proposal, the vast majority of which urged HHS to reconsider. Am. Compl. ¶ 166. The comments explained that the rollback would "lead to increased discrimination in healthcare," leading "people to delay or forego healthcare" resulting "in adverse health outcomes and greater overall healthcare costs." 85 Fed. Reg. at 37,165.

Before the final rule was published, the Supreme Court issued *Bostock*, affirming that "discrimination based on . . . transgender status necessarily entails discrimination based on sex"

---

[1]     The district court later converted its preliminary injunction to a permanent vacatur of those five words. *See Franciscan All. v. Azar*, No. 7:16-cv-00108-O, Dkt. No. 182 at 2 (N.D. Tex. Nov. 21, 2019) (modifying *Franciscan All. v. Azar*, 414 F. Supp. 3d 928, 928 (N.D. Tex. 2019)). That decision is on appeal, and the parties are briefing the effect of *Bostock*. Order, *Franciscan All. v. Azar*, No. 20-10093 (5th Cir., June 2, 2020).

under Title VII.   140 S. Ct. at 1754.   This interpretation flatly contradicted HHS's stated justification for its rulemaking.

Nevertheless, HHS published the Rollback Rule containing only "minor and primarily technical" changes from its proposed rule.   *See* 85 Fed. Reg. at 37,160.   In the teeth of the Supreme Court's holding that transgender-status discrimination is sex discrimination, the final rule deletes, among other things, the prohibition of categorical coverage exclusions for transgender-related care, 85 Fed. Reg. 37,247 (deleting provision codified at 45 C.F.R. § 92.207 (2017)), the requirement that covered entities "treat individuals consistent with their gender identity," *id.* (deleting provision codified at 45 C.F.R. § 92.206 (2017)), and the definition of "on the basis of sex," *id.* at 37,245 (deleting provision codified at 45 C.F.R. § 92.4 (2017)).   It also adds sweeping religion and abortion exemptions from provisions of Title IX that are not incorporated by reference in Section 1557.   85 Fed. Reg. 37243 (codified at 45 C.F.R. § 86.18 (2020)).

In the Rollback Rule's preamble—providing the rationale for the rule and addressing comments—HHS set out how it would enforce Section 1557.   Rejecting the holding of *Bostock*, it adhered to the "position . . . that discrimination 'on the basis of sex' in Title VII and Title IX does not encompass discrimination on the basis of sexual orientation or gender identity," *id.* at 37,168.   And it "disavow[ed]" all prior, contrary interpretations of Section 1557, stating that it would enforce Section 1557 as if "the biological binary meaning of sex" did not encompass these forms of discrimination, *id.* at 37,178–80, 37,191, that is, using an interpretation that *Bostock* had just rejected, *see*, 140 S. Ct. at 1739.

Plaintiffs are entities and an individual that will be harmed by the Rollback Rule and challenge the rule to stop those harms.   Darren Lazor is a transgender man who uses health

insurance and regularly needs to access treatment.  Am. Compl. ¶¶ 20–24.  Equality California

(EQCA) is a membership organization that advances the health and equality of LGBTQ+ people,

with over 500,000 members nationwide, including Mr. Lazor.  *Id.* ¶¶ 72–77.  Fenway Health,

Callen-Lorde Community Health Center, and NO/AIDS Task Force, d/b/a CrescentCare

(Plaintiff Healthcare Facilities) are healthcare facilities that serve LGBTQ+ people, including

individuals and families with LEP.  *Id.* ¶¶ 25–44.  Each sues on behalf of itself, its patients, and

others that use its services.  *Id.* ¶¶ 30, 36, 44.  The Boston Alliance of Gay, Lesbian, Bisexual

and Transgender Youth (BAGLY), Campaign for Southern Equality (CSE), Indigenous Women

Rising (IWR), and The Transgender Emergency Fund (TEF) (collectively, Plaintiff Healthcare

Advocates) are organizations that provide a wide range of services, such as facilitating access to

healthcare (including reproductive and pregnancy-related care) for LGBTQ+ people, Native

people, and people with LEP, and those at the intersection of these communities.  *Id.* ¶¶ 45–71.

Each sues on behalf of itself and those who use their services.  *Id.* ¶¶ 51, 60, 67, 71.

Plaintiffs claim that the Rollback Rule violates the Administrative Procedure Act.  Count

I claims that parts of the rule—including its narrow interpretation of discrimination on the basis

of sex, incorporation of broad exemptions, and piecemeal enforcement scheme—are contrary to

law, specifically the text of Section 1557 and other relevant statutes.  *Id.* ¶¶ 395–406.  Count II

claims that the promulgation of the entire rule was arbitrary and capricious because, among other

things, it contravenes *Bostock* and lacks an adequate regulatory impact analysis.  *Id.* ¶¶ 407–414.

Count III claims that the rule discriminates on the basis of sex without a close relationship to an

important government interest and demonstrates animus toward transgender people, contrary to

the Fifth Amendment's equal protection guarantee.  *Id.* ¶¶ 415–423.  And Count IV claims that

the rule adopted unlawful enforcement policies related to discrimination on the basis of sex and

to the entities subject to its enforcement.  *Id.* ¶¶ 424–427.

Defendants have moved to dismiss some, but not all, of these claims, while also questioning the Court's jurisdiction.  On the jurisdictional front, Defendants argue that Plaintiffs lack standing to bring any of their claims, *see* Mot. at 10, and that Plaintiffs' challenge to the decision to remove the definition of discrimination on the basis of sex is not ripe, *id.* at 24.  On the merits, Defendants argue that Count III did not sufficiently plead an equal protection claim, *id.* at 30–35, and that Count IV does not sufficiently allege final agency action with respect to the sex-discrimination enforcement policy, *id.* at 36–37.  Each of these arguments fails.

## LEGAL STANDARD

Rule 12(b)(1) governs Defendants' standing-related arguments.  "At the pleading stage, general factual allegations . . . may suffice," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), because at this stage, courts "must credit the plaintiff's well-plead factual allegations and draw all reasonable inferences in the plaintiff's favor," *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).  Where defendants raise a facial challenge to the complaint, a court asks whether plaintiffs "sufficiently alleged . . . jurisdiction." *Torres-Negron v. J & N Records, LLC*, 504 F.3d 151, 162 (1st Cir. 2007).  If standing turns on factual issues, a court may consider relevant evidence.  *See* 5B C. Wright & A. Miller, Federal Practice and Procedure § 1350 (3d ed. 2004).

Rule 12(b)(6) governs Defendants' merits arguments about Counts III and IV.  To state a claim, a plaintiff need not plead "[s]pecific facts," so long as the complaint "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation marks omitted).  Here too, the court "accept[s] as true all well-pleaded facts in the complaint and draw[s] all reasonable inferences in the plaintiffs' favor."  *Sutliffe v. Epping School Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

# ARGUMENT

## I.   Plaintiffs Have Sufficiently Alleged Standing To Challenge The Rollback Rule.

The Rollback Rule eliminates regulatory nondiscrimination protections for LGBTQ+ people, people who seek pregnancy-related and reproductive healthcare, people with LEP, and countless others.  Plaintiffs allege that the rule injures them, their patients, their clients, and their members.  This Court can redress Plaintiffs' injuries with an order declaring the rule unlawful, setting it aside, and enjoining its implementation.  That is all Article III requires.

### A.   Defendants' motion mischaracterizes Article III's requirements.

Article III has three familiar requirements: (1) "a concrete and particularized injury in fact," (2) "a causal connection that permits tracing the claimed injury to the defendant's actions," and (3) "a likelihood that prevailing in the action will afford some redress for the injury."  *Equal Means Equal v. Ferriero*, No. 20-CV-10015-DJC, 2020 WL 4548248, at *4 (D. Mass. Aug. 6, 2020) (internal quotation marks omitted).  Plaintiffs satisfy each requirement.

#### 1.   *Plaintiffs need only allege a substantial risk of harm to establish injury-in-fact.*

Nearly all of Defendants' injury-in-fact arguments rest on the flawed premise that "allegations of possible future injury are not sufficient to accord a party standing" and that injury must be "certainly impending."  Mot. at 10.  They lean on this standard to attack the allegations of Mr. Lazor and Plaintiff Healthcare Facilities' patients and clients who fear discrimination because of the Rollback Rule.  *See id.* at 10–11; *see also id.* at 15–16 (allegations that Plaintiff Healthcare Advocates must expend resources to mitigate the rule's negative effects); *id.* at 20 (allegations that IWR's clients will be harmed by the rule's fractured enforcement scheme).

The government has offered this argument before, and the First Circuit has rejected it.  An "effort to recast the imminence requirement as one of near certainty does not comport with

8

the law." *Massachusetts v. U.S. Dep't of Health & Human Servs.* ("*Mass. v. HHS*"), 923 F.3d 209, 225 (1st Cir. 2019). All that is required is "a substantial risk that harm will occur." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) and *Lujan*, 504 U.S. 555); *see also Mass. v. HHS*, 923 F.3d at 225 (observing that "[t]he Departments' brief fails to cite the 'substantial risk' standard").

Plaintiffs' allegations of injury-in-fact parallel those deemed sufficient in *Mass. v. HHS*. There, Massachusetts challenged rules that allowed exemptions from the ACA's contraceptive coverage requirement. It alleged an "imminent fiscal injury" based on a chain of actions: Some Massachusetts employers would obtain exemptions and cease providing coverage, and their employees would obtain state-funded services. *Mass. v. HHS*, 923 F.3d at 223. Massachusetts did not show that any employers had applied for exemptions, or that any employees had sought its services. *See id*. at 224–226. Even so, it had standing because "a plaintiff need not 'demonstrate that it is literally certain that the harms they identify will come about.'" *Id*. at 225 (quoting *Clapper*, 568 U.S. at 420); *see also id*. at 227 (observing that "the Supreme Court has found standing in cases involving causal chains more attenuated than this one").

Here, Plaintiffs have alleged the same chains of actions. To cite but two examples:

- Individuals' reasonable fears of renewed healthcare discrimination due to the Rollback Rule will cause them to spend time and money to identify providers that will provide non-discriminatory care. Am. Compl. ¶ 213–215, 224–228.

- The same fears will cause patients to seek out the services of Plaintiff Healthcare Facilities and Plaintiff Healthcare Advocates, who will suffer the financial and operational consequences of higher demand. Am. Compl. ¶¶ 234–235 (Fenway), 236 (Callen-Lorde), 237 (CrescentCare), 238, 229–233 (Plaintiff Healthcare Facilities); *see also* Am. Compl. ¶¶ 45–51, 240, 247 (BAGLY), 52–60, 248–256 (CSE), 61–67, 257–264 (IWR), 243–246 (TEF).[2]

---

[2]    *See also* Decl. Stark ¶¶ 31, 37 (noting many inquiries by patients about their rights under the Rollback Rule, and describing Callen-Lorde's resources spent responding to patients' fears from the rule); Decl. Hill at ¶ 15 (noting the increased requests to evaluate health care providers

"[A]nxiety surrounding the possibility of discrimination and denial of treatment is substantially likely to provoke" each of these kinds of "behavior." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. CV 20-1630 (JEB), 2020 WL 5232076, at *12 (D.D.C. Sept. 2, 2020).  Plaintiffs have thus alleged a "substantial risk" that these harms "will occur," *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks omitted), which suffices for standing purposes, *Reddy*, 845 F.3d at 500.

Defendants argue that Plaintiffs must show someone has *already* discriminated because of the Rollback Rule to establish injury.  *See, e.g.*, Mot. at 10, 12 (arguing that discrimination predating the rule is irrelevant); *id.* at 18 (requiring "allegations indicating that any health insurer has changed its coverage . . . or plans" to do so).  But allegations about past conduct *can* be sufficient to allege an injury in fact from a risk that conduct will recur.  *See O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."); *Mass. v. HHS*, 923 F.3d at 224 (concluding "it is highly likely that at least three employers . . . will use the expanded exemptions, based in part on their *past litigating positions* or their *past objections* . . . .") (emphasis added).

Plaintiffs allege that Mr. Lazor and the patients, members, and clients of Plaintiff Healthcare Facilities and Plaintiff Healthcare Advocates experienced discrimination in healthcare that the repealed provisions of the 2016 Rule had prohibited.  *See* Am. Compl. ¶¶ 20–24, 106–116, 213–228.  They also allege that such discrimination is common.  *See id.* ¶¶ 90–91, 107, 111–116.  Given these very real experiences with discrimination, the risk of discrimination

---

due in part to fear of discrimination by its membership); Decl. Smith at ¶ 16 (discussing increase in BAGLY's online counseling services after the Rollback Rule and clients' past discrimination).

based on the repeal, and the associated fear of that discrimination, is not the kind of "speculation," Mot. at 12–13, about future injury that makes standing questionable.[3]

And Plaintiffs have members, patients, and clients who reside and use healthcare in states where prior litigation positions show that future discrimination is likely.  For example, the challengers to the 2016 Rule in *Franciscan Alliance*—who claimed the rule forced them to change their policies—included an Illinois provider and the states of Texas, Wisconsin, Arizona, Kansas, Kentucky, Louisiana, Mississippi, and Nebraska.[4]  Arizona and North Carolina are relying on the Rollback Rule's deleted or modified definitions to defend transgender healthcare exclusions.  *See* Opp. to Mot. for Prelim. Inj. at 15, *D.H. v. Snyder*, No. 4:20-cv-335-SHR (D. Ariz. Sept. 28, 2020), ECF No. 18; *Kadel v. North Carolina*, No. 20-1409, Br. of Appellant at 21 (4th Cir. July 30, 2020), ECF No. 27.  Plaintiffs CrescentCare and Fenway have patients in Louisiana, Mississippi, and Texas; Fenway has telehealth patients in Illinois Kansas, and Wisconsin; CSE has members and provides services in North Carolina, and Mississippi; and EQCA has members in Arizona, Louisiana, Kansas, Kentucky, Mississippi, Nebraska, and Texas.  *See* Am. Compl. ¶¶ 25, 37, 52; Decl. Zbur ¶ 12.

Finally, Plaintiffs need not identify particular patients of Plaintiff Healthcare Facilities, or particular clients of Plaintiff Healthcare Advocates, to establish injury.  *See, e.g.*, Mot. at 20 (objecting to an "assum[ption]" that "an unnamed Native American will" face discrimination).

---

[3]    Defendants' reliance on *Clapper* is misplaced.  There, the plaintiffs lacked standing to challenge federal surveillance practices because they had "no actual knowledge" of the practices. 568 U.S. at 411.  Their efforts to avoid surveillance did not support an injury because they were "simply the product of their fear."  *Id.* at 417.  In contrast, Plaintiffs need not speculate about healthcare discrimination; they have experienced it.  *See, e.g.*, Am. Compl. ¶¶ 20–24, 224–228.

[4]    *See Franciscan Alliance*, 227 F. Supp. 3d at 670 & n.3, 675; Br. in Support of State Plaintiffs' Renewed Motion for Summary Judgment at 50–51, 7:16-cv-00108-O (N.D. Tex. Feb. 4, 2019), ECF 133; Private Plaintiffs' Br. in Support of Their Renewed Motion for Partial Summary Judgment at 1, 12, *id.* (N.D. Tex. Feb. 4, 2019), ECF 136.

The alleged injury does not turn on which patients or clients are harmed by the Rollback Rule. *See Mass. v. HHS*, 923 F.3d at 225 & n.13 (stating "plaintiffs need not point to a specific person who will be harmed" where "the likelihood of a fiscal injury to the [plaintiff] does not turn on the identification of specific [victims]").  Plaintiff Healthcare Facilities and Healthcare Advocates will have to expend resources so long as *any* client or patient turns to them for services because of the Rollback Rule.  *See id.* at 225 (noting that the farmers in *Monsanto* had not identified "particular alfalfa plants that had been, or would necessarily be, pollinated by bees who carried the genetically engineered gene at issue"); *see also Whitman-Walker*, 2020 WL 5232076 at *21 (holding "physicians *can* invoke the rights of unknown potential [LGBTQ] patients," just as courts "have long permitted abortion providers to invoke the rights of their actual *or potential patients* in challenges to abortion-related regulations" (quoting *June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2118, (2020) (plurality opinion) (citing cases))).

    2.    *The presence of a third party in a causal chain does not defeat standing.*

As to causation, Defendants argue that standing cannot exist if the connection between the Rollback Rule and Plaintiffs' injuries includes a third party's actions.  *See* Mot. at 11–12, 15, 19.  This broad assertion finds no support in the case law.

Courts have made clear that Defendants' argument "is impossible to maintain, of course." *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) (explaining that if "there is no standing to sue [for] action . . . which harms the plaintiff only through the reaction of third persons," then many common suits would be barred, such as "libel actions or suits for inducing breach of contract").  The correct rule is that causation may not exist where the connection between a challenged action and injury rests on the "*independent* action of some third party." *Lujan*, 504 U.S. at 560 (emphasis added) (internal quotation marks omitted).  But if "statistical analysis, common sense, or record evidence" support an inference that third parties will react to a

challenged government action in a predictable way, then the causation requirement is met.  *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 576 (S.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019).[5]

The Supreme Court concluded as much in *Department of Commerce v. New York*.  There, the plaintiffs challenged the Department of Commerce's plan to include a citizenship question on the 2020 census and alleged the following chain of causation:  The Department would include the question; residents would decline to complete the census for fear of immigration-related consequences; and underreporting would cause plaintiffs to lose federal funds.  *See* 139 S. Ct. 2551, 2565–66 (2019).  The plaintiffs showed "that third parties will likely react in *predictable* ways."  *Id.* at 2566 (emphasis added).  This moved their allegations from ones that rested "on mere speculation about the decisions of third parties"—that would not suffice—to ones that rested "instead on the predictable effect of Government action on the decisions of third parties"—that did.  *Id.*; *accord Bennett v. Spear*, 520 U.S. 154, 169 (1997) (approving of standing based on an "injury produced by determinative or coercive effect upon the action of someone else"); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734–735 (2008).

Defendants' contrary argument relies on a misreading of *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976).  *See* Mot. at 11, 12, 14.  There, indigent persons and their representatives challenged an Internal Revenue Services (IRS) ruling that gave

---

[5]    *See also Mass. v. HHS*, 923 F.3d at 227 (finding standing where "[t]he Commonwealth's cause and effect chain [wa]s predicated on *probable* market behavior" (internal quotation marks and alterations omitted)); *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104–105 (2d Cir. 2018) (finding "the agency's own pronouncements," as well as "[c]ommon sense and basic economics," showed that an "increased penalty has the potential to affect [third parties'] business decisions and compliance approaches" (internal quotation marks omitted)); *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015) (finding that DAPA would "enable[]" third parties "to apply for driver's licenses" and having "little doubt that many would do so"), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).

favorable tax treatment to non-profit hospitals that offered only emergency room services to indigent patients, alleging the ruling "'encourag[ed]' the hospitals to deny services." *Simon*, 426 U.S. at 33.  The Court questioned whether IRS rulings would affect decisions about whether to offer services to indigent patients, reasoning it was "just as plausible" that the "financial drain" from offering services might drive the decision.  *Id*. at 43.  The link between the ruling and any denial of services was thus "unadorned speculation."  *Id*. at 43–44.  All *Simon* shows is that causation is not met *if* a plaintiff does *not* show a third-party's response to government action is predictable.

Here, by contrast, the allegations provide a predictable, common sense, and record-based link between the Rollback Rule and the alleged injuries.  The 2016 Rule was promulgated to address specific harms from discrimination in healthcare; Plaintiffs have suffered those kinds of harms from past discrimination; and the repeal of the 2016 Rule's protections is likely to lead to a return of discrimination.  *See* Am. Compl. ¶¶ 190–264, 298–303; *see also infra* at 17, 18, 23, 28, 31, 34.  For example, it costs insurers money to reimburse healthcare providers for the costs of providing gender-affirming care.  Some insurers will thus predictably choose to forgo covering gender-affirming care in order to avoid this cost.  *Cf. Mass. v. HHS*, 923 F. 3d at 227 (causal chain based "on *probable* market behavior" (internal quotation marks and alterations omitted)).

Defendants acknowledged this commonsense result of their action during the rulemaking process, which only bolsters the case for causation.  The Rollback Rule recognizes that "entities may have changed their policies and procedures at the outset of the 2016 Rule."  85 Fed. Reg. 37,225; *see also Nondiscrimination in Health and Health Education Programs or Activities*, 84

14

Fed. Reg. at 27,876 (2019 proposed rule) (similar).[6]   And it recognizes that some entities will make changes, though it is "uncertain as to the total number."  85 Fed. Reg. at 37,225; *see also id.* ("[S]ome covered entities may no longer incur costs associated with processing grievances related to gender identity discrimination under Title IX, because such claims will not be cognizable under this final rule.").   Thus, Defendants themselves have "done much of the legwork in establishing that there is a substantial risk," *Mass. v. HHS*, 923 F.3d at 224–225, that third parties will react to the Rollback Rule in a way that injures Plaintiffs.

> 3. *A decision that will reduce Plaintiffs' injuries meets the redressability requirement.*

As to redressability, Defendants argue that the requirement is not met because "a favorable judgment here would not ensure that these third-party providers would refrain from engaging in the conduct plaintiffs dislike."  Mot. at 14, *see also, e.g., id.* at 11, 13, 14–15.  As with its other standing-related theories, they seek to impose a higher requirement than Article III mandates.  All that Article III requires is that Plaintiffs allege that a favorable decision would reduce their alleged injuries, which Plaintiffs have done.

Defendants argue that this Court could not change the *status quo* because a limited portion of the 2016 Rule had been vacated and because the statute itself might still protect against discrimination.  *See* Mot. at 11, 13.  Not so.  This Court can redress Plaintiffs' injuries. Plaintiffs alleged that the Rollback Rule will, among other things, cause confusion among healthcare providers and insurers regarding their legal obligations under Section 1557, embolden

---

[6]       On this front, Defendants were correct.  *See, e.g., Boyden v. Conlin*, 341 F. Supp. 3d 979, 989 (W.D. Wis. 2018) (noting that Wisconsin rescinded its exclusion for gender reassignment surgery from its state health insurance plan after the 2016 Rule); *see also id.* at 991–992 (noting that Wisconsin reinstated the exclusion after *Franciscan Alliance*); Br. for Equality North Carolina as Amicus Curiae Supporting Plaintiffs-Appellees and Affirmance, *Kadel v. North Carolina*, 2020 WL 6101994 (4th Cir. 2020) (noting a similar pattern for North Carolina).

providers and insurers to discriminate against persons on the basis of protected characteristics, and make it more difficult for patients to communicate with providers.  *See* Am. Compl. ¶¶ 279, 298, 317, 328, 338.  And Plaintiffs alleged that these effects will harm them:  Discrimination leads to delayed care or no care at all, *id.* ¶ 167, and the fear of discrimination does too, *id.* ¶ 230, and both of these consequences drive people towards entities like Plaintiff Healthcare Providers and Healthcare Advocates, which will force them to divert resources and strain their capacity, *id.* ¶¶ 233, 242.  An order from this Court declaring the Rollback Rule unlawful and enjoining its provisions would discourage providers and insurers from discriminating on the basis of protected characteristics, reduce the confusion regarding legal obligations under Section 1557, and make it easier for patients to communicate with providers.  All of this would redress the injuries to Plaintiffs and their patients, clients, and members.

Moreover, a plaintiff "need not show that a favorable decision will relieve his every injury."  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).  Thus in *Massachusetts v. EPA*, the Supreme Court rejected the EPA's argument that "its decision not to regulate greenhouse gas emissions . . . contributes so insignificantly to petitioners' injuries that [it] cannot be haled into federal court," explaining that EPA's argument "rests on the erroneous assumption that a small incremental step . . . can never be attacked in a federal judicial forum."  549 U.S. 497, 523–524 (2007).  A remedy that "will not by itself reverse" the injury still meets the redressability requirement if it "reduced [the injury] to some extent."  *Id.* at 525–526 (emphasis omitted).[7]

---

[7]      Likewise, a remedy that solves one cause of the injury, but not all causes, still meets the redressability requirement.  *See Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) ("[S]tanding does not require the challenged action to be the sole or even immediate cause of the injury"); *see also Bennett*, 520 U.S. at 168–169 (similar).  Defendants appear to conflate causation with proximate causation.  *See, e.g.*, Mot. at 14–15.  But "proximate causation" is "not a requirement of Article III standing."  *Lexmark Int'l*, 572 U.S. at 134 n.6.  And, even if it were,

**B.      Plaintiffs have sufficiently alleged standing as to each challenged provision.**

Plaintiffs allege that the Rollback Rule—in its entirety and also several provisions specifically—is arbitrary and capricious and contrary to law, and at least one Plaintiff has standing to challenge each specific provision at issue.[8]

> 1.   *The repeal of the definition of "on the basis of sex" and unlawful interpretation of that term in Title IX.*

Plaintiffs have standing to challenge the deletion of the definition of "on the basis of sex" and specific prohibitions in the 2016 Rule.  *See* 45 C.F.R. §§ 92.4, 92.206, 92.207 (2017); 45 C.F.R. §§ 92.1–92.105 (2020).  The provisions will cause them or their patients, clients, or members to incur costs to avoid discrimination and will lead to an increased demand on the resources of Plaintiff Healthcare Facilities and Plaintiff Healthcare Advocates.

*Mr. Lazor*:  Mr. Lazor has standing to challenge these provisions of the Rollback Rule for at least two reasons.  *First*, Plaintiffs allege that Mr. Lazor has experienced past discrimination in healthcare on the basis of his transgender status and that the Rollback Rule increases the risk that he will face this discrimination in the future.  *See* Am. Compl. ¶¶ 20–24, 190, 199–201, 213–215; *Maine People's All. and Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 284 (1st Cir. 2006) (finding standing where defendant created "a probabilistic increase in a risk that the [plaintiff] would in any event have had to run"); *see also, e.g.*, *Walker*

---

it would be enough to allege that the relief will reduce the injuries because an event can have more than one proximate cause.  *See, e.g., Staub v. Proctor Hospital*, 562 U.S. 411, 420 (2011).

[8]      If Defendants are arguing that Plaintiffs must allege standing as to each provision of the Rollback Rule to obtain vacatur of the entire rule, they are wrong.  The question of the scope of relief goes to the merits, not standing, and vacatur may be appropriate where, as here, the APA violations are "numerous, fundamental, and far-reaching," or "call[] into question the validity and integrity of the rulemaking venture itself."  *New York v. United States Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 577 (S.D.N.Y. 2019); *see also Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1217 (D.C. Cir. 2004) (vacating rule where the errors "permeated the entire rulemaking process" (internal quotation marks omitted)).

*v. Azar*, No. 20CV2834FBSMG, 2020 WL 4749859, at *6 (E.D.N.Y. Aug. 17, 2020) (finding similarly situated plaintiffs had standing to challenge Rollback Rule).

*Second*, Plaintiffs allege that Mr. Lazor has standing because he will likely incur costs due to that increased risk of discrimination and his fear of discrimination.  The emergency room closest to his home is at the hospital that previously denied him treatment and discriminated against him.  *See* Am. Compl. ¶ 213.  The Rollback Rule increases his fears of discrimination and substandard treatment were he to return to that hospital.  *Id.*  For that reason, if he were to experience a medical emergency, he would ask a friend or family member to drive him to an emergency room half an hour away.  *Id.*; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010) (finding standing based on costs to mitigate risk of crop infection).

**Plaintiff Healthcare Facilities**:  Plaintiff Healthcare Facilities have standing for three reasons.  *First*, Plaintiffs allege that they have standing because they are subject to the Rollback Rule.  As regulated entities, they can challenge HHS's promulgation of regulations in violation of the APA.  *See* Am. Compl. ¶¶ 25 (Fenway), 31 (Callen-Lorde), 37 (CrescentCare); *see also Lujan*, 504 U.S. at 560–561 (noting "there is ordinarily little question" that a regulated entity has standing to challenge an allegedly illegal statute or rule under which it is regulated).

*Second*, Plaintiffs allege that Plaintiff Healthcare Facilities have standing because these provisions of the Rollback Rule will negatively affect their organizational activities.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, (1982) (An organization has standing to sue where a defendant's conduct has "perceptibly impaired" its activities.).  The rule will increase demand for their medical services, straining their resources.  *See* Am. Compl. ¶¶ 233, 241; *see also Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993) (noting that "standard principles of 'supply and demand' [have been] routinely credited by courts" in "a variety of [standing] contexts").

The rule will also increase the need for internal staff training, patient education, patient navigation services, legal services, and other non-reimbursable services. *See* Am. Compl. ¶¶ 233, 238 (all Plaintiff Healthcare Facilities) 234–235 (Fenway), 236 (Callen-Lorde), 237, 241 (CrescentCare), 239–240 (BAGLY). These facilities operate on limited budgets and serve patients without regard to their ability to pay, so the increased demand will require additional resources and diversion of limited resources. *See* Am. Compl. ¶¶ 234–235 (Fenway), 236 (Callen-Lorde), 237 (CrescentCare), 238 (all Plaintiff Healthcare Facilities); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 76 (1st Cir. 2012) ("[A] relatively small economic loss—even an identifiable trifle—is enough to confer standing." (internal quotation marks omitted)).

These provisions will also negatively affect the organizational activities of Plaintiff Healthcare Facilities by diminishing their ability to provide effective care for their patients. *See* Am. Compl. ¶¶ 25–27 (Fenway), 31–33 (Callen-Lorde), 37–42 (CrescentCare). Because fear of discrimination will cause their patients to delay, avoid, or be unable to obtain necessary care or support services from other health care providers or decline to disclose their LGBTQ+ status to these other providers, patients will come to Plaintiff Healthcare Facilities with more acute medical conditions that will be more difficult and costlier for the Plaintiff Healthcare Facilities to treat. *See* Am. Compl. ¶¶ 229–233; *see also Whitman-Walker*, 2020 WL 5232076 at *10 (finding organizational standing for similarly situated healthcare facilities to challenge Rollback Rule because the Rule would "forc[e] them to deliver costlier and more difficult treatment to a growing number of patients"). This "*fear* of discrimination at the hands of third parties— regardless of whether such discrimination ultimately occurs—will cause individuals to turn to Plaintiff organizations for care, thereby necessarily generating financial and operational burdens that impair Plaintiffs' ability to provide services." *Whitman-Walker*, 2020 WL 5232076 at *12

(internal quotations and alterations omitted).  The Rollback Rule will thus also diminish Plaintiff Healthcare Facilities' ability to fulfill other aspects of their organizational missions, beyond providing effective care for their patients.  *See* Decl. Stark at ¶¶ 12–13, 34–36.

*Third*, Plaintiffs allege that Plaintiff Healthcare Facilities have third-party standing, on their patients' behalf, to challenge these provisions.  Third-party standing exists where the litigant has "a sufficiently concrete interest in the outcome of the issue in dispute," and "a close relation to the third party," and where there is "hindrance to the third party's ability to protect his or her own interests."  *Powers v. Ohio*, 499 U.S. 400, 410–411 (1991) (internal quotations omitted).

Plaintiff Healthcare Facilities meet those requirements.  *See Whitman-Walker*, 2020 WL 5232076 at *22 (D.D.C. Sept. 2, 2020) (finding standing for similarly situated healthcare facilities to challenge the Rollback Rule).  They have a concrete interest in the outcome of the dispute because they provide many services that will be affected by the Rollback Rule.  *See June Med. Servs.*, 140 S. Ct. at 2118–19 (observing that courts "have long permitted" healthcare providers "to invoke the rights of their actual or potential patients in challenges to . . . regulations" related to healthcare procedures offered by the provider).  Plaintiff Healthcare Facilities also have a close relationship with their patients.  Indeed, because "most of the medical procedures at issue here such as . . . gender-affirming surgery . . . cannot be safely secured without the aid of a physician," the "rights of the individual physician plaintiffs and their patients here are . . . closely intertwined."  *City & Cnty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001, 1011 (N.D. Cal. 2019).  And finally, these patients are hindered from asserting their rights because they face barriers to asserting claims—many have limited financial resources, limited English proficiency, would be endangered by publicly disclosing their LGBTQ+ status, and/or

would be endangered by publicly disclosing the treatments or services they seek.  *See* Am. Compl. ¶¶ 29 (Fenway), 34–35 (Callen-Lorde), 43 (CrescentCare); Decl. Twilbeck ¶¶ 13, 30, 34; *also compare, e.g.*, *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (observing that disclosure of a transgender person's status "exposes transgender individuals to a substantial risk of stigma, discrimination, intimidation, violence, and danger"), *with Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (observing that women affected by abortion restrictions "may be chilled . . . by a desire to protect the very privacy of [their] decision from the publicity of a court suit").

*Plaintiff Healthcare Advocates*:  Plaintiffs allege that Plaintiff Healthcare Advocates have standing to challenge the Rollback Rule's inaccurate definition of "on the basis of sex," and related provisions because these provisions will impair their activities and missions.  *See* Am. Compl. ¶¶ 45–51, 247 (BAGLY), 52–60, 248–256 (CSE), 61–67, 257–264 (IWR), 243–246 (TEF).  In particular, the Rollback Rule will increase service demand, leading to a drain on resources.  *See id.* at ¶¶ 240 (BAGLY), 249–254 (CSE), 257, 261, 264 (IWR), 243–246 (TEF); *see also Havens*, 455 U.S. at 379 (explaining that an organization has standing to sue where there has been an "injury to the organization's activities," accompanied by a "drain on the organization's resources").  For example, "BAGLY has seen an increase of young people accessing its counseling since the Rollback Rule was announced."  Am. Compl. ¶ 240.  "To expand its mental health services, BAGLY would need to hire an additional therapist and rent a larger space to accommodate more sessions, both of which would be major, unanticipated expenses for BAGLY."  *Id.*  "BAGLY has limited financial resources to dedicate to its healthcare services, and it does not anticipate a major increase in funding during this time of economic recession."  *Id.*  Those are precisely the sort of allegations that this Court concluded

were missing in *Equal Means Equal v. Dep't of Educ.*, 450 F. Supp. 3d 1, 8 (D. Mass. 2020).

The Rollback Rule will also negatively affect the organizational activities of Plaintiff Healthcare Advocates because, in order to address the rule's harmful effects and the confusion it engenders, they will be required to spend and divert already limited resources to help LGBTQ+ people navigate the discriminatory barriers to the care they will encounter.  *See* Am. Compl. ¶ 239, 247 (BAGLY), 248 (CSE); *cf. Havens*, 455 U.S. at 379 ("If, as broadly alleged, [defendants'] steering practices have perceptibly impaired [plaintiff organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact.").  For example, CSE "facilitates access to healthcare for LGBTQ+ people through cultural competency trainings for healthcare service providers" and through "*Pop-Up Resource Clinics* that educate LGBTQ+ people about their rights."  Am. Compl. ¶ 56.  Indeed, "[i]n a number of these trainings, [CSE] has used materials prepared by HHS about the providers' obligations to provide safe and affirming care to LGBT Southerners."  *Id*.  However, because of the Rollback Rule's inaccurate definition of "on the basis of sex," and related provisions, CSE "anticipates diverting additional staffing and funding resources towards their training programs and hiring a [part-time] consultant."  *Id*. ¶ 252.

***Membership Organizations***:  Plaintiffs allege that the Membership Organizations have standing, on their members' behalf, to challenge the Rollback Rule's definition of "on the basis of sex," and related provisions.  *See id*. at ¶¶ 72–77, 224–228 (EQCA); ¶¶ 52–60, 254–256 (CSE).  A "plaintiff organization may sue based on injuries to its members' interests . . . if (1) at least one of its members would have standing to sue as an individual, (2) the interests at stake are germane to the organization's purpose, and (3) individual members participation is not necessary to either the claim asserted or the relief requested."  *Animal Welfare Inst. v. Martin*, 623 F.3d 19,

25 (1st Cir. 2010) (internal quotation marks omitted).

EQCA meets all three criteria.  Its members would have standing to sue as individuals. Indeed, one of EQCA's members—Mr. Lazor—is suing in an individual capacity here, Am. Compl. ¶ 77, and several other members will suffer similar harms, *id*. at ¶¶ 224–228.  The interests at stake in this litigation are germane to EQCA's purpose of "combatting discrimination and injustice on the basis of sexual orientation and gender identity, and to protecting the fundamental rights of those within the LGBTQ+ community and the vulnerable communities of which they are a part."  *Id*. at ¶ 72.  Finally, the participation of EQCA's members is not necessary to either the claim asserted or the relief requested.

CSE also meets this standard.  CSE member, Stephe Koontz, has suffered discrimination by health care providers because she is transgender, causing her financial costs and emotional distress.  Decl. Koontz at ¶¶ 2–12, 14, 16-18, 20–24.  Her reasonable fears that she will face discrimination again are exacerbated by the Rollback Rule.  *Id.* at ¶ 26.  CSE regularly advocates for its members facing such discrimination.  Decl. Beach-Ferrara at ¶¶ 11–12, 26, 29.  The relief Plaintiffs request would benefit all such members equally, so their individual participation is not necessary to present the claim or obtain relief.

Defendants' arguments to the contrary—regarding future injury, third-party causation, and the *Franciscan Alliance* decision—are foreclosed by the allegations in the Complaint and the applicable law.  *First*, Defendants argue that "allegations of possible future injury are not sufficient to accord a party standing."  Mot. at 10, *see also id*. at 15–16.  As explained, *see supra* at 8–10, standing allegations can rest on a claim that "there is a substantial risk that harm will occur."  *Reddy*, 845 F.3d at 500.  And Plaintiffs have alleged that, because of the Rollback Rule, there is a substantial risk that they will be harmed.  *See supra* at 17–22.

23

*Second*, Defendants argue that "a plaintiff must show that the defendant's conduct—rather than that of a third party—caused its injuries, and that a decision in the plaintiff's favor will redress those injuries."  Mot. at 11, 14–15.  The involvement of third parties presents no barrier to standing.  Common sense, Defendants' own analysis, and regulated entities' litigation positions all show that it is substantially likely that some providers and insurers will respond to the Rollback Rule by discriminating against Plaintiffs, their members, their patients, and their clients.  *See supra* at 12–15.

*Third*, Defendants argue that Plaintiffs "cannot show redressability" because "the gender identity and termination of pregnancy provisions were vacated from the 2016 Rule by another court before this Rule was finalized."  Mot. at 13 (citing *Franciscan Alliance*, 227 F. Supp. at 687).[9]  Defendants are mistaken.  Plaintiffs need only allege that an order from this Court would reduce the alleged injuries and have alleged that vacating the Rollback Rule will reduce healthcare providers' and insurers' confusion regarding their obligations under Section 1557.  *See supra* at 15–16.  Moreover, Defendants do not acknowledge that a ruling vacating the Rollback Rule would also reject the agency's unlawful interpretation of "sex" discrimination in the preamble.  85 Fed. Reg. 37,178–80, 37,191.  Thus, even if HHS does not re-promulgate the 2016 Rule's definition, a decision by this court striking down HHS's policy as contrary to law would *require* HHS to enforce Section 1557 consistent with the interpretation that discrimination on the basis of sex includes discrimination based on gender identity, rather than its unlawful interpretation.

What is more, Plaintiffs' claim "is not confined to the 'gender identity' language" in the Rollback Rule's definition of discrimination on the basis of sex.  *Whitman-Walker*, 2020 WL

---

[9]     The district court order has been appealed.  *See supra* n.1.

5232076, at *14.  Plaintiffs "also contest HHS's elimination of the 2016 Rule's definition of sex

discrimination as including discrimination based on sex stereotyping," and "*Franciscan Alliance*,

notably, did not vacate this latter definitional provision; the court's opinion never even

mentioned it."  *Id.* (citing *Franciscan Alliance II*, 414 F. Supp. 3d 928); *Walker*, 2020 WL

4749859, at *7 (finding redressability because "*Franciscan Alliance* did not address the concept

of 'sex stereotyping'").  Plaintiffs further challenge HHS's elimination of the terms "pregnancy,

false pregnancy, . . . or recovery therefrom, childbirth or related medical conditions," from the

definition of "on the basis of sex," 81 Fed. Reg. at 31,467 (codified at 45 C.F.R. § 92.4 (2017)),

which were undisturbed by the vacatur of "termination of pregnancy" from that definition,

*Franciscan Alliance II*, 414 F. Supp. 3d 928.  If this Court enjoins the deletion of the definition

of discrimination on the basis of sex, "Plaintiffs would be left with the 2016 Rule's prohibition

against discrimination based on sex stereotyping" and against discrimination based on

"pregnancy," "childbirth," and related conditions.  *Whitman-Walker*, 2020 WL 5232076, at *14.

This "would clearly redress at least some of their injury."  *Id.*; *see also Walker*, 2020 WL

4749859, at *7.[10]

Defendants resist the reasoning of the two district courts that have found redressability

here, arguing that they "fail to explain why the 2020 Rule in any way affects coverage of 'sex

stereotyping.'"  Mot. at 13.  The Rollback Rule itself states all that is needed.  *See* 85 Fed. Reg.

at 37,183–86.  In response to a comment about *Price Waterhouse v. Hopkins*, 490 U.S. 228

(1989), and *Oncale v. Sundowner Offshore Oil Services*, Inc., 523 U.S. 75 (1998)—two of the

Supreme Court's sex stereotyping precedents—HHS responded that it believes "that, unlike

---

[10]    The *Whitman-Walker* opinion did not address redressability of the deletion of terms
related to pregnancy or childbirth from the definition of "on the basis of sex" because that
litigation did not raise claims related to deletion of those protections.

stereotypes, . . . the biological binary of male and female, may, and often must, play a part in the decisionmaking process—especially in the field of health services."  85 Fed. Reg. at 37,184–85 (internal quotation marks omitted).  Thus, Defendants' argument that the Rollback Rule does not affect protections against sex stereotyping, *see* Mot. at 13–14, relies on their view that sex stereotyping does not include discrimination on the basis of gender identity.  That view is wrong.  The parties' disagreement on this front speaks to the *merits* of Plaintiffs' challenge; it does not speak to Plaintiffs' standing.  Defendants impermissibly conflate the two.  *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing in no way depends on the merits of [the plaintiff's] contention that particular conduct is illegal." (internal quotation marks omitted)).

> 2.   *The narrowing of the definition of "covered entities."*

The Rollback Rule's narrowed definition of "covered entities" will consume Plaintiff Healthcare Facilities' budgets, force Plaintiff Healthcare Advocates to divert limited resources to help people navigate barriers to care, and make it harder for individuals to access care.[11] *Compare* 45 C.F.R. § 92.4 (2017), *with* 85 Fed. Reg. 37,244–45 (to be codified at 45 C.F.R. § 92.3(b), (c)).

**Plaintiff Healthcare Facilities**:  Plaintiffs allege that Plaintiff Healthcare Facilities rely, in part, on insurance reimbursement to fund their operations and the Rollback Rule will reduce the reimbursements that Plaintiff Healthcare Facilities receive for the care that they provide.  *See* Am. Compl. ¶¶ 234–235 (Fenway), 236 (Callen-Lorde), 237, 241 (CrescentCare); *see also id.*

---

[11]    Defendants break up their analysis of the Rollback Rule's narrowed definition of "covered entities" into two parts, focusing first on the narrowed definition's effect on "federal entities," *see* Govt. Br. at 16–17, and then turning to the definition of "health program or activity," *id*. at 17–18.  These two parts are in one provision of the Rollback Rule and can be analyzed as one.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 233–236 (1990).

¶¶ 211, 223.  As the Amended Complaint explains, the Rollback Rule exempts certain insurers from compliance with Section 1557's prohibition of discrimination.  As a result, some insurers will stop reimbursing Plaintiff Healthcare Facilities for certain services, including for example, gender-affirming care.  Because Plaintiff Healthcare Facilities provide care even when their patients cannot afford to pay for care—whether due to being uninsured or underinsured—and because many of Plaintiff Healthcare Facilities' have limited financial resources, Healthcare Facilities expect that the Rollback Rule's exemption of insurers will cause Healthcare Facilities to provide more unfunded care.  This type of "economic loss … is enough to confer standing." *Katz*, 672 F.3d at 76; *also compare Whitman-Walker*, 2020 WL 5232076, at *16 (finding healthcare facility had standing to challenge Rollback Rule's elimination of the 2016 Rule's prohibition on categorical coverage exclusions for gender-affirming care because facility would "obtain reduced reimbursements from insurers that scale back their coverage of such treatment").  Furthermore, Plaintiff Healthcare Facilities will need to expend more resources understanding, explaining, claiming and appealing denials of this decreased coverage.

*Plaintiff Healthcare Advocates*:  Plaintiffs allege that BAGLY has standing to challenge the Rollback Rule's narrowing of the definition of "Covered Entities" for much the same reason as Plaintiff Healthcare Facilities.  As the Amended Complaint explains, BAGLY also seeks insurance reimbursement for its insured clients, and it expects that the Rollback Rule's narrowing of the definition of "Covered Entities" will reduce the revenue that it can recover through insurance coverage.  *See* Am. Compl. ¶¶ 211, 223.  This narrowed definition will also add to BAGLY's administrative and financial burden because 12% of BAGLY's clients are on insurance plans of parents who do not live in Massachusetts.  *Id.* ¶ 239.  BAGLY will need to expend additional administrative resources to sort out which out-of-state patients have coverage

for the gender-affirming care they obtain through BAGLY, now that there is no standard federal mandate of coverage.  *See id.* ¶ 239; *see also Havens*, 455 U.S. at 379.

The Amended Complaint also alleges that the Rollback Rule's narrowing of the definition of "covered entities" will negatively affect the organizational activities of all Plaintiff Healthcare Advocates.  In order to counteract the Rollback Rule's harmful effects and the confusion it causes, some Plaintiff Healthcare Advocates will be required to spend and divert already limited resources to help LGBTQ+ people navigate the discriminatory barriers to care they will encounter.  *See* Am. Compl. ¶¶ 239, 240, 247 (BAGLY), 248 (CSE); *see also Havens*, 455 U.S. at 379.  For example, CSE has standing to challenge this provision because it "frequently provides advocacy and healthcare navigation and/or referrals to attorneys who specialize in health insurance appeals" for members who "contact [CSE] about health insurance denials for gender-affirming care."  Am. Compl. ¶ 55.  Similarly, TEF has standing to challenge this provision because the Amended Complaint states that TEF "assists clients who have been denied insurance coverage for needed care in navigating those denials with their health plans." *Id.* ¶ 69.

Certain Plaintiff Healthcare Advocates will also struggle with entities other than insurers who fall outside the Rollback Rule's narrowed definition.  Plaintiffs allege that the Indian Health Service (IHS) is the primary source of healthcare for most of IWR's clients, and that the "legacy of forced sterilizations, historically underfunded services, and cultural ignorance contributes to Indigenous people's fear of discrimination when seeking reproductive and pregnancy-related healthcare, particularly at facilities operated by IHS."  *Id.* ¶ 222.  Plaintiffs also allege that, by excluding IHS, the rule's narrowed definition will burden the ability of Indigenous people to access pregnancy-related and reproductive healthcare, exacerbate their fears of discrimination,

and cause more Native people to turn to IWR's Midwifery Fund and Abortion Fund to finance their care. *Id.* ¶¶ 260–264. "By straining [IWR]'s finances and operations, the Rollback Rule undermines [IWR]'s ability to achieve its broader mission of supporting culturally safe health options through its various other programs." *Id.* ¶ 264; *see Havens*, 455 U.S. at 379.

Defendants recycle many of their arguments against Plaintiffs' standing to challenge the sex-discrimination provisions of the Rollback Rule. The arguments are no more convincing in this context. *First*, they argue that Plaintiffs cannot meet Article III's causation requirement because the chain of causation involves the actions of a third party. *See* Mot. at 18. That is wrong. *See supra* at 12–15; *see also Davis*, 554 U.S. at 734–735; *Dep't of Commerce*, 139 S. Ct. at 2564–66. Plaintiff's allegations, common sense, and Defendants' own cost-benefit analysis support finding that insurers will likely respond to the rule in a way that harms Plaintiffs. *See supra* at 13–15.

*Second*, Defendants raise their third-party causation argument in a slightly different form to attack IWR's allegation that the Rollback Rule "signals that the law does not protect against pregnancy discrimination in the Indian Health Service . . . and opens the door to further discrimination against Native people." Mot. at 17. In Defendants' view, "[a] 'signal' is not a concrete injury to IWR." *Id.* But, the "signal" referenced in the Amended Complaint is not Plaintiffs' alleged injury. The injury is pregnancy discrimination against the Native people that IWR serves. The "signal" referenced in the Amended Complaint is the causal link between the Rollback Rule and the IHS providers who will discriminate against IWR's Native clients. And because that causal link is backed by a long history of "inconsistent, discriminatory, and substandard reproductive and pregnancy-related healthcare at IHS facilities—the primary source of healthcare for most IWR's clients," *see* Am. Compl. ¶ 258, the effects of the Rollback Rule

are sufficiently predictable to meet Article III's causation requirement, *see supra* at 12-15, 28; *see also Davis*, 554 U.S. at 734–735; *Dep't of Commerce*, 139 S. Ct. at 2564–66.

*Third*, Defendants briefly argue that "the fact that government entities like the IHS may not discriminate on the basis of sex as a result of the Equal Protection Clause, only adds to the speculation regarding the impact of the Rule on any Plaintiff." Mot. at 17. To the extent Defendants argue that the Plaintiffs cannot prove traceability here because the chain of causation depends on the intervening acts of third parties that are *unlawful*, Defendants cite no authority to support that argument. Nor could they. Again, plaintiffs can rely on the "predictable" actions of third parties, which are sufficient to prove standing "even if" those third parties act "unlawfully" or contrary to Government requirements. *Dep't of Commerce*, 139 S. Ct. at 2566.[12]

      3.      *The elimination of the uniform enforcement scheme.*

Plaintiffs have sufficiently alleged that it will be more difficult for Plaintiffs' patients and clients to bring claims of intersectional discrimination because of the elimination of this scheme. *Compare* 45 C.F.R. § 92.301 (2017), *with* 85 Fed. Reg. 37,245 (to be codified at 45 C.F.R. § 92.5).

---

[12]     Federal courts routinely find standing where the plaintiff's chain of causation depends on the intervening acts of third parties that are unlawful. For example, in data breach cases, courts have found that customers have standing to bring claims against the companies that failed to safeguard their data—even though the illegal actions of a hacker or "thief would be the most immediate cause of plaintiffs' injuries." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017); *Lambert v. Hartman*, 517 F.3d 433, 437–438 (6th Cir. 2008) (rejecting the argument that the intervening "criminal act of a third party" defeated standing where the plaintiff "link[ed] the act of identity theft" to the personal information divulged by the defendant). Similarly, in terrorist financing cases, courts have found standing against banks—even though the most immediate cause of injury is the unlawful actions of terrorists. *See, e.g., Rothstein v. UBS AG*, 708 F.3d 82, 93–94 (2d Cir. 2013) (concluding that "plaintiffs' injuries in bombings and rocket attacks conducted by Hizbollah and Hamas were fairly traceable to UBS's provision of U.S. currency to Iran").

***Plaintiff Healthcare Facilities***:  Plaintiffs allege that Plaintiff Healthcare Facilities have standing, on their own and on their patients' behalf, to challenge the Rollback Rule's elimination of the uniform enforcement scheme.  As the Complaint explains, "[t]he Rollback Rule's harms are magnified for those at the intersection of impacted communities, such as Black transgender women; disabled Latinx immigrants; or Indigenous pregnant people."   Am. Compl. ¶ 14. Plaintiff Healthcare Facilities serve diverse populations that include people who have experienced intersectional discrimination in the past and are likely to experience intersectional discrimination in the future.  Plaintiff Healthcare Facilities have limited resources to provide assistance with coverage denials, case management, and legal services to their patients in order to remedy discriminatory treatment and health care coverage.  *Id.* ¶¶ 236, 237; Decl. Stark ¶¶ 23, 31; Decl. Riener at ¶¶ 15, 25; Decl. LaPointe at ¶¶ 29, 33.   And the Rollback Rule's lack of clarity about remedies for intersectional discrimination, and elimination of avenues for administrative relief, will make it more difficult for patients, and Plaintiff Healthcare Facilities that help them, to assert patient rights under Section 1557 and obtain redress.  *See* Am. Compl. ¶¶ 316–317.  For the reasons explained above, *see supra* at 18–21, Plaintiff Healthcare Facilities have standing to seek a remedy for this injury on their own and on their patients' behalf.  *See Whitman-Walker*, 2020 WL 5232076, at *22 (finding standing for similarly situated healthcare facilities to challenge Rollback Rule on behalf of their patients).

***Plaintiff Healthcare Advocates***:  The Amended Complaint also adequately alleges that Plaintiff Healthcare Advocates have standing to challenge the elimination of the uniform enforcement scheme.  As is true of Plaintiff Healthcare Facilities, Plaintiff Healthcare Advocates serve diverse populations that include people who have experienced intersectional discrimination in the past and are likely to experience intersectional discrimination in the future.  IWR, for

example, serves Native women across the country.  *See* Am. Compl. ¶ 62, 65.  Its Abortion Fund

has served 172 people from Indigenous communities or tribes across the country, Decl. Lorenzo

¶ 4, and the sex education program has served approximately 3,000 people, *id.* ¶ 12.  Native

women experience high rates of intersectional discrimination in health care: 23% of Native

people report experiencing anti-Native discrimination when going to a doctor or health clinic,

and 29% of Native women report experiencing discrimination because they are women when

going to a doctor or health clinic.  *Id.* ¶ 25.  Likewise, 98% of the youth that BAGLY serves are

LGBTQ+, and BAGLY provides group therapy for young people with disabilities, for

transgender femmes, and another for all women, where participants regularly discuss their

experiences of discrimination when attempting to access health care.  *See* Decl. Sterling Stowell

at ¶ 14; Decl. Smith ¶ 17.  The Rollback Rule's lack of clarity about remedies for intersectional

discrimination, and its elimination of administrative remedies, will make it more difficult for the

clients of Plaintiff Healthcare Advocates who experience intersectional discrimination to assert

their rights under Section 1557 and obtain redress.  *See* Am. Compl. ¶¶ 316–317.  The

elimination of the uniform enforcement scheme thus does not only cause "confusion," Mot. at

20, but it will also make it less likely that those who experience discrimination can obtain relief.

  4. *The incorporation of Title IX's religious and abortion exemptions.*

  Plaintiffs have alleged standing because these provisions will increase demand for the

services of Plaintiff Healthcare Facilities and IWR, and because these provisions will make it

more difficult for clients to access care.  *Compare* 45 C.F.R. § 92.2 (2017), *with* 85 Fed. Reg.

37,243–44, 37,245 (to be codified at 45 C.F.R. §§ 86.18, 92.6)).

  ***Plaintiff Healthcare Facilities***:  Plaintiff Healthcare Facilities have standing to challenge

the Rollback Rule's incorporation of Title IX's religious and abortion exemptions because those

provisions will negatively affect the organizational activities of Plaintiff Healthcare Facilities.

*See Havens*, 455 U.S. at 379.  Just as was true of the Rollback Rule's inaccurate definition of "on the basis of sex," and related provisions, its incorporation of these exemptions will increase demand for Plaintiffs' services.  *See* Am. Compl. ¶¶ 233, 241.  For example, Plaintiffs allege that CrescentCare provides reproductive health and gender affirming services, *see id.* ¶¶ 38–40, and that the Rollback Rule will increase discrimination against their patients, *id.* ¶ 233.  As a result, Plaintiffs allege that CrescentCare "will experience increased strain on their resources and capacity" from patients seeking care at their facilities, where they do not need to fear discrimination.  *Id.*; *see also Whitman-Walker*, 2020 WL 5232076, at *15 (finding healthcare facility had standing to challenge Rollback Rule's incorporation of Title IX's religious exemption because "HHS's newly and explicitly incorporated religious exemption will cause patients to fear discrimination at the hands of religiously affiliated providers," and that "apprehension, in turn, further contributes to increased demand for the services of the health-provider Plaintiffs and their accompanying financial and operational injuries").

***Plaintiff Healthcare Advocates***:  Plaintiffs allege that IWR has standing to challenge these provisions.  The provisions will cause IWR to expend more resources on services for abortion, midwife, and doula care, on more expensive abortion care later in pregnancy, on clients' travel and related expenses to the few clinics that provide abortion care later in pregnancy, and on staff labor to provide information and resources to clients about abortion care.  *See* Am. Compl. ¶¶ 222, 257–264.  The provisions will also threaten the life and health of its clients who are denied abortion care, coverage, and information.  *Id.*  Plaintiffs have thus alleged that IWR has standing to challenge the provisions.  *See Havens*, 455 U.S. at 379.

Plaintiffs have also adequately alleged that IWR has standing on behalf of its clients to challenge these provisions.  *See* Am. Compl. ¶¶ 67, 222; *see also Carey v. Population Services*

*Int'l*, 431 U.S. 678 (1977) (distributors of contraceptives had standing to raise rights of prospective purchasers); *accord June Med. Servs.* 140 S. Ct. at 2118, 2139 n.4 (plurality and concurrence) (reaffirming third-party provider standing). For example, Plaintiffs allege that IWR provides critical information about pregnancy options and abortion care that is often not otherwise available to Indigenous people, and also helps them access abortion care by paying clinics for the procedure and by providing clients the necessary funds to cover lodging, gas, food, childcare, and related travel expenses. *See* Am. Compl. ¶¶ 67, 222. Plaintiffs also allege that IWR's clients "face financial, linguistic, and geographic barriers to care" and "face stigma in accessing abortion care." *Id.* ¶ 63; *see also Singleton*, 428 U.S. at 117 (noting that "obstacles" to asserting abortion rights include "a desire to protect the very privacy of her decision from the publicity of a court suit"). Many "live in rural areas, usually on reservations," from which they would have to "drive distances from over 2 hours to about 10 hours to access abortion care." Am. Compl. ¶ 63. Most have "limited financial resources and are either uninsured or lack insurance coverage of abortion." *Id.* And some "are represented by elders, for whom English is not their first language." *Id.* These allegations show that IWR is injured by the incorporation of Title IX's religious and abortion exemptions, that it has a close relationship with its clients, and that its clients are hindered in protecting their own interests. *See Powers*, 499 U.S. at 410–411.

In response, Defendants incorrectly assert that the allegations about the injury caused by the Rollback Rule's incorporation of Title IX's religious and abortion exemptions are "not particularized to any of the named plaintiffs." Mot. at 22. But as just shown, CrescentCare and IWR *have* alleged particularized injury from these provisions. Moreover, these allegations are not grounded in simple assertions that individuals will experience discrimination. They are grounded in Plaintiffs' and their patients' own past experiences, which are probative evidence of

34

"a real and immediate threat of repeated injury."  *O'Shea*, 414 U.S. at 496; *see supra* at 28.  For example, IWR's "clients have expressed fear that they will be discriminated against for having had an abortion by a hospital or IHS facility."  Am. Compl. ¶ 222.  Additionally, "due in part to inadequate resources, and in part to anti-abortion bias," Indigenous people who can become pregnant "are also denied access to abortion care and information about abortion at IHS facilities even where the Hyde Amendment—which restricts federal funding of abortion—does not apply, including cases of life endangerment, rape, and incest."  *Id*.  IWR's clients thus have already experienced discriminatory denials of reproductive health care and information, and discrimination because of their reproductive health histories will predictably be exacerbated by the incorporation of Title IX's exemptions.  *See Mass. v. HHS*, 923 F.3d at 224–225.

     5.     *The removal of protections for association discrimination.*

Plaintiffs have alleged that EQCA and IWR have standing to challenge the elimination of this provision, 45 C.F.R. § 92.209 (2017).

Defendants incorrectly state that Plaintiffs made no allegations of injury from the removal of protection for claims of discrimination based on association.  Mot. at 22.  Rather, Plaintiffs alleged that two EQCA members previously suffered discrimination by healthcare providers and insurers based upon association with their transgender daughter, and thus reasonably fear that they will face such discrimination again—in the form of, for example, denials of care, higher out-of-pocket costs, and more—because of the Rollback Rule.  Am. Compl. ¶ 225; Decl. Zbur ¶ 21.  These allegations show "a real and immediate threat" of association-based discrimination.  *O'Shea*, 414 U.S. at 496.  By removing express protections against that discrimination, the Rollback Rule undermines their ability to obtain administrative or judicial redress under Section 1557.  This suffices to establish EQCA's standing on this front.

35

Plaintiffs also alleged that many of IWR's clients are from Native American communities and are represented by grandparents or other elders for whom English is not their first language. Am. Compl. ¶ 63.  Discrimination against IWR's clients' representatives by healthcare providers based on the representatives' race, age, or LEP would prevent those clients from receiving the care that they need and would deter their ability to assert their rights under Section 1557 and obtain redress.  Without a way to challenge discrimination, these clients will be harmed.

      6.     *The elimination of the notice and taglines requirement.*

Plaintiffs have alleged that Plaintiff Healthcare Facilities have standing to challenge the elimination of these provisions, *see* 45 C.F.R. § 92.8 (2017), because they are regulated entities and because the provisions will harm their organizational activities by causing patients who initially seek care elsewhere to come to Plaintiff Healthcare Facilities worse off than they would be otherwise because of communication difficulties.

*First*, Plaintiffs allege that Plaintiff Healthcare Facilities have standing to challenge these provisions because the Amended Complaint states that they are regulated entities who must comply with Section 1557 and associated regulations.  *See* Am. Compl. ¶¶ 29 (Fenway), 35 (Callen-Lorde), 43 (CrescentCare); *see also Lujan*, 504 U.S. at 560–561.

*Second*, Plaintiffs allege that Plaintiff Healthcare Facilities have standing to challenge the Rollback Rule's elimination of the notice and taglines requirement because they provide patients education, navigation, and legal services (including support for remedying discriminatory healthcare coverage or provision of services) and accommodate patients with LEP through the use of translation services and through bilingual staff.  *See* Am. Compl. ¶¶ 29 (Fenway), 35 (Callen-Lorde), 43 (CrescentCare).  As the Amended Complaint explains, the Rollback Rule's elimination of the notice and taglines requirement will cause patients to "be less informed about applicable civil rights protections" and cause patients who seek care elsewhere to come to

Plaintiff Healthcare Facilities worse off than they would otherwise be because of communication difficulties.  *See id.* ¶¶ 12, 113, 190, 206–207, 242; *see also Whitman-Walker*, 2020 WL 5232076, at *17 (finding that healthcare facility had standing to challenge the elimination of the notice and tagline requirements because it would have to provide "costlier and more difficult treatment" to patients who had received inadequate care elsewhere).

Defendants' sole response is that allegations that Plaintiffs serve LGBTQ+ people, including individuals and families with LEP, are insufficient to establish organizational standing. *See* Mot. at 23.  But, again, Plaintiffs allege that the Rollback Rule's elimination of the notice and taglines requirement will cause patients who unsuccessfully seek care elsewhere because of communication difficulties to come to Plaintiff Healthcare Facilities.  *See* Am. Compl. ¶¶ 12, 113, 190, 206–207, 242; *see also Havens*, 455 U.S. at 379.  When patient care is delayed, the result is a patient pool with more severe conditions that are less responsive to treatment and require more expensive to treat.  *See* Am. Compl. ¶¶ 12, 113, 190, 206–207, 242.  Furthermore, Plaintiff Healthcare Facilities have limited financial resources they can dedicate to providing healthcare services, including the resultant non-reimbursable costs associated with increases in patient volumes.  *See* Decl. Riener at ¶¶ 20–21; Decl. Lapointe at ¶¶ 27, 35.

   7.   *The elimination of other non-discrimination regulations.*

Plaintiffs have sufficiently alleged that Plaintiff Healthcare Facilities have standing to challenge these provisions.  *See* 85 Fed. Reg. 37,221–22 (listing amended provisions).  The Rollback Rule eliminates protections against gender identity and sexual orientation discrimination in regulations that implement statutes other than Section 1557, such as Medicaid State Plans, Programs for All-Inclusive Care for the Elderly (PACE), and the ACA state health insurance marketplaces and plans.  *See* Am. Compl. ¶ 339.  The elimination of these protections will cut into the budgets of these facilities because they rely, in part, on insurance reimbursement

to fund their operations.  *See id.* ¶¶ 234–235 (Fenway), 236 (Callen-Lorde), 237, 241 (CrescentCare); *see also id.* ¶¶ 211, 223.  This type of "economic loss . . . is enough to confer standing."  *Katz*, 672 F.3d at 76; *see also Whitman-Walker*, 2020 WL 5232076, at *16 (finding that healthcare facility had standing to challenge Rollback Rule's elimination of the prohibition on categorical coverage exclusions for gender-affirming care because it would "obtain reduced reimbursements from insurers that scale back their coverage").

## II.    Plaintiffs' Claims Are Ripe.

Defendants argue that Plaintiffs' challenge to the Rollback Rule's elimination of the definition of "on the basis of sex" is not ripe.[13]  They suggest that they might—maybe—act in line with Plaintiffs' view of the proper interpretation of Section 1557 at some point.  Mot. at 24. A possibility of future lawfulness does not make a challenge to past lawlessness unripe.[14]

This challenge is fit for review.  The decision to remove the definition of discrimination on the basis of sex in the Rollback Rule was both contrary to law—because it conflicts with Section 1557 and other statutes—and arbitrary and capricious—because HHS offered no reasoned basis for removing it after *Bostock* undermined HHS's stated rationale.  Am. Compl. ¶¶ 396–397, 408–412.   This is a challenge to an already promulgated regulation, not to "uncertain and contingent events that may not occur as anticipated or . . .  at all."  *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003).  Defendants admit, moreover, that

---

[13]    Defendants' refer to "several of HHS's other decisions" but they discuss only one in detail: the decision to decline to define on the basis of sex.  Mot. at 24.  Their arguments as to other claims rest "on the same principles" and so are wrong for the same reasons.  Mot. at 29.

[14]    Defendants invoke the so-called *prudential* ripeness factors.  Mot. at 25 (discussing fitness for review and hardship from delay).  Where plaintiffs meet Article III's requirements, declining jurisdiction "on grounds that are prudential . . . is in some tension with . . . the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging."  *Susan B. Anthony List*, 573 U.S. at 167 (internal quotation marks omitted).

this is a "purely legal" challenge, Mot. at 26, the kind that courts "exhibit a greater willingness to decide." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995).

Defendants' arguments to the contrary are either merits arguments or are irrelevant to ripeness.  They argue that this Court should decline to hear this challenge because "HHS denies" adopting an interpretation of discrimination on the basis of sex.  Mot. at 27.  The allegations show otherwise.  *See supra* at 24–25.  But in any event, this denial speaks to the merits, not ripeness.  If Defendants truly adopted no interpretation at all, the Rollback Rule would be the definition of arbitrary, as it gives protected people and regulated entities no clarity on their rights and obligations.  But the denial says nothing about whether the Rollback Rule is fit for review.

Defendants further argue that if Section 1557 compelled the 2016 Rule's definition of discrimination on the basis of sex, then they would have to comply with it, whether it is in the regulation or not.  Mot. at 27–28.  That also goes to the merits, whether Defendants acted arbitrarily in deleting the definition.  It does not stop this Court from answering the question now.

This case is nothing like *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156 (D.C. Cir. 1997).  *See* Mot. at 27.  There, plaintiffs challenged a training manual, but the agency had "not had an opportunity to explain, in an authoritative way, the purpose of the Manual and how it is used." *Aulenback*, 103 F.3d at 167.  Here, the preamble explains Defendants' interpretation of Section 1557, and there is an administrative record on which to assess the rule's legality.

Defendants also suggest this case might be advisory because *future* litigation—such as a hypothetical private suit under Section 1557—might generate judicial opinions about the meaning of Section 1557.  Mot. at 29.  But Plaintiffs' claims are that the *Rollback Rule* is

unlawful and harms them now—the possibility that it may also harm other, future plaintiffs does not render Plaintiffs' claims unripe, and Defendants cite no case for that proposition.

As to hardship, Defendants repackage their injury-in-fact arguments. They argue that Plaintiffs allege that "nothing more than abstract confusion" follows from the Rollback Rule. *Id.* at 25. This is wrong. *See supra* at 17–37 (alleging injuries from discrimination). Nor do the cases Defendants rely on support declining jurisdiction. In *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998), an organization challenged a forestry plan that would have *no* effect until it was implemented by later permitting actions that could be challenged. And in *National Park Hospitality Association v. Department of Interior*, 538 U.S. 803, 811 (2003), the plaintiffs challenged the position an agency stated it *would* take *if* certain disputes arose, before any dispute had arisen. Neither involved a challenge like this one: to the deletion of regulatory protections where Plaintiffs allege concrete harms from the deletion.

Defendants' ripeness argument would insulate from judicial review *any* decision to delete regulatory protections. That is because all regulations with the force of law implement statutory text, and it is difficult to imagine a statutory requirement that could not be addressed in *some* judicial forum. And so the upshot of Defendants' view is that no rescission of regulatory protections could be reviewed. This is not the law. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1910 (2020) (reviewing rescission); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34, (1983) (same).

## III.    Plaintiffs Have Stated A Claim As To Counts III And IV.

### A.    The Amended Complaint States An Equal Protection Violation.

Count III claims that the Rollback Rule violates the equal protection guarantee of the Fifth Amendment because it discriminates on the basis of sex and is motivated by animus toward transgender people. Defendants argue that the Rollback Rule does not discriminate because it

merely makes Section 1557—not regulations—the source of any protections and that Plaintiffs' allegations do not amount to animus.  Both of these arguments are wrong.

*First*, Plaintiffs alleged that the Rollback Rule amounts to sex-based discrimination that is subject to, and fails, heightened scrutiny.  Discrimination on the basis of sexual orientation or because a person is transgender is discrimination on the basis of sex.  *See Bostock*, 140 S. Ct. at 1743.  The Rollback Rule unconstitutionally singled out regulatory protections for LGBTQ+ individuals for elimination, in direct defiance of a Supreme Court opinion.  *See supra* at 4–5; *see also Romer v. Evans*, 517 U.S. 620, 635 (1996) (describing laws "singling out" a group "not to further a proper legislative end but to make them unequal to everyone else" as impermissible).  And Defendants' insistence that the Rollback Rule innocuously repeats Section 1557 and does nothing more is belied by the preamble's statements that the rule is justified because the 2016 Rule should not have covered discrimination against LGBTQ+ persons.  *See* 85 Fed. Reg. 37,175, 37,180, 37,183, 37,191, 37,194, 37,198.  In other words, the Rollback Rule is premised on a view that *Bostock* was wrong and Defendants will not apply it when implementing Section 1557.  Defendants' new litigation position does not change this.  *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification [for sex-based classifications] must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

*Second*, Plaintiffs allege unconstitutional animus.[15]  Plaintiffs allege an administration-wide pattern of eliminating protections for transgender persons that shows a "campaign of consistent, repeated anti-transgender sentiments, advocacy, and comments by the Administration

---

[15]    Because Defendants' actions were motivated by animus, they fail to satisfy rational basis review, let alone the heightened scrutiny that applies in cases of sex discrimination.  *See Romer*, 517 U.S. at  632 (action motivated by "animus . . . lacks a rational relationship to legitimate state interests"); *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 730 (2003) ("[M]easures that differentiate on the basis of gender warrant heightened scrutiny . . . .").

as a whole." Am. Compl. ¶ 365; *id.* ¶¶ 366–376. They also allege that HHS specifically pursued that campaign. *Id.* ¶¶ 380–384. They then allege that Roger Severino, who directs the HHS office that promulgated the Rollback Rule "has consistently exhibited such animus." *Id.* ¶ 377. He did so before assuming that role when commenting on whether the very statute cross-referenced in Section 1557 prohibits LGBTQ+ discrimination, *id.* ¶¶ 377–378, in other contexts, *id.* ¶ 379, and while in office at OCR, where he dismissed claims of discrimination as "hypothetical" even though his own agency had received such claims, *id.* ¶ 388. And Plaintiffs allege that the Rollback Rule contains statements—such as misgendering transgender persons and asserting dishonestly that transgender persons are a threat to young children—that evidence animus. *Id.* ¶¶ 391, 393. That the Government puts forth other justifications, *see* Mot. at 31–32, does not defeat the Equal Protection claim. Agency action is unconstitutional even if it rests on discriminatory animus only in part. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

Defendants' attempt to dismiss these allegations, Mot. at 33–34, lacks a basis in precedent. Had Plaintiffs alleged only statements from uninvolved officials that were "remote in time and made in unrelated contexts," Defendants might have an argument. *See Regents of the Univ. of California*, 140 S. Ct. at 1916. But Plaintiffs' allegations are specific to the agency, office, and official that promulgated the Rollback Rule, and show that these actors expressed animus toward LGBTQ+ people and acted to strip their protections. That is sufficient at the pleading stage.

In any event, dismissal now would be premature. Defendants have not produced the administrative record, which, as they acknowledge, is relevant to the question whether an administrative action was based on unconstitutional animus. *See* Mot. at 33; *see also Arlington*,

429 U.S. at 266, 268 (explaining that the "administrative history may be highly relevant"); *District Hosp. Partners, L.P. v. Sebelius*, 794 F. Supp. 2d 162, 171–173 (D.D.C. 2011).

### B.      The Amended Complaint States A Final, Reviewable Agency Action.

Plaintiffs alleged that the Rollback Rule adopted a final, reviewable enforcement policy. To be final, an action must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–178 (internal quotation marks omitted).

Those requirements are met here. HHS stated that it would "return[] to" a policy of enforcing Section 1557 based on a "biological binary meaning of sex," which in its view means that Section 1557 does not cover anti-LGBTQ+ discrimination. Am. Compl. ¶ 425(a) (quoting 85 Fed. Reg. at 37,180). It "disavow[ed]" any prior interpretations of Section 1557 that were inconsistent with that new policy. *See supra* at 5; 85 Fed. Reg. at 37,191. It did so not to *avoid* taking a position on what Section 1557 means but because it had *rejected* its prior interpretations. *See* 85 Fed. Reg. at 37,191 (HHS "has concluded that the position stated in the 2012 OCR letter reflected an incorrect understanding of Title IX."); *id.* ("Having considered the matters raised fully, [HHS] disavows the views expressed in the 2012 letter that concern the coverage of gender identity and sex discrimination under Section 1557."). Indeed, HHS made clear that "some covered entities may no longer incur costs associated with processing grievances related to gender identity discrimination under Title IX, because such claims *will not be cognizable under this final rule*." *Id.* at 37,225 (emphasis added). HHS's policy decision that such claims "will not be cognizable" is not a "tentative or interlocutory" position—it is the "consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178.

This policy has legal effect. It means that OCR will not take administrative enforcement action on complaints of discrimination based on gender identity. *See* 85 Fed. Reg. 37,180

("returning to" enforcing Section 1557 using "the biological binary meaning of sex" irrespective of discrimination on the basis of sexual orientation or transgender status). That removes a key route for those who experience discrimination to seek relief. *See* Am. Compl. ¶¶ 10, 210, 216. Indeed, HHS itself explained that its interpretation means that a claim based on LGBTQ+ discrimination "will not be cognizable" under its regulations and relief lies, if at all, in a private right of action. 85 Fed. Reg at 37,225; *see also id.* at 37,203 ("To the extent that Section 1557 permits private rights of action, plaintiffs can assert claims under Section 1557 itself . . . .").

Defendants' contrary argument hinges on a single sentence in the rule's preamble: "[T]o the extent that a Supreme Court decision is applicable in interpreting the meaning of a statutory term, the elimination of a regulatory definition of such term would not preclude application of the Court's construction." *Id.* at 37,168. This statement cannot bear the weight Defendants pile atop it. It simply restates the truism that eliminating the definition of discrimination on the basis of sex would not *prohibit* interpreting Section 1557 in line with Supreme Court precedent. But HHS published its rule, and this sentence, *after Bostock*. The only reading of HHS's actions is that—as of the time of the Rollback Rule—it did not see *Bostock* as relevant to its decision to enforce Section 1557 in line with a "biological binary meaning of sex" that excludes anti-LGBTQ+ discrimination. 85 Fed. Reg. at 37,180. Just as a severability clause cannot save a regulation thoroughly infected with legal error, *see Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2319 (2016), this sentence cannot save the Rollback Rule's enforcement policy where that policy relies entirely on an interpretation of sex-based discrimination that *Bostock* rejected.

Defendants' cursory argument that this enforcement policy is unreviewable is also wrong. A "statement of a general enforcement policy" is reviewable. *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676–677 (D.C. Cir. 1994); *OSG Bulk Ships, Inc. v. United States*, 132 F.3d

808, 812 (D.C. Cir. 1998).   Such a policy does not involve the case-by-case exercise of discretion that is presumptively shielded from review.  *See Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (reviewing a general enforcement policy based on an interpretation of the statute and implementing regulations); *Crowley*, 37 F.3d at 676 (holding that "an agency's statement of a general enforcement policy may be reviewable" if set out "in some form of universal policy statement").   HHS's statement of a new general policy that a claim based on LGBTQ+ discrimination "will not be cognizable" is thus reviewable.  85 Fed. Reg at 37,225.

## CONCLUSION

The Court should deny Defendants' motion to dismiss the Plaintiffs' Complaint.

Dated: November 18, 2020

Kevin Costello (BBO No. 669100)
Maryanne Tomazic (admitted pro hac vice)
Alexander Chen (admitted pro hac vice)
CENTER FOR HEALTH LAW & POLICY
INNOVATION
Harvard Law School
1585 Massachusetts Avenue
Cambridge, MA 02138
Phone: 617.496.0901
kcostello@law.harvard.edu

Sunu Chandy (admitted pro hac vice)
Michelle Banker (admitted pro hac vice)
Lauren Gorodetsky (admitted pro hac vice)
Dorianne Mason (admitted pro hac vice)
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle NW Suite 800
Washington, DC 20036
Phone: 202.588.5180
schandy@nwlc.org
mbanker@nwlc.org
lgorodetsky@nwlc.org
dmason@nwlc.org

David Brown (admitted pro hac vice)
Noah E. Lewis (admitted pro hac vice)
Alejandra Caraballo (admitted pro hac vice)
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND, INC.
520 8th Ave. Ste. 2204
New York, NY 10018
Phone: 646.862.9396
dbrown@transgenderlegal.org
nlewis@transgenderlegal.org
acaraballo@transgenderlegal.org

Respectfully submitted,

/s/ William H. Kettlewell
William H. Kettlewell (BBO No. 270320)
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110
Phone: 617.371.1000
bill.kettlewell@hoganlovells.com

Jessica L. Ellsworth (admitted pro hac vice)
Kirti Datla (admitted pro hac vice)
Jo-Ann Tamila Sagar (admitted pro hac vice)
Erin R. Chapman (admitted pro hac vice)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Phone: 202.637.5600
jessica.ellsworth@hoganlovells.com
kirti.datla @hoganlovells.com
jo-ann.sagar@hoganlovells.com
erin.chapman@hoganlovells.com

Kristina Alekseyeva (admitted pro hac vice)
Peter W. Bautz (admitted pro hac vice)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Phone: 212.918.3000
kristina.alekseyeva@hoganlovells.com
peter.bautz@hoganlovells.com

Lynly Egyes (admitted pro hac vice)
Dale Melchert (admitted pro hac vice)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: 510.587.9696
lynly@transgenderlawcenter.org
dale@transgenderlawcenter.org

*Counsel for Plaintiffs*

**EXHIBITS**

- **Exhibit A**:  Declaration of Jasmine Beach-Ferrara, Executive Director of Campaign for Southern Equality

- **Exhibit B**:  Declaration of Chastity Bowick,  Director of the Transgender Emergency Fund of Massachusetts

- **Exhibit C**:  Declaration of Ivy Hill, Community Health Program Director of Campaign for Southern Equality

- **Exhibit D**:  Declaration of Ellen LaPointe, Chief Executive Office of Fenway Health

- **Exhibit E**:  Declaration of Darren Lazor, Member of Equality California

- **Exhibit F**:  Declaration of Rachael Lorenzo,  Co-founder of Indigenous Women Rising

- **Exhibit G**:  Declaration of Alice Riener, Chief of Staff of NO/AIDS Task Force, d/b/a CrescentCare

- **Exhibit H**:  Declaration of Galina Mae Smith,  Health Programs Manager at the Boston Alliance of Lesbian, Gay, Bisexual, Transgender, Queer Youth

- **Exhibit I**:  Declaration of Wendy Stark, Executive Director of Callen-Lorde Community Health Center

- **Exhibit J**:  Declaration of Grace Sterling Stowell, Executive Director of the Boston Alliance of Lesbian, Gay, Bisexual, Transgender, Queer Youth

- **Exhibit K**:  Declaration of Stephe Thayer Koontz,  Member of Campaign for Southern Equality

- **Exhibit L**: Declaration of Noel Twilbeck,  Chief Executive Officer of NO/AIDS Task Force, d/b/a CrescentCare

- **Exhibit M**: Declaration of Rick Zbur, Executive Director of Equality California