Exhibit E

Declaration of Darren Lazor,

Member of Equality California

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth (BAGLY); Callen-Lorde Community Health Center; Campaign for Southern Equality; Darren Lazor; Equality California; Fenway Health; and Transgender Emergency Fund of Massachusetts,<br><br>        Plaintiffs,<br><br>v.<br><br>United States Department of Health and Human Services; Alex M. Azar II, *in his official capacity as secretary of the U.S. Department of Health and Human Services*; Roger Severino, *in his official capacity as Director, Office for Civil Rights, U.S. Department of Health and Human Services*; and Seema Verma, *in her official capacity as Administrator for the Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services*,<br><br>        Defendants. | Civil Action No. 1:20-cv-11297 |

## DECLARATION OF DARREN LAZOR

I, Darren Lazor, declare as follows:

1. I am 35 years old. I live at 1108 Glencove Commons, Brunswick, Ohio 44212.

And I am a transgender man.

## Past Experience of Discrimination in Healthcare

2. I have experienced sex discrimination—specifically discrimination based on my gender identity—in healthcare. I first experienced discrimination in healthcare as a child. I remember one experience where a physician commented on the fact that I was wearing boys' underwear even though my medical chart said that I was a girl. That experience made me feel uncomfortable visiting the doctor's office.

3. As an adult, I have experienced a similar type—but a more severe form—of sex discrimination related to my gender identity. For example, I experienced discrimination when I sought treatment for issues I was having with my reproductive organs. Starting in 2012, I sought treatment for heavy, frequent, and severely painful menstruation. I did not have a primary care physician at that time, so I visited my mother's primary care physician who conducted blood tests and an ultrasound, discovered that I was borderline anemic, and provided me with a referral to see an obstetrician-gynecologist (OG-GYN) at the same hospital. But I was subsequently denied treatment on three successive occasions when I tried to address my symptoms.

4. First, I made an appointment with the OB-GYN referred by mother's doctor. But when I saw the doctor, he refused to examine me or review my symptoms. He told me that although a hysterectomy can be a treatment option for a person with my symptoms, "I will never perform a hysterectomy on a young woman." That statement both misgendered me and declared that a treatment option was not available to me simply because of my physician's biases about my gender identity. I did not accept treatment

2

from that first OB-GYN and continued to search for care.

5. I made an appointment with a second OB-GYN at a new hospital. About a week to ten days before this appointment, a receptionist at the hospital called me and said that this doctor did not want to see me and thought it best if I found another OB-GYN.

6. I then made an appointment with a third OB-GYN at the the same hospital as the previous one. Before the appointment, I received a message asking me to call the doctor's office. When I did, that doctor told me that the second OB-GYN, the one who had previously canceled the appointment with me, was a "close friend." The third OB-GYN also mentioned that she knew I had been treated for gender dysphoria. However, I had never told either doctor that I had been treated for gender dysphoria. Nor had either doctor diagnosed me with that condition. This leads me to believe that both doctors had made assumptions about me, my symptoms, and my treatment that were not based on discussions that they had actually had with me. Finally, the third OB-GYN also told me that, although she was willing to treat me, she would not be willing to perform a hysterectomy to resolve my symptoms. I felt that, in saying that she would not be willing to perform a hysterectomy without having met me, examined me, or heard me describe my symptoms, she was indicating that she would not treat me as she would treat any other patient. I cancelled my appointment with that third OB-GYN.

7. Finally, the fourth OB-GYN I visited was willing to treat me without discrimination and took my symptoms seriously. But in order to find this physician, I needed to seek care at a medical facility that is further away from my home than the hospitals where I had initially sought care. That fourth OB-GYN diagnosed me with

3

endometriosis and suggested a hysterectomy as a treatment option. I agreed to that treatment plan. During the hysterectomy surgery, the fourth OB-GYN also discovered a large cyst on one of my ovaries. The ovarian cyst contained a liter of fluid and caused me problems with my urinary tract, leading me to occasionally lose control of my bladder. That cyst should have been identified in the first ultrasound that I received with my first physician—my mother's primary care doctor—but it was not. The fourth OB-GYN's diagnosis of endometriosis and discovery of a large ovarian cyst further confirmed my view that the previous physicians had discriminated against me based on my gender identity and denied me medically appropriate care based on my gender identity.

8. I know that the hospital where I experienced discrimination from the second and third OB-GYNs has a policy against discrimination on the basis of gender identity. However, it is clear to me that the hospital has failed to provide the requisite training and culture to ensure that transgender individuals receive nondiscriminatory care. I believe that discrimination at that hospital will only worsen if federal law no longer unambiguously requires the hospital to maintain its nondiscrimination policy.

9. I also experienced discrimination related to my gender identity when I sought treatment for a recurring health problem that causes shortness of breath and that has required me to seek emergency, life-saving care. When I first experienced this problem in 2006 or 2007, I did receive adequate treatment for it. The physician who treated me at that time believed that my symptoms were caused by an autoimmune issue. The physician treated me with antibiotics, and my symptoms resolved.

10. However, when I experienced a recurrence of these symptoms in December 2017,

4

I did not received adequate care because hospital staff discriminated against me on the basis of my gender identity. When I began experiencing shortness of breath, I went to the emergency room closest to my home. While I was there, the hospital staff discriminated against me in several ways. First, the doctor asked me when my last menstrual period was and if there was a possibility that I might be pregnant even though my transition was complete at that point and my driver's license identified me as a man. Second, the hospital staff misgendered me on the hospital bracelet as a female. Third, the physician's assistant expressed disgust when preparing me to take an EKG; his facial expressions spoke volumes as it appeared he was disgusted by my mastectomy scars. The physician's assistant also refused to remove the EKG stickers from my chest after the EKG. It appeared that the physician's assistant would not remove the stickers because the physician's assistant did not want to touch me. Fourth, the hospital staff left me unmonitored and waiting for assistance for a significant period of time. My repeated attempts to call a nurse by pressing the call button went unanswered. And finally, the physician told me "we don't know how to treat you," then sent me away without any diagnosis or treatment plan. I was forced to deal with my symptoms on my own. During that time, I suffered from both physical and mental distress. But, fortunately, my symptoms resolved after several weeks.

11. In December of 2017 or January of 2018, I filed a complaint about this discrimination through the hospital's internal grievance process. In that complaint, I described the December 2017 experience, and how the hospital staff had discriminated against me on the basis of my gender identity and had ultimately denied me care. I

received a letter from the hospital in response acknowledging the existence of my complaint. But the letter did not indicate that the hospital had taken any action to reprimand the medical staff that discriminated against me, or to educate them about discrimination.

12. I have forgone health care for shortness of breath due to fear of further discrimination. For example, in 2019, I experienced another episode of extreme shortness of breath. I refused to call (and refused to permit others to call) an ambulance when I needed emergency treatment. I knew that the closest emergency room was associated with a hospital where I had previously experienced discrimination in December 2017. And I had no family members or friends available to drive me to a hospital further away. Instead of calling an ambulance, I decided to attempt to treat myself. I knew that this self-treatment would be less effective than medical treatment, but I also believed that I would not receive adequate medical treatment if I returned to the hospital where I had previously been denied treatment and faced discrimination.

### Fear of Future Discrimination Due to the Rule

13. I understand that the Department of Health and Human Services has published a new rule that attempts to rescind critical protections against discrimination for the LGBTQ community, in the health care setting. I believe that this Rule's rescission threatens my health, my safety, and my life, as well as the health and safety of others.

14. Like all people, I may experience a medical emergency. Unfortunately, the hospital at which I have previously been discriminated against and at which I have been denied treatment is the hospital that has an emergency room closest to my home. For that

reason, if I ever experience an emergency, I would not call an ambulance. An ambulance would take me to the closet emergency room, and because I was discriminated against and denied care the last time I was there, I believe that I would not receive appropriate treatment if I were to return to that hospital. I have refused to call an ambulance on this basis in the past, and I would do so again. Instead, I would ask a friend or family member to drive me to an emergency room that is further way and that is associated with a hospital where I have not experienced discrimination. I do fear, though, that traveling this longer distance may be the difference between life and death in an emergency situation.

15. I also have health insurance needs related to my transgender identity, which the Rule also puts at risk. I have had many different types of insurance plans, including employer-sponsored plans and plans that I have found on the online exchange. I need bi-yearly doctor's visits and yearly bloodwork to keep receiving the hormone treatments that are part of my gender-affirming care. I have always used insurance to pay for those doctor's visits and that bloodwork. Because the Rule has created a lack of clarity around discrimination protections, I am also afraid that my health care insurer may deny me access to the care that I need.

16. The Rule has also amplified my fear and anxiety about contracting COVID-19. I have recurring health issues with shortness of breath. I believe those recurring issues put me at further risk for contracting COVID-19. Because of the Rule, I am afraid that health care providers may either refuse to treat me or provide me with incomplete care on account of my being transgender, which could ultimately lead to severe health

7

consequences or even my death. This denial of care would also put others at risk, since if undiagnosed, a respiratory illness or highly infectious disease poses a danger to the population as a whole.

17. The Rule further harms me by eliminating my previous ability to seek recourse for any discrimination or mistreatment I receive from health care providers or insurers on account of my gender identity. I have filed a complaint about mistreatment in the past, and I would do so again in the future if I thought that it would help me or others receive better care in the future.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 17, 2020

_Darren_ [signature]

Darren Lazor