Exhibit F

Declaration of Rachael Lorenzo,

Co-founder of Indigenous Women Rising

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth (BAGLY); Callen-Lorde Community Health Center; Campaign for Southern Equality; Darren Lazor; Equality California; Fenway Health; Indigenous Women Rising; NO/AIDS Task Force (d/b/a CrescentCare); and Transgender Emergency Fund of Massachusetts,

Plaintiffs,

v.

United States Department of Health and Human Services; Alex M. Azar II, *in his official capacity as secretary of the U.S. Department of Health and Human Services*; Roger Severino, *in his official capacity as Director, Office for Civil Rights, U.S. Department of Health and Human Services*; and Seema Verma, *in her official capacity as Administrator for the Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services*,

Defendants.

Civil Action No. 1:20-cv-11297

# DECLARATION OF RACHAEL LORENZO,
# CO-FOUNDER AND ABORTION ACCESS LEAD, INDIGENOUS WOMEN RISING

I, Rachael Lorenzo, declare as follows:

1.      I am a co-founder of Indigenous Women Rising (IWR), a Native-led and Native-centered reproductive justice collective that uplifts Indigenous-led community organizing and ensures reproductive justice movements are inclusive of Indigenous people and families.  Our

mission is to honor Native & Indigenous People's inherent right to equitable and culturally safe health options through accessible health education, resources, and advocacy.

2.    I am Mescalero Apache/Laguna Pueblo/Xicana, born in Las Cruces, New Mexico, and raised on my father's ancestral land in Laguna, New Mexico. I attended the University of New Mexico, where I graduated with a bachelor's degree in political science and a master's degree in public administration, focusing on public health. Currently, I serve as Assistant Commissioner of Engagement and Tribal Liaison at the New Mexico State Land Office and Chair of the Board of Directors for the YWCA-New Mexico in addition to my role as Co-Founder and Abortion Access Lead of IWR.  I am a queer parent of two and live in Albuquerque, New Mexico.

3.    I helped start IWR in 2014 as a campaign to bring attention to the fact that Indigenous people who can become pregnant and who rely on the United States Indian Health Service (IHS) for health care were being denied access to emergency contraception.  Now, IWR has expanded to provide broader support for Indigenous people in accessing health care, focusing in particular on abortion care, midwifery care, and sex education. IWR also provides education for Indigenous people, including information about abortion, access to reproductive health care and lactation support, and most recently the COVID-19 care packages.

4.    IWR's Abortion Fund is open to all Indigenous people in the United States and Canada who have the capacity to become pregnant and are seeking an abortion in the United States. IWR's Abortion Fund helps Indigenous people pay for abortion care by paying clinics for a portion of the procedure and by providing our clients the necessary funds to cover lodging, gas, food, childcare, and other related travel expenses. The Abortion Fund also provides critical information about pregnancy options and abortion care to clients that often is not provided by either IHS or

other health care providers and hospitals upon which IWR's clients rely.  To date, the Abortion Fund has served 172 clients (including repeated clients).

5.      The Abortion Fund's work is critical because health insurance in the United States often fails to include coverage for abortion, making abortion care unaffordable and inaccessible for many. This is particularly true for Native people, the vast majority of whom rely upon IHS for their health care. IHS is subject to the Hyde Amendment, which prohibits certain federal funds, including funding for IHS, from being used to pay for an abortion except in the case of incest, rape, or life endangerment. Historically, however, most IHS facilities have failed to provide or refer for *any* abortion care, even in these limited permitted circumstances.[1] Notably, many Native people obtain insurance in addition to their IHS benefits, such as Medicaid or a qualified health plan offered through the Affordable Care Act marketplaces, because of the limitations on services available through IHS. However, because of the Hyde Amendment's application to other health coverage programs, state laws that prohibit insurance coverage of abortion in private and marketplace plans, and other barriers put in place for private issuers, coverage of abortion care is often non-existent.  IWR's Abortion Fund clients often also look to us to explain their pregnancy options and what to expect when obtaining abortion care, as they generally do not receive this information from their own providers at IHS facilities. We have to provide basic education about abortion care to about three-quarters of our clients. Thus, Native pregnant people must turn to IWR both to be able to afford abortion care and to learn how to access abortion care.

6.      While our Abortion Fund clients come from Indigenous communities or tribes all over the United States, about half of the clients we serve identify as Diné or Navajo.  And while we provide funding at clinics across the country, most of the clients we serve receive care in clinics

---

[1] *See* Shaye Beverly Arnold, *Reproductive Rights Denied: The Hyde Amendment and Access to Abortion for Native American Women Using Indian Health Service Facilities*, 104 Am. J. Pub. Health 1892, 1892 (2014).

in Phoenix, Arizona; Fargo, North Dakota; and Albuquerque, New Mexico. Approximately one-fifth of our clients require abortion care towards the second half of their second trimester or in their third trimester, but there are very few providers who are able to provide abortion care later in pregnancy. In particular, our clients seeking abortion care at or after 24 weeks generally must travel to Colorado or New Mexico to obtain the care they need. Yet patients who require abortion care later in pregnancy are also those who are at greater risk of experiencing emergency pregnancy complications, rendering such travel a danger to their health and lives.

7.      Most of the IWR Abortion Fund's clients have limited financial resources and are either uninsured or lack insurance coverage of abortion. Moreover, many of our clients come from traditional Native communities and live in rural Native lands. These clients are oftentimes represented by an elder for whom English is not their first language.  In our communities, it is common for grandparents to raise grandchildren. In part, community elders and grandparents assume this responsibility because they are the keepers of our cultural knowledge, traditional language, and spiritual wisdom. But grandparents have also been forced into this role by federal policy and colonization causing generational trauma that manifests in parents as substance abuse, unemployment, incarceration, teen parenting, abandonment, and serious illnesses.[2] And yet Native elders face their own inequalities: Native grandparent caregivers are more likely to be female, live on a reservation, speak little or no English, not participate in the labor force, not have a college degree, and have many people living in the household.[3]  As a result, we often have grandparents calling on behalf of their grandchildren, who are usually minors. Some of these families are so far

---

[2] *See* Lisa Byers, *Native American Grandmothers: Cultural Tradition and Contemporary Necessity*, 19 J. Ethic & Cultural Diversity in Social Work 305 309-10 (2010); Suzanne L. Cross, Mich. St. Univ. Sch. Social Work, American Indian Grandparents Parenting Their Grandchildren in Michigan: A Qualitative Study Report 1, 3 (March 2005).
[3] Byers, *supra*, at 310.

removed geographically that they may be six or seven hours from the nearest city and might not even have running water. About half of our Abortion Fund clients are driving distances from over 2 hours to about 10 hours to get to their appointment, especially our clients in North Dakota and South Dakota who must travel to Fargo for care. These geographic, linguistic, and financial limitations make it very difficult for our clients to access the care that they need.

8.     Several of our Abortion Fund clients indicate that they will be alone when obtaining abortion care or do not have anyone at home or in their communities that will support them in accessing abortion care, which shows the stigma we are working against and how critical it is for us to provide support for our clients in a sensitive way. Moreover, many of our Abortion Fund clients indicate to us that it is not safe for us to leave a voicemail identifying who we are because of domestic violence or stalking. We routinely ask our clients whether they have access to mental health care and provide resources to assist them in accessing such care, because we know our clients may be experiencing post-traumatic stress disorder, abuse, or depression. We research mental health providers in their area, including whether the provider takes insurance, offers services on a sliding scale, or has ever seen Indigenous patients, and we provide that information to clients who need assistance. Some of our Abortion Fund clients are transgender or gender nonconforming and have specifically sought our help in obtaining mental health services that are sensitive to the needs of transgender and gender nonconforming people. It is very difficult for transgender or gender nonconforming Native people to find health care providers who are willing to listen to us and provide care that is gender affirming.

9.     Not only do our clients face stigma in accessing abortion care, they also fear discrimination by health care providers at IHS facilities or at non-IHS hospitals. Abortion care is extraordinarily safe, but it is protocol for abortion providers to instruct patients to go to an

emergency room in the unlikely event they experience uncommon bleeding following a procedure. And in some circumstances, clients will seek follow up care to confirm termination of their pregnancies after obtaining a medication abortion.  Clients have expressed fear that they will be discriminated against for having had an abortion if they visit a hospital or IHS facility. People ask: "if I need to go to the hospital, will they need to know that I have had an abortion?" This fear of discrimination may cause clients to either withhold information about their health or to forgo care altogether, with potentially devastating consequences.

10.     IWR's Midwifery Fund was launched in May 2020 to help Indigenous people in New Mexico access quality, culturally competent pregnancy-related care by providing families with up to $10,000 to help pay for midwifery care, doula care, and related supplies.  We also help to match families with a midwife that will best suit their needs, and we are currently in the process of compiling a referral network of midwives and doulas that will contain a host of information critical to our clients seeking care, including what kind of insurance they take, their fee, their experience working with Indigenous people, whether they travel, their policies around different spiritual beliefs, and other information that will be useful for Native people in obtaining nondiscriminatory, high quality, and culturally sensitive pregnancy-related care. We carefully screen the midwives and doulas in our network through a detailed intake form to ensure that they will provide nondiscriminatory, culturally competent care. Although the Midwifery Fund is a new program, we have also already raised enough funding to support three families, and we are currently providing one family with support.

11.     The Midwifery Fund was established as a response to longstanding and pervasive discrimination against Indigenous people who can become pregnant seeking care related to pregnancy and reproductive health, as I will discuss more fully below.  Birth attendants such as

midwives and doulas can function as a safeguard against discrimination based on both sex and race, such as the discrimination recently experienced by Native pregnant people in New Mexico who were racially profiled in the delivery room and had their newborns separated from them, discussed in greater detail below.[4]  The Midwifery Fund was created out of an emergency need to help Indigenous people access quality pregnancy-related care.

12.     Our sex education program, "NDN Sex Ed," engages with Native families, schools, agencies, and other entities to provide sexual education that is culturally competent and meets the State of New Mexico standards.  We are also launching a texting hotline for our Native communities to ask questions about sex and bodies that they may not feel comfortable asking a family member or health care provider.  Our sex education curriculum is inclusive of grandparents and any caretaker who might have trouble talking with the young person in their life about sex.  Over the last two years, we have served approximately 3,000 people as we have traveled across New Mexico and the country to provide sexual health education and harm reduction products like condoms and dental dams.

13.     Recently, we launched our COVID-19 care packages program.  These packages contain masks, menstrual supplies, diapers, basic hygiene supplies, lactation support, sexual health items, education on bodily autonomy, and other necessities.  So far, over 4,000 people from around the United States and Canada have applied for our care packages.  We have been able to serve 443 to date and hope to complete these applications by the end of January 2021.

14.     IWR is funded through individual donations and foundational grants.  We do not receive funding from either the state of New Mexico or the federal government.  Most of the

---

[4] Bryant Furlow, A Hospital's Secret Coronavirus Policy Separated Native American Mothers From Their Newborns, ProPublica (June 13, 2020), https://www.propublica.org/article/a-hospitals-secret-coronavirus-policy-separated-native-american-mothers-from-their-newborns.

funding we receive is unrestricted and may be reallocated to meet demand. For example, due to the COVID-19 pandemic, we have had to reallocate funding towards COVID relief efforts, including shipping COVID relief care packages. This has put a strain on our staff capacity.

15.     We anticipate that we will need to deplete our already limited funding to address the increased strain on the Abortion Fund and Midwifery Fund that will occur as a result of increased discrimination and denials of reproductive health care and coverage under the Rule "Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority," 85 Fed. Reg. 37,160 (June 19, 2020) (the "Rollback Rule"). Given IWR's limited budget and the existing strain on our resources, we may be forced to forgo providing other services critical to accomplishing our mission of supporting the health of Native communities in New Mexico and nationwide, such as our sexual and political education efforts.

**Discrimination Against Native People Who Can Become Pregnant**

16.     Throughout the process of colonization, a period of 500 years and counting, Native people who can become pregnant have collectively experienced generational and individual trauma. These acts have come in many forms, including assault, rape, forced sterilization, poverty, assimilation, objectification, exploitation, murder, and everything in between.

17.     This country has a long and dark history of relying on paternalistic, sexist, and racist beliefs to control Native populations.  Reproductive justice is about the right to control your body, to have children or not have children, and to be able to parent the children you have in a way that makes sense economically, socially, politically, and culturally.  But Native people have often been denied this fundamental right.  In the late 1800s, the federal government forced thousands of

Native children to attend assimilation boarding schools, robbing families of the autonomy to raise their children within their own languages, religion, and culture.[5]

18.    The abuse on Native people was especially acute in the 1960s and 1970s, when IHS, tasked with providing family planning services to Native Americans, instead performed forced sterilization on thousands of Native women.  A federal report found that four IHS facilities sterilized 3,406 Native American women between 1973 and 1976.[6]  That number included women under age 21, despite a court-ordered moratorium on sterilizations of women younger than 21.[7]  In one case, two 15-year-old girls were sterilized during what they were told were tonsillectomy operations.[8] An independent study by Dr. Connie Pinkerton-Uri, Choctaw/Cherokee, found that 1 in 4 Native women had been sterilized without her consent.[9]  Pinkerton-Uri's research indicated that IHS had "singled out full-blooded Indian women for sterilization procedures."[10]

19.    Indigenous people who can become pregnant have also been coerced into taking long-acting reversible contraception ("LARCs").  Although LARCs are highly effective in preventing pregnancy and are an important option among contraceptive methods, when combined with coercive practices, they are a form of population control targeted toward Indigenous people. In the 1990s, at the height of the wars on poverty and drugs, states introduced measures that would require women to have LARCs inserted in order to receive public benefits or as a condition of

---

[5] Becky Little, *How Boarding Schools Tried to 'Kill the Indian' Through Assimilation*, History (Nov. 1, 2018), https://www.history.com/news/how-boarding-schools-tried-to-kill-the-indian-through-assimilation.
[6] U.S. Nat'l Library of Medicine, *1976: Government Admits Unauthorized Sterilization of Indian Women*, https://www.nlm.nih.gov/nativevoices/timeline/543.html.
[7] *Id.*
[8] Andrea Smith, Conquest: Sexual Violence and American Indian Genocide, Duke Univ. Press (Sept. 17, 2015).
[9] U.S. Nat'l Library of Medicine, *supra* note 6.
[10] *Id*.  In 1977, the United Nations released a report prepared in conjunction with the Native American Solidarity Committee. It outlined the genocidal practices of the U.S. government, including the sterilization of Native American women. The report concluded that 24 percent of Native women had been sterilized and that 19 percent of the women were of child-bearing age. *See* The Systemic Genocide of Native Nations By the United States Government, Am. Indian Treaty Council Inform. Ctr. 3 (June 1977), available at https://tinyurl.com/yxtg8csj.

receiving a reduced sentence.[11]   Even today, we hear stories of people not being given the full spectrum of reproductive health care options—including IHS offering only a limited selection of contraceptive methods, of providers pressuring Native people to have LARCs inserted regardless of the person's sexual or reproductive health needs, and of providers resisting Native people's requests to have LARCs removed.[12]  Some state Medicaid plans also limit reimbursement for LARC removal.[13]

20.     Hospitals have also played a role in separating Native families.   Health care providers conduct drug tests on pregnant people—disproportionately people of color—and make reports to state authorities that result in arrests, civil commitment, and child separations.[14]  My own relatives have reported doctors making unfounded insinuations about substance abuse during childbirth. Even now, in the middle of a global pandemic, it was reported that a hospital in Albuquerque, New Mexico instituted a secret policy that separated Native people from their newborn babies.  The hospital staff racially profiled pregnant people who appeared to be Native, regardless of whether they were symptomatic or high-risk, and then compared their ZIP code against a hospital list of reservation ZIP codes.  If the ZIP codes matched, the pregnant patient would be tested for COVID-19.  But because the hospital does not use rapid testing, newborns would be taken away until the results came back, which could take up to three days.[15]

---

[11] Rachel Benson Gold, Guarding Against Coercion While Ensuring Access: A Delicate Balance, 17 Guttmacher Inst. 8, 10-11 (2014), https://www.guttmacher.org/sites/default/files/article_files/gpr170308.pdf.

[12] *See also* Jenny A. Higgins et al, Provider Bias in Long-Acting Reversible Contraception (LARC) Promotion and Removal: Perceptions of Young Adult Women, 106 Am J. Pub. Health 1932–37 (2016).

[13] *See* Julia Strasser et al., Access to Removal of Long-acting Reversible Contraceptive Methods Is an Essential Component of High-Quality Contraceptive Care, 27 Women's Health Issues, 253, 254 (2017).

[14] *See, e.g.*, Lynn M. Paltrow & Jeanne Flavin, Arrests of and Forced Interventions on Pregnant Women in the United States, 1973–2005: Implications for Women's Legal Status and Public Health, 38 J. Health Politics, Policy & L. 299, 300–01, 311–12 (2013).

[15] Bryant Furlow, A Hospital's Secret Coronavirus Policy Separated Native American Mothers From Their Newborns, ProPublica (June 13, 2020), https://www.propublica.org/article/a-hospitals-secret-coronavirus-policy-separated-native-american-mothers-from-their-newborns.

21.     This American history is my own history.  A close relative of mine was coerced into having her tubes tied shortly after giving birth to her youngest child.  As she tells the story, the nurse and doctor came into the room together and insinuated that she did not need to have more children.  They brought up insurance and the financial burden of pregnancy and childbirth and childrearing, and that pressure led her to give her "consent" to the procedure.  And I have experienced coercion with contraception.  I decided to have an IUD inserted, but after 10 months of uncommon bleeding, I decided that I wanted to have it removed.  I went to see four different doctors, but none of them would remove it.  They ignored my pain and limited my reproductive freedom.

### United States Indian Health Service

22.     IHS was founded in 1955 to fulfill U.S. treaty obligations to provide comprehensive health care for Indigenous people living in the United States.  The agency serves approximate 2.56 million "Native Americans and Alaska Natives" who belong to 574 federally recognized Tribes in 37 states.[16] For many Indigenous communities, especially those in rural areas, IHS and tribal health care facilities are the only source of health care services.[17]

23.     IHS has historically been underfunded and has never provided adequate care to Native people.[18]  IHS facilities do not have enough doctors or nurses to provide quality care: in 2018, the overall vacancy rate for providers was 25%, ranging from 13% to 31% across areas.[19] Often, positions are filled with temporary contract providers who are unable to provide necessary

---

[16] Indian Health Servs., IHS Profile (August 2020), https://tinyurl.com/y4x37oll.
[17] Indian Health Servs., The 2016 Indian Health Service and Tribal Health Care Facilities' Needs Assessment Report to Congress 3 (2016), https://tinyurl.com/yxuxftw6.
[18] In 2017, IHS health care expenditures per person were only $3,332, compared to $9,207 for federal health care spending nationwide. U.S. Commission on Civil Rights, Broken Promises: Continuing Federal Funding Shortfall for Native Americans 66-67 (Dec. 2018), https://www.usccr.gov/pubs/2018/12-20-Broken-Promises.pdf.
[19] U.S. Gov't Accountability Office, Indian Health Service: Agency Faces Ongoing Challenges Filling Provider Vacancies 9 (Aug. 2018), https://www.gao.gov/assets/700/693940.pdf.

continuity of care.[20]   Funding is so poor that Native people are sometimes subjected to "life or

limb" tests—that is, they are denied care unless their situation threatens life or limb.[21]   But even

in emergency situations, IHS is often unequipped to provide necessary care, as the emergency

rooms at IHS facilities are frequently not open 24 hours per day and there is no guarantee that they

will have someone on staff who is not an intern. In my experience, IHS providers also often are

not members of the communities they serve and lack the cultural competency necessary to provide

appropriate, high quality care for Native peoples.

24.     Given these constraints in capacity and competency, it is not surprising that Native

people have a lower life expectancy than the general population.   Natives continue to die at higher

rates from chronic liver disease and cirrhosis, diabetes, injuries, assault/homicide, intentional self-

harm and suicide, and chronic lower respiratory diseases.[22]   And Native people, like Black people,

are experiencing a maternal mortality crisis in the United States. According to a CDC report,

Native women were 2.5 times more likely than white women to die during pregnancy, labor, and

within a year after childbirth.[23]   The majority of these deaths are preventable, revealing the

consequences of systemic and institutional racism.[24]   Likewise, in 2013, the infant mortality rate

was higher for Black infants (11.11 deaths per 1000 live births) and Native infants (7.61 deaths

per 1000 live births) versus white infants (5.06 deaths per 1000 live births).[25]   Disparities are also

---

[20] *Id.* at 32.

[21] Tribal Leader Letter, Department of Health and Human Services, Indian Health Service, (Jan. 15, 2013), https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/2013_Letters/01-15-2013_DTLL_FollowupCHSPreventionServices.pdf (providing update from Dr. Yvette Roubideaux on then-named Contract Health Services (CHS) program increases for referrals for prevention services as a follow-up to the Tribal Leader Letter dated August 2, 2012).

[22] Indian Health Servs., Disparities (Oct. 2019), https://www.ihs.gov/newsroom/factsheets/disparities.

[23] Ctrs. for Disease Control & Prevention, Vital Signs: Pregnancy-Related Deaths, United States, 2011–2015, and Strategies for Prevention, 13 States, 2013–2017 (May 7, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6818e1-H.pdf.

[24] *Id.*

[25] Ctrs. for Disease Control & Prevention, Infant Mortality Statistics From the 2013 Period Linked Birth/Infant Death Data Set 5 (Aug. 6, 2015), https://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_09.pdf.

pronounced in obstetrics and gynecology.   Only 69% of Native women have had prenatal care in the first trimester compared to 89% of white women.[26]

25.     To this day, Native people are wary of IHS.  The legacy of forced sterilizations and underfunded services contributes to our suspicion.  Likewise, Native people continue to experience outright discrimination and implicit biases.  A study found that 23% of Native people reported experiencing anti-Native discrimination when going to a doctor or health clinic, and 13% said they have avoided going to a doctor or seeking health care for themselves or someone in their family out of concern that they would be discriminated against or treated poorly because they are Native.[27] Likewise, 29% of Native women reported experiencing discrimination because they are women when going to a doctor or health clinic, and 27% of Native women avoided going to a doctor or seeking health care out of concern they would be discriminated against because they are women.[28] When looking around at their community, 24% of Native people said their neighborhood is in fair or poor health, and 30% reported that the quality of available doctors or health care services in their neighborhood is worse than in other places.[29]

### Discrimination Against Native People Seeking Abortion Care

26.     Because IHS is subject to the Hyde Amendment, it does not provide or pay for all medically necessary abortion care. As discussed above, due in part to inadequate resources, and in part to anti-abortion bias, this is true even in circumstances where the Hyde Amendment allows

---

[26] ACOG, Committee No. 649, Racial and Ethnic Disparities in Obstetrics and Gynecology (Dec. 2015), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2015/12/racial-and-ethnic-disparities-in-obstetrics-and-gynecology.
[27] NPR/Robert Wood Johnson Foundation/Harvard T.H. Chan School of Public Health, Discrimination in America: Experiences and Views of Native Americans 8, 12 (2017), https://legacy.npr.org/documents/2017/nov/NPR-discrimination-native-americans-final.pdf.
[28] NPR/Robert Wood Johnson Foundation/Harvard T.H. Chan School of Public Health, Discrimination in America: Experiences and Views of American Women 21 (2017), https://legacy.npr.org/assets/news/2017/12/discriminationpoll-women.pdf.
[29] NPR, Experiences and Views of Native Americans, *supra* note 27, at 19, 20.

funding, including cases of life endangerment, rape, and incest. Since many Native people rely on IHS for health care, restrictions on abortion care acutely impact their access. Federal policy thus forces many Native pregnant people to rely on an abortion fund like IWR or pay out-of-pocket, and to travel long distances to obtain abortion care. For some, these and other barriers to accessing abortion care are insurmountable and will force them to forgo abortion care altogether.

27.     IHS also does not usually refer for abortions and often IHS facilities fail to provide information to patients about abortion care or counseling about pregnancy options. At the Fort Defiance Indian Hospital, for example, the health care providers are explicitly told not to talk about abortions. At the IHS facility I grew up using in New Mexico, patients seeking information about abortion were instructed to "Google it." On occasion, some providers will go against their facility's policy to care for their patient and refer them to IWR for abortion care.

28.     As a result of these policies, Native pregnant people who are experiencing emergency pregnancy complications that may require pregnancy termination cannot rely on IHS for care. Some of those patients will turn to IWR for assistance in accessing abortion care, if their circumstance allows. IWR has received calls from pregnant people—usually in their late second or early third trimesters—whose pregnancies are no longer viable and who need assistance obtaining care. In situations involving an immediate threat to the patient's life or health, however, the patient will need to travel to a non-IHS hospital's emergency room to obtain emergency care. For example, people who live in my community in New Mexico must travel 30 miles to Grants, New Mexico, or 50 miles to Albuquerque for emergency abortion care at a non-IHS hospital. But there is still a real risk that they will be denied the care they need or receive substandard care due to hospital policies that forbid provision of abortion care, or personal objections to providing abortion care by individual physicians, nurses, or other health care workers.

29.     I know this to be true from personal experience, unfortunately.  In 2013, I learned that I was pregnant but that the fetus was not viable.  My doctors told me the fetus would expel itself within a few weeks, and that I might experience back pain and bleeding.  No one told me that removing the fetus was an option or explained the risks I faced by forgoing appropriate treatment.  After some time, I started to bleed severely and could not stand up straight.  When I experienced contractions, I traveled to the nearest hospital that took my insurance (Medicaid), which was located in Albuquerque.  When I arrived with my husband and then one-year-old daughter, I was placed in a triage bed in the emergency room and given pain medication.  No doctor came to see me, even though I started to feel the urge to push and lay in bed bleeding.  The pain became so bad that I began to feel dizzy and my vision was blurry.  After some time, my husband had to take our daughter to a family member's house for childcare.  I was left alone, blood soaking through my sheets.  The hospital staff refused to give me additional pain medication.  Hours later, I finally saw a doctor, but they refused to treat me, saying—"I know what needs to be done, but I can't do that for you."  The doctor said someone else would take care of me.  I continued to lay there, untreated, and left abandoned in the most pain I have ever experienced in my life.  Finally, another doctor arrived who performed a dilation and curettage to remove the tissue from my uterus. By then I had lost a significant amount of blood.

30.     I survived this experience, but my mental health suffered. Because the hospital dismissed my concerns and refused to treat me with adequate care and dignity, my experience was painful and dehumanizing.  I developed an addiction to oxycodone, a pain management medicine provided by the hospital.  I also feared getting pregnant again.  Though I eventually gave birth again, the next pregnancy took an emotional toll.  Due to this experience, I decided, at age 25, to have a procedure to ensure that I would not become pregnant again.

**Effect of the 2020 Rule**

31.     The Rollback Rule will harm the Native people that IWR serves by emboldening discriminatory refusals of reproductive health care, coverage, and information, and, in turn, will harm IWR by causing increased strain on the Abortion Fund and Midwifery Fund in a time when capacity is already strained due to the COVID-19 pandemic.

32.     The Rollback Rule will cause more people to apply for assistance from IWR's Midwifery Fund to avoid experiencing discrimination when accessing pregnancy-related care.  By deleting the 2016 Rule's explicit protections against discrimination on the basis of "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, [or] childbirth or related medical conditions" and incorporating an unlawful religious exemption into Section 1557, the Rule will allow and embolden discrimination in reproductive health care, including obstetrics and gynecological care.  The Rule's consequences will be especially devastating to Indigenous people who already receive inconsistent, discriminatory, and substandard reproductive and pregnancy-related healthcare at IHS facilities—the primary source of health care for most IWR's clients. By removing the unitary standard, the Rule will also make it more difficult for Native people who can become pregnant to bring claims of intersectional discrimination, which is critical for the people we serve because they so often experience discrimination based on a combination of their sex and race.  Finally, the Rollback Rule removes IHS entirely from the regulatory prohibitions by limiting the Rule's scope of application only to HHS programs administered under Title I of the ACA. By removing the threat of HHS enforcement and making it more difficult to obtain a judicial remedy, the Rule sends a signal that the law does not protect against pregnancy discrimination in IHS and opens the door to further discrimination against Native people. Already, Native people avoid going to the doctor out of fear of discrimination.  This Rule will exacerbate the fear of discrimination,

substandard care, denials of care, and coercion, which will cause Native people who need pregnancy-related care to mistrust providers and turn to the Midwifery Fund for midwife or doula care. As a result, IWR will have to dedicate more funding and resources to its Midwifery Fund to support their needs. Ultimately, these layers upon layers of discrimination have devastating consequences for the reproductive health—and emotional health—of Native pregnant people.

33.     The Rollback Rule stigmatizes abortion in particular and will embolden and encourage refusals of abortion care and coverage and information about abortion, even in emergency situations. Although the legal landscape governing provision of abortion care is complex, the 2016 Rule's explicit protections for "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom" in the definition of "on the basis of sex" made clear that Section 1557 provides critical protection for access to abortion care. By deleting this regulatory definition of "on the basis of sex," unlawfully adding an abortion exemption and a religious exemption into Section 1557's nondiscrimination protections, singling out abortion in the preamble, and attempting to excise IHS from the scope of the Rule's application, the Rule signals to IHS facilities that they can refuse abortion care and information about abortion care without consequence, even in cases allowable under the Hyde Amendment, thus threatening to exacerbate refusals of care and information. Moreover, by stigmatizing abortion care and reinforcing the negative attitude the government holds toward abortion care, the Rollback Rule signals to healthcare providers and plan sponsors outside of IHS that they can refuse abortion care, coverage, and information without consequence.

34.     The Rollback Rule will simultaneously aggravate clients' fears about being denied the abortion care, coverage, and information they need, even in cases of emergency. Again, many Native people already forgo obtaining health care for fear of discrimination. By giving the green

light to providers (both within and without IHS) to refuse abortion care based on personal or religiously motivated objections, as happened to me, the Rollback Rule will exacerbate this fear. Moreover, the Rule signals to our clients—who already express concern about sharing their abortion histories with health providers out of fear of discrimination—that they should keep their abortion histories private or forgo or delay care, with potentially serious adverse consequences for their health.

35.     The Rollback Rule's attacks on abortion will increase costs for IWR's Abortion Fund. Again, our clients already face serious financial constraints, as well as geographic and linguistic barriers to accessing the care they need. For many Native people experiencing a miscarriage or other pregnancy complications, termination may be necessary. People seeking abortion care who are either denied appropriate care or fear that they will be denied such care from IHS or a non-IHS hospital may delay or forgo care altogether, with potentially deadly consequences. Others will turn directly to IWR for financial and logistical assistance in accessing the care they need rather than risk discrimination at a hospital or IHS facility, putting increased strain on our finances and operations. Still others may seek financial or other support from IWR after experiencing a denial of emergency abortion care similar to what I went through.

36.     The Rollback Rule's attacks on abortion will increase demand for informational resources from IWR's Abortion Fund. The Abortion Fund provides critical information about pregnancy options and abortion care to clients because that information often is not provided by either IHS or other health care providers and hospitals upon which IWR's clients rely. Neither the Hyde Amendment nor other federal laws applicable to IHS restricting access to abortion care extend to provision of information about abortion, and so IHS should be providing information and counseling about all pregnancy options. Yet too many IHS facilities already fail to provide the

critical information necessary for patients to make informed decisions about their health and futures. By removing protections for abortion care and attempting to carve IHS out of the scope of the Rollback Rule's protections, the Rule threatens to exacerbate denials of information about abortion care by IHS facilities. This will cause more clients to turn to IWR as a trusted resource to supply the information they need, further straining IWR's already limited staff resources.

37.    Denying care, coverage, and information about abortion care will also inhibit or delay access to abortion care. This will put a greater financial burden on the IWR Abortion Fund because the cost of abortion care increases when abortion care is delayed, and fewer clinics are able to provide abortion care later in pregnancy.

38.    Thus, not only does the Rollback Rule threaten the life and health of IWR's clients who are denied the care, coverage, and information they need, it also will cause IWR's Abortion Fund to expend greater resources on increased demand for funding, on more expensive abortion care later in pregnancy, on clients' travel and related expenses to the few clinics that provide abortion care later in pregnancy, and on staff labor to provide information and resources to clients about abortion care. By straining IWR's finances and operations, the Rollback Rule undermines IWR's ability to achieve our broader mission of supporting culturally safe health options through our other programs, including our sexual and political education efforts.

39.    Ultimately, my concern is for the Native people IWR serves. As my own experience illustrates, being denied reproductive and pregnancy-related health care can cause serious physical, mental, and emotional consequences.  Yet the Rollback Rule encourages and will cause precisely this type of discrimination, harming the health of the very people HHS—and IHS—are charged with protecting.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  November 17, 2020

_____
Rachael Lorenzo
Co-Founder and Abortion Access Lead, Indigenous Women Rising