## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth (BAGLY); Callen-Lorde Community Health Center; Campaign for Southern Equality; Darren Lazor; Equality California; Fenway Health; Indigenous Women Rising; NO/AIDS Task Force (d/b/a CrescentCare); and Transgender Emergency Fund of Massachusetts,<br><br>       Plaintiffs,<br><br>    v.<br><br>United States Department of Health and Human Services; Alex M. Azar II, *in his official capacity as secretary of the U.S. Department of Health and Human Services*; Roger Severino, *in his official capacity as Director, Office for Civil Rights, U.S. Department of Health and Human Services*; and Seema Verma, *in her official capacity as Administrator for the Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services*,<br><br>       Defendants. | Civil Action No. 1:20-cv-11297<br>(Leave to file granted on 12/03/2020) |

## BRIEF OF *AMICI CURIAE* THE HARVARD LAW SCHOOL LGBTQ+ ADVOCACY CLINIC, AIDS UNITED, THE CENTER FOR CONSTITUTIONAL RIGHTS, THE NATIONAL CENTER FOR LESBIAN RIGHTS, THE NATIONAL CENTER FOR TRANSGENDER EQUALITY, THE NATIONAL LGBT BAR ASSOCIATION, AND THE NATIONAL TRANS BAR ASSOCIATION IN SUPPORT OF PLAINTIFFS

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST…………………………………………………………………1

SUMMARY OF ARGUMENT……………………………………………………………...3

ARGUMENT…….…………………………………………………………...…………...3

    I. Discrimination In Health Care On the Basis of Gender Identity Limits the Ability of Transgender and Gender Non-Conforming People To Access Needed Care …………….3

        A. Financial Barriers, Including Discrimination by Insurance Providers, Present Major Obstacles to Access to Health Care………………………………………..4

        B. As a Result of Bias and Discrimination, Transgender and Gender Non-Conforming People Often Report Negative Experiences When They Are Able To Access Health Care……………………..……………………………………5

        C. Experiences of Discrimination When Accessing Health Care, or Fear of Such Discrimination, Further Widens the Access to Care Gap…………………..……..7

    II. Discrimination in Health Care Leads to Worse Health Outcomes for Transgender and Gender Non-Conforming People……………………………………………………….8

    III. The Rule Wrongfully Attempts To Roll Back Protections for Many Transgender and Gender Non-Conforming People Who Experience Health Care Discrimination…………9

    IV. The Rule's Incorporation of Religious Exemptions Will Cause Harm, Especially in Rural Areas………………………………………………………………..…………12

CONCLUSION…………………………………………………………………….………17

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Bostock v. Clayton County*,
   140 S. Ct. 1731 (2020)…………………………………………………...…10

*Conforti v. Saint Joseph's Healthcare*,
   2019 WL 3847994 (D.N.J. 2019)…………………………………………………..13

*Flack v. Wis. Dep't of Health Serv.*
   395 F.Supp. 3d 1001 (D. Wis. 2019)…………………………………………………10

*Minton v. Dignity Health*,
   252 Cal. Reptr. 3d 5th 616 (Cal. Ct. App 2019)………………………………………..13, 14

*Prescott v. Rady Child. Hosp. San Diego*,
   265 F.Supp. 3d 1090 (S.D. Cal. 2017)………………………………………………..10,11

*Rumble v. Fairview Health Serv.*,
   2015 WL 1197415 (D. Minn. 2015)…………………………………...……………………...10

*Tovar v. Essentia Health*,
   342 F.Supp. 3d 947 (D. Minn. 2018)……………………………………..……………….....10, 11

## Federal Register

*Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37160 (June 19, 2020) (to be codified at 42 C.F.R.pts. 438, 440, and 460 and 45 C.F.R. pts. 86, 92, 147, 155, and 156)……………………….……………3, 10, 12

## Other Authorities

Christy Mallory et al., *The Impact of Stigma and Discrimination Against LGBT People in Virginia*, The Williams Institute, 36 (2020), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Impact-LGBT-Discrimination-VA-Jan-2020.pdf…………………………..9

Human Rights Watch, *"All We Want Is Equality:" Religious Exemptions and Discrimination Against LGBT People in the United States* (2018), https://www.hrw.org/report/2018/02/19/all-we-want-equality/religious-exemptions-and-discrimination-against-lgbt-people………………………………………………………..14, 16

Human Rights Watch, *"You Don't Want Second Best:" Anti-LGBT Discrimination in US Health Care* (2018), https://www.hrw.org/sites/default/files/report_pdf/us_lgbt0718_web.pdf. ……………………………………………………………………………6, 8, 12, 14, 16

Ilan H. Meyer et al., *Demographic Characteristics and Health Status of Transgender Adults in Select US Regions*, 107 Am. J. Pub. Health 582 (2017)………………………………….…….4

Institute of Medicine, *The Health of Lesbian, Gay, Bisexual, and Transgender People* (2011)……………………………………………………………………………………...4, 9

Jen Kates et al., *Health Care Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the US*, Kaiser Family Foundation (2018), http://files.kff.org/attachment/Issue-Brief-Health-and-Access-to-Care-and-Coverage-for-LGBT-Individuals-in-the-US……………………............................................…4, 5, 9

Jocelyn M. Wascher et al., *Do Women Know Their Hospital Is Catholic? Results From A National Survey*, 98(6) Contraception 498, 501 (2018)…………………………………15

Jody L. Herman et al., *Demographic and Health Characteristics of Transgender Adults in California*, The Williams Institute (2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/CHIS-Transgender-Adults-Oct-2017.pdf………......................................8

Kenrith J. Conron and Shoshana K. Goldberg, *LGBT People in the US Not Protected By State Non-Discrimination Statutes*, The Williams Institute (2020), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-ND-Protections-Update-Apr-2020.pdf……………………………………….....................................................12

Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey of Discrimination Against LGBT People and People with HIV* (2014), https://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring.pdf........................................................7, 8

Lois Uttley and Christine Khaikin, *Growth of Catholic Hospitals and Health Systems: 2016 Update on the Miscarriage of Medicine Report*, MergerWatch (2016), https://archive.org/details/MWUpdate2016MiscarrOfMedicineReport/page/n1/mode/2up. ……………………………………………………………………………………15

NPR, *Discrimination In America: Experiences and Viewpoints of LGBTQ Americans* (2017), https://legacy.npr.org/documents/2017/nov/npr-discrimination-lgbtq-final.pdf.........4, 5, 8

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, National Center for Transgender Equality (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf...........................................................4, 5, 6, 7, 8, 9, 16

Shabab Ahmed Mirza and Caitlin Rooney, *Discrimination Prevents LGBTQ People From Accessing Health Care*, American Progress (2018), https://www.americanprogress.org/issues/lgbtq-rights/news/2018/01/18/445130/discrimination-prevents-lgbtq-people-accessing-health-care/....................................................................................6, 7, 8, 16

Southerners on New Ground and Transgender Law Center, *The Grapevine: A Southern Trans Report* (2019), http://transgenderlawcenter.org/wp-content/uploads/2019/05/grapevine_report_eng-FINAL.pdf..............................................7

iii

**STATEMENT OF INTEREST**

*Amicus Curiae* the Harvard Law School LGBTQ+ Advocacy Clinic ("the Clinic") is an

organization dedicated to advancing the rights of LGBTQ+ people in the United States.[1]  The

Clinic engages in impact litigation, policy advocacy, and direct representation to advocate for the

rights of LGBTQ+ people on both the national and local levels, with a particular focus on issues

affecting underrepresented groups within the LGBTQ+ umbrella.

*Amicus Curiae* AIDS United is a policy and advocacy organization with the goal of

ending the HIV epidemic.  To do that, all people with HIV or at risk for HIV should have equal

access to the care and services they need.  Discrimination is not acceptable.

*Amicus Curiae* the Center for Constitutional Rights is a national, non-profit legal,

educational, and advocacy organization committed to progressive social change.  Founded in

1966 to represent civil rights activists in the South, CCR works creatively to advance and defend

the constitutional and human rights of social justice movements and communities under threat—

including the LGBTQIA+ community and communities of color—and fights to dismantle

systems of oppression.

*Amicus Curiae* the National Center for Lesbian Rights (NCLR) is a national nonprofit

legal organization dedicated to protecting and advancing the civil rights of lesbian, gay, bisexual,

transgender, and queer people and their families through litigation, public policy advocacy, and

public education.  Since its founding in 1977, NCLR has played a leading role in securing fair

and equal treatment for LGBTQ people and their families in cases across the country involving

constitutional and civil rights.  NCLR has a particular interest in eradicating discrimination

---

[1] The Clinic, which is housed within the WilmerHale Legal Services Center of Harvard Law School, is a distinct
entity from other Harvard affiliates.

against LGBTQ people in health care settings and represents LGBTQ people in cases relating to access to health care in courts throughout the country.

*Amicus Curiae* the National Center for Transgender Equality (NCTE), founded in 2003, works to improve the lives of the nearly two million transgender people in the United States and their families through sound public policy, public education, and groundbreaking research. NCTE has worked with countless health and human service providers as well as local, state, and federal agencies on policies to ensure equal access to vital health and human services. In 2015, NCTE conducted the U.S. Transgender Survey, the largest survey to date of transgender people with nearly 28,000 respondents from all 50 states.

*Amicus Curiae* the National LGBT Bar Association is a nonprofit membership-based 501(c)(6) professional association. The National LGBT Bar Association's more than 10,000 members and subscribers include lawyers, judges, legal academics, law students, and affiliated legal organizations supportive of lesbian, gay, bisexual, and transgender ("LGBT") rights. The National LGBT Bar Association and its members work to promote equality for all people regardless of sexual orientation or gender identity or expression, and fight discrimination against LGBT people as legal advocates. The National LGBT Bar Association is a membership organization and files this brief on behalf of its members, who object to discrimination in health care services on the bases of sexual orientation or gender identity or expression.

*Amicus Curiae* the National Trans Bar Association ("NTBA") is a national bar association by and for transgender and gender non-conforming legal professionals and law school students and allies who care about transgender rights. The National Trans Bar Association's core mission is to support transgender and gender non-conforming people in the legal profession and to increase the community's access to affordable and culturally competent

legal services. NTBA also strives to secure formal legal protections for transgender and gender non-conforming people to meaningfully address issues of equity.

No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than *Amici Curiae*, their members, or their counsel, contributed money intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

No one should have to experience discrimination when seeking health care simply because of who they are. But that is the reality that millions of transgender and gender non-conforming people face today in America. Data shows that discrimination in health care settings already disproportionately limits the ability of transgender and gender-nonconforming people to access health care and leads to worse health outcomes for those who can.

The Department of Health and Human Services ("HHS")'s newly promulgated rule, Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (Aug. 18, 2020) (the "Rule") will worsen this problem in two respects. First, the Rule wrongfully attempts to read anti-discrimination protections on the basis of gender identity and sex stereotyping out of Section 1557 of the Affordable Care Act ("ACA"), a position which illegally attempts to dilute remedies available to transgender and gender non-conforming people under the ACA. Second, the Rule's incorporation of religious exemptions into the ACA will strip legal protections from people who experience religiously motivated discrimination in health care, especially in rural areas.

## ARGUMENT

## I. Discrimination In Health Care On the Basis of Gender Identity Limits the Ability of Transgender and Gender Non-Conforming People To Access Needed Care

Discrimination in health care and health insurance creates significant barriers in access to care for transgender and gender non-conforming people. LGBTQ+ people face a number of barriers to accessing health care, including financial barriers, limitations on access to health insurance, insufficient provider knowledge, negative provider attitudes, and stigma against their gender identity or sexuality.[2] Empirical studies have made clear that transgender and gender non-conforming people experience discrimination from health care providers and insurers on both a personal and systemic level. This discrimination burdens the ability of transgender and gender non-conforming people to access needed health care.

### A.  Financial Barriers, Including Discrimination by Insurance Providers, Present Major Obstacles to Access to Health Care

Financial barriers present the first of many hurdles to access to health care for the LGBTQ+ community. Nearly one in two transgender people have reported that they did not seek needed health care at some point in their life due to financial concerns.[3] In one study, one in three avoided needed care due to cost concerns within the past year.[4] Transgender people are more likely than non-transgender people not to have health care coverage or a personal health care provider, and are more likely to be unable to afford to visit a doctor when they need to.[5] These financial barriers are often the result of discrimination—for example, transgender people report higher rates of poverty due to high rates of employment discrimination and family

---

[2] Institute of Medicine, *The Health of Lesbian, Gay, Bisexual, and Transgender People* 75 (2011).

[3] Jen Kates et al., *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the US*, Kaiser Family Foundation, 14 (2018), http://files.kff.org/attachment/Issue-Brief-Health-and-Access-to-Care-and-Coverage-for-LGBT-Individuals-in-the-US.

[4] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, National Center for Transgender Equality, 98 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[5] Ilan H. Meyer et al., *Demographic Characteristics and Health Status of Transgender Adults in Select US Regions*, 107 Am. J. Pub. Health 582, 585 (2017); NPR, *Discrimination In America: Experiences and Viewpoints of LGBTQ Americans*, 2 (2017), https://legacy.npr.org/documents/2017/nov/npr-discrimination-lgbtq-final.pdf

rejection—and put the transgender community's ability to access health care in jeopardy even before they encounter health care-specific discrimination.[6]

Discrimination by insurance providers is a major financial barrier in access to care. While upwards of one in five transgender Americans are uninsured, even those who have insurance may face discrimination that financially inhibits their ability to access medical care.[7] One in four transgender Americans reported experiencing discriminatory treatment from their insurance providers in the past year because they were transgender.[8] Among the problems they reported with insurance providers were denial of coverage for transition-related surgery, denial of coverage for hormone therapy, only partial coverage of transition-related treatment, lack of surgery providers within network, a refusal to correct names or genders in records, and denial of other routine health care because of transgender status.[9] Many insurance plans exclude or deny transition-related coverage to transgender people, even if coverage for these procedures is provided to non-transgender people; for example, they may cover hormone therapy for non-transgender women for menopause but not to transgender women for their transition.[10]

B.  **As a Result of Bias and Discrimination, Transgender and Gender Non-Conforming People Often Report Negative Experiences When They Are Able to Access Health Care**

Even when transgender and gender-nonconforming people are able to access health care, experiences of personal discrimination from doctors and other health care providers can cause significant harm. Transgender people are particularly at risk among the LGBTQ+ community for personal discrimination from health care providers, as the presence of gender markers in

[6] James et al., *supra* note 4, at 4-7, 73.
[7] NPR et al., supra note 5, at 28.
[8] James et al., *supra* note 4, at 95.
[9] James et al., *supra* note 4, at 95.
[10] Kates et al., *supra* note 3, at 14.

medical records often makes 'nondisclosure' to avoid discrimination not an option.[11]  Overall, 33% of transgender people report having had at least one negative experience of discrimination from a health care provider within the past year, including being asked unrelated or unnecessary questions about their transgender status, being required to educate health care providers about transgender people, verbal harassment, physical mistreatment or assault, or being refused health care.[12]  Transgender people of color are more likely to experience these forms of negative treatment.[13]

Service denials are the most blatant form of personal discrimination against transgender people seeking health care.  29% of transgender people report that their health care providers have refused to give them non-transition related health care because of their gender identity.[14] These medical service denials extend to medical care entirely unrelated to gender identity or sexuality, including denial of fertility treatments, counseling sessions, checkups and other basic health care.[15]  Additionally, 12% of transgender people report that health care providers refused to give them transition-related care, such as hormone therapy or gender-affirming surgery.[16]

Other forms of hostility and discrimination against transgender and gender non-conforming people from health care providers are prevalent.  21% of transgender and gender non-conforming people reported that health care providers used harsh or abusive language when

[11] Human Rights Watch, "*You Don't Want Second Best:" Anti-LGBT Discrimination in US Health Care* 7 (2018), https://www.hrw.org/sites/default/files/report_pdf/us_lgbt0718_web.pdf.

[12] James et al., *supra* note 4, at 97.

[13] James et al., *supra* note 4, at 97.

[14] Shabab Ahmed Mirza and Caitlin Rooney, *Discrimination Prevents LGBTQ People From Accessing Health Care*, American Progress (2018), https://www.americanprogress.org/issues/lgbtq-rights/news/2018/01/18/445130/discrimination-prevents-lgbtq-people-accessing-health-care/.

[15] Human Rights Watch, *supra* note 11, at 22.

[16] Mirza and Rooney, *supra* note 14.

addressing them.[17]  Almost one in four reported that doctors or health care providers intentionally misgendered them or addressed them by the wrong name.[18]  Additionally, 18% of transgender people who had discussed their gender identity with a professional, such as a counselor or psychologist, reported that the professional attempted to persuade them to stop being transgender, a deeply harmful practice known as conversion therapy.[19]

This discrimination and hostility extends to physical harm as well.  A shocking 29% of transgender people who had visited a doctor or health clinic in the past year reported experiencing unwanted physical contact from a doctor or other health care provider, including sexual assault.[20]  Other surveys of transgender people have found similarly alarming rates of physical assault and violence from health care providers against transgender patients.[21]  These experiences are worse in certain regions of the country: for instance, 40% of transgender people in the South reported experiencing violence from health care providers.[22]

These forms of personal discrimination from health care providers—from service denials, to verbal abuse, to physical assault—present a real danger to the health and wellbeing of transgender people.

### C. Experiences of Discrimination When Accessing Health Care, or Fear of Such Discrimination, Further Widens the Access to Care Gap

Concern about discrimination can prevent transgender and gender non-conforming people from seeking needed health care even when they have the means to do so.  People who

---

[17] Mirza and Rooney, *supra* note 14. Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey of Discrimination Against LGBT People and People with HIV*, 5 (2014), https://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring.pdf.

[18] Mirza and Rooney, *supra* note 14.

[19] James et al., *supra* note 4, at 109.

[20] Mirza and Rooney, *supra* note 14.

[21] James et al., *supra* note 4, at 96; Lambda Legal, *supra* note 17, at 6.

[22] Southerners on New Ground and Transgender Law Center, *The Grapevine: A Southern Trans Report*, 6 (2019), http://transgenderlawcenter.org/wp-content/uploads/2019/05/grapevine_report_eng-FINAL.pdf.

have experienced anti-LGBTQ+ discrimination from a health care provider in the past year are six times more likely to avoid seeking needed health care than those who hadn't.[23]  22% of transgender people who had experienced health care discrimination in the past year reported avoiding or postponing seeking needed medical care as a result of that discrimination.[24]  Even without recent experiences of direct discrimination, fear of such discrimination can lead people to avoid seeking the health care they need.  20% of transgender and gender non-conforming people report high levels of concern that they will be denied medical services when needed because of their gender identity.[25]  Because of this concern, nearly a quarter of transgender Americans report avoiding doctors or failing to seek needed health care to avoid mistreatment for being transgender.[26]  Through this fear of discrimination, the ramifications of discrimination in the health care system spread far beyond outright refusal of health care.

## II.     Discrimination in Health Care Leads to Worse Health Outcomes for Transgender and Gender Non-Conforming People

Discrimination in health care, by limiting access to care in general and by worsening the experience of those who are able to access care, causes poorer health outcomes for those who experience it.  These poor outcomes cause health disparities between the transgender and gender non-conforming community and the United States population in general, including mental health disparities.  Transgender adults are significantly more likely to experience suicidal thoughts, severe psychological distress, and to have attempted suicide during their lifetime than cisgender adults.[27]  In 2015 7% of transgender people reported attempting suicide in the past year, when

---

[23] Human Rights Watch, *supra* note 11, at 24.
[24] Mirza and Rooney, *supra* note 14.
[25] Lambda Legal, *supra* note 17, at 6.
[26] NPR et al., supra note 5, at 20; James et al., *supra* note 4, at 98.
[27] Jody L. Herman et al., *Demographic and Health Characteristics of Transgender Adults in California*, The Williams Institute, 4 (2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/CHIS-Transgender-Adults-Oct-2017.pdf.

the rate for the U.S. population as a whole was 0.6%.[28]  Transgender people are also more likely to report experiencing "fair" or "poor" overall health, encompassing mental and physical health, than non-transgender people.[29]

These health disparities are caused by discrimination, not by any inherent characteristic of the transgender and gender non-conforming community.  The Institute of Medicine has written that "it is clear that stigma [in health care] has exerted an enormous and continuing influence on the life and consequently the health status" of LGBTQ+ individuals, an observation confirmed by significant empirical evidence.[30]  Unsupportive legal landscapes, which permit or endorse discrimination, are linked to LGBTQ+ health disparities, including disparities in health-related risk factors.[31]  Experiences of discrimination and stigma are a significant cause of LGBTQ+ people's elevated risk for mental health conditions.[32]  For example, transgender people who have been subjected to an attempt at conversion therapy from a health care professional are far more likely to experience severe psychological distress and to have attempted suicide.[33]  Discrimination, particularly health care discrimination, can have significant negative health impacts on those who experience it.

III.    **The Rule Wrongfully Attempts To Roll Back Protections for Many Transgender and Gender Non-Conforming People Who Experience Health Care Discrimination**

The Rule wrongfully interprets Section 1557 of the Affordable Care Act as not encompassing federal protections against discrimination on the basis of gender identity or sex

---

[28] James et al., *supra* note 4, at 112.

[29] James et al., *supra* note 4, 105.

[30] Institute of Medicine, *supra* note 2, at 75.

[31] Christy Mallory et al., The Impact of Stigma and Discrimination Against LGBT People in Virginia, The Williams Institute, 36 (2020), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Impact-LGBT-Discrimination-VA-Jan-2020.pdf.

[32] Kates et al., *supra* note 3, at 8.

[33] James et al., *supra* note 4, at 110.

stereotyping in medical treatment and insurance coverage.[34]  It flouts the Supreme Court's recent

holding in *Bostock v. Clayton County* that discrimination on the basis of transgender status

constitutes sex discrimination.  *See* 140 S. Ct. 1731, 1741 (2020).  Although *Bostock* confirms

that, as many courts have already recognized, section 1557 has always protected transgender and

gender non-conforming people, *see, e.g., Flack v. Wis. Dep't of Health Serv.*, 395 F. Supp. 3d

1001 (D. Wis. 2019); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947 (D. Minn. 2018); *Prescott v.

Rady Children's Hosp. San Diego*, 265 F. Supp. 3d 1090 (S.D. Cal. 2017); *Rumble v. Fairview

Health Serv.*, 2015 WL 1197415 (D. Minn. 2015), the Rule will nevertheless cause harm by

preventing people from being able to pursue federal administrative relief for the discrimination

they have experienced.

The Affordable Care Act, when correctly interpreted to include gender identity and sex

stereotyping within its anti-discrimination mandates, has allowed many transgender and gender-

nonconforming Americans who experienced discrimination to enforce their right to healthcare in

court.  In the years since the ACA was passed, a number of transgender Americans have

successfully brought cases against discriminatory healthcare providers in which Section 1557

was the primary or only federal claim they were able to successfully bring.

Plaintiffs have successfully challenged discriminatory practices by insurers under the

ACA's protections against discrimination on the basis of gender identity and sex stereotyping,

protections which the new Rule unlawfully disavows.  In *Flack*, for example, the plaintiffs used

Section 1557 to challenge Wisconsin's policy of denying Medicaid coverage for any medical

services or treatments for the purposes of treating gender dysphoria, even when those treatments

---

[34] *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg.
37160 (June 19, 2020) (to be codified at 42 C.F.R. pts. 438, 440, and 460 and 45 C.F.R. pts. 86, 92, 147, 155, and
156).

were covered to treat other conditions.  395 F. Supp. 3d at 1009.  Section 1557 has also been the

federal basis of challenges against discriminatory private insurers, such as in *Tovar*, where the

plaintiff sued a private insurer that categorically denied coverage of transition-related care

refused to cover medically necessary hormone treatments and surgery for plaintiff's son, who

suffered from gender dysphoria.  342 F. Supp. 3d at 950-51.

Plaintiffs have also had success in challenging mistreatment and discrimination by

healthcare professionals under Section 1557.  For example, in *Prescott*, a mother brought suit

under Section 1557 on behalf of her transgender son, who was admitted for emergency

psychiatric care for suicidal thoughts and self-harm related to his gender dysphoria.  265 F. Supp.

3d at 1096.  Hospital staff repeatedly misgendered her son, despite his mother's warning that

doing so would be harmful to him, and even blocked her phone number when she attempted to

correct the problem.  *Id.* at 1097.  The psychological effect of this misgendering was so profound

that, despite the seriousness of the problems for which the plaintiff's son had been admitted, his

physicians recommended he be discharged prematurely rather than continue to experience the

hospital's mistreatment.  *Id.*  Tragically, he died by suicide a month later. *Id.*

Under the Rule, HHS would not assist a transgender or gender non-conforming person

who experienced any of these forms of health care discrimination and filed a complaint with

HHS's Office of Civil Rights with getting relief, because HHS would not consider their

experiences discrimination under its flawed interpretation of the law.  For those who may not be

able to bring a lawsuit for personal or financial reasons, the Rule could eliminate their only

recourse.   This is particularly true because Section 1557 of the ACA is the only health care–

related anti-discrimination protection available for many transgender Americans.  The majority

of states and localities still lack any protections for transgender and gender non-conforming

people in health care.  Approximately 6.5 million of the estimated 13 million LGBTQ+ people in the United States live in states without statutory bans on discrimination in public accommodations, including health care.[35]  Only 13 states and the District of Columbia ban health insurance discrimination on the basis of sexual orientation and gender identity.[36]  The majority of states do not prohibit health insurers from excluding medical services for transgender people, nor do they explicitly provide for these services in their Medicaid plans.[37]  This lack of state and local alternatives makes the availability of federal administrative remedies for transgender and gender non-conforming people particularly important.

**IV.     The Rule's Incorporation of Religious Exemptions Will Cause Harm, Especially in Rural Areas**

The Rule incorporates Title IX's religious exemptions into the Affordable Care Act's mandate against discrimination on the basis of sex.[38]  These exemptions, by legally sanctioning discrimination in health care, will cause harm to transgender and gender non-conforming people. Health care is a matter of life and death, and while freedom of religion is a fundamental part of our constitutional system, it does not extend to the right to harm others, especially in the context of health care.  There are serious harms that follow from a legal regime that allows medical professionals to refuse to provide lifesaving health care—or health care of any kind—on the basis of personal religious belief, while removing or undermining legal recourse for those who experience these refusals.  The Rule creates just such a legal regime.  In so doing, it exposes

---

[35] Kenrith J. Conron and Shoshana K. Goldberg, *LGBT People in the US Not Protected By State Non-Discrimination Statutes*, The Williams Institute, 1 (2020), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-ND-Protections-Update-Apr-2020.pdf.
[36] Human Rights Watch, *supra* note 11, at 8.
[37] Human Rights Watch, *supra* note 11, at 8.
[38] *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37160 (June 19, 2020) (to be codified at 42 C.F.R. pts. 438, 440, and 460 and 45 C.F.R. pts. 86, 92, 147, 155, and 156).

many transgender and gender non-conforming people to discrimination and the harms that follow from it.

Refusals to provide medically necessary health care to transgender people on the basis of religion and other forms of religiously motivated discrimination are common in health care settings. They have been the subject of a number of recent lawsuits, including two cases in which religious hospitals refused to perform routine hysterectomies for transgender men. *See Conforti v. Saint Joseph's Healthcare*, 2019 WL 3847994 (D.N.J. 2019); *Minton v. Dignity Health*, 252 Cal. Rptr. 3d 616 (Cal. Ct. App. 2019). In *Minton*, a Catholic hospital cancelled the plaintiff's hysterectomy the day before it was scheduled to be performed once it learned that the plaintiff was transgender. 252 Cal. Rptr. 3d at 619. This cancellation caused the plaintiff "great anxiety and grief," and threatened to disrupt or delay the timing other transition-related procedures he had scheduled, as the hospital provided him no referral or aid in finding an alternate provider that would be willing to perform the procedure. *Id*. While Minton was ultimately able to have the hysterectomy after his surgeon acquired emergency privileges at another hospital, the defendant hospital only provided this referral after the plaintiff and his physician exerted considerable pressure on the hospital, and Minton experienced considerable uncertainty about whether he would be able to find an alternative within the network coverage of his insurance policy. *Id*. at 621-22.

As Minton's case illustrates, relying on religious providers to provide referrals if they refuse service to transgender or gender non-conforming people is not sufficient to protect their right to health care nor to cure the harm caused by discrimination. Patients may only receive referrals when they are knowledgeable enough or able to forcefully advocate for themselves. In *Minton*, the Catholic hospital who cancelled the plaintiff's hysterectomy provided a referral only

after his physician objected; had his physician not been determined enough to advocate for him, or if he had not been able to leverage local media pressure, he would have been left without any referral or alternative from the hospital for his cancelled procedure.  *See id.*

More importantly, the act of being discriminated against is a harm that cannot be cured by a referral to another provider.  The pain and stigmatization caused by the act of discrimination constitutes harm in and of itself, and can discourage or prevent those who experience it from seeking out health care even if they are provided with an alternative.  As one psychologist who treats the LGBTQ+ community explains, "being simply turned away from counseling when you're hurting and you need help is absolutely detrimental—it makes it less likely that the person will continue to seek help."[39]  For example, one transgender teenager reported being so distressed by the hostility and overt religiosity he experienced from medical services providers that he refused to seek out urgently needed care out of fear that he would experience more discrimination.[40]  Even plaintiffs who are willing to continue to seek out care after experiencing a denial of care for religious reasons may be prevented from doing so by a number of logistical issues, such as not being provided a referral, a lack of non-religious providers in their area, or the alternative provider being out of their insurance network.  Finally, the existence of religious refusal laws can cause harm itself; the existence of laws that, like religious refusal laws, legally sanction LGBTQ+ discrimination is correlated with a rise in LGBTQ+ people reporting elevated levels of mental distress and failing to seek needed health care.[41]

---

[39] Human Rights Watch, *supra* note 11, at 23.
[40] Human Rights Watch, *"All We Want Is Equality:" Religious Exemptions and Discrimination Against LGBT People in the United States* (2018), https://www.hrw.org/report/2018/02/19/all-we-want-equality/religious-exemptions-and-discrimination-against-lgbt-people.
[41] Human Rights Watch, *supra* note 11, at 24.

The lack of alternatives to religiously affiliated health care providers in many parts of the country creates a strong likelihood that religious refusals will cause unavoidable harm to those who experience them. For many transgender and gender non-conforming people, it is simply not possible to find an alternative provider when a health care provider discriminates against them on the basis of religious belief.

This problem is particularly acute in rural areas, where health care providers are already few and geographically spread out, and where many providers are religiously affiliated and thus free to discriminate under the Rule. The number of religious health care providers in the US has grown to the point that no secular alternatives are available in many parts of the country. In the past two decades the number of Catholic hospitals in the US has grown 22%, so that one in six hospital beds in the US are Catholic-owned or affiliated.[42] There are 46 Catholic hospitals that are the sole community providers of short-term acute care in their geographic region, with the next comparable provider being more than 35 miles or 45 minutes of travel time away.[43] For the more than 1 million people who visit these hospitals' emergency departments each year, there is no reasonable alternative for them to seek immediate care if they experience discrimination.[44] Additionally, many patients may not be aware that their health care provider is religiously affiliated, making them unable to make an informed decision to avoid potential discrimination, even if they have the financial means.[45]

---

[42] Lois Uttley and Christine Khaikin, *Growth of Catholic Hospitals and Health Systems: 2016 Update on the Miscarriage of Medicine Report*, MergerWatch, 3-4 (2016), https://archive.org/details/MWUpdate2016MiscarrOfMedicineReport/page/n1/mode/2up.

[43] Uttley and Khaikin, *supra* note 42, at 5.

[44] Uttley and Khaikin, *supra* note 42, at 5.

[45] Jocelyn M. Wascher et al., *Do Women Know Their Hospital Is Catholic? Results From A National Survey*, 98(6) Contraception 498, 501 (2018).

This situation creates a dangerous scarcity of resources for transgender and gender non-conforming people, forcing some to travel great distances to reach a non-discriminatory provider, and those without the means to do so to go without.  Transgender people are already three times more likely than non-transgender people to have to travel more than 50 miles for transition-related care than for routine health care, due to a lack of nondiscriminatory local providers.[46]  For example, one transgender person from east Tennessee reported having to regularly to drive to North Carolina in order to obtain hormone treatments.[47]

This difficulty in accessing local health care is not limited to transition-related care. Many transgender people in rural areas report that finding alternative care of any kind if they were turned away from a hospital, health clinic, or pharmacy because they were transgender would be difficult or impossible.[48]  In one study of the LGBTQ+ community, 31% of transgender respondents reported that it would be "very difficult" or "impossible" to find medical services at another hospital if they were turned away, jumping to 41% for those in rural areas.[49]  This scenario is unfortunately not a hypothetical one for many transgender people; for example, one transgender woman in Mississippi was told by a religious medical provider that they wouldn't even treat her for cold or flu symptoms because of her transgender status.[50]  As a result, some transgender people have had to drive for hours, often crossing state lines, in order to access the health care services they need.[51]  This scarcity of accessible secular health care resources increases the harm caused by religious refusals.

---

[46] James et al., *supra* note 4, at 99.
[47] Human Rights Watch, *supra* note 11, at 14
[48] Human Rights Watch, *supra* note 11, at 13.
[49] Mirza and Rooney, *supra* note 14.
[50] Human Rights Watch, *supra* note 40.
[51] Human Rights Watch, *supra* note 11, at 14.

Against this backdrop of religiously-motivated discrimination in health care, which can cause unavoidable harm for many, the Rule's incorporation of religious exemptions will, like the removal of anti-discrimination protections, cause harm to transgender and gender non-conforming people by creating a legal regime that not only denies them recourse for harm they experience, but endorses this discrimination as well.

## CONCLUSION

Discrimination in health care on the basis of gender identity causes significant harm to transgender and gender non-conforming people. It disproportionately limits the ability of transgender and gender-nonconforming people to access health care and leads to worse outcomes for those who can. The Rule wrongfully attempts to interpret the ACA's anti-discrimination protections as not encompassing discrimination on the basis of gender identity and sex stereotyping and incorporates Title IX's religious exemptions into the ACA, both of which will harm transgender and gender non-conforming people who experience healthcare discrimination, particularly in rural areas. Accordingly, *Amici* urge this Court to deny Defendants' Motion to Dismiss.


Dated: December 03, 2020          Respectfully Submitted,

                                  __/s/ Alexander Chen_____
                                  Alexander Chen
                                  LGBTQ+ Advocacy Clinic
                                  WilmerHale Legal Services Center of
                                  Harvard Law School
                                  122 Boylston Street
                                  Jamaica Plain, MA 02130
                                  achen@law.harvard.edu
                                  617-998-1054