## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| BOSTON ALLIANCE OF GAY, LESBIAN, BISEXUAL AND TRANSGENDER YOUTH (BAGLY); CALLEN-LORDE COMMUNITY HEALTH CENTER; CAMPAIGN FOR SOUTHERN EQUALITY; DARREN LAZOR; EQUALITY CALIFORNIA; FENWAY HEALTH; INDIGENOUS WOMEN RISING; NO/AIDS TASK FORCE (D/B/A CRESCENTCARE); AND TRANSGENDER EMERGENCY FUND OF MASSACHUSETTS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBINSUE FROHBOESE, IN HER OFFICIAL CAPACITY AS ACTING DIRECTOR, OFFICE FOR CIVIL RIGHTS, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; AND CHIQUITA BROOKS-LASURE, IN HER OFFICIAL CAPACITY AS ADMINISTRATOR FOR THE CENTERS FOR MEDICARE AND MEDICAID SERVICES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Defendants. | Civil Action <br> No. 20-11297-PBS |

---

## MEMORANDUM AND ORDER

August 18, 2021

Saris, D.J.

**INTRODUCTION**

Plaintiffs challenge a final rule promulgated by the United States Department of Health and Human Services ("HHS") entitled Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020) ("2020 Rule"), which implements Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116. Plaintiffs include three private healthcare facilities that serve LGBTQ+ people, one membership organization, four advocacy organizations that provide services to the LGBTQ+ community, a Native-led reproductive justice collective, and a transgender man. They allege that the 2020 Rule violates the Administrative Procedure Act and the Constitution.[1]

Among other things, Plaintiffs contend that the 2020 Rule arbitrarily repealed provisions of the 2016 Rule including the definition of "on the basis of sex," the prohibition of categorical coverage exclusions for transgender-related care, the requirement

---

[1] Plaintiffs bring claims for violation of 5 U.S.C. § 706(2)(A) (agency action "not in accordance with law") and 5 U.S.C. § 706(2)(C) (agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right")(Count I); violation of 5 U.S.C. § 706(2)(A) (agency action that is "arbitrary, capricious, [or] an abuse of discretion") (Count II); violation of 5 U.S.C. § 706(2)(B) (agency action "contrary to constitutional right, power, privilege, or immunity") and the equal protection component of the Fifth Amendment's Due Process Clause (Count III); and violation of 5 U.S.C. § 706(2)(A) (enforcement policy "not in accordance with law")(Count IV).

that covered entities "treat individuals consistent with their gender identity," the prohibition of "association" discrimination, and the specific requirement that covered entities provide certain notices of prohibited discrimination and taglines indicating the availability of language assistance services. Plaintiffs also object to the 2020 Rule's incorporation of Title IX's religious and abortion exemptions, the narrowing of the scope of covered entities, and the change to the enforcement scheme. They challenge many of these provisions in light of Bostock v. Clayton County, 140 S. Ct. 1731, 1747 (2020), which held that "discrimination based on . . . transgender status necessarily entails discrimination based on sex." This decision was issued just after the Rule was promulgated.

The Government now moves to dismiss all claims based on lack of standing and ripeness. It also moves to dismiss Count III for failure to state a claim.[2] After hearing, the Court **ALLOWS** in part and **DENIES** in part Defendants' motion to dismiss (Dkt. 21). Some of the plaintiffs have established organizational standing based on economic injury caused by portions of the 2020 Rule (and redressable by its vacatur) to challenge (1) the incorporation of Title IX's abortion exemption, (2) the narrowing of the scope of

---

[2] Plaintiffs agreed not to press Count IV in light of HHS's May 10, 2021 "Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972" (Dkt. 50).

covered entities, and (3) the elimination of the prohibition on categorical coverage exclusions for care related to gender transition. Plaintiffs lack standing to challenge the change to the enforcement scheme, the elimination of the prohibition on association discrimination, the elimination of the notice and taglines requirements, and the conforming amendments to related regulations because they have not adequately alleged an injury in fact caused by those provisions.

## **FACTUAL BACKGROUND**

### I.   **The 2016 Rule**

Congress enacted the Affordable Care Act ("ACA") in 2010. 42 U.S.C. § 18116. The ACA contains a non-discrimination provision known as § 1557, which states:

> [A]n individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) ["race, color, or national origin"], title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) ["sex"], the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.) ["age"], or section 794 of Title 29 ["disability"], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

Id. § 18116(a).

In 2016, HHS promulgated a final rule implementing § 1557. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) ("2016 Rule"). Among other things, the 2016 Rule states that § 1557 applies to:

> every health program or activity, any part of which receives Federal financial assistance provided or made available by [HHS]; every health program or activity administered by [HHS]; and every health program or activity administered by a Title I entity.

81 Fed. Reg. at 31,466 (formerly codified at 45 C.F.R. § 92.2(a)). It defines "covered entity" as "(1) [a]n entity that operates a health program or activity, any part of which received Federal financial assistance; (2) [a]n entity established under Title I of the ACA that administers a health program or activity; and (3) [HHS]." Id. It defines discrimination "on the basis of sex" as including "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." Id. at 31,467.

The 2016 Rule also specifically requires covered entities to post notice of prohibited discrimination and taglines in at least the top fifteen languages spoken by individuals with limited English proficiency in that State in "conspicuous physical locations where the entity interacts with the public" and in significant communications that are not small-sized, and in at least the top two languages in significant communications that are

small-sized. Id. at 31,469 (formerly codified at 45 C.F.R. § 92.8(f)-(g)); see also id. at 31,468 (defining taglines as "short statements written in non-English languages that indicate the availability of language assistance services free of charge"). It prohibits covered entities providing health insurance from "[h]av[ing] or implement[ing] a categorical coverage exclusion or limitation for all health services related to gender transition." Id. at 31,472 (formerly codified at 45 C.F.R. § 92.207(b)(4)). Under the Rule, a plaintiff bringing a claim under § 1557 can invoke the enforcement mechanism from any of the referenced civil rights statutes, regardless of the type of discrimination alleged. Id. (formerly codified at 45 C.F.R. § 92.301(a)).

A Catholic hospital association, a Christian healthcare professional association, and several states sued to enjoin portions of the 2016 Rule. Franciscan Alliance, Inc. v. Becerra, No. 16-cv-00108-O, 2021 WL 3492338 at *1-2 (N.D. Tex. Aug. 9, 2021). They alleged that the Rule's prohibition of discrimination on the basis of "termination of pregnancy" and "gender identity" violated the APA and violated the Religious Freedom Restoration Act ("RFRA") as applied to the religious association plaintiffs. Id. at *2. The court "vacated the 2016 Rule insofar as it defined 'on the basis of sex' to include gender identity and termination of pregnancy." Id. at *1. The Fifth Circuit later remanded to the district court for further consideration in light of the 2020 Rule

6

and actions by the Biden Administration. Id. at *2. On August 9, 2021, based on the alleged RFRA violations, the district court issued an Order "permanently enjoin[ing] HHS . . . from interpreting or enforcing Section 1557 . . . or any implementing regulations thereto against Plaintiffs, their current and future members, and those acting in concert or participation with them . . . in a manner that would require them to perform or provide insurance coverage for gender-transition procedures or abortions." Id. at *12.

## II.   **The 2020 Rule**

The 2020 Rule substantially repeals the 2016 Rule. See 85 Fed. Reg. 37,160. Among other things, it removes the definition of "on the basis of sex," id. at 37,245, the prohibition of categorical coverage exclusions for gender transition-related care, id. at 37,247, the requirement that covered entities "treat individuals consistent with their gender identity," id., and the specific requirement that covered entities provide certain notice and taglines, id. at 37,204. It explicitly incorporates the religious and abortion exemptions from Title IX. Id. at 37,243. It also changes the scope of covered entities, stating that § 1557 applies to:

> (1) [a]ny health program or activity, any part of which is receiving Federal financial assistance (including credits, subsidies, or contracts of insurance) provided by [HHS]; (2) [a]ny program or activity administered by [HHS] under Title I of the [ACA]; or (3) [a]ny program

or activity administered by any entity established under
such Title.

Id. at 37,244 (codified at 45 C.F.R. § 92.3(a)). The scope of
covered entities is restricted by the 2020 Rule's definition of
"health program or activity." Id. (codified at 45 C.F.R. § 92.3(b).
The 2020 Rule includes within that definition "all of the
operations of entities principally engaged in the business of
providing healthcare that receive Federal financial assistance as
described," but it categorizes "an entity principally or otherwise
engaged in the business of providing health insurance" as not
"principally engaged in the business of providing healthcare." Id.
at 37,244-37,245 (codified at 45 C.F.R. § 92.3(b)-(c)). It also
changes the § 1557 enforcement scheme to apply the enforcement
mechanism of only the referenced civil rights statute that
corresponds to the discrimination alleged. Id. 37,202, 37,245
(codified at 45 C.F.R. § 92.5(a)).

III.   **Challenges to the 2020 Rule**

"Almost immediately [after Bostock], five cases sprung up
seeking to prevent enforcement of the 2020 Rule and to revive
various aspects of the 2016 Rule." Religious Sisters of Mercy v.
Azar, No. 3:16-CV-00386, 2021 WL 191009, at *7 (D.N.D. Jan. 19,
2021), judgment entered sub nom. Religious Sisters of Mercy v.
Cochran, No. 3:16-CV-00386, 2021 WL 1574628 (D.N.D. Feb. 19, 2021).
There are now six cases challenging the 2020 Rule – three have

received rulings on standing and two are stayed without decision. Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs., 485 F. Supp. 3d 1, 64 (D.D.C. 2020) (ruling on standing and enjoining portions of the 2020 Rule); Washington v. U.S. Dep't of Health & Hum. Servs., 482 F. Supp. 3d 1104, 1122 (W.D. Wash. 2020) (ruling on standing); Walker v. Azar, 480 F. Supp. 3d 417, 427 (E.D.N.Y. 2020) (ruling on standing and enjoining portions of the 2020 Rule); Order Granting Unopposed Motion to Stay Proceedings, New York v. U.S. Dep't of Health & Hum. Servs., Case No. 1:20-cv-05583 (S.D.N.Y. February 18, 2021), ECF No. 41 (stayed without decision); Minute Order Granting ECF No. 18 Joint Motion to Stay, Chinatown Service Center v. U.S. Dep't of Health & Hum. Servs., No. 21-cv-00331 (D.D.C. May 27, 2021) (stayed without decision).

Two district courts have issued nationwide preliminary injunctions enjoining Defendants from implementing some portions of the 2020 Rule. See Walker, 480 F. Supp. 3d at 430 (enjoining elimination of the 2016 Rule's definition of "on the basis of sex," "sex stereotyping," and "gender identity" in 45 C.F.R. § 92.4); Walker v. Azar, Case No. 20-CV-2834 (FB) (SMG), 2020 WL 6363970, at *4 (E.D.N.Y. Oct. 29, 2020) (enjoining repeal of 45 C.F.R. § 92.206, which requires healthcare providers to "treat individuals consistent with their gender identity" and prohibits them from "deny[ing] or limit[ing] health services that are ordinarily or exclusively available to individuals of one sex, to

a transgender individual"); <u>Whitman-Walker Clinic</u>, 485 F. Supp. 3d at 64 (enjoining removal of "sex stereotyping" from the definition of "on the basis of sex" and incorporation of Title IX's religious exemption).

In light of the nationwide injunctions issued by sister courts, this Court declines to address now Plaintiffs' challenges to the repeal of the definition of "on the basis of sex," the repeal of 45 C.F.R. § 92.206, and the incorporation of Title IX's religious exemption. <u>See</u> <u>Abbott Labs v. Gardner</u>, 387 U.S. 136, 155 (1967) (holding that a court may "in its discretion dismiss a declaratory judgment or injunctive suit if the same issue is pending in litigation elsewhere"); <u>City of Bangor v. Citizens Commc'ns Co.</u>, 532 F.3d 70, 99 (1st Cir. 2008) ("A district court enjoys inherent power to 'control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'") (quoting <u>Landis v. N. Am. Co.</u>, 299 U.S. 248, 254 (1936)).

Plaintiffs' assert that confusion as to those provisions will cause harm despite the nationwide injunctions. It is true that the 2016 Rule, its repeal by the 2020 Rule, President Biden's Executive Order (see below), and potentially cross-cutting injunctions have created a difficult terrain to follow. This Court will only address portions of the Rule not already enjoined by sister courts.

**IV.   Biden Administration Policies**

On January 20, 2021, President Biden signed the Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation. It states:

> Under Bostock's reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 et seq.) . . . along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary. . . .It is the policy of my Administration to prevent and combat discrimination on the basis of gender identity or sexual orientation, and to fully enforce Title VII and other laws that prohibit discrimination on the basis of gender identity or sexual orientation.

Exec. Order No. 13988, 86 Fed. Reg. 7023, 7023. The Executive Order instructed agency heads to "review all existing . . . regulations . . . that: (i) were promulgated or are administered by the agency under Title VII or any other statute or regulation that prohibits sex discrimination . . .; and (ii) are or may be inconsistent with the policy set forth in . . . this order." Id. at 7023–24.

On May 10, 2021, HHS issued a notice entitled "Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972." It states:

> Consistent with the Supreme Court's decision in Bostock and Title IX, beginning today, [the Office of Civil Rights] will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual

11

orientation; and (2) discrimination on the basis of gender identity.

Dkt. 50 at 3. In so doing, "OCR will comply with [RFRA] and all other legal requirements . . . [and] with all applicable court orders." Id.

## V.  Parties

Plaintiff Darren Lazor is a transgender man who lives in Ohio and "regularly needs to access medical treatment, and uses health insurance coverage." Dkt. 18 ¶ 19. Mr. Lazor has experienced past discrimination in healthcare based on his transgender status.

Plaintiffs Fenway Health, Callen-Lorde Community Health Center, and NO/AIDS Task Force (d/b/a CrescentCare) are private healthcare facilities that serve LGBTQ+ people. Fenway Health serves more than 33,000 patients at its three Boston locations and many more through its telehealth program. About 42% of its patient population have a sexual orientation other than heterosexual and about 12% are transgender. Callen-Lorde Community Health Center serves nearly 18,000 patients at four New York City locations and more through its telehealth program. It also provides consulting services to other clinicians and has direct services programs. About 80% of its patient population are lesbian, gay, bisexual, or identify as having a sexual orientation other than heterosexual and about 24% are transgender. CrescentCare serves almost 14,000 individuals at two New Orleans clinics and served over 20,000

people through its testing and prevention programs and more than 3,500 individuals through its supportive services programs in 2019. About 40% of its patient population have a sexual orientation other than heterosexual and over 7% are transgender.

Plaintiffs Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth ("BAGLY"), Campaign for Southern Equality, Indigenous Women Rising ("IWR"), and Transgender Emergency Fund of Massachusetts are organizations that provide services to LGBTQ+ people. BAGLY provides free healthcare and health education services to LGBTQ+ youth. About 98.7% of its service population are lesbian, gay, bisexual, transgender, non-binary, or have a sexual orientation other than heterosexual, and about 60% are transgender and/or non-binary. The Campaign for Southern Equality is a nonprofit organization with about 8,000 members for advancing LGBTQ+ civil rights. About 40% of its work focuses on LGBTQ+ persons' access to healthcare.

IWR is a "Native-led and Native-centered reproductive justice collective." Dkt. 18 ¶ 61. It supports Indigenous people who become pregnant in accessing healthcare, focusing on an abortion fund, a midwifery fund, and a sex education program. It helps Indigenous people pay for abortion care by providing clients with funds to cover lodging, gas, food, childcare, and related travel expenses. Many of the clients come from Native communities and live in rural areas, usually on reservations. Most of the fund's clients have

limited financial resources and are either uninsured or lack insurance coverage for abortion.

Plaintiff Transgender Emergency Fund provides financial assistance to transgender people for co-payments for hormone replacement therapy, provides referrals, and assists in navigating health insurance coverage denials. It serves exclusively transgender and gender-nonconforming people.

Plaintiff Equality California is a nonprofit membership organization that advocates for the health and equality of LGBTQ+ people. It has over 500,000 members throughout the United States, the majority in California. Its programs include training for healthcare providers on culturally competent care for LGBTQ+ patients.

Defendant United States Department of Health and Human Services ("HHS") is an "agency" under 5 U.S.C. § 551(1). Defendant Xavier Becerra is named in his official capacity as Secretary of HHS. Defendant Robinsue Frohboese is named in her official capacity as Acting Director of the Office for Civil Rights at HHS. Defendant Chiquita Brooks-Lasure is named in her official capacity as Administrator for the Center for Medicare and Medicaid Services.

**DISCUSSION**

I.   **Jurisdiction**

   **A. Legal Standard**

   Defendants argue that Plaintiffs lack standing to bring each of their claims, and that their challenges to certain provisions of the 2020 Rule are not ripe. Plaintiffs argue that Plaintiff Darren Lazor, a transgender man, has individual standing and that Plaintiff membership organizations and healthcare facilities have both representational standing based on substantial risk of discrimination against their LGBTQ+ members or patients and organizational standing based on substantial risk of financial harm and frustration of purpose.

   Standing is a threshold question in every case; "if a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case." United States v. AVX Corp., 962 F.2d 108, 113 (1st Cir. 1992). "[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2208 (2021). So long as one plaintiff has standing to bring each claim, the court need not address whether other plaintiffs have standing. Massachusetts v. E.P.A., 549 U.S. 497, 518 (2007) (citing Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006)).

15

"A plaintiff has standing only if he can allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." California v. Texas, 141 S. Ct. 2104, 2113 (2021) (cleaned up). The plaintiff must show that the injury is "certainly impending" or "there is a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (cleaned up). "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party . . . the plaintiff must show at the least that third parties will likely react in predictable ways." California v. Texas, 141 S. Ct. at 2117 (cleaned up).

Where an organization brings a claim on its own behalf, it must show "injury to the organization's activities" and "the consequent drain on the organization's resources" to satisfy the injury prong. Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). However, "an organization cannot establish standing if the 'only injury arises from the effect of [a challenged action] on the organizations' lobbying activities, or when the service impaired is pure issue-advocacy.'" Equal Means Equal v. Ferriero, 3 F.4th 24, 30 (1st Cir. 2021) (quoting People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087, 1093-94 (D.C. Cir. 2015)).

To survive a motion to dismiss for lack of standing, "[t]he complainant must set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing." Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016) (quoting AVX Corp., 962 F.2d at 115). "Neither conclusory assertions nor unfounded speculation can supply the necessary heft." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016).

Ripeness is another essential component of federal subject matter jurisdiction. McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 70 (1st Cir. 2003). "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior, 538 U.S. 803, 808 (2003). "Both prongs of the test must be satisfied, although a strong showing on one may compensate for a weak on the other." McInnis-Misenor, 319 F.3d at 70. "In general, standing and ripeness inquiries overlap." Id. at 69 (citations omitted); see also 13B Wright & Miller, Fed. Prac. & Proc. (3d ed.), § 3531.12 ("The most direct connections [among justiciability doctrines] run between standing and ripeness.").

The Court may consider evidence outside of the pleadings on jurisdictional questions. United States ex rel. Gadbois v.

PharMerica Corp., 809 F.3d 1, 6 n.2 (1st Cir. 2015) ("[W]e conclude that a supplemental pleading can be used to cure a jurisdictional defect."). The Supreme Court analyses the standing inquiry based on the time "when the complaint [was] filed." See Lujan v. Defs. of Wildlife, 504 U.S. 555, 569 n.4 (1992). However, in assessing a claim of imminent harm, it defies common sense not to consider the time after the complaint is filed in order to assess how imminent the risk of harm really was. See Nat'l Fair Hous. All. V. Carson, 330 F. Supp. 3d 14, 46 (D.D.C. 2018).

Here, the case was stayed at the request of the Government until May. The Plaintiffs were given the opportunity to supplement the pleadings with additional declarations to demonstrate standing. The Court will consider those supplements: the Declaration of Katie Keith, co-founder of the health insurance information initiative Out2Enroll, and the Declaration of Rachael Lorenzo, co-founder and Abortion Access Lead of IWR (Dkt. 56). The Government initially challenged standing because Plaintiffs provided no evidence of actual harm. The supplemental pleadings attempt to address that challenge. The Court will also consider the supplemental briefing and declaration filed on July 15, 2021 by the Government.

**B. Analysis of Challenges to 2020 Rule**

Because Plaintiffs raise multiple challenges, the Court must address the jurisdictional questions, issue-by-issue.

18

### i. Title IX's Abortion Exemption

The 2020 Rule explicitly incorporates Title IX's abortion exemption ("Danforth Amendment") into § 1557. It provides in relevant part:

> (a) Nothing in this part shall be construed to force or require any individual or hospital or any other institution, program, or activity receiving Federal funds to perform or pay for an abortion.
> (b) Nothing in this part shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion. Nothing in the preceding sentence shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion.

85 Fed. Reg. at 37,243. See 20 U.S.C. § 1688 (Title IX's abortion exemption). This case challenges this provision of the 2020 Rule.

Plaintiffs allege that the 2020 "Rule's incorporation of the Title IX . . . abortion exemption[] will embolden and, in some cases allow, hospitals, insurers, and others to discriminate against patients based on sex by using . . . anti-abortion beliefs as justifications to refuse care or coverage." Dkt. 18 ¶ 191. Specifically, Plaintiffs allege that Plaintiffs CrescentCare and IWR have organizational standing to challenge the incorporation of the abortion exemption. According to Plaintiffs, due to the abortion exception CrescentCare "will experience increased strain on their resources and capacity" from patients seeking care in an environment they know to be non-discriminatory, Dkt. 18 ¶ 233, and

19

IWR will "expend more resources on services for abortion, midwife, and doula care" including "more expensive abortion care later in pregnancy," Dkt. 27 at 42.

In their supplemental filings, Plaintiffs argue that those fears have been borne out. Since the fall of 2020, IWR's Abortion Fund has gone from getting one to three callers per week to about ten callers per week, and from spending a maximum of $2000 per month to about $5000 per month. Some callers "report that [Indian Health Services ("IHS")] and other providers refuse to give them the information that they need to access an abortion." Dkt. 56-2 ¶ 5. Because IHS is administered by HHS but not established under Title I of the ACA, it is no longer a covered entity under the 2020 Rule. See 85 Fed. Reg. at 37,244 (codified at 45 C.F.R. § 92.3(a)). IWR's co-founder took a $30,000 pay cut to ensure the fund could continue, and it has halted "direct health care funding in our" abortion fund and midwifery fund this summer. Dkt. 56-2 ¶ 7.

Defendants respond that Plaintiffs have failed to establish how the Rule has resulted in cognizable injury or how injury was imminent when they filed suit. Defendants argue that organizational injuries caused by increased demand from patients who fear discrimination due to the 2020 Rule are "not . . . fairly traceable to [the government] because they are based on third parties' subjective fear." Dkt. 33 at 10 (quoting Clapper v.

<u>Amnesty Int'l</u>, 568 U.S. 398, 417 n.7 (2013)). With respect to IWR, Defendants argue that it fails to carry its burden to demonstrate that it suffered an injury caused by the 2020 Rule that can be redressed by the relief it seeks. The Acting Chief Medical Officer for IHS, Dr. Greggory Woitte, submitted a supplemental declaration stating that "IHS did not make any changes to any of its policies or practices based on HHS's 2020 final rule." Dkt. 59-3 ¶ 10.

CrescentCare and IWR have established organizational standing based on a substantial risk of organizational harm. The abortion exception allows "any individual or hospital or any other institution, program, or activity receiving Federal funds" to refuse "to perform or pay for an abortion," and allows "any person, or public or private entity" to refuse "to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 85 Fed. Reg. at 37,243. Its incorporation will likely cause patients who seek or have had abortion care to fear discrimination by healthcare providers, which will contribute to increased demand for the services of CrescentCare and IWR and their accompanying financial and operational injuries. <u>Cf.</u> <u>Whitman-Walker Clinic</u>, 485 F. Supp. 3d at 33 (finding healthcare provider had standing to challenge the 2020 Rule's incorporation of the religious exemption based on patients' fear of discrimination by other providers and increased demand for care from plaintiff). While it is true there is no evidence that the 2020 rule caused

the Indian Health Service to cut back funding of abortion care, this stark evidence concerning the depletion of the funds for abortion supports a reasonable inference of present injury caused by the predictable reaction of Indigenous people who need an abortion and fear denial by IHS and other entities. Plaintiffs CrescentCare and IWR have established a substantial risk of harm from the Defendants' conduct resulting from a denial of abortion services or fear of such denial that could be redressed by equitable relief.

### ii. Narrowing of Scope of Covered Entities

The Amended Complaint alleges that Plaintiffs Fenway Health and CrescentCare will be injured by HHS's construction of the scope of covered entities since third party payors will no longer feel constrained from offering plans that categorically exclude gender-affirming care or other sex-based treatment. Plaintiffs argue that diminishing insurance coverage will generate harm to Fenway Health in terms of diminished reimbursement and administrative time appealing coverage decisions. Defendants challenge Plaintiffs' allegations that they will receive fewer insurance reimbursements from insurers who will view themselves as outside of the 2020 Rule's definition of "health program or activity" as based "on pure speculation that insurers are discriminating against or limiting healthcare coverage for LGBTQ individuals." Dkt. 22 at 28. "The Amended Complaint," in Defendants' view, "includes zero

allegations indicating that any health insurer has changed its coverage because of the 2020 Rule or plans on changing its insurance coverage." Id.

The 2020 Rule "modifies the 2016 Rule's definition of entities covered by Section 1557." 85 Fed. Reg. at 37,162. Under the 2020 Rule, "covered entities" are:

> (1) Any health program or activity, any part of which is receiving Federal financial assistance (including credits, subsidies, or contracts of insurance) provided by [HHS]; (2) any program or activity administered by [HHS] under Title I of the ACA; or (3) any program or activity administered by any entity established under such Title."

85 Fed. Reg. at 37,244 (codified at 45 C.F.R. § 92.3(a)). It further defines "health program or activity" as "all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance," but "[f]or any entity not principally engaged in the business of providing healthcare, . . . such entity's operations only to the extent any such operation receives Federal financial assistance." Id. (codified at 45 C.F.R. § 92.3(b)).

The 2016 Rule had listed as covered entities:

> (1) An entity that operates a health program or activity, any part of which receives Federal financial assistance; (2) An entity established under Title I of the ACA that administers a health program or activity; and (3) [HHS].

81 Fed. Reg. at 31,466 (formerly codified at 45 C.F.R. § 92.4). It broadly defined "health program or activity" as:

> [T]he provision or administration of health-related services, health-related insurance coverage, or other health-related coverage, and the provision of assistance to individuals in obtaining health-related services or health-related insurance coverage. For an entity principally engaged in providing or administering health services or health insurance coverage or other health coverage, all of its operations are considered part of the health program or activity. . . . Such entities include a . . . group health plan [and] health insurance issuer. . . . A health program or activity also includes all of the operations of a State Medicaid program, a Children's Health Insurance Program, and the Basic Health Program.

Id. at 31,467 (formerly codified at 45 C.F.R. § 92.4). HHS said it changed this regulatory definition "in order to align it more closely with the statutory text." 85 Fed. Reg. at 37,162.

The 2020 Rule exempts certain insurers from compliance with § 1557's prohibition of discrimination. It is difficult to assess the full impact of this narrowing of the scope of covered entities on Plaintiffs, but some insurers that are exempted will likely react in predictable ways: deny coverage for gender-affirming care. See Dep't of Commerce v. New York, 139 S. Ct. 2551, 2565-66 (2019) (relying on the predictable effect of Government action on third parties); Massachusetts v. U.S. Dep't of Health & Hum. Servs., 923 F.3d 209, 227 (1st Cir. 2019) (finding standing based on probable market behavior). The agency itself recognized that some entities would make changes in response to the Rule. 85 Fed. Reg. at 37,225.

Plaintiffs plausibly allege that the narrowed scope of covered entities will result in more patients seeking their services and reduced insurance reimbursements,[3] which "will consume Plaintiff Healthcare Facilities' budgets, force Plaintiff Healthcare Advocates to divert limited resources to help people navigate barriers to care, and make it harder for individuals to access care." Dkt. 27 at 35. "It is by no means speculative to conclude that, under the 2020 Rule, certain insurers will deny reimbursement for treatment they previously covered." Whitman-Walker Clinic, 485 F. Supp. 3d at 29.

### iii. Categorical Coverage Exclusions

The 2020 Rule eliminates the 2016 Rule's prohibition on categorical coverage exclusions for care related to gender transition. 85 Fed. Reg. at 37,247. The 2016 Rule stated: "A covered entity shall not, in providing or administering health-related insurance or other health-related coverage[,] . . . [h]ave or implement a categorical coverage exclusion or limitation for all health services related to gender transition." 81 Fed. Reg. at 31,471–31,472 (formerly codified at 45 C.F.R. § 92.207).

Plaintiffs allege that as a result of the 2020 Rule's elimination of the prohibition on categorical coverage exclusions for care related to gender transition, "some insurers will stop

---

[3] The parties dispute the extent to which Medicaid remains a covered entity under the 2020 Rule.

reimbursing Plaintiff Healthcare Facilities for . . . gender-affirming care." Dkt. 27 at 36. Lack of reimbursement will cause financial injury to Plaintiff healthcare facilities because they provide care regardless of a patient's ability to pay.

Analysis of 2021 marketplace plans supports that allegation. Out2Enroll, "a national initiative dedicated to ensuring that LGBTQ people have information about their health insurance options," Dkt. 56-1 ¶ 5, found "the highest number of insurers using [transgender-specific] exclusions that Out2Enroll has documented in its five years of analysis," id. ¶ 10. From 2020 to 2021, "the number of insurers using transgender-specific exclusions . . . more than doubled." Id. ¶ 10. The report shows that four insurers—Bright Health, United Healthcare, Alliance, and MercyCare—contain transgender-related exclusions for thirteen 2021 silver marketplace plans in nine states. Plaintiffs also allege that Plaintiff healthcare facilities have patients enrolled in Cigna, which has changed its coverage to exclude "surgical services commonly deemed medically necessary as an integral part of gender affirming care." Dkt. 56 at 2. For example, Cigna now covers rhinoplasty for several medical reasons but not for gender affirming care.

Defendants argue that Plaintiffs' allegations amount to "speculation that their future patients' health insurers will change their policies in a manner that harms them due to the 2020

Rule, which . . . is not predictable." Dkt. 33 at 19–20. Further, Defendants argue that because "there was no gender-affirming care standard mandate of coverage before the 2020 Rule," Plaintiffs "cannot plausibly contend [they] face[] a substantial likelihood of a discernable increase in administrative costs due to this portion of the 2020 Rule." Dkt. 33 at 19–20. They push back on the Out2Enroll report because Plaintiffs failed to show a personal injury from any of these plans or that any of the Plaintiffs experienced a decrease in reimbursement because of these policies, or a nexus between the exclusion and the repeal of the 2016 Rule's prohibition.

Here, Plaintiffs have shown a substantial risk that insurers will deny reimbursement for treatment they previously covered based on the elimination of the prohibition on categorical coverage exclusions. Out2Enroll's analysis indicates that "the number of insurers using transgender-specific exclusions . . . more than doubled" after HHS promulgated the 2020 Rule. Dkt. 56-1 ¶ 10. For example, Plaintiffs submit that CresentCare has a patient who "was unable to get coverage for gender affirming treatment because their plan, offered by the Louisiana Office of Group Benefits, had a categorical exclusion for treatment related to gender dysphoria." Dkt. 27-7 at 10. Defendants are correct that the 2016 Rule did not mandate coverage of gender-affirming care, but it did forbid categorical coverage exclusions for care related to gender

27

transition. The elimination of the prohibition on categorical coverage exclusions will likely cause some insurers to deny coverage on a sweeping basis. See Whitman-Walker Clinic, 485 F. Supp. 3d at 29-30; but see Washington, 482 F. Supp. 3d at 1117. Plaintiff healthcare facilities thus have standing.

### iv. Change to Enforcement Scheme

Plaintiffs challenge the 2020 Rule's elimination of the unified enforcement scheme that allowed plaintiffs to bring discrimination claims under § 1557 through the enforcement mechanism of any of the four referenced civil rights statutes. The 2016 Rule provided:

> (a) The enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, or the Age Discrimination Act of 1975 shall apply for purposes of Section 1557 as implemented by this part.
> (b) Compensatory damages for violations of Section 1557 are available in appropriate administrative and judicial actions brought under this rule.

81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.301).

The 2020 Rule instead provides:

> (a) The enforcement mechanisms provided for, and available under, [the referenced statutes], including under the Department's regulations implementing those statutes, shall apply for purposes of violations of § 92.2 of this part.
> (b) The Director of the Office for Civil Rights has been delegated the authority to enforce 42 U.S.C. 18116 and this part, which includes the authority to handle complaints, . . . make enforcement referrals to the Department of Justice, in coordination with the Office of the General Counsel and the relevant component or

28

>components of the Department, and take other appropriate
>remedial action as the Director deems necessary, in
>coordination with the relevant component or components
>of the Department, and as allowed by law to overcome the
>effects of violations of 42 U.S.C. 18116 or of this part.

85 Fed. Reg. at 37,245.

Plaintiffs allege that "it will be more difficult for Plaintiffs' patients and clients to bring claims of "intersectional discrimination"[4] because of the elimination of [the uniform enforcement] scheme." Dkt. 27 at 30. This provides a basis for both representational and organizational standing, in Plaintiffs' view, because Plaintiff healthcare facilities and advocacy organizations "serve . . . people who have experienced intersectional discrimination in the past and are likely to experience intersectional discrimination in the future" and "Plaintiff Healthcare Facilities have limited resources to provide assistance with coverage denials, case management, and legal services to their patients in order to remedy discriminatory treatment and health care coverage." Dkt. 27 at 40. Plaintiffs also point to Plaintiff Darren Lazor's past experience of discrimination as evidence of a substantial risk of future discrimination giving rise to a § 1557 claim. Defendants argue that greater difficulty bringing claims of intersectional

---

[4] To explain "intersectional discrimination" Plaintiffs use the examples of Black transgender women, disabled Latinx immigrants, or Indigenous pregnant people.

discrimination is "an impermissible generalized grievance . . . because the impact on plaintiffs is plainly undifferentiated and common to all members of the public." Dkt. 33 at 20 (cleaned up).

Plaintiffs have not alleged sufficient facts to establish standing. Without adequate explanation, they allege increased difficulty for patients and clients who experience intersectional discrimination.[5] See Dkt. 27 at 40. However, Plaintiffs have not demonstrated why the enforcement scheme in the referenced statutes (like Title IX) are inadequate. As the court said in Whitman-Walker Clinic:

> [Plaintiffs] briefly reference excerpts from declarations emphasizing the challenges posed by the possibility of intersectional discrimination. . . . Plaintiffs have not established that any future discrimination — especially discrimination causing an individual to actually sue under Section 1557 — would be sufficiently imminent to qualify as a valid injury-in-fact. Even if it were, Plaintiffs could not plausibly allege that such discrimination would be fairly traceable to HHS's interpretation of Section 1557's legal standard in the 2020 Rule.

485 F. Supp. 3d at 33 (cleaned up). Moreover, Plaintiff Darren Lazor's past experience of discrimination does not constitute a substantial risk of future discrimination which cannot be remedied by existing statutory provisions. See City of Los Angeles v. Lyons,

---

[5] Plaintiffs also challenge the 2020 Rule's removal of compensatory damages from the § 1557 enforcement scheme. Plaintiffs have not alleged that any Plaintiff organization or member of a Plaintiff organization faces a substantial risk of imminent injury due to the unavailability of compensatory damages.

461 U.S. 95, 105 (1983) (holding that plaintiff's past alleged injury "does nothing to establish a real and immediate threat" that the same injury would occur again). Nor have Plaintiffs shown an organizational injury. Because Plaintiffs have not shown that diversion of their resources "to provide assistance with coverage denials, case management, and legal services to their patients," Dkt. 27 at 40, would be fairly traceable to the 2020 Rule's change to the enforcement mechanism, Plaintiffs have not demonstrated standing.

### v. "Association"

Section 1557 is silent as to whether it prohibits discrimination based on association with someone who has a protected characteristic. 42 U.S.C. § 18116(a). The 2020 Rule eliminated the provision of the 2016 Rule that explicitly prohibited association discrimination. The 2016 Rule provided:

> A covered entity shall not exclude from participation in, deny the benefits of, or otherwise discriminate against an individual or entity in its health programs or activities on the basis of the race, color, national origin, sex, age, or disability of an individual with whom the individual or entity is known or believed to have a relationship or association.

81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.209). In support of this provision, HHS stated in the 2016 Rule that § 1557 "does not restrict [its] prohibition [of discrimination] to discrimination based on the individual's own [protected characteristics]," and that "a prohibition on associational

31

discrimination is consistent with longstanding interpretations of existing anti-discrimination laws . . . [and] with the approach taken in the ADA." Id. at 31,439. Cases challenging the 2020 Rule have not addressed elimination of the association discrimination provision. Plaintiffs argue that its elimination is "contrary to case law and the underlying [civil rights] statutes, and therefore is not in accordance with law." Dkt. 18 ¶ 401.

Plaintiffs allege that Equality California and IWR have representational standing to challenge the elimination of the prohibition on association discrimination. According to Plaintiffs, "two [Equality California] members previously suffered discrimination by healthcare providers and insurers based upon association with their transgender daughter, and thus reasonably fear that they will face such discrimination again—in the form of, for example, denials of care, higher out-of-pocket costs, and more—because of the Rollback Rule." Dkt. 27 at 44. They further allege that many of IWR's clients are represented by elders from their Native American communities whose first language is not English, and that discrimination against these representatives by healthcare providers would harm IWR's clients. "By removing express protections against [associational] discrimination," Plaintiffs argue, "the Rollback Rule undermines their [members' or clients'] ability to obtain administrative or judicial redress under Section 1557." Dkt. 27 at 44.

Plaintiffs have not established any future discrimination that would be sufficiently imminent to qualify as a valid injury-in-fact. See Whitman-Walker Clinic, 485 F. Supp 3d at 33-34 (cleaned up); Already, LLC v. Nike, Inc., 568 U.S. 85, 98 (2013) ("[W]e have never held that a plaintiff has standing to pursue declaratory relief merely on the basis of being 'once bitten.' Quite the opposite."); Lyons, 461 U.S. at 103 ("[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy.").

### vi. Notice and Taglines

The 2020 Rule removed a requirement that all covered entities provide certain notices of prohibited discrimination and taglines stating the availability of translation services in the top fifteen languages spoken in each state. More generally, the 2020 Rule continues to require covered entities to "take reasonable steps to ensure meaningful access . . . by limited English proficient individuals." 85 Fed. Reg. at 37,245 (codified at 45 C.F.R. § 92.101).

Plaintiffs allege that the 2020 Rule's elimination of the notice and taglines requirement "will cause patients to be less informed about applicable civil rights protections and cause patients who seek care elsewhere to come to Plaintiff Healthcare Facilities worse off than they would otherwise be because of communication difficulties." Dkt. 27 at 45-46 (cleaned up).

Defendants argue that Plaintiffs' allegations are premised on a chain of speculations: that some covered entities might change their notices and taglines, that the change will negatively impact limited English proficiency patients, and that patients receiving those revised notices and taglines would switch to Plaintiff healthcare facilities.

Plaintiffs have not demonstrated a sufficiently imminent injury in fact to establish standing. The future harm Plaintiffs allege is premised on actions of third parties. That alone does not defeat standing, but the actions of a third party must be predictable results of a defendant's challenged action to support standing. New York, 139 S. Ct. at 2566. Whether healthcare providers and insurers will change their notice and taglines in response to the elimination of the specific requirements, healthcare providers will provide worse care due to the change, and impacted patients will seek care at Plaintiff Healthcare Facilities are speculative rungs on a speculative ladder of causation.

Defendants point out that the link is particularly weak because the 2020 Rule requires covered entities to "take reasonable steps to ensure meaningful access to such programs or activities by limited English proficient individuals." 85 Fed. Reg. at 37,245. While this standard provides less explicit guidance for entities covered by § 1557 than the former notice and taglines requirement,

the results of this change are too speculative to support standing. See Clapper, 568 U.S. at 401 (finding a "theory of future injury . . . too speculative to satisfy the well-established requirement that threatened injury must be certainly impending") (cleaned up).

### vii. Conforming Amendments to Related Regulations

Plaintiffs challenge the 2020 Rule's elimination of "protections against gender identity and sexual orientation discrimination in regulations that implement statutes other than Section 1557, such as Medicaid State Plans, Programs for All-Inclusive Care for the Elderly (PACE), and the ACA state health insurance marketplaces and plans." Dkt. 27 at 46. They allege "[t]he elimination of these protections will cut into the budgets of [plaintiff healthcare] facilities because they rely, in part, on insurance reimbursement to fund their operations." Id. at 46–47.

Plaintiffs' allegation is vague and speculative—that insurers and state programs will discriminate based on gender identity and sexual orientation because of the change made to a variety of related regulations—particularly in light of Bostock and the President's Executive Order. See 140 S. Ct. at 1731.

### viii. Ripeness

The Government argues that prudential ripeness concerns indicate that the Court should dismiss Plaintiffs' challenge to the 2020 Rule's elimination of the definition of "on the basis of

sex." As stated earlier, in an exercise of its own discretion, the Court declines to address the definition of "on the basis of sex" in light of the injunctions issued by sister courts and the Executive Order. See Abbott Labs, 387 U.S. at 155. As to the provisions for which the Court finds standing, each is ripe for review. No court has enjoined the incorporation of Title IX's abortion exemption, the narrowing of the scope of covered entities, or the elimination of the prohibition on categorical coverage exclusions for care related to gender transition. Although HHS has stated its intention to "initiate a [new] rulemaking proceeding on Section 1557," it has not yet done so at this juncture. See Dkt. 59 at 18 (alteration in original). Plaintiffs have shown changes in coverage by several insurers and face a risk of economic injury from reduced reimbursements now.

## II.  Count III: Violation Of The APA (Agency Action That Is Contrary To Constitutional Right—Fifth Amendment Due Process Clause, Equal Protection)

Plaintiffs claim that the 2020 Rule discriminates on the basis of sex and was motivated by discriminatory animus against transgender people. Therefore, Plaintiffs argue, it violates the equal protection guarantee of the Fifth Amendment's Due Process Clause, and should be set aside under 5 U.S.C. § 706(2)(B) (compelling courts to set aside agency action that is "contrary to

36

constitutional right, power, privilege, or immunity").[6] Defendants have moved to dismiss Count III on the basis that Plaintiffs have not pleaded a plausible equal protection claim. See Fed. R. Civ. P. 12(b)(6).[7]

## A. Rule 12(b)(6)

In analyzing whether a complaint states a claim under Rule 12(b)(6), the Court sets aside conclusory statements and examines only the pleader's factual allegations. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

## B. Standard of Review

Because the applicable standard of review will dictate what the Plaintiffs must allege, the Court addresses this issue first.

---

[6] Plaintiffs challenge the rule as a whole, rather than singling out specific provisions.

[7] The First Circuit has held that "the plausibility standard does not apply to a complaint for judicial review of final agency action." Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013). However, that holding was based on the premise that the scope of review would be limited to the administrative record. See id. That premise does not hold in this case, for reasons described below, and Atieh's holding is therefore inapplicable.

Generally, cases not involving "suspect" classifications are subject to rational basis review, under which the challenged action survives "so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631 (1996). Gender-based classifications, however, are subject to intermediate scrutiny, and must be "substantially related to achieving an important governmental objective." Massachusetts v. U.S. Dep't of Health & Hum. Servs., 682 F.3d 1, 9 (1st Cir. 2012); see United States v. Virginia (VMI), 518 U.S. 515, 532-33 (1996). Under rational basis review, any legitimate government interest will suffice, while under intermediate scrutiny "a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." VMI, 518 U.S. at 535-36; see also id. at 546 (requiring an "exceedingly persuasive justification").

Defendants argue that the Court is bound to apply rational basis review, citing Massachusetts, 682 F.3d at 9, and Cook v. Gates, 528 F.3d 42, 61-62 (1st Cir. 2008). The First Circuit in these cases declined to designate sexual orientation a suspect classification, but it did conclude that the Court should "scrutinize with care the purported bases for the legislation" including ordinarily affected groups that have been "long the subject of discrimination." Massachusetts, 682 F.3d at 11-12. It did not address transgender status. As the Supreme Court recently

held, "discrimination based on . . . transgender status necessarily entails discrimination based on sex." Bostock, 140 S. Ct. at 1747. And, as established, discrimination based on sex draws heightened scrutiny.

Though Bostock was a Title VII case, the Supreme Court's reasoning applies equally outside of Title VII. And while the First Circuit has not spoken on the subject, other circuits have held that intermediate scrutiny applies to discrimination based on transgender status in the equal protection context. See, e.g., Grimm v. Gloucester Cty. Sch. Bd., 972 F.3d 586, 608-09 (4th Cir. 2020), as amended (Aug. 28, 2020), cert. denied, No. 20-1163, 2021 WL 2637992 (U.S. June 28, 2021); Karnoski v. Trump, 926 F.3d 1180, 1201 (9th Cir. 2019); Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034, 1051 (7th Cir. 2017).

Accordingly, the Court will apply intermediate scrutiny.

**C. Scope of Review**

The Plaintiffs' claim hinges on allegations of discriminatory animus toward transgender people. Defendants argue that the Court must confine its search for discriminatory animus to the administrative record. In challenges to agency action, review is generally limited to the administrative record, Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam), subject to a few narrow exceptions, see Overton Park, 401 U.S. 402, 420 (1971). But this challenge, although it arises under the Administrative Procedure

Act, is constitutional in substance. See 5 U.S.C. § 706(2)(B) (requiring a court to set aside agency action that is "contrary to constitutional right, power, privilege, or immunity"). The caselaw on whether the APA's scope of review limits apply to constitutional claims is less settled.

As Defendants point out, some courts have held that constitutional challenges to agency action are subject to the APA's scope of review restrictions. See Dkt. No. 22 at 43 n.9. However, few of those cases involve allegations of illicit animus, and those that do acknowledge that extra-record evidence may sometimes be appropriate when evaluating a constitutional claim. See, e.g., Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 58 F. Supp. 3d 1191, 1241 (D.N.M. 2014) (involving a First Amendment retaliation claim).

Other courts have acknowledged that limiting the scope of review to the administrative record makes little sense in the context of an inquiry into illicit animus. "Most people know by now that the quiet part should not be said out loud." Cook County, Illinois v. Wolf, 461 F. Supp. 3d 779, 794 (N.D. Ill. 2020), motion to certify appeal denied, No. 19 C 6334, 2020 WL 3975466 (N.D. Ill. July 14, 2020). The Cook County court, evaluating an equal protection claim challenging the Department of Homeland Security's "public charge" rule, reasoned that "because evidence of racial animus (if any) will reside outside the administrative record,

presumptively limiting discovery to the record can allow the racial
motivations underlying racially motivated policymaking to remain
concealed." Id. at 795. Similarly, the district court in New York
v. United States Department of Commerce held that extra-record
discovery was appropriate when reviewing an equal protection
challenge to the Department of Commerce's addition of a citizenship
question to the census, noting that limiting itself to the
administrative record "would prevent the Court from conducting the
more expansive and searching inquiry into 'circumstantial and
direct evidence of intent' that Arlington Heights requires." 351
F. Supp. 3d 502, 668 (S.D.N.Y.), rev'd in part on other grounds,
139 S. Ct. 2551 (2019) (quoting Vill. of Arlington Heights v.
Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)). The Supreme
Court held that the extra-record discovery, while premature, "was
ultimately justified." New York, 139 S. Ct. at 2574. Although both
New York and Cook County address allegations of illicit racial
animus, which receives strict (rather than intermediate) scrutiny,
the reasoning in those cases applies to allegations of sex-based
animus as well. Intermediate scrutiny (unlike rational basis
review but like strict scrutiny) mandates an inquiry into "actual
state purposes," VMI, 518 U.S. at 535-36, so an analysis aimed at
"smoking out" illicit animus is appropriate, cf. New York, 351 F.
Supp. 3d at 667. See also Soto v. Flores, 103 F.3d 1056, 1066 (1st
Cir. 1997) (requiring evidence that gender discrimination is "a

motivating factor" in § 1983 equal protection claim brought by survivors of domestic violence).

The Court's scope of review on the constitutional claims, therefore, is not limited to the administrative record.

### D. Analysis

Because Plaintiffs have not alleged that the 2020 Rule explicitly discriminates on the basis of sex, the Court must examine both a discriminatory impact and discriminatory intent. See Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 273-75 (1979) (citing Washington v. Davis, 426 U.S. 229 (1976); Arlington Heights, 429 U.S. 252 (1977)).

As to impact, the Plaintiffs have plausibly alleged that the 2020 Rule's provisions regarding health insurance plans will cause transgender patients to "experience significantly less advantageous third-party reimbursement" for necessary healthcare services. Dkt. No. 18 ¶ 223. "For example, some of Fenway Health, Callen-Lorde, CrescentCare, and BAGLY patients' third-party payors will understand the Rollback Rule to mean that they may now offer plans that categorically exclude gender-affirming care or other sex-based treatments because HHS asserts they are not prohibited by Section 1557." Id.

The Plaintiffs also allege that the Rule was motivated by discriminatory intent in the form of animus against transgender people. Potential evidentiary sources for this claim include

"[t]he historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes," "[t]he specific sequence of events leading up to the challenged decision," and the "administrative history . . . especially where there are contemporary statements by members of the decisionmaking body." Arlington Heights, 429 U.S. at 267-268.

Plaintiffs point to, among other things, statements by Roger Severino before he was appointed as Director of OCR at HHS in January 2017. For instance, as recently as summer of 2016, he published pieces arguing that transgender people "us[e] government power to coerce everyone, including children, into pledging allegiance to a radical new gender ideology" and that transgender military personnel serving openly "dishonors the[] sacrifice" of veterans. Dkt. 18 ¶¶ 377, 379.

The government argues that the Supreme Court precluded consideration of these statements in Department of Homeland Security v. Regents of the University of California, when it declined to consider "pre- and post-election statements" by then-President Trump as "contemporary statements" probative of animus motivating the DOJ's decision to rescind DACA. 140 S. Ct. 1891, 1915-16 (2020). First, the relevant section of the Regents opinion did not command a majority of the Court. Id. Moreover, the Supreme Court noted that the cited statements in Regents were both "remote in time and made in unrelated contexts" and not made by the

"relevant actors" (i.e., the acting secretary of DHS and the Attorney General). <u>Id.</u> at 1916. But Severino, as Director of OCR at HHS, was a relevant actor. <u>Cf.</u> <u>Make the Rd. N.Y. v. Pompeo</u>, 475 F. Supp. 3d 232, 266 (S.D.N.Y. 2020) (considering "statements by high-level officials that are responsible for the . . . framework represented by the government actions at issue," including statements from before their government appointments). The cited statements, along with HHS's deprioritizing of LGBTQ+ issues in the leadup to the rulemaking (including by removing LGBTQ+ health issues from its four-year strategic plan and instructing staff at the Centers for Disease Control and Prevention not to use "transgender" in its 2019 budget request), raise a plausible inference that anti-transgender animus was a motivating factor in the decision to promulgate the 2020 Rule.

## ORDER

Defendants' motion to dismiss for lack of jurisdiction (Dkt. 21) is **ALLOWED** in part as to the enforcement scheme, the prohibition on association discrimination, the notice and taglines requirement, and the amendments to related regulations and **DENIED** in part as to the scope of covered entities, the prohibition on categorical coverage exclusions, and Title IX's abortion

exemption. Defendants' motion to dismiss Count III for failure to
state a claim (Dkt. 21) is **DENIED**.


SO ORDERED.

                              /s/ PATTI B. SARIS
                              Hon. Patti B. Saris
                              United States District Judge