# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BAGLY, *et al.*,

               Plaintiffs,

  v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*

               Defendants.

Civil Action No. 20-cv-11297-PBS

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

    A.     Regulatory History & Legal Background ...................................................... 4

    B.     Factual Background ........................................................................................ 6

          1.     The Rollback Rule Has Led To Changes In The Provision Of
               Health Care For LGBTQI+ Individuals ............................................ 7

          2.     The Rollback Rule Has Led To Changes In The Provision Of
               Health Care For People Who Are, Have Been, Or May Become
               Pregnant ............................................................................................ 8

    C.     Procedural History ....................................................................................... 10

          1.     Plaintiffs File Suit ........................................................................... 10

          2.     This Court Denies Defendants' Motion To Dismiss ......................... 11

          3.     The Parties Agreed To Stay The Litigation ...................................... 12

STANDARD OF REVIEW ................................................................................................ 14

ARGUMENT ..................................................................................................................... 16

    A.     This Court Should Vacate The Rollback Rule's Discrete Provisions .......... 16

          1.     This Court Should Vacate The Rollback Rule's Repeal Of The
               Definition Of Discrimination "On The Basis Of Sex." ................... 16

               a.     The Rollback Rule's Interpretation Of Discrimination
                     "On The Basis Of Sex" Is Contrary To Law Because It
                     Is Foreclosed By The Text Of Section 1557 ....................... 18

               b.     HHS Failed To Adequately Explain Its Change In
                     Position Regarding The Definition Of Discrimination
                     "On The Basis Of Sex." ...................................................... 22

          2.     This Court Should Vacate The Rollback Rule's Incorporation
               of Title IX's Religious-Institution and Abortion-Provision-and-
               Coverage Exemptions ....................................................................... 26

**TABLE OF CONTENTS—Continued**

Page(s)

    a.    HHS's Adoption Of The Religious Exemption Is Contrary To Law Because It Is Foreclosed By The Text Of Section 1557 ...................................................................26

    b.    HHS's Adoption Of The Abortion Exemption Is Contrary To Law Because It Is Foreclosed By The Text Of Section 1557 ...................................................................29

    c.    HHS's Adoption Of Title IX's Exemptions Is Arbitrary And Capricious Because HHS Failed To Consider Important Aspects Of The Problem And Did Not Adequately Explain Its Change In Position ........................................30

3.    This Court Should Vacate The Rollback Rule's Interpretation Of "Health Program Or Entity" And Enjoin Defendants From Enforcing Section 1557 Pursuant To This Interpretation ...............................34

    a.    The Rollback Rule Improperly Exempts Health Coverage Issuers and Administrators ....................................34

    b.    The Rollback Rule Improperly Exempts Certain Programs And Activities That HHS Administers, Including The Indian Health Service ....................................37

    c.    The Rollback Rule Improperly Excludes From Section 1557's Scope Any Part Of A Health Program Or Activity Not Principally Engaged In Providing Health Care, Unless That Particular Part Receives Federal Financial Assistance...............................................................39

B.    In The Alternative, This Court Should Vacate The Rollback Rule In Its Entirety...................................................................................................42

1.    This Court Should Vacate The Rollback Rule Because It Was Motivated By Impermissible Bias ...................................................42

    a.    HHS's Bad Faith In Promulgating The Rule Violates The APA .......................................................................42

    b.    At A Minimum, HHS Failed To Consider An Important Aspect Of The Problem: The Risk Of Discrimination Against LGBTQI+ Persons, Women, and Pregnant People In Accessing Health Care......................................47

**TABLE OF CONTENTS—Continued**

**Page(s)**

2.   This Court Should Vacate The Rollback Rule In Its Entirety
     Because HHS Failed to Conduct an Adequate Regulatory
     Impact Analysis ............................................................................................49

CONCLUSION............................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*A.C. by M.C. v. Metro. Sch. Dist.*,
   75 F.4th 760 (7th Cir. 2023) ................................................18

*Adams v. Sch. Bd.*,
   57 F.4th 791 (11th Cir. 2022) ................................................18

*Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*,
   No. 26 MAP 2021, 2024 WL 318389 (Pa. Jan. 29, 2024)....................20

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
   215 F.3d 61 (D.C. Cir. 2000) ................................................33

*Associated Fisheries of Maine, Inc. v. Daley*,
   127 F.3d 104 (1st Cir. 1997)................................................14, 16

*Barber v. Thomas*,
   560 U.S. 474 (2010).........................................................29

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002).........................................................30

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
   838 F.3d 42 (1st Cir. 2016).................................................14

*Bostock v. Clayton County*,
   140 S. Ct. 1731 (2020)................................................. *passim*

*Boyden v. Conlin*,
   341 F. Supp. 3d 979 (W.D. Wis. 2018) ......................................19

*C.P. by and through Pritchard v. Blue Cross Blue Shield of Ill.*,
   No. 3:20-cv-06145, 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022)...............18, 35, 46, 47

*California v. BLM*,
   277 F. Supp. 3d 1106 (N.D. Cal. 2017) .....................................49

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................14

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)................................................. *passim*

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Chipman v. Grant Cnty. Sch. Dist.*,
    30 F. Supp. 2d 975 (E.D. Ky. 1998) ......................................................20

*Cohen v. Brown Univ.*,
    991 F.2d 888 (1st Cir. 1993) ..................................................................41

*Conley v. Nw. Fla. State Coll.*,
    145 F. Supp. 3d 1073 (N.D. Fla. 2015)...................................................19

*Consol. Rail Corp. v. Darrone*,
    465 U.S. 624 (1984)................................................................................35

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
    543 U.S. 157 (2004)................................................................................38

*Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) ................................................................49

*D.C. Fed. of Civic Assocs. v. Volpe*,
    459 F.2d 1231 (D.C. Cir. 1972)..............................................................43

*Davis v. Monroe Cnty. Bd. Of Educ.*,
    526 U.S. 629 (1999)................................................................................20

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020)............................................................................16

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022)...................................................................9, 10, 32

*Doe v. C.A.R.S. Prot. Plus, Inc.*,
    527 F.3d 358 (3d Cir. 2008)....................................................................20

*Doe v. Maher*,
    515 A.2d 134 (Conn. Super. Ct. 1986) ..................................................21

*Doe v. Mercy Catholic Med. Ctr.*,
    850 F.3d 545 (3d Cir. 2017)....................................................................36

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022) ..................................................................18

*Dorer v. Quest Diagnostics Inc.*,
    20 F. Supp. 2d 898 (D. Md. 1998)..........................................................37

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Hogar Agua y Vida en el Desierto, Inc. v. Suarez-Medina,*
  36 F.3d 177 (1st Cir. 1994) ................................................................39

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ...............................................................24, 33

*Erickson v. Bartell Drug Co.,*
  141 F. Supp. 2d 1266 (W.D. Wash. 2001) ................................................21

*Fain v. Crouch,*
  618 F. Supp. 3d 313 (S.D.W. Va. 2022) ...............................................18

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...............................................2, 15, 17, 22

*Franciscan All., Inc. v. Azar,*
  414 F. Supp. 3d 928 (N.D. Tex. 2019) ...............................................21

*Franciscan All., Inc. v. Burwell,*
  227 F. Supp. 3d 660 (N.D. Tex. 2016) ...............................................24, 28

*Grabowski v. Ariz. Bd. of Regents,*
  69 F.4th 1110 (9th Cir. 2023) ...............................................18

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020) ...............................................18

*Grove City College v. Bell,*
  465 U.S. 555 (1984) ...............................................41

*Hall v. Lee Coll.,*
  932 F. Supp. 1027 (E.D. Tenn. 1996) ...............................................20

*Hammons v. Univ. of Md. Med. Sys. Corp.,*
  649 F. Supp. 3d 104 (D. Md. 2023) ...............................................18

*Hogan v. Ogden,*
  No. 06-CV-5078, 2008 WL 2954245 (E.D. Wash. July 30, 2008) ...............................................20

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW
  v. Johnson Controls, Inc.,*
  499 U.S. 187 (1991) ...............................................20, 32

*Jackson v. Birmingham Bd. of Educ.,*
  554 U.S. 167 (2005) ...............................................18

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Joganik v. E. Texas Med. Ctr.*,
   No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455 (E.D. Tex. Dec. 14, 2021).......................18

*Johnson v. Koplovsky Foods, Inc.*,
   5 F. Supp. 2d 48 (D. Mass. 1998) ...........................................................................................39

*Kadel v. Folwell*,
   446 F. Supp. 3d 1 (M.D.N.C. 2020) .......................................................................................46

*Kadel v. Folwell*,
   620 F. Supp. 3d 339 (M.D.N.C. 2022) ...................................................................................32

*Kadel v. Folwell*,
   No. 1:19-CV-272, 2022 WL 17415050 (M.D.N.C. Dec. 5, 2022) ..........................................18

*King v. Burwell*,
   576 U.S. 473 (2015).............................................................................................................3, 39

*Lange v. Houston Cnty.*,
   608 F. Supp. 3d 1340 (M.D. Ga. 2022) ..................................................................................46

*Latecoere Int'l, Inc. v. U.S. Dep't. of Navy*,
   19 F.3d 1342 (11th Cir. 1994) ....................................................................................43, 45, 46

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*,
   507 U.S. 163 (1993)..........................................................................................................27, 30

*Mingo Logan Coal Co. v. EPA*,
   829 F.3d 710 (D.C. Cir. 2016) ...............................................................................................49

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..................................................................................................................15

*Murphy v. Health Care Serv. Corp.*,
   No. 22-CV-2656, 2023 WL 6847105 (N.D. Ill. Oct. 17, 2023) .............................................18

*N. Haven Bd. of Educ. v. Bell*,
   456 U.S. 512 (1982)................................................................................................................35

*N.M. Right to Choose/NARAL v. Johnson*,
   975 P.2d 841 (N.M. 1998) ......................................................................................................21

*Nat'l Ass'n of Home Builders v. E.P.A.*,
   682 F.3d 1032 (D.C. Cir. 2012) .............................................................................................49

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ............................................................................................4, 39

*Neese v. Becerra,*
  640 F. Supp. 3d 668 (N.D. Tex. 2022) ..................................................................18

*Nevada Dep't of Human Res. v. Hibbs,*
  538 U.S. 721 (2003) ...............................................................................................19

*New York v. U.S. Dep't of Health & Human Servs.,*
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ..............................................................23, 46

*New York v. U.S. Dep't of Health & Human Servs.,*
  No. 1:20-cv-05583, 2020 WL 4059929 (S.D.N.Y. July 20, 2020) ...........................5

*Pfeiffer v. Marion Ctr. Area Sch. Dist.,*
  917 F.2d 779 (3d Cir. 1990) ...................................................................................19

*Prescott v. Rady Children's Hosp.-San Diego,*
  265 F. Supp. 3d 1090 (S.D. Cal. 2017) ..................................................................19

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
  374 F.3d 1209 (D.C. Cir. 2004) ...................................................................4, 42, 50

*Relentless, Inc. v. U.S. Dep't of Com.,*
  62 F.4th 621 (1st Cir. 2023) ...............................................................14, 15, 44, 45

*Rosa v. Park W. Bank & Tr. Co.,*
  214 F.3d 213 (1st Cir. 2000) ..................................................................................19

*Sanders v. United States,*
  373 U.S. 1 (1963) ...................................................................................................28

*Scott v. St. Louis Univ. Hosp.,*
  600 F. Supp. 3d 956 (E.D. Mo. 2022) ....................................................................18

*Shays v. Fed. Election Comm'n,*
  528 F.3d 914 (D.C. Cir. 2008) ...............................................................................15

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.,*
  997 F.3d 1247 (D.C. Cir. 2021) ..............................................................................33

*Tovar v. Essentia Health,*
  342 F. Supp. 3d 947 (D. Minn. 2018) .....................................................................19

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Tummino v. Torti*,
603 F. Supp. 2d 519 (E.D.N.Y. 2009) ............................................................. *passim*

*Turic v. Holland Hosp., Inc.*,
85 F.3d 1211 (6th Cir. 1996) ..........................................................................20

*United States v. Gonzales*,
520 U.S. 1 (1997) ............................................................................................35

*United States v. Johnson*,
529 U.S. 53 (2000) ..........................................................................................27

*United States v. Rutherford*,
442 U.S. 544 (1979) ........................................................................................20

*United States v. Smith*,
499 U.S. 160 (1991) ..................................................................................27, 30

*United States v. Ven–Fuel, Inc.*,
758 F.2d 741 (1st Cir. 1985) ...........................................................................38

*United States v. Woods*,
571 U.S. 31 (2013) ..........................................................................................38

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ......................................................................25

*Util. Solid Waste Activities Grp. v. EPA*,
901 F.3d 414 (D.C. Cir. 2018) ........................................................................48

*Walker v. Azar*,
480 F. Supp. 3d 417 (E.D.N.Y. 2020) ........................................................5, 18

*Walker v. Azar*,
No. 1:20-cv-02834, 2020 WL 6363970 (E.D.N.Y. Oct. 29, 2020) ...................5

*Washington v. U.S. Dep't of Health & Human Servs.*,
482 F. Supp. 3d 1104 (W.D. Wash. 2020)........................................................6

*Washington v. U.S. Dep't of Health & Human Servs.*,
No. 2:20-cv-01105, 2020 WL 4050303 (W.D. Wash. July 16, 2020).....................5

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020) .................................................................. *passim*

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Zamora-Quezada v. HealthTexas Med. Grp. of San Antonio,*
   34 F. Supp. 2d 433 (W.D. Tex. 1998) ........................................................................... 37

**STATUTES:**

5 U.S.C. § 706 ............................................................................................................... 2

5 U.S.C. § 706(2) ....................................................................................................... 4, 16

5 U.S.C. § 706(2)(A) ....................................................................................... 4, 13, 14, 16

5 U.S.C. § 5371 .......................................................................................................... 36, 37

20 U.S.C. § 1232(d)(1) .................................................................................................. 20

20 U.S.C. § 1681(a) ...................................................................................................... 26

20 U.S.C. § 1681(a)(3) ...................................................................................... 26, 28, 29

20 U.S.C. § 1687(1) ...................................................................................................... 41

20 U.S.C. § 1687(2) ...................................................................................................... 41

20 U.S.C. § 1687(3) ...................................................................................................... 41

20 U.S.C. § 1687(4) ...................................................................................................... 41

20 U.S.C. § 1688 .......................................................................................................... 26

42 U.S.C. § 300gg-3 .................................................................................................... 36

42 U.S.C. § 300gg-91(b)(1) ......................................................................................... 37

42 U.S.C. § 18023(a)(1) .............................................................................................. 30

42 U.S.C. § 18023(c)(2) .............................................................................................. 32

42 U.S.C. § 18113 ........................................................................................................ 27

42 U.S.C. § 18113(b) ................................................................................................... 37

42 U.S.C. § 18116 ..................................................................................................... 5, 35

42 U.S.C. § 18116(a) ........................................................................................... *passim*

42 U.S.C. § 18116(b) ................................................................................................... 32

## TABLE OF AUTHORITIES—Continued

**Page(s)**

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 ...................................20

**REGULATIONS:**

34 C.F.R. § 106.40 ...........................................................................................................19

45 C.F.R. § 92.3(a)(2) ........................................................................................................3

45 C.F.R. § 92.3(b) ..............................................................................................34, 39, 40

45 C.F.R. § 92.3(c) ...................................................................................................34, 35

45 C.F.R. § 92.4 ..............................................................................................................17

45 C.F.R. § 92.6(b) ............................................................................................................2

45 C.F.R. § 92.206 ..........................................................................................................17

45 C.F.R. § 92.207 ..........................................................................................................17

39 Fed. Reg. 22,228 (June 20, 1974) .............................................................................20

40 Fed. Reg. 24,128 (June 4, 1975) ...............................................................................19

45 Fed. Reg. 30,955 (May 9, 1980) ...............................................................................19

81 Fed. Reg. 31,376 ..........................................................................................................2

81 Fed. Reg. at 31,379 ....................................................................................................29

81 Fed. Reg. at 31,380 ....................................................................................................31

81 Fed. Reg. at 31,387 ....................................................................................................16

81 Fed. Reg. at 31,388 ....................................................................................................23

81 Fed. Reg. at 31,434 ....................................................................................................19

81 Fed. Reg. at 31,444 ....................................................................................................48

81 Fed. Reg. at 31,460 ..............................................................................................23, 47

82 Fed. Reg. 8,351 (Jan. 20, 2017) ...............................................................................42

85 Fed. Reg. 37,160 (June 19, 2020) ...............................................................................1

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

85 Fed. Reg. 37,160 ...........................................................................................46

87 Fed. Reg. 47,829 ...........................................................................................38

**RULE:**

Fed. R. Civ. P. 56(c) ..........................................................................................14

**OTHER AUTHORITIES:**

Black's Law Dictionary (10th ed. 2014)...........................................................28

*Block Religious Liberty Bill Concerning Same-Sex Marriage*, The Daily Signal
    (Mar. 9, 2016), https://perma.cc/KA2U-NPHS .......................................44

Jim DeMint & Roger Severino, *Commentary: Court Should Reject Obama's
    Radical Social Experiment* (Nov. 7, 2016),
    https://www.inquirer.com/philly/opinion/20161107_Commentary__Court_sho
    uld_reject_Obama_s_radical_social_experiment.html.........................................44

Dan Diamond, *Trump Policy Shop Filters Facts to Fit His Message*, Politico (July
    28, 2018), https://politi.co/3fcJokc. .........................................................45

Exec. Order No. 13,563 § 1(b)........................................................................4, 49

Health Care and Education Reconciliation Act of 2010, 156 Cong. Rec. S. 1,821
    (daily ed. Mar. 23, 2010) .............................................................................4

Letter from Leon Rodriguez, Dir., U.S. Dep't of Health & Human Servs., Off. for
    Civil Rights, to Maya Rupert, Federal Policy Director, Nat'l Ctr. for Lesbian
    Rts. (July 12, 2012), https://perma.cc/RB8V-ACZU............................................25

Letter from Sunu Chandy, Deputy Dir. for Civil Rts., Dep't of Health & Hum.
    Servs., to Marcia D. Greenberger, NWLC, & Dr. Jay Gogue, President,
    Auburn Univ. (Jan. 19, 2017), https://perma.cc/5QX2-329M.................................25

Letter from Sunu Chandy, Deputy Dir. for Civil Rts., Dep't of Health & Hum.
    Servs., to Marcia D. Greenberger, NWLC, & Frank T. Brogan, Chancellor,
    Pa. State Sys. of Higher Educ. (Jan. 19, 2017), https://perma.cc/ZRG3-GSFG.....................25

Letter from Sunu Chandy, Deputy Dir. for Civil Rts., Dep't of Health & Hum.
    Servs., to Marcia D. Greenberger, NWLC, & Jeffrey Wadsworth, President &
    CEO, Batelle Mem'l Inst. (Jan. 19, 2017), https://perma.cc/U8YT-H7ZF .............................25

**TABLE OF AUTHORITIES—Continued**

Page(s)

Letter from Sunu Chandy, Deputy Dir. for Civil Rts., Dep't of Health & Hum.
  Servs., to Marcia D. Greenberger, NWLC, & Thayne M. McCulloh, President,
  Gonzaga Univ. (Jan. 19, 2017), https://perma.cc/BJX4-A6N5 .................................................25

Elizabeth Nash et al., Guttmacher Inst., *State Policy Trends 2019: A Wave of
  Abortion Bans, But Some States Are Fighting Back* (Dec. 10, 2019),
  https://www.guttmacher.org/article/2019/12/state-policy-trends-2019-wave-
  abortion-bans-some-states-are-fighting-back ...........................................................................32

Emily O'Hara, *Trump Administration Removes LGBTQ Content From Federal
  Websites*, NBC News (Jan. 24, 2017), https://nbcnews.to/31SgD8g.......................................45

*Pentagon's Radical New Transgender Policy Defies Common Sense*, CNSNews
  (July 1, 2016), https://perma.cc/VK37-5FP7 ...........................................................................44

Sandhya Raman, *Trump Administration Swayed by Conservative Think Tank on
  Abortion, LGBT Decisions, Group Says*, Roll Call (Apr. 25, 2019).......................................44

*Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or
  Are Experiencing Pregnancy Loss*, Ctrs. for Medicare & Medicaid Servs.
  (Sept. 17, 2022), https://www.cms.gov/files/document/qso-21-22-hospital-
  revised.pdf ...............................................................................................................................31

Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies
  Are Required to Ensure Equality of Opportunity* ....................................................................20

Roger Severino, *DOJ's Lawsuit Against North Carolina Is Abuse of Power, The
  Daily Signal (May 9, 2016) https://perma.cc/3FFM-KFMB.* .................................................44

Roger Severino, *Filibusted: Missouri Democrats Fail to Block Religious Liberty
  Bill Concerning Same-Sex Marriage*, The Daily Signal (Mar. 9, 2016),
  https://perma.cc/KA2U-NPHS..................................................................................................44

Roger Severino, *Pentagon's Radical New Transgender Policy Defies Common
  Sense*, CNSNews (July 1, 2016), https://perma.cc/VK37-5FP7 .............................................44

Sejal Singh et al., *The Trump Administration Is Rolling Back Data Collection on
  LGBT Older Adults*, Ctr. for Am. Progress (Mar. 20, 2017),
  https://ampr.gs/3iA7reN...........................................................................................................45

*Trump Administration Removes LGBTQ Content From Federal Websites*, NBC
  News (Jan. 24, 2017), https://nbcnews.to/31SgD8g ................................................................45

# INTRODUCTION

Section 1557 of the Patient Protection and Affordable Care Act ("ACA") prohibits discrimination in health care on the basis of a person's sex, race, color, national origin, age, and disability. In 2020, the U.S. Department of Health and Human Services ("HHS") promulgated a regulation that undermines Section 1557's nondiscrimination provision. *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) (codified at 42 C.F.R. pts 438, 440, 460) (the "Rollback Rule" or the "Rule"). Because HHS rolled back earlier interpretations of Section 1557 that had protected the Plaintiffs, Plaintiffs brought this suit. However, the early stages of this litigation straddled the 2020 presidential election and the resulting change in administration. Consequently, not long after this Court partially denied HHS's motion to dismiss, HHS assured the Plaintiffs, this Court, and the greater public that it would fix the problems in the Rollback Rule by promulgating a new regulation. That was three years ago. Although HHS claims to be on the verge of promulgating a new rule, it has been making that claim for months, and Plaintiffs cannot wait forever. While HHS works on a new rule, the Rollback Rule remains in effect and continues to harm Plaintiffs. What is more, the calendar inches closer to another election, and another potential change in administration. This Court should resolve Plaintiffs' claims now and set guardrails to govern Section 1557 rulemaking that will apply to future interpretations of the statute.

Plaintiffs are entitled to partial summary judgment on their Administrative Procedure Act ("APA") claims. Three sets of the Rollback Rule's individual provisions cannot withstand scrutiny, because they conflict with the statute that they purport to implement, because the agency's decision to adopt those provisions was arbitrary and capricious, or both. Two additional errors in the Rollback Rule are similarly unlawful and require vacatur of the entire rule.

*First*, the Rollback Rule eliminated HHS's earlier definition of discrimination "on the basis of sex," which had included, among other things, discrimination based on sexual orientation, gender identity, and pregnancy, including termination of pregnancy, and express prohibitions on discrimination based on gender identity, claiming that this definition was not "consistent" with purportedly authoritative interpretations of Title IX. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,467 (former 45 C.F.R. § 92.4), 31,471-72 (former 45 C.F.R. §§ 92.206, 92.207), 27,854 (May 18, 2016) (the "2016 Rule"). However, it is the Rollback Rule that defies longstanding authority and is therefore statutorily foreclosed at *Chevron* Step One. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984). HHS's interpretation is also arbitrary and capricious, *see* 5 U.S.C. § 706, in that HHS failed to adequately explain its change in position. Although HHS acknowledged it was reversing course from the 2016 Rule, its explanation falls short of the required standard of a *reasoned* explanation for the change, *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), especially in light of the Supreme Court's rejection of HHS's narrow understanding of discrimination on the basis of sex in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). This Court should vacate these provisions constraining the definition of sex discrimination.

*Second*, the Rollback Rule unlawfully imports two cherry-picked exemptions from Title IX—the "religious exemption" and "abortion-provision-and-coverage exemption"—into the health care context. 45 C.F.R. § 92.6(b). Title IX has numerous exemptions; selectively adopting these two cannot be reconciled with Section 1557's text or with the APA's requirement of reasoned decision making. Among other problems, there is no way to incorporate these exemptions without also incorporating their focus on the educational context. And importing the abortion-provision-and-coverage exemption is foreclosed given the existence of abortion-specific provisions

2

elsewhere in the ACA. These provisions thus fail at *Chevron* Step One. HHS's decision to insert these exemptions was also arbitrary and capricious because HHS failed to consider the harm they would cause, and it failed to adequately explain why its views on these harms had changed since the 2016 Rule. This Court should vacate the exemption provisions.

*Third*, the Rollback Rule adopted a definition of "health program or entity" that improperly excludes health coverage issuers and administrators, improperly exempts certain programs that HHS itself administers, and improperly narrows the reach of the regulation's nondiscrimination provisions within a covered entity. 45 C.F.R. § 92.3(a)(2), (b), (c). No matter how HHS slices and dices the text of the statute, its attempts to exempt regulated entities are not persuasive. HHS cannot reasonably contend that a nondiscrimination provision in a health coverage statute does not apply to health coverage. *See King v. Burwell*, 576 U.S. 473, 478-80 (2015) (explaining that the ACA is "a series of interlocking reforms designed to expand coverage in the individual health insurance market"). Nor is it reasonable for HHS to largely exempt itself from a nondiscrimination provision that it has been charged with administering. And HHS cannot reasonably wall off Section 1557's application to only specific subparts of certain covered entities. These provisions also fail at *Chevron* Step One and violate the APA's requirement of reasoned decision making.

*Fourth*, the Rollback Rule violates the APA by betraying the drafters' biases. The Rule itself evinces animus toward, and negative stereotypes about, transgender people and their health care. And the decisionmakers that developed the Rule spoke openly about their prejudice in the leadup to its promulgation. This type of "subjective bad faith" by agency decision-makers "constitutes arbitrary and capricious action." *Tummino v. Torti*, 603 F. Supp. 2d 519, 542 (E.D.N.Y. 2009) (citations omitted) (collecting cases). At a minimum, HHS failed to consider an important aspect of the problem: the likely risk of discrimination—motivated by bias—against

LGBTQI+ persons, women, and pregnant people in accessing health care. Because these errors permeate the Rollback Rule, it should be vacated in its entirety.

*Fifth*, HHS failed to conduct an adequate regulatory impact analysis. Instead, HHS leaned on purported savings associated with repealing notice-and-tagline requirements and discounted the costs of discrimination because they could not be easily quantified. But HHS is not entitled simply to disregard costs that are uncertain or difficult to quantify. The "mere fact" that the effect of a rule "is uncertain is no justification for disregarding the effect entirely." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004). HHS's analysis does not add up to a "reasoned determination that [a regulation's] benefits justify its costs." Exec. Order No. 13,563 § 1(b). HHS's arbitrary cost-benefit analysis also counsels in favor of full vacatur.

This Court should grant Plaintiffs' Motion for Partial Summary Judgment, "hold unlawful and set aside" the Rollback Rule as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2), (2)(A), and vacate both the challenged provisions and the Rule as a whole.

## **BACKGROUND**

### A.  **Regulatory History & Legal Background.**

Passed in 2010, the ACA, Pub. L. No. 111-148, 124 Stat. 119, is "a comprehensive national plan" to "increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538-39, 583 (2012). As the cornerstone of Congress's efforts to "remedy the shameful history of invidious discrimination and the stark disparities in outcomes in our health care system" and "ensure that all Americans are able to reap the benefits of health insurance reform equally, without discrimination," Congress included Section 1557, which prohibits discrimination on the basis of race, color, national origin, sex, disability, and age in health programs or activities receiving federal financial assistance. Health

Care and Education Reconciliation Act of 2010, 156 Cong. Rec. S. 1,821, 1,842 (daily ed. Mar. 23, 2010) (statement of Sen. Patrick Leahy); 42 U.S.C. § 18116.

Plaintiffs incorporate by reference the regulatory history of Section 1557, including the promulgation of the 2016 Rule and the Rollback Rule, as described in the Amended Complaint. *See* Amended Complaint ("Am. Compl.") ¶¶ 86-188, ECF No. 18.

In the wake of HHS's promulgation of the Rollback Rule, several different parties filed suit to prevent the Rule's enforcement and to revive certain aspects of the 2016 Rule. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 1:20-cv-01630, 2020 WL 3444030 (D.D.C. June 22, 2020); Compl., *Walker v. Azar*, No. 1:20-cv-02834 (E.D.N.Y. June 26, 2020), ECF No. 1; *Washington v. U.S. Dep't of Health & Human Servs.*, No. 2:20-cv-01105, 2020 WL 4050303 (W.D. Wash. July 16, 2020); *New York v. U.S. Dep't of Health & Human Servs.*, No. 1:20-cv-05583, 2020 WL 4059929 (S.D.N.Y. July 20, 2020). Courts issued partially overlapping injunctions in two of those suits. *See Walker v. Azar*, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 64-65 (D.D.C. 2020). Both courts determined that the 2020 Rule likely violated the APA, yet the chosen remedies slightly differed. *See Walker*, 480 F. Supp. 3d at 429-30; *Whitman-Walker*, 485 F. Supp. 3d at 41-42. In *Walker*, the preliminary injunction reinstates the 2016 Rule's definitions of "on the basis of sex," "gender identity," and "sex stereotyping," and stays the repeal of 45 C.F.R. Section 92.206. *See* 480 F. Supp. 3d at 430; *Walker v. Azar*, No. 1:20-cv-02834, 2020 WL 6363970, at *4 (E.D.N.Y. Oct. 29, 2020).[1] By contrast, the preliminary injunction in *Whitman-Walker* revives the 2016 Rule's definition of "on the basis of sex" only insofar as it includes "discrimination on the

---

[1] It is unclear whether the *Walker* injunction reinstates the definition of "on the basis of sex" with respect to pregnancy and termination of pregnancy, making further clarification from this Court critical.

basis of sex [stereotyping]," and enjoins HHS "from enforcing [the 2020 Rule's] incorporation of the religious exemption contained in Title IX." 485 F. Supp. 3d at 64. Further, the court concluded that HHS had failed to adequately weigh the impact incorporation of the religious exemption might have on access to health care. *Id.*

All ongoing challenges the Rollback Rule are currently stayed.[2] *See Chinatown Serv. Ctr. v. U.S. Dep't of Health & Human Servs*, *et al.*, No. 21-cv-00331 (D.D.C. May 27, 2021); Joint Mot. for Stay of Proceedings at 3, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 1:20-cv-01630-JEB (D.D.C. Feb. 16, 2021), ECF No. 70; Minute Order (D.D.C. Feb. 16, 2021); Unopposed Mot. For A Stay of Proceedings at 2, *New York v. U.S. Dep't of Health & Human Servs*, No. 1:20-cv-05583-AKH (S.D.N.Y. Feb. 10, 2021), ECF No. 139, Order at 1, No. 20-3827 (2d Cir. May. 18, 2021)); Order at 8, *Asapansa-Johnson Walker v. Azar II*, No. 1:20-cv-02834-FB (E.D.N.Y. Oct. 29, 2020), ECF No. 34.[3]

On July 25, 2022, Defendants issued a notice of proposed rulemaking regarding Section 1557 of the ACA. HHS submitted a draft of the new final rule to OIRA on December 21, 2023. ECF No. 132. The final rule has not yet been promulgated. All aspects of the 2020 Rollback Rule—other than those enjoined in *Walker* and *Whitman-Walker*—remain in effect today.

### B.  Factual Background.

The Defendants' promulgation of the Rollback Rule has had substantial negative effects on the health care landscape, including, *inter alia¸* the provision of health coverage and health care

---

[2] The State of Washington's case was dismissed for lack of standing. *See Washington v. U.S. Dep't of Health & Human Servs.*, 482 F. Supp. 3d 1104, 1122 (W.D. Wash. 2020).

[3] HHS appealed both adverse preliminary injunction decisions. *See Walker v. Azar*, USCA No. 20-3827 (D.C. Cir. Nov. 10, 2020); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, USCA No. 20-5331 (2d Cir. Nov. 9, 2020). Both appeals have been held in abeyance. *See* Joint Mot. To Stay Appeal at 3, No. 20-5331, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.* (D.C. Cir. Feb. 16, 2021); Order at 1, No. 20-5331 (D.C. Cir. May 14, 2021); Joint Mot. To Stay Appeal at 3, No. 20-3827, *Asapansa-Johnson Walker v. Azar II* (2d Cir. Mar. 15, 2021); Order at 1, No. 20-3827 (2d Cir. May 18, 2021).

for people protected by Section 1557.

> 1.     **The Rollback Rule Has Led To Changes In The Provision Of Health Care For LGBTQI+ Individuals.**

The Rollback Rule emboldens discriminatory practices by insurance companies and creates barriers to care for LGBTQI+ individuals, as health care providers and insurers received a greenlight to deny coverage or treatment based on gender identity, sexual orientation, and sex stereotyping. This has resulted in LGBTQI+ individuals being denied access to essential health services, such as gender affirming care. For example, since the Rollback Rule, the insurer of Ebony Eva Harper, a transgender woman, has denied her certain types of gender affirming care. Ex. A, Declaration of Tony Hoang ("Hoang Decl.") ¶ 22; *see also* Ex. B, Declaration of Patrick McGovern ("McGovern Decl.") ¶¶ 15, 19; *see generally* Ex. C, Declaration of Alice Reiner ("Reiner 2024 Decl.). Similarly, CrescentCare recently performed a pap smear on a transgender man, but when the claim was submitted to the patient's plan, it was denied, citing changes to the patient's gender designation for the reason for denial. *Id.* ¶ 18. These denials support the statistics that commenters raised: that "[t]wenty-five percent of respondents experienced a problem with their insurance . . . related to their being transgender, including being denied coverage for care related to gender transition." Ex. D, Sagar Decl. ¶ 3(d) at 5 (citation omitted). The increase of insurance denials under the Rule has a direct correlation to an increase in un-and under-treated conditions in patients which, in turn, creates a greater burden of time and resources on health care providers. McGovern Decl. ¶¶ 30-31.

The Rollback Rule has also created a discriminatory landscape affecting members of Equality California in Texas, Nebraska, Kentucky, Kansas, Louisiana, Arizona, Mississippi, and other states that are hostile to protecting LGBTQI+ health care. Hoang Decl. ¶ 12. Without robust anti-discrimination protections, its members are at a substantial risk of experiencing discrimination

or denials of care, including potentially in emergency situations. *Id.* ¶ 13; *see also* McGovern Decl. ¶¶ 13-15. If one of Equality California's members has a medical emergency in any of those states, a hospital could refuse to treat them because they are transgender, could misgender them, or, as discussed below, could deny them life-saving emergency abortion care. *Id.* ¶ 13.

Simply put, as predicted by commenters, the Rollback Rule has "only serve[d] to amplify [LGBTQI+ peoples' health] disparities." Sagar Decl. ¶ 3(b).

2.    **The Rollback Rule Has Led To Changes In The Provision Of Health Care For People Who Are, Have Been, Or May Become Pregnant.**

The Rollback Rule emboldens covered health entities to deny critical reproductive and pregnancy-related health care and information and foments increased fear of such discrimination, leading to adverse health outcomes. *See* Ex. E, Declaration of Rachael Lorenzo ("Lorenzo Decl.") ¶ 25. For many who have had an abortion or suffered a miscarriage, the Rule has increased fear of discrimination based on those reproductive health decisions or prior pregnancy outcomes, which in turn has caused people to delay or forgo all types of health care. *See id.* ¶ 13, 15. For those seeking care to support their pregnancy, the Rule has reduced perceived protections against substandard or culturally insensitive maternity care, again causing pregnant patients to forgo care and exacerbating the maternal mortality crisis, particularly for pregnant Indigenous and Black people. *See id.* ¶ 19. For those seeking to terminate their pregnancy, the Rule has greenlit refusals to provide complete and accurate information about pregnancy options, leading to delays in care and adverse outcomes. *See id.* ¶ 8.

The Rollback Rule has particularly harmed those facing pregnancy-related emergencies. *Id.* ¶¶ 8, 9. For example, Plaintiff Indigenous Women Rising ("IWR") has received a substantial uptick in calls from clients suffering pregnancy complications for which emergency abortion care is the necessary treatment but who have been denied that care by the hospitals in their communities.

8

*Id.* ¶ 11. These individuals have been forced to seek assistance from abortion funds like IWR to travel away from their home communities to access life- and health-saving emergency abortion care. *Id.* The Rule's deletion of express regulatory protections for pregnant individuals in these circumstances and incorporation of exemptions greenlights these denials of care, jeopardizing patient health and increasing costs on support organizations like IWR. *Id*. ¶¶ 13-14.

When health care, including pregnancy and abortion care, is delayed or denied, costs rise. For example, due to the lack of clear guidance on federal protections against discrimination in the Rollback Rule, the average amount of grant funding IWR provides to each of its clients has increased significantly since its last declaration, and overall funding outlays have skyrocketed.[4] *Id.* ¶¶ 6, 8, 14. Likewise, IWR has been forced to expand operations to meet increased demand for nondiscriminatory, stigma-free pregnancy-related doula and midwifery care. *Id.* ¶ 17–20.

Commenters predicted these outcomes, explaining that without robust nondiscrimination protections health care "providers have invoked personal beliefs to deny access to health insurance and an increasingly broad range of health care services, including, birth control, sterilization, certain fertility treatments, abortion, transition-related care for transgender individuals, and end of life care." Sagar Decl. ¶ 3(f). Commenters presented evidence that these denials would particularly impact Black women, who are more likely to need to seek reproductive health care at religiously-affiliated health care institutions and are also more likely to experience pregnancy complications that require services and procedures prohibited at religiously-affiliated institutions. *Id*. ¶ 3(f). Commenters raised that one in every six patients is treated at a Catholic health care institution, and religious hospitals are increasingly the *only* available option in many regions. *Id*. ¶ 3(g).

---

[4] While multiple factors have contributed to this strain, including the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Org*., 597 U.S. 215 (2022), HHS's decision to target abortion in the Rollback Rule rather than clarify federal nondiscrimination requirements has only compounded the harm. Lorenzo Decl. ¶¶ 12, 16.

Commenters further explained that refusals of maternity care and coverage would have devastating consequences for Black and Indigenous people in particular, who are already suffering extreme rates of death from pregnancy. *Id*. ¶ 3(ff). Indeed, pregnancy-related complications are one of the ten leading causes of death for Black people capable of pregnancy between the ages of 15-34 years. *Id*. ¶ 3(pp) at 61 (citation omitted). Commenters also explained that denial of family planning services result in increased unintended pregnancies, which in turn lead to poor birth outcomes, maternal health complications, and economic hardship and insecurity. *Id*. ¶ 3(ddd). A study cited by one commenter found that carrying an unwanted pregnancy to term quadrupled the odds that the parent and child would live below the federal poverty lines. *Id*.

The Rollback Rule sows confusion and signals to health care entities that they can refuse to provide complete and accurate information about pregnancy and abortion care, deny emergency abortion care and miscarriage management, and refuse or force treatment based on a patient's past reproductive health decisions or pregnancy outcomes—all without consequence. This confusion is particularly harmful for people who live in or travel to states that have challenged federal protections for access to reproductive health care. Lorenzo Decl. ¶ 10 (discussing the harms arising from both the Rollback Rule and post-*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)). Simply put, the Rollback Rule's deletion of explicit protections against discrimination based on pregnancy and termination of pregnancy and incorporation of exemptions only exacerbates the fear of discrimination and the resultant harm to patient health. *Id.* ¶¶ 9, 15-16.

### C.    Procedural History.

#### 1.    Plaintiffs File Suit.

Shortly after the Rollback Rule was finalized, Plaintiffs filed this action. *See* ECF No. 1. Plaintiffs are a diverse group of persons and entities that are being harmed by the Rule, including a transgender man who uses health insurance and regularly needs to access medical treatment,

Hoang Decl. ¶ 19; a membership organization that advances the health and equality of LGBTQI+ people, *Id.* ¶¶ 2, 15; three private health care facilities that serve LGBTQI+ people, one of which also provides some pregnancy-related services, McGovern Decl. ¶¶ 3-4; *see also* ECF No. 27-12 (Twilbeck Decl.) ¶¶ 5, 7-8; ECF No. 27-7 (Riener Decl., Nov. 18, 2020) ¶ 3; and four health care advocacy organizations that provide a wide range of services, such as facilitating access to health care to LGBTQI+ people and reproductive and pregnancy-related health care to people who can become pregnant. Am. Compl. ¶¶ 45-71. Each health care facility has sued on behalf of itself, its patients, and others that use its services. *Id.* ¶¶ 30, 36, 44-71. Each health care advocacy organization has sued on behalf of itself and those that use their services. *Id.* ¶¶ 51, 60, 67, 71.

Plaintiffs challenge both the legality of specific provisions of the Rollback Rule and the legality of the Rule as a whole under the APA. Chiefly, Plaintiffs ask the Court to declare the Rollback Rule to be illegal, to set aside, vacate it, and to enjoin its implementation permanently.

### 2.     This Court Denies Defendants' Motion To Dismiss.

Defendants filed a motion to dismiss, ECF No. 21, which this Court largely denied, ECF No. 63. The Court found that Plaintiffs had standing to assert APA challenges as to three provisions of the Rollback Rule.[5] *First*, it found that Plaintiffs IWR and CrescentCare have organizational standing to challenge the Rule's incorporation of Title IX's abortion-provision-and-coverage exemption. ECF No. 63 at 21. *Second*, the Court found that Plaintiffs have standing to challenge the Rule's narrowed scope of covered entities. *Id.* at 24-25. *Third*, the Court found that Plaintiffs have standing to challenge the Rollback Rule's elimination of the 2016 Rule's prohibition on

---

5 The Court also held that Plaintiffs stated a claim that the Rollback Rule discriminates on the basis of sex and was motivated by animus against transgender people, in violation of the Due Process Clause of the U.S. Constitution, ECF No. 63 at 44, and concluded that intermediate scrutiny would apply to this claim, *id.* at 38-39. Plaintiffs now move for partial summary judgment. *See infra* pp.13-14.

categorical coverage exclusions for gender transition care. *Id.* at 27-28.[6]

The Court also held that Plaintiffs' claims are ripe. *See id.* at 35-36. The Court acknowledged Defendants' "stated . . . *intention*" to promulgate a new rule, but also recognized that "Plaintiffs have shown changes in coverage by several insurers and face a risk of economic injury from reduced reimbursements *now*." *Id.* at 36 (emphasis added). Because "[n]o court has enjoined the incorporation of Title IX's abortion exemption, the narrowing of the scope of covered entities, or the elimination of the prohibition on categorical coverage exclusions for care related to gender transition," and Defendants had not yet finalized a new rule on these topics, the Court held that "prudential ripeness concerns" did not counsel in favor of dismissal. *Id.* at 35-36.

The Court also held that Plaintiffs stated a claim that the Rollback Rule discriminates on the basis of sex and was motivated by animus against transgender people, in violation of the Due Process Clause of the U.S. Constitution, *id.* at 44, and concluded that intermediate scrutiny would apply to this claim, *id.* at 38-39.

### 3. The Parties Agreed To Stay The Litigation.

Shortly after this Court resolved the motion to dismiss, Defendants moved for voluntary remand without vacatur, and for a dismissal of Plaintiffs' Amended Complaint without prejudice. ECF No. 66. In the alternative, Defendants renewed their request for a stay, ECF No. 67 at 17, asserting that HHS would propose a new rule "no later than April 2022." *Id.* at 1.

After a hearing, this Court denied the motion for voluntary remand but granted a time-limited stay. ECF No. 83. As this Court explained, although "Defendants declare that their reconsideration of the 2020 Rule 'is based on a substantial and legitimate need to ensure the 2020

---

[6] The Court declined to address Plaintiffs' standing to challenge the repeal of the definition of "on the basis of sex," the repeal of 45 C.F.R. Section 92.206, and the incorporation of Title IX's religious exemption based on "the nationwide injunctions issued by sister courts." ECF No. 63 at 10.

Rule's provisions adequately advance the Administration's policy,'" the Defendants "cannot guarantee anything other than that the new final rule '*may* resolve or moot *some* or all of the claims that remain subject to review in this litigation.'" *Id*. at 2 (quoting ECF No. 68 ¶ 13 and ECF No. 67 at 3). At the same time, because "federal courts possess the inherent power to stay proceedings for prudential reasons," the Court granted Defendants' request for a stay "until the end of April 2022 to save both judicial and administrative resources." *Id*. at 2-3. Defendants did not propose a new rule before April 2022. The Court therefore ordered production of the administrative record (ECF No. 97), which was filed on July 18, 2022 (ECF No. 102-2).

After Defendants issued a notice of proposed rulemaking in July 2022*, see* ECF No. 104-1, the Parties filed a joint motion to stay all proceedings until thirty (30) days after Defendants publish a new final rule implementing Section 1557. ECF No. 111. Plaintiffs agreed to this stay with the expectation that Defendants would issue a final rule by "no[] later than this winter" of 2023. ECF No. 124. Defendants have not done so.

The Court issued an order that Plaintiffs' motion for summary judgment "should be filed no earlier than December 21, 2023." ECF No. 123. Because the Defendants have failed to meet their own deadline, Plaintiffs now move for summary judgment on three of the four counts in their Amended Complaint: Count I for violation of the APA, 5 U.S.C. § 706(2)(A), for agency action not in accordance with law, Count II for violation of the APA, 5 U.S.C. § 706(2)(A), for agency action that is arbitrary, capricious, and an abuse of discretion, and Count IV for violation of the APA, 5 U.S.C. § 706(2)(A), for adopting an enforcement policy narrowing the scope of covered entities that is contrary to law.[7]

---

[7] Plaintiffs agreed not to press Count IV to the extent that it alleged that "HHS adopted a general enforcement policy based on its reading of Section 1557 in the Rollback Rule and will 'return[] to' enforcing Section 1557 using 'the biological binary meaning of sex,' without regard for discrimination on the basis of, *inter alia*, sexual orientation or

**STANDARD OF REVIEW**

A motion for summary judgment must be granted if the moving party proves "that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). However, "the summary judgment rubric has a 'special twist in the administrative law context.'" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (citation omitted). Here, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id*.

The APA requires courts to "hold unlawful and set aside agency action" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's "policy choices" are "[s]ubject, of course, to statutory constraints," that courts must enforce. *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). The First Circuit recently reiterated "the familiar *Chevron* two-step analysis" in considering an agency's interpretation of a statute. *Relentless, Inc. v. U.S. Dep't of Com.*, 62 F.4th 621, 628 (1st Cir. 2023); *cert. granted*, 144 S. Ct. 325 (2023).[8] At step one, the court asks "whether Congress has directly spoken to the precise question at issue." *Id*. To determine this question, courts "apply the 'ordinary

___

transgender status." ECF No. 18 ¶ 425(a) (citation omitted). HHS's "Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972," reversed that policy. ECF No. 50 at 1. Plaintiffs therefore agree to dismiss this part of Count IV. ECF No. 51 at 6. The remaining part of Count IV addresses HHS's enforcement policy with respect to the scope of covered entities encompassed by the statutory term "any health program or activity, any part of which is receiving Federal financial assistance" and "any program or activity . . . administered by an Executive Agency or any entity established under [Title I of ACA]," 42 U.S.C. § 18116(a)." ECF No. 18 ¶ 425(b) (citation omitted). This part of Count IV remains an active controversy as discussed *infra* Section A.3.

[8] The Supreme Court granted certiorari in *Relentless* to consider whether to continue deferring to agency interpretations of statutes. Plaintiffs will advise this Court if the Supreme Court ultimately decides to alter the applicable analysis.

tools of statutory construction.'" *Id.* (citation omitted). Here, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.* "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9. This Court can and should stop at *Chevron* Step One as the statute at issue is clear and unambiguous. And even if a court reaches step two, where "the statute is silent or ambiguous with respect to the specific issue," courts should not blindly defer to the agency. *Relentless*, 62 F.4th at 628. Instead, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (citation omitted). In either case, courts must "reject administrative constructions of a statute that frustrate the policy that Congress sought to implement." *Shays v. Fed. Election Comm'n*, 528 F.3d 914, 925 (D.C. Cir. 2008) (alterations omitted).

A rule that is consistent with the law still may be set aside if it is arbitrary and capricious. An agency rule is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation omitted).

APA review further requires courts to consider an agency's prior positions. Where an agency departs from a prior policy, it must "display awareness that it is changing position," show that "there are good reasons" for the reversal, and demonstrate that its new policy is "permissible under the statute." *Fox Television Stations*, 556 U.S. at 515. The agency must also "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into

account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). It is "arbitrary and capricious to ignore such matters." *Id.*

Where the Court finds that the challenged agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the court must "hold unlawful and set aside" that action. 5 U.S.C. § 706(2), (2)(A). "[T]he normal practice is to set it aside pending further proceedings," and "a remand for further explanation while leaving the regulation in force" is a disfavored remedy. *Daley*, 170 F.3d at 32.

## ARGUMENT

### A.    This Court Should Vacate The Rollback Rule's Discrete Provisions.

The Rollback Rule is contrary to Section 1557. HHS failed to supply a reasoned explanation for its policy change from the 2016 Rule, it adopted a regulation not supported by and contrary to the evidence in the administrative record, and it failed to address important issues raised during the notice-and-comment process. This Court should therefore vacate and hold unlawful several of the Rollback Rule's individual provisions, including: (1) the deletion of the 2016 Rule's definition of discrimination "on the basis of sex" and the express prohibition on discrimination based on gender identity; (2) the selective importation of exemptions from Title IX; and (3) the narrowing of the scope of health programs and activities subject to Section 1557 by excluding many private health insurers and many of HHS' own programs.

### 1.    This Court Should Vacate The Rollback Rule's Repeal Of The Definition Of Discrimination "On The Basis Of Sex."

In its 2016 Rule, HHS defined "on the basis of sex" to include "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." 81 Fed. Reg. at 31,387. This

clarification was necessary to "reflect the current state of nondiscrimination law." *Id.* at 31,388. As such, "the definition of 'on the basis of sex' established by this rule is based upon existing regulation and previous Federal agencies' and courts' interpretations." *Id.* at 31,388.

The Rollback Rule repeals this definition of "on the basis of sex" and adopts an interpretation that is contrary to Section 1557, purportedly to make HHS's understanding of that term "more consistent" with HHS's own interpretations. 84 Fed. Reg. at 27,854-27,857; 85 Fed. Reg. at 37,162. Meanwhile, HHS "decline[d]" to insert a different definition of "sex." 84 Fed. Reg. at 27,857; 85 Fed. Reg. at 37,178.

For two reasons, this Court should vacate the Rollback Rule's elimination of the 2016 Rule's definition of "on the basis of sex," 81 Fed. Reg. at 31,467 (former 45 C.F.R. § 92.4), and express prohibitions on discrimination based on gender identity, *id.* at 31,471-72 (former §§ 92.206, 92.207), at *Chevron* Step One as impermissible interpretations of Section 1557, and also hold Defendants' actions were arbitrary and capricious. *First*, Defendants' decision to remove the 2016 Rule's protections against discrimination based on gender identity, sexual orientation, sex stereotyping, and pregnancy and related medical conditions, including termination of pregnancy, was based on their mistaken interpretation of federal civil rights law, *see* 85 Fed. Reg. at 37,168, 37,177-80; *id.* at 37,183-97, and purported desire "to restore[] the rule of law by confining regulation within the scope of the Department's legal authority." *id.* at 37,163. These positions are both contrary to the plain text of Section 1557 and flatly irreconcilable with *Bostock* and longstanding Title IX precedent. *Second*, HHS failed to fulfill its responsibility to offer sufficient explanation for this change. *See Fox Television Stations*, 556 U.S. at 515.

> **a.     *The Rollback Rule's Interpretation Of Discrimination "On The Basis Of Sex" Is Contrary To Law Because It Is Foreclosed By The Text Of Section 1557.***

Section 1557 bars sex discrimination "on the ground prohibited under . . . title IX." 42

U.S.C. § 18116(a). Title IX is "broadly written" with "a broad reach." *Jackson v. Birmingham Bd. of Educ.*, 554 U.S. 167, 175 (2005). The Supreme Court has repeatedly emphasized that Title IX must be given "a sweep as broad as its language." *Id.* at 173 (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982)). Section 1557's statutory prohibition on discrimination "on the basis of sex" therefore includes discrimination on the basis of sexual orientation, gender identity, sex stereotyping, pregnancy, and related medical conditions, including termination of pregnancy.

The Supreme Court has clarified "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," because "homosexuality and transgender status are inextricably bound up with sex." *Bostock*, 590 U.S. at 660-61. *Bostock* applied a straightforward, textual reading of Title VII's prohibition on discrimination "because of . . . sex." *Id.* After *Bostock*, the overwhelming majority of federal courts to consider the question have determined that the Supreme Court's Title VII analysis in *Bostock* applies with equal force to Title IX,[9] and in turn to Section 1557.[10] Even before *Bostock*, courts consistently held that Section 1557's prohibition on sex discrimination reaches discrimination against transgender people.[11] These courts invoked various theories, including that discrimination

---

[9] *See, e.g.*, *A.C. by M.C. v. Metro. Sch. Dist.*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 593, 619 (4th Cir. 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020); *but see Adams v. Sch. Bd.*, 57 F.4th 791, 808 (11th Cir. 2022).

[10] *See, e.g.*, *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp. 3d 104, 115-16 (D. Md. 2023); *C.P. by and through Pritchard v. Blue Cross Blue Shield of Ill.*, No. 3:20-cv-06145, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *Fain v. Crouch*, 618 F. Supp. 3d 313, 335 (S.D.W. Va. 2022); *Kadel v. Folwell*, No. 1:19-CV-272, 2022 WL 17415050, at *2 (M.D.N.C. Dec. 5, 2022); *Scott v. St. Louis Univ. Hosp.*, 600 F. Supp. 3d 956, 965 (E.D. Mo. 2022); *Murphy v. Health Care Serv. Corp.*, No. 22-CV-2656, 2023 WL 6847105, at *2 (N.D. Ill. Oct. 17, 2023); *Walker*, 480 F. Supp. 3d at 429; *Joganik v. E. Texas Med. Ctr.*, No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455, at *10 (E.D. Tex. Dec. 14, 2021); *but see Neese v. Becerra*, 640 F. Supp. 3d 668, 676-84 (N.D. Tex. 2022) (single outlier court holding that Title IX's, and thus Section 1557's, prohibition on sex discrimination does not extend to sexual orientation or gender identity discrimination).

[11] *See, e.g.*, *Boyden v. Conlin*, 341 F. Supp. 3d 979, 995-97 (W.D. Wis. 2018); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 952 (D. Minn. 2018); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099-1100 (S.D. Cal. 2017).

based on gender identity or sexual orientation is a form of sex stereotyping prohibited under federal laws protecting against sex discrimination. *See, e.g.*, *Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).[12]

Section 1557's prohibition against sex discrimination also includes discrimination on the basis of pregnancy and related medical conditions, including termination of pregnancy. This statutory interpretation has been long and widely understood, as the 2016 Rule correctly explained. *See* 81 Fed. Reg. at 31,434 & n.259. Indeed, for nearly five decades, the regulations implementing Title IX have explicitly prohibited sex discrimination on the basis of "pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom." Department of Health, Education, and Welfare, General Administration, 40 Fed. Reg. 24,128, 24,135, 24,140, 24,142 (June 4, 1975), codified at C.F.R. pt. 86[13]; *see also Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1076-79 (N.D. Fla. 2015) (upholding the Title IX regulations because, "[i]n light of the legislative history of Title IX, the broad sweep of its language, and the fact that the term 'sex' is understood in common usage to encompass pregnancy, . . . Congress's prohibition of discrimination 'on the basis of sex' unambiguously includes pregnancy-based discrimination within its purview").[14] No court

---

[12] Sex-stereotyping doctrine also protects against discrimination based on pregnancy and related medical conditions, including abortion. *See Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003) (upholding the Family Medical Leave Act as countering stereotypes about "mothers or mothers-to-be . . . that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees.") (citation omitted).

[13] Upon its creation in 1979, the Department of Education adopted the Title IX regulations originally promulgated by the Department of Health, Education, and Welfare unchanged in relevant part. *See* 45 Fed. Reg. 30,955 (May 9, 1980), codified at 34 C.F.R. § 106.40.

[14] *See also Pfeiffer v. Marion Ctr. Area Sch. Dist.*, 917 F.2d 779, 784 (3d Cir. 1990), *abrogated by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) (Title IX regulations "specifically apply its prohibition against gender discrimination to discrimination on the basis of pregnancy"); *Hogan v. Ogden*, No. 06-CV-5078, 2008 WL 2954245, at *9 & n.11, 13 (E.D. Wash. July 30, 2008) (same); *Chipman v. Grant Cnty. Sch. Dist.*, 30 F. Supp. 2d 975, 977-78 (E.D. Ky. 1998) (same); *Hall v. Lee Coll.*, 932 F. Supp. 1027, 1033 n.1 (E.D. Tenn. 1996) (same); *see also Cazares v. Barber*, No. 90-CV-0128, slip op. (D. Ariz. May 31, 1990); *Wort v. Vierling*, No. 82-3169, slip op. (C.D. Ill. Sept. 4, 1984), *aff'd*, 778 F.2d 1233 (7th Cir. 1985).

has ever held to the contrary.[15] And Congress tacitly approved this definition when the original Title IX regulations were presented to Congress for review in 1975.[16] *See United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979) ("[O]nce an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.").[17]

Discrimination on the basis of termination of pregnancy broadly encompasses both adverse action against individuals because they have obtained or sought abortion care, and also policies or practices that restrict the provision or coverage of abortion care. Because only pregnant people need abortion care, denying such medical treatment when a covered entity is competent to provide it, or denying abortion coverage from an otherwise comprehensive health plan, is a discriminatory sex-based denial of health services. *See, e.g.*, *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, No. 26 MAP 2021, 2024 WL 318389, at *62 (Pa. Jan. 29, 2024) (excluding abortion coverage from Medicaid is sex discrimination); *N.M. Right to Choose/NARAL v. Johnson*, 975

---

[15] Further, it has long been understood that Title VII—which courts routinely turn to when interpreting Title IX, *see, e.g.*, *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 651 (1999), and, in turn, Section 1557—prohibits discrimination based on pregnancy, including termination of pregnancy. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 197-99 (1991) (discrimination based on capacity for pregnancy is sex discrimination); *see also, e.g.*, *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir 2008), *order clarified*, 543 F.3d 178 (3d Cir. 2008) (discrimination based on abortion is sex discrimination); *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1213-14 (6th Cir. 1996) (same).

[16] At the time, federal law required that the Department of Health, Education, and Welfare submit regulations to Congress for review and comment; Congress then had 45 days to pass a joint resolution rejecting the regulations in whole or in part. 20 U.S.C. § 1232(d)(1). Congress held extensive hearings on the Title IX regulations and considered and rejected a number of resolutions calling for disapproval of the regulations in whole or in part. *See* Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 Marquette Sports L. Rev.11, 21 n.50 (2003). In the end, the regulatory definition of discrimination on the basis of sex as including "pregnancy" and "termination of pregnancy" (originally listed in the notice of proposed rulemaking as "abortion" and "miscarriage," 39 Fed. Reg. 22,228, 22,234–37 (June 20, 1974)) remained.

[17] Further, Congress has twice amended Title IX without ever casting doubt upon the statutory interpretation embodied in the regulations. *See* Education Amendment of 1976, Pub. L. No. 94-482, Title IV, § 412(a), 90 Stat. 2234; Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, § 3(a), 102 Stat. 28.

P.2d 841, 856 (N.M. 1998) (same); *Doe v. Maher*, 515 A.2d 134, 159 (Conn. Super. Ct. 1986) (same); *cf. Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1270-71 (W.D. Wash. 2001) (excluding contraceptive coverage from a comprehensive prescription plan is sex discrimination). Indeed, the existence of Title IX's abortion-provision-and-coverage exemption confirms that Congress understood Title IX to otherwise require abortion care and coverage. Congress's addition of this language makes clear not only that Title IX prohibits discrimination based on pregnancy and termination of pregnancy, but also that absent an explicit exception, laws prohibiting sex discrimination require the provision and coverage of abortion care when denying that care would single out pregnant people for less comprehensive treatment or coverage.

Furthermore, HHS removed the 2016 Rule's express protections against discrimination related to sexual orientation, gender identity, sex stereotyping, and pregnancy, including termination of pregnancy, based on the federal government's position in *Bostock*, and a single case granting first a preliminary injunction and then summary judgment against the 2016 Rule. *See* 85 Fed. Reg. at 37,163-64 (citing *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 669, 689 (N.D. Tex. 2016) (concluding that "HHS's expanded definition of sex discrimination [in the 2016 Rule] exceeds the grounds incorporated by Section 1557")); *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019) (vacating and remanding that portion of the 2016 Rule based on the faulty reasoning in the preliminary injunction opinion)).[18] But *Franciscan Alliance* creates no ambiguity about whether the Rollback Rule's erasure of the definition of "on the basis of sex" is contrary to law, and in no way brings that rule in line with the plain text of Section 1557.

---

[18] The Rollback Rule also references an order in *Religious Sisters of Mercy. v. Burwell*, which found the *Franciscan Alliance* preliminary injunction decision to be "thorough and well-reasoned," but did not engage in any additional analysis. *See Religious Sisters of Mercy v. Burwell*, Nos. 3:16-cv-386 & 3:16-cv-432 (D.N.D. Jan. 23, 2017) (temporarily staying enforcement of Section 1557's prohibitions against discrimination based on gender identity and termination of pregnancy against named plaintiffs in cases raising claims under the Religious Freedom Restoration Act and the First Amendment).

No court decision—including *Franciscan Alliance*—has questioned Section 1557's well-established prohibitions on pregnancy discrimination, and so erasing the term "pregnancy" from the Rollback Rule's definition of sex was clearly contrary to law. Defendants' reliance on *Franciscan Alliance* to roll back protections against discrimination based on gender identity and termination of pregnancy was no less misplaced. As to gender identity, *Franciscan Alliance*'s reasoning is contrary to the overwhelming weight of authority. *See infra* n.19. As to termination of pregnancy, the decision contravenes the plain text and intent of Section 1557's incorporation of Title IX's sex discrimination prohibition and longstanding case law and regulatory guidance. *See supra* pp. 19-21. Thus, *Franciscan Alliance* is an outlier decision that eschews precedent and lacks even persuasive authority. Further, while the preliminary injunction in *Franciscan Alliance* vacated a portion of the 2016 Rule's definition of sex discrimination, "it did not order the agency to do anything in particular when promulgating a future rule implementing Section 1557." *Whitman-Walker Clinic, Inc.*, 485 F. Supp. 3d at 41. Defendants cannot rely on this single, erroneous, and unpersuasive case to justify a regulation inconsistent with the statute it purports to implement.

> **b.    HHS Failed To Adequately Explain Its Change In Position Regarding The Definition Of Discrimination "On The Basis Of Sex."**

There is a second, separate reason for this Court to vacate the Rollback Rule: HHS's failure to adequately explain why the agency changed positions regarding the definition of discrimination on the basis of sex. Although HHS acknowledged it was reversing course from the 2016 Final Rule, its explanation falls short of the required standard of a *reasoned* explanation for the change. *See Fox Television Stations*, 556 U.S. at 515.

HHS has not sufficiently explained its decision to remove the additional clarification offered in the 2016 Rule. In 2016, HHS found that although the ACA already prohibited

discrimination based on sex, "many women and transgender individuals continue[d] to experience discrimination in the health care context," which "demonstrate[d] the need for further clarification regarding the prohibition of discrimination on the basis of sex." 81 Fed. Reg. at 31,460. Indeed, commenters presented evidence of discrimination against those groups, which Plaintiffs' own experiences further validated, indicating that the discrimination that the 2016 Rule identified remains prevalent. *See* Sagar. Decl. ¶ 3(e), (s); *see also* Hoang Decl. ¶¶ 15, 17, 19-20. If the agency were correct that the definition needed to be adjusted to better align with other interpretations, that is no reason to choose to not include a definition at all. That is precisely the kind of "disconnect between the decision made and the explanation [] given" that this Court "cannot ignore." *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 541 (S.D.N.Y. 2019) (citation omitted).

HHS also asserts that the 2016 Rule's interpretation of civil rights law was "erroneous," 84 Fed. Reg. at 27,849; 85 Fed. Reg. at 37,166, and that after *Bostock*, there remained widespread "confusion" regarding whether discrimination based on transgender status counts as sex discrimination. 85 Fed. Reg. at 37,180; *see also* 84 Fed. Reg. at 27,848. But HHS's legal analysis does not actually explain *how* that interpretation was incorrect. *See* 84 Fed. Reg. at 27,849; 85 Fed. Reg. at 37,166. To the contrary, the 2016 Rule grounded its interpretation of "sex" on a detailed survey of the extensive existing case law. *See* 81 Fed. Reg. at 31,388-92. And the 2016 Rule's analysis of the case law *was* correct. Am. Compl. ¶¶ 119-152. Indeed, nearly all federal appellate courts that have addressed the question, even before *Bostock*, concluded that Title IX's statutory prohibitions on sex discrimination encompass discrimination against transgender individuals for having a gender identity different from their sex assigned at birth. *See supra* p. 5. The Rollback Rule addressed this authority in a handful of dismissive paragraphs that did not acknowledge—let

alone respond to—this substantial body of contrary authority. *See*, *e.g.*, 84 Fed. Reg. at 27,849; 85

Fed. Reg. at 37,164 & n.15. Instead, the Rule heavily relied on *Franciscan Alliance*, which cannot

bear the weight HHS placed on it. *Supra* pp. 21-22.[19] HHS's terse explanation, which says "almost

nothing," is wholly inadequate to justify a policy reversal. *Encino Motorcars*, 579 U.S. at 223.

Indeed, the timing of HHS's promulgation of the Rollback Rule suggests that HHS hoped

to avoid having to explain its decision making. The 2019 Proposed Rule conceded that the *Bostock*

opinion "will likely have ramifications for the definition of 'on the basis of sex' under Title IX."

85 Fed. Reg. at 37,168. Multiple advocates asked HHS to wait to issue the Rollback Rule until it

could incorporate the Court's ruling. *See id.*; *see also* Sagar. Decl. ¶ 3(s). Yet HHS designated the

Rollback Rule for publication on June 19, 2020, even though the Supreme Court typically issues

all decisions by late June or early July for each Term. And the Rollback Rule itself repeatedly

relied on the Department of Justice's imperiled—and ultimately defeated—litigating position in

*Bostock*. 85 Fed. Reg. at 37,168. By rushing the Rollback Rule's publication, HHS failed to

consider the concerns raised by commenters, the prevailing textual arguments in *Bostock*, and the

risks, costs, and benefits of immediately implementing a regulation which they knew to contradict

Supreme Court precedent.

But rushing to print does not excuse HHS's failures to distinguish or explain its departures

from its own earlier interpretations. HHS claimed in the Rollback Rule that by eliminating the

2016 Rule's definition of discrimination "on the basis of sex," it was reverting to "longstanding

---

[19] HHS's reliance on *Franciscan Alliance* to support deleting the definition of "on the basis of sex" was additionally arbitrary and capricious because the only issue presented by the plaintiffs in that case was whether the 2016 Rule required them to "perform and provide insurance coverage for gender transitions and abortions." *Franciscan All., Inc.*, 227 F. Supp. 3d at 670. By vacating protections for gender identity and termination of pregnancy wholesale from the 2016 Rule, the relief granted was overbroad and injected confusion about Section 1557's prohibitions on other forms of discrimination related to gender identity and termination of pregnancy—such as harassment for being transgender, refusal of miscarriage management, or mistreatment against a patient because they sought or had an abortion in the past. Defendants' decision to perpetuate that error cannot pass muster as reasoned decision making.

statutory interpretations" of the civil rights statutes underlying Section 1557 that conformed with the government's "official position concerning those statutes." 85 Fed. Reg. at 37,161. But in 2012, the HHS Office for Civil Rights ("OCR") specifically stated, "Section 1557's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity," and it took the position that Section 1557 prohibited discrimination on the basis of sexual orientation.[20] In addition, in 2015, OCR entered into a voluntary agreement with The Brooklyn Hospital Center resolving allegations of gender identity discrimination under Section 1557. *See* 85 Fed. Reg. at 37,191. Likewise, in response to complaints filed in 2013 alleging that several health plan sponsors violated Section 1557's prohibition against pregnancy discrimination by excluding maternity coverage for dependent children, OCR initiated investigations that culminated in several of those plan sponsors voluntarily amending their plans to add that coverage effective January 1, 2016, prior to the 2016 Rule's effective date.[21] Each of the letters closing out those investigations clarified the agency's understanding that Section 1557 prohibits discrimination on the basis of, *inter alia,* "sex (including pregnancy)." *Id.*[22]

In sum, an agency's flexibility to depart from prior policies "has limits." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019). HHS's actions here

---

[20] *See* Letter from Leon Rodriguez, Dir., U.S. Dep't of Health & Human Servs., Off. for Civil Rights, to Maya Rupert, Federal Policy Director, Nat'l Ctr. for Lesbian Rts. (July 12, 2012), https://perma.cc/RB8V-ACZU.

[21] *See, e.g.*, Letter from Sunu Chandy, Deputy Dir. for Civil Rts., Dep't of Health & Hum. Servs., to Marcia D. Greenberger, NWLC, & Dr. Jay Gogue, President, Auburn Univ. (Jan. 19, 2017), https://perma.cc/5QX2-329M.

[22] *See also* Letter from Sunu Chandy, Deputy Dir. for Civil Rts., Dep't of Health & Hum. Servs., to Marcia D. Greenberger, NWLC, & Jeffrey Wadsworth, President & CEO, Batelle Mem'l Inst. (Jan. 19, 2017), https://perma.cc/U8YT-H7ZF; Letter from Sunu Chandy, Deputy Dir. for Civil Rts., Dep't of Health & Hum. Servs., to Marcia D. Greenberger, NWLC, & Thayne M. McCulloh, President, Gonzaga Univ. (Jan. 19, 2017), https://perma.cc/BJX4-A6N5; Letter from Sunu Chandy, Deputy Dir. for Civil Rts., Dep't of Health & Hum. Servs., to Marcia D. Greenberger, NWLC, & Frank T. Brogan, Chancellor, Pa. State Sys. of Higher Educ. (Jan. 19, 2017), https://perma.cc/ZRG3-GSFG.

transgress those limits.

2.   **This Court Should Vacate The Rollback Rule's Incorporation of Title IX's Religious-Institution and Abortion-Provision-and-Coverage Exemptions.**

Defendants cherry-picked Title IX's exemptions for educational institutions "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization," 20 U.S.C. § 1681(a)(3), and for the provision and coverage of abortion, 20 U.S.C. § 1688, for incorporation into the Rollback Rule. But as explained below, there is no way to incorporate Title IX's exemptions without also incorporating their focus on the educational context, which is incompatible with the text and purpose of the ACA. Likewise, the other abortion- and religion-specific provisions in the ACA foreclose incorporation of Title IX's exemptions. This Court should vacate these provisions of the Rollback Rule at *Chevron* Step One as impermissible interpretations of Section 1557 and also hold that HHS promulgated them in a manner inconsistent with the APA's protection against arbitrary and capricious agency action.

a.   ***HHS's Adoption Of The Religious Exemption Is Contrary To Law Because It Is Foreclosed By The Text Of Section 1557.***

The plain language of Section 1557 makes clear that HHS may not incorporate any of Title IX's exemptions. Section 1557 states that "[e]xcept as otherwise provided for in this title (or an amendment made by this title), an individual shall not, *on the ground prohibited* under. . . title IX of the Education Amendments of 1972 . . . be subjected to discrimination. . . ." 42 U.S.C. § 18116(a) (emphasis added). This text forecloses HHS's reading of the statute. Section 1557 refers to the cross-referenced non-discrimination statutes for the grounds on which they prohibit discrimination, and the "ground prohibited" under Title IX is "sex." *Id.*; 20 U.S.C. § 1681(a).

Further, the presence of explicit exceptions in Section 1557 rules out the possibility that further unstated exceptions were intended. Where an exception is already expressly stated in a law,

no other exceptions may be implied—"expressio unius est exclusio alterius." *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993); *see also United States v. Smith*, 499 U.S. 160, 167 (1991) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (citation omitted)). Section 1557 states that its prohibition on discrimination applies "[e]xcept as otherwise provided for in this title (or an amendment made by this title)." 42 U.S.C. § 18116(a). Elsewhere in Title I of the ACA, Congress provided various exemptions, including those of a religious nature. *See, e.g.*, 42 U.S.C. § 18113 (an exemption for those who have a religious objection to participating in aid-in-dying procedures); *id.* § 18023(c)(2)(A)(i) (stating that nothing in the Act "shall be construed to have any effect on Federal laws regarding . . . conscience protection"). "When Congress provides exceptions in a statute," "[t]he proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000). That inference applies here; Congress' decision to incorporate in Section 1557 the other exceptions in Title I of the ACA suggests that Congress did not intend any other exceptions—such as Title IX's exemption for certain religious educational institutions—to apply.

Defendants purport to justify the incorporation of the exemption by citing the *Franciscan Alliance* decision and arguing that incorporating this exemption followed "Congress's specific direction to prohibit only the ground [for discrimination] proscribed by Title IX." *See* 85 Fed. Reg. at 37,180 n.190 (citation omitted). The *Franciscan Alliance* court, in turn, reasoned that because "Congress included the signal '*et seq.*,' which means 'and the following,' after the citation to Title IX . . . Congress intended to incorporate [Title IX's] entire statutory structure, including . . . [its] religious exemptions." *Franciscan Alliance*, 227 F. Supp. 3d at 690. These arguments read far too

much into the structure of a citation and misconstrue the meaning of the term "ground."

Title IX's exemptions do not form part of "the ground," 42 U.S.C. § 18116(a), on which Title IX "prohibit[s] … discrimination"—the exemptions do not "prohibit" discrimination at all—they permit discrimination in certain circumstances. That is, the word "ground" means "the reason or point that something (as a legal claim or argument) relies on for validity." Black's Law Dictionary (10th ed. 2014); *see also*, *e.g.*, *Sanders v. United States*, 373 U.S. 1, 16 (1963) (defining "ground" to mean "a sufficient legal basis for granting the relief sought"). For that reason, the "ground" on which something is prohibited cannot include instances in which that same thing is permitted. And the format of the statutory citation within the text of Section 1557—including "*et seq.*" at the end of the statute—cannot reasonably be read to change the plain meaning of the word "ground." Thus, at least one court has already determined that "[b]y referencing the 'ground' of discrimination prohibited by Title IX, Section 1557 plainly barred discrimination on the basis of sex . . . It did not, however, explicitly incorporate Title IX's exemption of certain educational operations of entities controlled by religious organizations from its nondiscrimination mandate." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 43.

Moreover, Title IX includes an abundance of other exemptions that would be clearly absurd to incorporate in the health care context. In the very same subsection of the United States Code where Title IX's religious exemption is codified, *see* 20 U.S.C. § 1681(a)(3), a host of other organizations are granted permission to discriminate on the basis of sex for uniquely educational purposes, *see id.* § 1681(a)(3)-(a)(9). These include: military academies; sororities and fraternities; the Boy Scouts, Girl Scouts, YWCA, and YMCA; Boys State and Girls State conferences; certain mother-daughter and father-son activities; and scholarships or financial assistance awarded as a prize in beauty pageants. *See id.* Exempting such organizations that sex segregate for educational

purposes from Section 1557's non-discrimination provision—which applies when an organization conducts a health program or activity—would be at best futile, and at worst would yield absurd and potentially harmful results. Further, incorporating these exemptions would do nothing to serve the original purpose for Congress's grant of these exemptions in Title IX—to serve educational purposes. No reasonable reading of Section 1557 would require incorporating these exemptions, and there is no legal or textual basis to include some but not all of Title IX's exemptions.

Nor is there anything special about the religious exemption that makes HHS's cherry-picking make sense. As the 2016 Rule explained, *see* 81 Fed. Reg. at 31,379-80, Title IX's religious exemption—which is limited to the educational context—is incompatible with Section 1557's broad statutory scheme that regulates the conduct of "health programs or activities," including health care providers, researchers, and insurers. First, in attempting to shoehorn it in, the agency appears to suggest that the exemption can simply be re-written so that it applies to "**any** ~~educational~~ institution which is controlled by a religious organization." 20 U.S.C. § 1681(a)(3). But that is not what Title IX says, and agencies do not have the authority to read words out of statutes. *Cf. Barber v. Thomas*, 560 U.S. 474, 490 (2010) (noting that courts should avoid interpretations that "read words out of the statute"). And because Title IX explicitly limits its religious exemption to *educational* institutions, Title IX's religious exemption has no place in a law prohibiting discrimination in a wide variety of *health* programs and activities.

### b.      HHS's Adoption Of The Abortion Exemption Is Contrary To Law Because It Is Foreclosed By The Text Of Section 1557.

For many of the same reasons that HHS cannot reasonably interpret Section 1557 to include Title IX's religious exemption, HHS cannot reasonably interpret Section 1557 to include Title IX's abortion-provision-and-coverage exemption either.

The same textual analysis discussed *supra* regarding Title IX's religious exemption

precludes incorporation of the abortion-provision-and-coverage-exemption. Indeed, the textual argument for not incorporating the abortion exemption applies with even greater force because courts presume Congress has acted "intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another section of the same Act," *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002), and abortion is directly addressed elsewhere in Title I of the ACA. *See* 42 U.S.C. § 18023(a)(1) (clarifying that Title I of the ACA allows states to prohibit abortion coverage in the state exchanges); *id.* § 18023(c)(1) (indicating that the ACA shall not "preempt or otherwise have any effect on State laws regarding the prohibition of (or requirement of) coverage, funding, or procedural requirements on abortions, including parental notification or consent for the performance of an abortion on a minor"); *id.* § 18023(c)(2)(A)(ii) (clarifying that Title I of the ACA incorporates existing "Federal laws regarding . . . willingness or refusal to provide abortion"). These abortion-specific provisions in Title I, coupled with Section 1557's statement that its prohibition of discrimination applies "[e]xcept as otherwise provided for" in Title I, further confirm that the abortion-provision-and-coverage exemption cannot reasonably be read into Section 1557. *See Leatherman*, 507 U.S. at 168; *Smith*, 499 U.S. at 167.[23]

> **c.**   ***HHS's Adoption Of Title IX's Exemptions Is Arbitrary And Capricious Because HHS Failed To Consider Important Aspects Of The Problem And Did Not Adequately Explain Its Change In Position.***

HHS previously understood the gravity of harm that would result from importing Title IX's

---

[23] Defendants again cite *Franciscan Alliance* in support of their decision to read Title IX's abortion-provision-and-coverage-exemption into Section 1557, but that court's rationale makes no more sense here than it did with respect to the religious exemption. The inclusion of the phrase '*et seq.*,' cannot logically be read to mean that some, unspecified additional provisions should be imported into a health care statute. And there is no way to incorporate the entirety of Title IX without also incorporating its focus on education, and that focus is incompatible with the ACA. Thus, for reasons similar to those discussed above, importing the Title IX abortion-provision-and-coverage-exemption is incompatible with the text and purpose of Section 1557.

exemptions into the health care context. In 2016, the Department declined to deviate from the plain language of Section 1557 and thus did not incorporate Title IX's religious-or abortion- exemption in the 2016 Rule. *See* 81 Fed. Reg. at 31,380, 31,388. HHS reasoned that the exemptions "do not readily apply" in the health care context because "there are significant differences between the educational and health care contexts that warrant different approaches." *Id.* at 31,378, 31,380. HHS explained that, unlike students choosing between educational institutions, patients often cannot choose between providers—especially in rural areas. *See id.* at 31,380. HHS further recognized that a person in an ambulance does not have the option of comparison-shopping hospitals, particularly in the emergency context. *See id.* Thus, HHS concluded that incorporating Title IX's exemptions "could result in a denial or delay in the provision of health care to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results." *Id.*

With the Rollback Rule, Defendants reverse course. Despite overwhelming concerns raised by commenters, Defendants refused to acknowledge the danger to patients from incorporation of Title IX's exemptions into the health context. Multiple commenters discussed the acute harm that would arise in the context of pregnancy-related emergencies, where abortion care is often the clinically appropriate treatment.[24] Laws prohibiting sex discrimination generally require covered entities to provide abortion care where denying it would single out pregnant patients for less comprehensive treatment, absent an explicit exception. *See infra* p. 34. In the emergency context, this means that when a hospital otherwise offers comprehensive emergency care and has the competency to provide gynecologic or obstetric care, refusing to provide emergency abortion care

---

[24] *See* Sagar Decl. ¶ 3(f), (bb), (cc), (ccc); *see also Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss*, Ctrs. for Medicare & Medicaid Servs. 4 (Sept. 17, 2022), https://www.cms.gov/files/document/qso-21-22-hospital-revised.pdf.

violates Section 1557.[25] Commenters explained that incorporating Title IX's abortion-provision-and-coverage and religious-institutional exemptions from the limited education context to apply to *all* health providers receiving federal financial assistance could expand the pool of those at risk of being denied critical and often life-saving abortion care.[26] And while the harm is particularly acute now given the widespread confusion and fear wrought by state abortion bans since *Dobbs*, *see* Lorenzo Decl. ¶¶ 9-12, HHS was well aware of these potential effects and the need for clear federal standards on what care hospitals must provide notwithstanding state law[27] at the time the Rollback Rule was finalized.[28]

Multiple commenters also emphasized that the incorporation of Title IX's religious exemption could increase the number of health care facilities that refuse to provide a wide variety of health care services, including birth control, fertility services, sterilization, abortion, gender

---

[25] Because Section 1557 applies "except as otherwise provided for" under Title I of the ACA, Section 1303 of the ACA incorporates into Section 1557 harmful federal laws that allow certain entities to refuse to provide abortion care or coverage in limited situations—the Weldon, Church, and Coats-Snowe Amendments. 42 U.S.C. § 18023(c)(2). However, Section 1303 clarifies that its application of refusal laws excludes emergency care. *See id.* 18023(d) ("Nothing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law," including Section 1557, the Emergency Medical Treatment and Active Labor Act (EMTALA), and other laws prohibiting discrimination in health care, denials of emergency care, and medical malpractice, among others).

[26] *See* Sagar Decl. ¶ 3(bb), (f), (cc)

[27] Section 1557 expressly preempts any state law—whether criminal or civil—that bans abortion care that Section 1557 requires. 42 U.S.C. § 18116(b) ("Nothing in [Title I of the ACA] . . . shall be construed to . . . supersede State laws that provide additional protections against discrimination . . . ."); *id.* § 18041(d) ("Nothing in [Title I of the ACA] shall be construed to preempt any State law that does not prevent the application of the provisions of this title."); *id.* § 18023 (exempting from preemption only laws regarding the "coverage, funding, or procedural requirements on abortions"). Moreover, because refusing this care is facially discriminatory, even good faith reliance on state law is no defense. *See Johnson Controls, Inc.*, 499 U.S. at 199 (where there is explicit facial discrimination, the reason for discriminating is irrelevant); *accord Kadel v. Folwell*, 620 F. Supp. 3d 339, 376 (M.D.N.C. 2022). The need for clarity around Section 1557's federal obligations is even more dire given that the U.S. Supreme Court will consider this term the extent to which EMTALA separately requires emergency abortion care notwithstanding state abortion bans. *See Moyle v. United States* and *Idaho v. United States*, U.S. Sup. Ct. Docket Nos. 23-276 and 23-277.

[28] Although the U.S. Supreme Court overturned the federal constitutional right to abortion care in 2022, in 2019—when the Rollback Rule was first proposed—multiple states signed 25 new bans on all, most, or some abortion care into law, with the expectation that the federal constitutional protection would be overturned. *See* Elizabeth Nash et al., Guttmacher Inst., *State Policy Trends 2019: A Wave of Abortion Bans, But Some States Are Fighting Back* (Dec. 10, 2019), https://www.guttmacher.org/article/2019/12/state-policy-trends-2019-wave-abortion-bans-some-states-are-fighting-back. Thus, Defendants were aware of these potential effects.

affirming care, and end-of-life care.[29] Other commenters noted that the exemption could be interpreted by some medical institutions to permit them to deny any and all health services to individuals on the basis of sex, including refusing to treat LGBTQI+ people or people who had previously had an abortion, even when the care was health-or life-saving.[30] These denials of care would be especially harmful for those who live in rural areas, the Association of American Medical Colleges highlighted, because alternate care could be too far or too expensive.[31]

Nonetheless, Defendants determined that the Title IX exemptions ought to be incorporated in the Rollback Rule, *see* 85 Fed. Reg. at 37,162, without acknowledging the likely impact on access to care, or explaining why it reversed course from the 2016 Rule. Indeed, Defendants persisted in this approach despite emphasizing the significant differences between health care and education elsewhere in the rule. *See id.* at 37,183-84.

HHS's failure to consider an important aspect of the problem and provide a reasoned explanation for reversing its prior position renders the Rule's incorporation of the Title IX exemptions arbitrary and capricious. *See Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (finding agency action arbitrary and capricious where agency "gave no indication it even considered" an important aspect of the problem before it beyond a "single sentence"); *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) (explaining that an agency "must respond to significant points raised during the public comment period"); *Encino*, 579 U.S. at 222 (explaining that when an agency reverses course, a "reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered

---

[29] *See* Sagar Decl. ¶ 3(a), (f), (ff).

[30] *See id.* ¶ 3(d), (gg).

[31] *See id.* ¶ 3(hh), (ii).

by the prior policy" (citing *Fox*, 556 U.S. at 515-16)). One court has thus already held that the Rollback Rule was likely arbitrary and capricious given HHS's failure to "'adequately consider the effect of' a blanket religious exemption on the ability for individuals to access care on a prompt and nondiscriminatory basis." *Whitman-Walker Clinic, Inc.*, 485 F. Supp. 3d at 43-47.

### 3. This Court Should Vacate The Rollback Rule's Interpretation Of "Health Program Or Entity" And Enjoin Defendants From Enforcing Section 1557 Pursuant To This Interpretation.

The Rollback Rule's interpretation of the phrase "health program or activity" is impermissibly restrictive and should be enjoined for at least three reasons. First, the Rule expressly excludes health coverage issuers and administrators as not "principally engaged in the business of providing healthcare." *See* 45 C.F.R. § 92.3(c). Second, the Rule narrows the category of covered entities to a "program or activity administered by" HHS under Title I of the ACA, not to other health programs and activities that HHS administers. *See id.* § 92.3(a)(2)). Third, the Rule walls off Section 1557's application to only specific subparts of certain covered entities. *See id.* § 92.3(b). The Rule thus severely limits the scope of Section 1557's application, departing from the statutory text and Section 1557's broad remedial intent. This Court should vacate these provisions of the Rollback Rule at *Chevron* Step One as impermissible interpretations of Section 1557, and also hold that HHS promulgated them in a manner inconsistent with the APA's protection against arbitrary and capricious agency action.

#### a. The Rollback Rule Improperly Exempts Health Coverage Issuers and Administrators.

The Rollback Rule interprets Section 1557 to exempt activities of health coverage issuers and administrators (other than operations that directly receive funding from HHS) from its requirements). *See* 45 C.F.R. § 92.3(c). The Rule provides that "an entity principally or otherwise engaged in the business of providing health insurance shall not, by virtue of such provision, be

considered to be principally engaged in the business of providing healthcare." *Id.* But the text of Section 1557 states the law applies to "*any* health program or activity." 42 U.S.C. § 18116 (emphasis added). The provision of health coverage is unambiguously a health program or activity, rendering this portion of the Rollback Rule contrary to the statute's plain language. *See Pritchard*, 2022 WL 17788148, at *7 (holding that "the plain language of [Section 1557] includes insurance contracts and their administration as 'health program[s] or activit[ies],'" and thus "[c]learly, application of the [Rollback] Rule is contrary to the statutory law").

Start with the text. Congress deliberately chose broad language in this provision. "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New Int'l Dictionary 97 (1976)). Consequently, in the absence of "any language limiting the breadth of that word," it must be read as referring to *all* of the subject that it is describing. *Id.* The statutory term "program or activity" is also generally given broad application, especially when interpreting the underlying civil rights laws that are constituent parts of Section 1557. *See, e.g.*, *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 632-34 (1984); *Bell*, 456 U.S. at 520-35. The provision of health coverage fits comfortably within those broad statutory terms. Health coverage issuers and administrators define what care plan members receive; by designing plan benefits, administering utilization management policies, creating drug formularies, and contracting with a network of providers, these entities are inextricably intertwined with medical care. The provision of health coverage is therefore a "health program or activity" encompassed by the plain text of Section 1557.

Other provisions of the ACA support this reading of the statute. Indeed, in the phrase directly following "any health program or activity," Congress specifically identified "contracts of insurance" as one of the types of federal financial assistance that might bring an entity within the

scope of the statute. 42 U.S.C. § 18116(a).  The hallmark provisions of the ACA reset longstanding health insurance practices that, until the passage of the ACA, amounted to permissible discrimination. *See, e.g.*, 42 U.S.C. §§ 300gg-3 ("Prohibition of Preexisting Condition Exclusions or Other Discrimination Based on Health Status"); 300gg(a) ("Prohibiting Discriminatory Premium Rates"); 300gg-4 ("Prohibiting Discrimination Against Individual Participants and Beneficiaries Based on Health Status"); 18116 ("Nondiscrimination"). Against this clear legislative purpose, Congress did not silently exclude health coverage issuers and administrators from the statute's general nondiscrimination provision.

For these reasons, HHS's declaration that health insurers are not a "program or activity" under Section 1557 and not subject to Section 1557's nondiscrimination prohibitions because they are not "principally engaged in the business of providing healthcare" is untenable. To support its new interpretation, HHS contends that providing "health insurance" is different than providing "healthcare" and points to the definitions of "healthcare" and "health insurance" in unrelated statutes to support its distinction. *See* 85 Fed. Reg. at 37,172-73. But Section 1557 does not, by its terms, apply only to "health care." Rather, Section 1557 plainly covers all "health programs and activities," in addition to direct health care. *Cf. Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 553-54 (3d Cir. 2017) (rejecting argument that "education programs or activities" should be read to apply to "educational institutions" only). And health coverage clearly is a health-related program or activity. It is what enables the vast majority of Americans to access health care.

Moreover, the statutory support used in the Rollback Rule to distinguish health coverage does not move the needle. Take, for example, 5 U.S.C. § 5371, which concerns pay rates and personnel practices for federal employees. That statute uses the term "health care" simply to describe a category of federal employees who work in that sector. *See id.* ("For the purposes of

this section, 'health care' means direct patient-care services or services incident to direct patient-care services."). The second example is drawn from a subchapter of the Social Security Act that deals with administrative data standards. *See* 45 C.F.R., Subchapter C. Transposing these definitions into a health coverage statute with a broad remedial purpose makes no sense. *See Singh*, 386 F.3d at 1233 n.8 ("The same or similar words may have different meanings when used in different statutes motivated by different legislative purposes.").

Even if Section 1557's reference to "any health program or activity" could somehow be limited to "health care," that limitation would not exclude health insurance. To the contrary, other parts of the ACA define "health care" to include "health insurance," and vice versa. *See, e.g.*, 42 U.S.C. § 18113(b) (defining "the *term 'health care entity'* [to] *include[ ] . . . a health insurance plan*") (emphasis added); 42 U.S.C. § 300gg-91(b)(1) ("[t]he term *'health insurance coverage' means benefits consisting of medical care*") (emphasis added). And as several courts have recognized, an entity need not be directly involved in *patient* care to be considered principally engaged in providing *health* care. *See, e.g.*, *Dorer v. Quest Diagnostics Inc.*, 20 F. Supp. 2d 898, 900 (D. Md. 1998) (holding a laboratory which provided clinical diagnostic testing and received Medicare and Medicaid was principally engaged in providing health care); *Zamora-Quezada v. HealthTexas Med. Grp. of San Antonio*, 34 F. Supp. 2d 433, 444 (W.D. Tex. 1998) (explaining that a health care delivery system was fueled by the financial arrangements of an insurance company, and thus the insurance company controlled the delivery of health care and caused the discrimination patients experienced).

> ### b.    *The Rollback Rule Improperly Exempts Certain Programs And Activities That HHS Administers, Including The Indian Health Service.*

HHS also attempts to limit Section 1557's nondiscrimination protections to only those health programs or activities of HHS that are administered under Title I of the ACA, not to other

health programs and activities that HHS administers. *See* 85 Fed. Reg. at 37,244 (codified at 45 C.F.R. § 92.3(a)(2)). In the Rollback Rule, HHS asserts that the text of the statute compelled this interpretation because Congress had included a limitation in the text—"under this title"—meaning Title I programs and activities. *See* 85 Fed. Reg. at 37,170. The consequence of HHS's interpretation is that many HHS health programs and activities are purportedly no longer subject to Section 1557's anti-discrimination requirements.

HHS's interpretation, however, is inconsistent with the plain language of the statute, which states Section 1557 applies to "any program or activity that is administered by an Executive Agency *or* any entity established under this title." 42 U.S.C. § 18116(a) (emphasis added). HHS reads the word "or" out of the statute, and it reads "under this title" into the preceding phrase "any program or activity that is administered by an Executive Agency." 87 Fed. Reg. 47,829; *id.* at 47,838. But this Court must apply "traditional tools of statutory construction" in determining Congress's intent, *Chevron*, 467 U.S. at 843 n.9, and it is a "settled rule that [courts] must, if possible, construe a statute to give every word some operative effect," *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004); *see also United States v. Ven–Fuel, Inc.*, 758 F.2d 741, 751-52 (1st Cir. 1985) ("All words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous."). The word "or" is clearly doing some work here. "[I]ts ordinary use is almost always disjunctive, that is, the words it connects are to 'be given separate meanings.'" *United States v. Woods*, 571 U.S. 31, 45 (2013) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)). Moreover, if "under this title" applied to "Executive Agency," there would have been no need for the statute to reference programs administered by Executive agencies; the two phrases would be redundant. The only reading of the statute that gives effect to

each of the words in the statute is a reading that acknowledges HHS's health programs and activities are covered.

HHS's reading is also inconsistent with the purpose of the statute and other ordinary canons of statutory construction. Again, the purpose of the ACA is to increase health access and coverage, not narrow it. *See, e.g.*, *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 538-39. Two canons of statutory construction buttress this view. First, civil rights laws like Section 1557 enjoy liberal construction so that the beneficiaries protected by those laws realize the fullest benefit possible. *See, e.g.*, *Hogar Agua y Vida en el Desierto, Inc. v. Suarez-Medina*, 36 F.3d 177, 182 (1st Cir. 1994). Second, Section 1557 is a civil rights law embedded in a broader remedial statute—the Affordable Care Act. Courts should give language in remedial statutes "a generous construction consistent with its reformative mission" so long as the results are not unreasonable. *See Johnson v. Koplovsky Foods, Inc.*, 5 F. Supp. 2d 48, 54 (D. Mass. 1998) (citation omitted). According to this liberal construction, and viewing Section 1557 in context of the larger ACA statutory scheme as this Court must do, *King*, 576 U.S. at 486, it is clear that Section 1557 should be read broadly. Yet HHS's unreasonable interpretation would do the opposite and result in numerous HHS health programs and activities being excluded from Section 1557's scope.

> **c.** **The Rollback Rule Improperly Excludes From Section 1557's Scope Any Part Of A Health Program Or Activity Not Principally Engaged In Providing Health Care, Unless That Particular Part Receives Federal Financial Assistance.**

The Rollback Rule defines the term "health program or activity" to mean different things depending on whether the entity in question is deemed to be principally engaged in the business of providing health care. *See* 45 C.F.R. § 92.3(b). Where an entity is deemed "principally engaged in the business of providing healthcare," and any part of that entity "receive[s] Federal financial assistance," HHS concedes that the term "'health program or activity' encompasses all of the

operations of [that] entit[y]." *Id.* However, "[f]or any entity *not* principally engaged in the business of providing healthcare," HHS has interpreted Section 1557 so that "the requirements applicable to a 'health program or activity' under this part shall apply to such entity's operations *only to the extent* any such operation receives Federal financial assistance." *Id.* (emphases added).

The statute prohibits this reading. Section 1557 applies to "any health program or activity, *any part of which* is receiving Federal financial assistance." 42 U.S.C. § 18116(a) (emphasis added). Congress's use of the phrase "*any part of which* is receiving Federal financial assistance" makes clear that Section 1557 applies to the *entire* health program or activity, *not just part* of it, and that Federal financial assistance need touch only a "part" of the covered entity for Section 1557's duties to attach to the whole. *Id.* (emphasis added). Under the only reading of the statute that is consistent with the text, universities, school districts, and state and local governments need not be principally engaged in health care for the health programs and activities that they operate (for example, the health plans they sponsor) to be subject to Section 1557, even if those particular health programs don't receive federal funding. Similarly, even if health coverage were not a health program or activity, *but see supra* pp. 34-37, health insurers who sponsor non-insurance-related health programs that receive federal funding would still be bound by Section 1557.

Unable to rely on the text of Section 1557 itself, HHS attempts to justify the provision by pointing to the Civil Rights Restoration Act of 1987 ("CRRA"). According to HHS, the CRRA defined "program or activity" under Title IX and other laws to cover all the operations of entities only when they are "principally engaged in the business of providing . . . health care . . . ." 85 Fed. Reg. at 37,171 (quoting Pub. L. 100-259, 102 Stat. 28 (Mar. 22, 1988)). HHS therefore claims that limiting the application of Section 1557 to the particular operations that receive Federal financial assistance of health programs or activities not engaged in providing health care "more clearly and

consistently applies the CRRA's limitations." 85 Fed. Reg. at 37,172. HHS is wrong.

As an initial matter, HHS's reading subverts the entire point of the CRRA. Congress enacted the CRRA to supersede *Grove City College v. Bell*, 465 U.S. 555, 570-74 (1984), where the Supreme Court limited Title IX's coverage only to the particular "program or activity" within a private college that received federal funding, not to the entire educational institution. *See Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir. 1993). HHS's distorted application of the CRRA to Section 1557 in effect resurrects *Grove City*, as if it were never abrogated by statute. Setting *Grove City* aside, HHS's reading of the CRRA doesn't make sense on its own terms because HHS overlooks key portions of the CRRA's definition. The CRRA defines "program or activity," to "mean all of the operations of" several types of entities—*regardless* of whether those entities are "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation"—if "any part of" the entity "is extended Federal financial assistance." 20 U.S.C. § 1687(1)-(4). Yet in promulgating regulations to define "program or activity" in Section 1557, HHS imported only the part of the CRRA's definition that describes a "corporation, partnership, or other private organization, or an entire sole proprietorship," *see id.* § 1687(3), without the remaining parts of the CRRA's definition of "program or activity," *id*. § 1687(1)-(2), (4). Given that the rest of the CRRA requires an entire entity to comply with anti-discrimination laws if *any part* receives Federal financial assistance, HHS is wrong to suggest that its narrow reading represents a "return to the CRRA's statutory text." 84 Fed. Reg. at 27,862.

Finally, HHS argues it can limit application of Section 1557 to particular operations of a health program or activity that receive Federal financial assistance because that limitation "advances its goal of reducing regulatory burdens" in furtherance of Executive Order 13765. 85 Fed. Reg. at 37,172. The Executive Order that HHS references provides that "to the maximum

41

extent permitted by law", the Secretary of HHS and others with responsibilities under the ACA shall take actions to minimize the economic regulatory burdens imposed by the Act. *See* Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal, Exec. Order No. 13,765, 82 Fed. Reg. 8,351 (Jan. 20, 2017). But, for all the reasons cited above, HHS's interpretation of the statute is not permitted by law. HHS thus cannot rely on Executive Order 13765 to support its unduly limited reading of Section 1557.

**B.      In The Alternative, This Court Should Vacate The Rollback Rule In Its Entirety.**

Three other errors "permeated the entire rulemaking process" such that this Court should vacate the Rollback Rule in its entirety. *Pub. Citizen*, 374 F.3d at 1217. First, bad-faith anti-LGBTQ+ bias motivated the Rollback Rule, making it ultimately arbitrary and capricious in violation of the APA .[32] Second, in promulgating the Rollback Rule, HHS failed to consider an important aspect of the problem: the likely risk of discrimination against LGBTQ+ persons, women, and pregnant people in accessing health care and resulting harm to patient health. Third, the Rollback Rule fails to comply with the requirements of reasoned decision making in weighing costs and benefits. These errors supply an independent basis for vacatur of the provisions outlined above, as well as all other provisions of the Rollback Rule.

**1.      This Court Should Vacate The Rollback Rule Because It Was Motivated By Impermissible Bias.**

*a.      HHS's Bad Faith In Promulgating The Rule Violates The APA.*

Under the APA, "[p]roof of subjective bad faith by [decision-makers], depriving a [petitioner] of fair and honest consideration of its proposal, generally constitutes arbitrary and capricious action." *Tummino*, 603 F. Supp. 2d at 542 (collecting cases).

---

[32] HHS's bad faith in promulgating the rule also violates the Equal Protection Clause. Plaintiffs reserve the right to later engage in discovery and move on summary judgment with respect to the constitutional claims.

*Tummino* is instructive. There, the court cited improper political influence as the basis for invalidating as arbitrary and capricious the Food and Drug Administration's (FDA) decision to impose a minimum age requirement for obtaining an emergency contraceptive over the counter. *See id.* at 544-47. The court found that FDA lacked good faith in its decision based on "repeated and unreasonable delays," "pressure emanating from the White House," and "significant departures from the FDA's normal procedures and policies." *Id.* at 544. The White House had pressured the FDA, citing concerns over "unhappy constituents," and the FDA rejected its own internal scientific recommendation that no such age restriction was needed, instead invoking "fanciful and wholly unsubstantiated 'enforcement concerns.'" *Id.* at 546-47.

For three reasons, the same result should obtain here. *First*, like *Tummino*, there was "improper political influence" on HHS's decision-making such that it was "influenced by factors not relevant under the controlling statute." 603 F. Supp. 2d at 544; *see also, e.g.*, *Latecoere Int'l, Inc. v. U.S. Dep't. of Navy*, 19 F.3d 1342,1354-58 (11th Cir. 1994) (finding agency action arbitrary when motivated by bias against a foreign company); *D.C. Fed. of Civic Assocs. v. Volpe*, 459 F.2d 1231, 1245-46 (D.C. Cir. 1972) (finding agency action arbitrary when political pressures motivated the agency to disregard statutory factors).

The Rollback Rule itself evinces animus toward, and reliance on negative stereotypes about, transgender people and their health care. *E.g.*, 85 Fed. Reg. at 37,187 (claiming, counter to fact, that "the medical community is divided on many issues related to gender identity, including the value of various 'gender affirming' treatments for gender dysphoria (especially for minors), the relative importance of care based on the patient's sex, and the compatibility of gynecological practice with a requirement of nondiscrimination on the basis of gender identity"). Throughout the Preamble, HHS makes clear its reason for removing "gender identity" from the definition of sex

was to enforce a "biological binary of male and female," thereby excluding transgender, nonbinary, and intersex people from protection. *See, e.g.*, *id.* at 37,178.

This animus echoes statements that were made by the political officials who crafted the rule. Former OCR Director Roger Severino also made numerous public statements expressing animus toward LGBTQI+ people before and after he took office. *See Dep't of Com.*, 139 S. Ct. at 2573-74 (holding that courts considering whether agency action is arbitrary and capricious may inquire into "the mental processes of administrative decisionmakers" upon a "strong showing of bad faith or improper behavior" (citation omitted)). Severino argued that transgender people "us[e] government power to coerce everyone, including children, into pledging allegiance to a radical new gender ideology,"[33] that a transgender boy wanting to use the boys' restrooms at school was "a gender-dysphoric teen girl . . . [who] sued her school district to get full access to the boys' bathrooms,"[34] and that transgender military personnel serving openly "dishonors the[ ] sacrifice[ ]" of veterans.[35] He published several articles expressing opposition to same-sex marriage and denying the existence of sexual orientation discrimination.[36] While serving as Director, Severino labeled claims of discrimination against transgender people as "hypothetical" and "not yet seen out in the world."[37] Under his leadership, HHS ceased gathering information about transgender

---

[33] Roger Severino, *DOJ's Lawsuit Against North Carolina Is Abuse of Power*, The Daily Signal (May 9, 2016) https://perma.cc/3FFM-KFMB.

[34] Jim DeMint & Roger Severino, *Commentary: Court Should Reject Obama's Radical Social Experiment* (Nov. 7, 2016), https://www.inquirer.com/philly/opinion/20161107_Commentary__Court_should_reject_Obama_s_radical_social_experiment.html.

[35] Roger Severino, *Pentagon's Radical New Transgender Policy Defies Common Sense*, CNSNews (July 1, 2016), https://perma.cc/VK37-5FP7.

[36] *E.g.*, Roger Severino, *Filibusted: Missouri Democrats Fail to Block Religious Liberty Bill Concerning Same-Sex Marriage*, The Daily Signal (Mar. 9, 2016), https://perma.cc/KA2U-NPHS.

[37] Sandhya Raman, *Trump Administration Swayed by Conservative Think Tank on Abortion, LGBT Decisions, Group Says*, Roll Call (Apr. 25, 2019), https://bit.ly/31R9YLJ.

people in its surveys[38] and removed references to LGBTQI+ issues in its strategic plans.[39]

Severino's animus clearly infected the agency's rulemaking process because the evidence before the agency does not support the rule it promulgated. *Tummino*, 603 F. Supp. 2d at 542; *Latecoere Int'l, Inc.*, 19 F.3d at 1365. HHS issued the Rollback Rule despite ample record evidence from major medical organizations and health care professionals describing the standard of care for transgender people, *see* Sagar Decl. ¶ 3(a), (aa), (cc), (mm), (ll), (nn), (hh), (oo), (qq), (rr), (ss), (tt), (uu), (bbb), (eee); numerous accounts from transgender people about their experiences of discrimination in health care settings, and data demonstrating the high rates of such discrimination.[40] The Preamble's insistence on enforcing a "biological binary of male and female" ignored medical consensus that sex is made up of numerous traits, including gender identity, and that physical sex characteristics often do not fall on a binary scale.[41] Instead, the Preamble relied on debunked ideas about the negative effects of hormones, prevalence of regret, and efficacy of "less drastic" interventions to conclude that there is "a lack of scientific and medical consensus" about the efficacy of gender affirming care. Fed. Reg. 85 at 37,187; 37,197. This deeply flawed reasoning suggests that HHS's stated reasons are not, in fact, those that actually motivated the agency's decision. *See, e.g.*, *Dep't of Com.*, 139 S. Ct. at 2575 (affirming remand of rule where

---

[38] Sejal Singh et al., *The Trump Administration Is Rolling Back Data Collection on LGBT Older Adults*, Ctr. for Am. Progress (Mar. 20, 2017), https://ampr.gs/3iA7reN.

[39] Dan Diamond, *Trump Policy Shop Filters Facts to Fit His Message*, Politico (July 28, 2018), https://politi.co/3fcJokc. The Rollback Rule was part of a larger campaign by the previous presidential administration against the LGBTQI+ community. These changes were both large and small: Among the first actions of the Trump presidency were to target LGBTQI+ people through withdrawals of administrative protections in education, employment, housing, the census, the military, in custody, and seeking asylum. *See, e.g.*, Am. Compl. ¶¶ 367-76. The administration also scrubbed all mentions of LGBTQI+ people from the websites of the White House, Department of State, and Department of Labor on its fifth day in office. Emily O'Hara, *Trump Administration Removes LGBTQ Content From Federal Websites*, NBC News (Jan. 24, 2017), https://nbcnews.to/31SgD8g.

[40] Sagar Decl. ¶ 3(c), (f), (h), (i), (j), (k), (l), (m), (n), (p), (q), (r), (t), (u), (v), (w), (x), (y), (z), (aa), (dd), (ee), (jj), (vv), (ww), (xx), (yy), (zz), (aaa).

[41] Sagar Decl. ¶ 3(o), (vv).

the "the evidence tells a story that does not match the explanation the Secretary gave for his decision"); *Latecoere Int'l, Inc.*, 19 F.3d at 1364 (agency's action was arbitrary where there was "strong evidence" that its decision was "irrational and resulted from prejudicial violations").

*Second*, HHS's decisional process represents a "significant departure[] from the [agency's] normal procedures and policies." *Tummino*, 603 F. Supp. 2d at 544; *see also id*. at 547. HHS posted the final Rollback Rule on June 12, 2020, three days before the Supreme Court issued its decision in *Bostock*. The Rollback Rule was then published in the federal register on June 19, 2020, only with "minor and primarily technical corrections," 85 Fed. Reg. 37,160, failing to amend Preamble language inconsistent with *Bostock*. These "procedural irregularities," *Tummino*, 603 F. Supp. 2d at 544, and the "timing of the decision," *id.* at 547, suggest that HHS acted in bad faith.

*Third*, HHS invoked only "fanciful and wholly unsubstantiated . . . 'concerns,'" in support of its adoption of the new positions in the Rollback Rule. *Id.* at 546; s*ee also, e.g.*, *New York*, 414 F. Supp. 3d at 541 (holding another OCR rule arbitrary and capricious where the central factual claim of a "significant increase" of complaints of violations of federal refusal of care statutes was "flatly untrue"). HHS largely relied on *Franciscan Alliance* to support its reversals but ignored the substantial body of caselaw holding that categorical gender-affirming care exclusions amount to unlawful sex discrimination,[42] asserting without support that those cases have "caused confusion." 85 Fed. Reg. at 37,180.[43]

This case is on all fours with *Tummino* and the decisions on which it relies. There can be

---

[42] *See, e.g.*, *Kadel v. Folwell*, 446 F. Supp. 3d 1, 17 (M.D.N.C. 2020), *aff'd sub nom. Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422 (4th Cir. 2021), *as amended* (Dec. 2, 2021); *Lange v. Houston Cnty.*, 608 F. Supp. 3d 1340, 1358-60 (M.D. Ga. 2022); *C.P. v. Blue Cross Blue Shield of Ill.*, 3:20-CV-06145-RJB, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022).

[43] The Rollback Rule also takes the position that misgendering transgender people is not sex discrimination. 85 Fed. Reg. at 37,185. It does so in the face of numerous accounts of harassment related to misgendering, data that misgendering leads to negative health consequences, and consensus by medical professionals that gendering people

no question that animus was at least a motivating factor behind Defendants' actions. HHS promulgated the rule as part of the Trump administration's anti-transgender political agenda, lacked scientific justification, and failed to provide a substantive response to commenters who raised these issues. The promulgation of the Rollback Rule was a product of "bad faith by [agency decision-makers]"—driven by impermissible animus. *Tummino*, 603 F. Supp. 2d at 542. As in *Tummino*, HHS's Rollback Rule is arbitrary and capricious under the APA.

> **b.   At A Minimum, HHS Failed To Consider An Important Aspect Of The Problem: The Risk Of Discrimination Against LGBTQI+ Persons, Women, and Pregnant People In Accessing Health Care.**

In the 2016 Rule, HHS explicitly acknowledged the seriousness of continuing discrimination against LGBTQI+ individuals and women in accessing health care, including pregnancy-related care, and the disparities that such discrimination causes. 81 Fed. Reg. at 31,460 ("[D]espite the ACA improving access to health services and health insurance, many women and transgender individuals continue to experience discrimination in the health care context . . . ."). HHS pointed to research finding that a quarter of the transgender individuals studied reported "being harassed in health care settings and postponing medical care because of discrimination by providers" and another finding that 26.7% of the transgender people surveyed reported that a health care provider had refused to see them because of their actual or perceived sexual orientation in the year prior. *Id.* (internal quotation marks and alterations omitted). HHS also acknowledged the

---

correctly is the standard of care. *See* Sagar Decl. ¶ 3(p), (q). HHS also persistently and gratuitously misgenders transgender people throughout the Preamble. *See, e.g.*, 85 Fed. Reg. at 37,180 & n.90-91 ("[Aimee] Stephens 'quite obviously' is not 'a woman' because 'Stephens's sex' is male"); *id.* at 37,189 (referring to a hypothetical "transgender patient [who] self-identifies as male" as "her"); *id.* (referring to a pregnant transgender man as "her" and "in fact a . . .woman"); *id.* at 37,191 (referring to the decedent in *Prescott v. Rady Children's Hospital*, who died by suicide following severe mistreatment because of his transgender status, as "her"—despite quoting the court opinion correctly referring to him as a boy). The Rollback Rule further permits denying reproductive health care to people just because they are transgender. *Id.* at 37,185 (claiming it does not violate Section 1557 to "limit[] access to lactation rooms and gynecological practices to female users and patients," after defining "female" based on sex assigned at birth).

crucial role of the ACA in preventing discrimination against women and other people capable of pregnancy in health care and coverage, noting that historically, women paid more for coverage that often excluded preventive services and obstetric and gynecological care. *Id.* HHS recognized that individuals subject to discrimination are "denied opportunities to obtain health care services provided to others, with resulting adverse effects on their health status." 81 Fed. Reg. at 31,444.

While *Whitman-Walker* acknowledged that the Rollback Rule cited "scientific studies, government reviews, and comments[,]" 485 F. Supp. 3d at 47, the Rule does nothing to refute the findings of the 2016 Rule—much less provides facts, studies, or data to support the provisions that are at issue in this case. Indeed, the Rollback Rule fails to acknowledge the over 150,000 comments received by HHS, many of which addressed discrimination against LGBTQI+ people, women, pregnant people. These comments noted that repealing the 2016 Rule's protections would invite covered health care providers and insurers to discriminate against transgender people, pregnant people, and people who have previously had an abortion; cause confusion about patients' rights; lead to coverage exclusions; and exacerbate people's fear of discrimination, substandard care, denials of care, and coercion, including during emergencies. 85 Fed. Reg. at 37,164-65, 37,170–74.[44] All of this, commenters explained, would result in worse health outcomes and exacerbate existing crisis-level racial disparities in the rates of pregnancy-related mortality.[45]

HHS apparently ignored the multitude of concerns that major medical organizations, patient advocacy organizations, and individuals raised. Where, as here, an agency fails "to consider an important aspect of the problem," it is "one of the hallmarks of arbitrary and capricious" agency action. *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 430 (D.C. Cir. 2018). This failure

---

[44] *See supra* Factual Background; Sagar Decl. ¶ 3(hh), (ii), (ll).

[45] *See* Sagar Decl. ¶ 3(ll), (bbb), (eee).

permeated the entire rulemaking process, rendering the Rollback Rule arbitrary and capricious.

> **2.      This Court Should Vacate The Rollback Rule In Its Entirety Because HHS Failed to Conduct an Adequate Regulatory Impact Analysis.**

"As a general rule, the costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act," and "consideration of costs is an essential component of reasoned decisionmaking under the Administrative Procedure Act." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732-33 (D.C. Cir. 2016) (Kavanaugh, J., dissenting). In promulgating the Final Rule, HHS conducted an economic and regulatory impact analysis as required by "Executive Order 12866 on Regulatory Planning and Review" and "Executive Order 13563 on Improving Regulation and Regulatory Review," 85 Fed. Reg. at 37,222, and relied on that analysis in promulgating the Final Rule. *see id.* at 37,224.  "When an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1039-40 (D.C. Cir. 2012) (reviewing Executive Order 12866 cost-benefit analysis under arbitrary and capricious standard).

The Rollback Rule disregards costs to patients, misrepresents costs to the health care industry, and fails to account for costs transferred to the States. Meanwhile, the only quantifiable benefit provided as justification—"approximately $2.9 billion in cost savings"—allegedly comes from "repealing . . . provisions related to mandatory notices." *See* 85 Fed. Reg. at 37,162. These repealed notice provisions are entirely disjointed from the swath of other regulatory changes challenged here and cannot support a "reasoned determination that [the Rule's] benefits justify its costs." Exec. Order No. 13563 § 1(b). A cost-benefit analysis is, by definition, an exercise in considering both "side[s] of the equation." *California v. BLM*, 277 F. Supp. 3d 1106, 1123 (N.D. Cal. 2017). An agency may not "put a thumb on the scale" by undervaluing key effects while overvaluing others. *Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172,

49

1198 (9th Cir. 2008). But the Rule squarely ignores *all* negative effects on vulnerable populations.

As commenters predicted, the Rollback Rule has reduced access to care for LGBTQ people, women, and pregnant people. *See supra* Factual Background & Part B. Remarkably, HHS *acknowledged* that some covered entities would revert to discriminatory policies and practices. 85 Fed. Reg. at 37,225. But it simply concluded that it was "uncertain as to the total number of covered entities that will change their policies," and that it lacked "the data necessary to estimate" the harm, including the "greater public health costs, cost-shifting, and expenses" from the Rule. *Id.*

That is so despite several comments that proposed quantitative models to estimate cost. For example, one comment suggested a model estimating that solely with respect to four types of cancer, the Rule would produce $1.4 billion in excess costs over ten years, an 18% increase in preventable mortality among LGBTQ people, and $39 billion to the U.S economy, citing survey data showing that LGBTQ individuals forgo care due to discrimination. *Id.* at 37,238. HHS acknowledges this and other models but dismissively concludes that it lacked "reliable data or methods to calculate the economic impacts." *Id.* That is the *opposite* of the analysis that is required of HHS. Even when "some important benefits and costs . . . may be difficult or impossible to quantify or monetize given current data and methods," agencies must still carefully evaluate non-quantifiable and non-monetized benefits and costs. Office of Mgmt. & Budget, Circular A-4 on Regulatory Analysis (2003). The "mere fact" that the effect "is uncertain is no justification for disregarding the effect entirely." *Pub. Citizen*, 374 F.3d at 1219.

## CONCLUSION

For these reasons, this Court should grant Plaintiffs' Motion and vacate the Rollback Rule.

Dated: March 19, 2024

Respectfully submitted,

*/s/ Gregory F. Noonan*
Gregory F. Noonan
(BBO# 651035)
Safa Osmani
(BBO# 697034)
HOGAN LOVELLS US LLP
125 High Street
Boston, MA 02110
(617) 371-1000
gregory.noonan@hoganlovells.com
safa.osmani@hoganlovells.com

Jessica L. Ellsworth*
Jo-Ann Sagar*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
jo-ann.sagar@hoganlovells.com

Peter William Bautz*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
peter.bautz@hoganlovells.com

Sydney Duncan*
Shayna Medley*
TRANSGENDER LEGAL DEFENSE &
EDUCATION FUND
520 8th Avenue, Suite 2204
New York, NY 10018
(646) 898-2205
sduncan@transgenderlegal.org
smedley@transgenderlegal.org

Dale Melchert*
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
(510) 407-6367
dale@transgenderlawcenter.org

Michelle Banker*
Alison Tanner*
Kenna Titus*
NATIONAL WOMEN'S LAW CENTER
1350 Eye Street NW, Suite 700
Washington, DC 20002
(202) 588-5180
mbanker@nwlc.org
atanner@nwlc.org
ktitus@nwlc.org

Lynly Egyes*
TRANSGENDER LAW CENTER
594 Dean Street
Brooklyn, NY 11238
(973) 454-6325
lynly@transgenderlawcenter.org

Maryanne I. Tomazic*
CENTER FOR HEALTH LAW AND POLICY
INNOVATION
Harvard Law School
1585 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-1668
mtomazic@law.harvard.edu

*Admitted Pro Hac Vice

Counsel for Plaintiffs

### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 19, 2024, a copy of the foregoing was filed and served via ECF on all counsel of record.

<u>*/s/ Gregory F. Noonan*</u>
Gregory F. Noonan